UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

DALE GILMORE,

                                        Plaintiff,

                                                          9:17-cv-1349
v.                                                        (DNH/TWD)

SMITH; SERGEANT GUIDO;
SERGEANT GANGUREM;
SERGEANT CELLINO;
CAPTAIN DEAN; OFFICER DOE,

                                        Defendants.
_____

APPEARANCES:                              OF COUNSEL:

DALE GILMORE
Plaintiff, *pro se*
18-A-0389
Clinton Correctional Facility – Annex
P.O. Box 2002
Dannemora, NY 12929

GOLDBERG SEGALLA LLP                      JONATHAN M. BERNSTEIN, ESQ.
Counsel for Defendants
8 Southwoods Boulevard, Suite 300
Albany, NY 12211

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## ORDER AND REPORT-RECOMMENDATION

## I.    INTRODUCTION

        Plaintiff Dale Gilmore has commenced this *pro se* civil rights action under 42 U.S.C. §

1983 for violation of his constitutional rights during his confinement in the Schenectady County

Jail ("SCJ").  (Dkt. No. 1; *see also* Dkt. No. 7.)  Following an initial review of the original

complaint pursuant to 28 U.S.C. § 1915(e) and 28 U.S.C. § 1915A, only Plaintiff's First

Amendment access to the courts claims against Defendants Corrections Officer ("C.O.") Smith,

Sergeant ("Sgt.") Guido, Sgt. Gangurem, Sgt. Cellino, Captain ("Capt.") Dean, and Officer Doe

remained.  (Dkt. No. 15.)  Plaintiff's second amended complaint, the operative pleading, was

accepted for filing on March 6, 2016.  (Dkt. No. 31.[1])  Defendants Smith, Guido, Gangurem,

Cellino and Captain Dean (collectively, "Defendants") filed their answers on April 6, 2018.

(Dkt. No. 38.)

Defendants now move for summary judgment pursuant to Rule 56 of the Federal Rules of

Civil Procedure on the grounds that: (1) Plaintiff's access to the courts claims fail on the merits;

(2) Plaintiff's claim relating to the "Exact-Cite System" is not cognizable; (3) Plaintiff has not

identified Officer Doe; and (4) Defendants are entitled to qualified immunity.  (Dkt. Nos. 49; 49-

1 at 7-16.[2])  Plaintiff has filed responsive papers.  (Dkt. Nos. 53; 56; 60.)  Defendants have

replied.  (Dkt. Nos. 54; 61.)  The Court has considered all of the parties' submissions.  (*See* Dkt.

No. 58; see also Dkt. Nos. 49; 53; 54; 56; 60; 61.)  For the reasons that follow, the Court

recommends that Defendants' motion be granted.

## II.    FACTUAL BACKGROUND

At all relevant times, Plaintiff was in custody of the SCJ.  (*See generally* Dkt. No. 31; *see*

*also* Dkt. Nos. 49-8 at 130; 56 at 2.)  Plaintiff claims that from April through July of 2017, while

---

[1]  The Court finds Plaintiff's second amended complaint was adequately verified under 28
U.S.C. § 1746 by Plaintiff's declaration under penalty of perjury.  (Dkt. No. 31.)

[2]  Page references to documents identified by docket number are to the numbers assigned by the
CM/ECF docketing system maintained by the Clerk's Office.  Paragraph numbers are used
where documents identified by the CM/ECF docket number contain consecutively numbered
paragraphs.  Unless noted, excerpts from the record are reproduced exactly as they appear in the
original and errors in spelling, punctuation, and grammar have not been corrected.

confined as a pre-trial detainee, Smith denied him access to a notary.  (Dkt. No. 31 at 7-8.)

Plaintiff also claims Officer Doe prevented him from sending free legal mail and refused to send

his mail to the Attorney General.  *Id*. at 8.

On September 6, 2017, Plaintiff was convicted by a jury in Schenectady County Court of

two counts of criminal possession of a weapon in the second degree, reckless endangerment, and

obstructing governmental administration.  (Dkt. Nos. 49-2 at ¶ 5.)  During his trial before the

Hon. Kathleen B. Hogan, Acting Supreme Court Justice, Plaintiff was represented by Michael

Mansion, Esq., a court-appointed attorney.  *Id*. at ¶ 8.[3]  According to Plaintiff, during his first

sentencing appearance, he "requested to proceed *pro se* due to ineffective assistance of counsel."

(Dkt. No. 60 at ¶ 4.)  Plaintiff's sentencing was adjourned from November 14, 2017, to January

10, 2018.  *Id.*; *see also* Dkt. No. 49-6 at 3.

Plaintiff claims that on November 20, 2017, he informed "the Sgts." that he was "*pro se*,"

"indigent," and "needed paper, notary, copies, and time with the law library to assist [him] in

preparing for [his] sentencing" and that he had "time limits on filing motions that [he] had to file

with the Courts."  (Dkt. No. 31 at 6.[4])  However, Plaintiff was "denied" and "told to grieve the

issue."  *Id*.  Specifically, Plaintiff claims Guido denied him access to the courts, the law library,

law books, and requested materials, while Gangurem denied his requests for "paper and

envelopes to send [his] legal documents to the Courts.  *Id*. at 7; Dkt. No. 53-1 at ¶ 10.  Plaintiff

claims Dean "ignored" a letter sent by Plaintiff requesting to be moved to a cell closer to the law

---

[3]  SCJ records indicate Plaintiff met with Mr. Mansion at the jail on August 14, September 4, and
November 6, 2017.

[4]  According to Defendants, SCJ's threshold for inmate to be "indigent" is 50 cents or less in
their account for two consecutive weeks.  (Dkt. No. 49-9 at ¶ 6.)  Defendants maintain Plaintiff
was never in this status while confined at the SCJ.  *Id*.

library.  *Id.*  He also alleges Dean "was aware of . . . and ignored" the other Defendants' alleged

misconduct.  (Dkt. No. 53-1 at ¶ 13.)

On November 22, 2017, Plaintiff filed a grievance, stating:

> I am being denied access to the law library or legal assistance to
> the point that my right of access to the court is frustrated.  I have
> no attorney I am *pro se* for sentencing.

(Dkt. No. 49-8 at 121.)  Plaintiff also claims he asked for an additional grievance form, but

Cellino denied his request and threatened him.  (Dkt. Nos. 31 at 8; 53-1 at ¶ 9.)  On November

29, 2017, the grievance coordinator accepted Plaintiff's grievance as follows, in legible part:

> Due to the nature of your current *pro se* status, arrangements will
> be made in the jail to prepare material for your pending criminal
> case.  Times will be on Friday and Saturday . . . .

*Id.*  On November 30, 2017, Plaintiff accepted the grievant officer's response and did not appeal

his grievance to the Chief Administrative Officer.  *Id.* at 125.

On December 7, 2017, Plaintiff filed another grievance accusing unidentified jail officials

of "hindering inmates defense" and "denying access to the courts."  (Dkt. No. 49-11 at 12.)

Plaintiff requested the following action:

> Optional to law books and optional access to kiosk library for all
> inmates.  Access to adequate assistance from persons trained in
> law, "law clerk" cancel "runner system" inadequate copies.

*Id.*  On December 14, 2017, Plaintiff's grievance was denied on the merits by a grievance

coordinator as follows:

> Your request for additional time on our jail kiosk has been
> afforded to you by supervisory staff.  The times that will be offered
> to you will occur when it is not disruptive to the running of the
> facility.  Additional time on the kiosk may be used when your
> recreation period takes place in the indoor recreation room.  You
> have also been afforded the law books that we offer in the facility
> without time restraints.  A law clerk is not a part of the legal
> services offered to inmates in this facility.  Legal material request

4

> forms will continue to be part of the services offered to you while
> you are criminally committed to this facility.  Additionally, copies
> and the use of a notary public shall be offered when needed by any
> individual inmate upon request.

*Id.* at 6.  Plaintiff appealed the deicison to the Chief Administrative Officer.  *Id*. at 8.  On

December 21, 2017, the Chief Grievance Officer denied the grievance on the merits as follows:

> As a *pro se* inmate you have been afforded additional access to,
> and usage time of, the law library database, which on several
> occasions you have declined to use.  You have be[en] given legal
> supplies free of charge, law library books to peruse in your housing
> unit and had meetings with an attorney.  Since you cite several
> case laws in this grievance, and it itself has been notarized, there is
> no merit to your allegations in this grievance.

*Id*.  On December 22, 2017, Plaintiff indicated he wished to appeal the Chief Administrative

Officer's decision to the Citizen's Policy and Complaint Review Counsel.  *Id*.

As set forth in the affidavit of Gregory A. Cufari, a Captain at the Schenectady County

Sheriff's office, legal research kiosks, located in the facility's law library and indoor recreation

room, provide inmates access to Lexis Nexis.  (Dkt. No. 49-9 at ¶¶ 1, 10.)  Inmates can use the

kiosks to find citations for the cases they want to review.  *Id*.  Then, they can fill out a request

form to have the documents delivered to them from the Public Defenders' office.  *Id*.  The SCJ

records provided by Defendants, which Cufari avers were made, kept, and maintained in the

normal and ordinary course of businesses at the SCJ, indicate Plaintiff was regularly offered use

of the kiosk.  *Id*. at ¶¶ 3, 12.  Plaintiff acknowledges that "arrangements were made so [he] could

prepare for sentencing" and that he "was giv[en] the opportunity" to use SCJ's legal research

kiosks.  (Dkt. No. 53-1 at ¶ 8.)

Plaintiff used the kiosk on December 1 and 2, 2017.  (Dkt. No. 49-8 at 24.)  On

December 8, 9, 15, and 16, 2017, he refused offers to use the kiosk.  *Id*. at 20-22.  On December

18, 2017, Plaintiff used the law library.  *Id*. at 20.  He refused offers to use the kiosk on

December 21, 22, 29, and 30, 2017, and again on January 5 and 12, 2018.  *Id*. at 14-18.  On

January 13, 2018, Plaintiff used the kiosk.  *Id*. at 12.  According to Plaintiff, he declined use of

the kiosk on certain dates "due to fear [of being] alone with the . . . defendants" and only felt

comfortable using the kiosks "when he knew that visiting hours were being conducted" so that

"if any foul conduct was to occur[,] the plaintiff would have witnesses."  (Dkt. No. 60 at ¶¶ 8-9.)

Plaintiff claims he was "threaten[ed] by staff" when attempting to use the kiosks.  (Dkt. No. 53-1

at ¶ 8.)

 Additional SCJ records submitted by Defendants indicate, in relevant part: (1) Plaintiff's

mail was routinely delivered; (2) Plaintiff was supplied with notary services on October 13,

2017, and December 30, 2017; (3) Plaintiff was provided with a law book on November 19,

2017; (4) Plaintiff was supplied with legal pads and pens; and (4) Plaintiff had funds in his

account which allowed Plaintiff to purchase items through commissary such as pen, paper,

stamps, and envelopes.  (Dkt. No. 49-9 at ¶¶ 6, 7, 8, 9, 12, 16.)

 On January 17, 2018, Plaintiff appeared at his sentencing *pro se*.  (Dkt. No. 49-6 at 3.)

His former attorney, Mr. Mansion, was also present and entered an appearance "as standby

counsel" for Plaintiff.  *Id*.  Plaintiff was sentenced to fifteen years in state prison and a period of

supervised release.  *Id*. at 31.  According to the public website maintained by DOCCS, Plaintiff

was received into custody on January 26, 2018.[5]

## III. APPLICABLE LEGAL STANDARD

 Summary judgment may be granted only if the submissions of the parties taken together

"show that there is no genuine issue of material fact and that the moving party is entitled to

judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477

---

[5] *See* http://nysdoccslookup.doccs.ny.gov (DIN 18A0389) (last visited July 18, 2019).

U.S. 242, 251-52 (1986). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248.

Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin*, 467 F.3d at 272-73. The nonmoving party must do more than "rest upon the mere allegations . . . of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 585-86 (1986). "Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

In *Jeffreys v. City of New York*, the Second Circuit reminded that on summary judgment motions "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005). "To defeat summary judgment, . . . nonmoving parties may not rely on conclusory allegations or unsubstantiated speculation." *Id*. (citation and quotation marks omitted). "At the summary judgment stage, a nonmoving party must offer some hard evidence showing that its version of the events is not wholly fanciful." *Id*. (citation and quotation marks omitted). "[T]o satisfy Rule 56(e), affidavits must be based upon 'concrete particulars,' not conclusory allegations." *Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir. 1997) (citation omitted); *Smith v. Woods*, No. 9:03-CV-480 (DNH/GHL), 2006 WL

1133247, at *3 & n.10 (N.D.N.Y. Apr. 24, 2006).[6]  "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment."  *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party.  *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008).  Where a party is proceeding *pro se*, the court is obliged to "read [the *pro se* party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest."  *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994).  However, "a *pro se* party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment."  *Cole v. Artuz*, No. 93 Civ. 5981 (WHP)(JCF), 1999 WL 983876, at *3 (S.D.N.Y. Oct. 28, 1999) (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

## IV.   FAILURE TO COMPLY WITH L.R. 7.1(a)(3)

While courts are required to give due deference to a plaintiff's *pro se* status, that status "does not relieve plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment."  *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003).  While Plaintiff has responded to Defendants' motion for summary judgment, he has failed to do so in the manner required under L.R. 7.1(a)(3).[7]  (Dkt. No. 59.)

---

[6]  The Court will provide Plaintiff with copies of all unpublished decisions cited herein in accordance with the Second Circuit's decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

[7]  L.R. 7.1(a)(3) requires the opposing party to file a response to the movant's statement of material facts.  Under the rule, the response "shall mirror the movant's statement of material facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs.  Each denial shall set forth a specific citation to the record where the factual issue arises."

Where a party has failed to respond to the movant's statement of material facts as required by L.R. 7.1(a)(3), the facts in the movant's statement will be accepted as true (1) to the extent they are supported by evidence in the record,[8] and (2) the nonmovant if proceeding *pro se*, has been specifically advised of the possible consequences of failing to respond to the motion.[9] *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996).

Although this Circuit adheres to the view that nothing in Rule 56 imposes an obligation on a court to conduct a search and independent review of the record to find proof of a factual dispute where a non-movant willfully fails to respond to a properly filed summary judgment motion, *Amnesty Am. v. Town of West Hartford*, 288 F.3d 467, 470 (2d Cir. 2002), the Second Circuit has ruled that "[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules," including local rules relating to requirements regarding the submission of and response to statements of material facts on summary judgment motions, and to "conduct an assiduous review of the record." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001) (citation and quotation marks omitted).

In this case, neither party's submissions adhere strictly to the Local Rules. In light of this circumstance and in deference to Plaintiff's *pro se* status, the Court has opted to review the entire summary judgment record.

---

[8]  Under L.R. 7.1(a)(3), "[t]he Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." *But see Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d. Cir. 2004) ("[I]n determining whether the moving party has met his burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts in the moving party's [Statement of Material Facts]. It must be satisfied that the citation to evidence in the record supports the assertion.") (citations omitted).

[9]  Plaintiff was provided with the requisite notification. (Dkt. No. 59.)

## V.     ANALYSIS

### A.     Access to the Courts

"Prisoners, including pretrial detainees, 'have a constitutional right of access to the courts.'" *Bourdon v. Loughren*, 386 F.3d 515, 519 (2d Cir. 1993) (quoting *Bounds v. Smith*, 430 U.S. 817, 821 (1977)).  This right is grounded in the First Amendment, which protects the ability of inmates to "petition the Government for a redress of grievances."  U.S Const. amend. I; *see Modelle v. Fauro*, No. 9:08-CV-1042 (DNH/GHL), 2010 WL 624023, at *2 (N.D.N.Y. Feb. 18, 2010).  Although not "an abstract, freestanding right to a law library or legal assistance," the right of access to the courts does require "'prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law.'" *Lewis v. Casey*, 518 U.S. 343, 346, 351 (1996) (quoting *Bounds*, 430 U.S. at 828).  Inmate access to the courts must be "adequate, effective, and meaningful." *Bounds*, 430 U.S. at 822.

To prevail on a claim for denial of access to the courts, a plaintiff must demonstrate "that a defendant's interference caused him actual injury," meaning "that 'a non-frivolous legal claim had been frustrated or was being impeded' as a result of defendant's actions." *Suggs v. Maxymillian*, No. 9:13-CV-359 (NAM/TWD), 2015 WL 5750998, at *10 (N.D.N.Y. Sept. 30, 2015) (quoting *Lewis*, 518 U.S. at 353).  The *Lewis* Court explained that an inmate cannot demonstrate actual injury "simply by establishing that his prison's law library or legal assistance program is sub-par in some theoretical sense." *Lewis*, 518 U.S. at 351.  Additionally, a law library is only one way for inmates to be provided with access to courts.  *See Bounds*, 430 U.S. at 830-31.  If an inmate is afforded counsel, for instance, there is no constitutional requirement he also be afforded access to law books.  *Id.*; *Bourdon*, 386 F.3d at 93 (confirming "that the

appointment of counsel can be a valid means of satisfying a prisoner's right of access to the courts").

       1.    <u>Standby Counsel</u>

Here, it is undisputed that Plaintiff appeared at his January 17, 2018, sentencing before Judge Hogan with Mr. Mansion as standby counsel. (Dkt. Nos. 49-3 at ¶ 17; 56 at 3.) Although Plaintiff requested to proceed *pro se*, the trial judge nonetheless assigned him standby counsel. (Dkt. No. 56 at 3.) Moreover, his standby attorney was the same court-appointed attorney who represented him at trial. (Dkt. No. 49-3 at ¶ 16.)

The Second Circuit has previously indicated the involvement of standby counsel is sufficient to protect an inmate's access to the courts. *See Spates v. Manson*, 644 F.2d 80, 85 (2d Cir. 1981). Other circuits to have considered the issue more directly have agreed. *See Howland v. Kilquist*, 833 F.2d 639, 643 (7th Cir. 1987) (finding "that the trial court's offer of appointment of counsel . . . and the appointment of standby counsel, satisfied any obligation which the state had to provide . . . legal assistance"); *see also United States v. West*, 557 F.2d 151, 152 (8th Cir. 1977). Even where an inmate refuses the assistance of his court-appointed standby counsel, such legal assistance has been held sufficient to defeat a claim alleging denial of access to courts. *See United States v. Davis*, No. 05 Crim. 1157 (LAK), 2008 WL 1758715, at *1 (S.D.N.Y. Apr. 16, 2008); *see also United States v. Knox*, 950 F.2d 516, 519-20 (8th Cir. 1991).

The SCJ records indicate Plaintiff met with his court-appointed counsel on November 6, 2017, as he was preparing for sentencing. (Dkt. No. 49-8 at 140.) Records further indicate Plaintiff sent legal mail to his attorney no fewer than nine times between his September 6, 2017, conviction and his January 17, 2018, sentencing. (Dkt. No. 49-10 at 6-10.) Although Plaintiff appears to have disliked working with his court-appointed attorney due, in part, to an unspecified

"conflict of interest," the record is devoid of any evidence indicating Defendants prevented him from communicating with his standby counsel as he prepared for his January 17, 2018, sentencing.

In light of the foregoing, the Court finds Plaintiff had access to a court-appointed attorney during his time at SCJ, thereby negating his claim that Defendants unconstitutionally denied him access to the courts. Therefore, the Court recommends Defendants' motion for summary judgment be granted.

2.    Injury

Even assuming Plaintiff did not have access to adequate legal assistance in the form of standby counsel, the Court finds his First Amendment access to the courts claim nevertheless fails for lack of injury. Significantly, Plaintiff does not claim he missed any filing deadlines or failed to submit necessary papers for his case. Rather, he merely claims he was "deprive[d] the chance to submit a proper[ly] researched[] caselaw motion," and Defendants' conduct "caused [his] motions to be incomplete, sloppy-rushed, with uncertain [and] unresearched caselaws." (Dkt. No. 56 at 4.) Plaintiff also claims Defendants' alleged "actions frustrated and impeded [his] effort to pursue his nonfrivolous legal claim" and that the "exact-cite system" utilized by the SCJ and the quality and quantity of the legal materials that he received from the law library were sub-par, *i.e.*, "the books were damaged and pages were missing." (Dkt. No. 31 at 16.) Specifically, Plaintiff contends "[i]t is unrealistic to expect a prisoner to know in advance exactly what materials he needs to [consult]." *Id.*

Generally speaking, "a prisoner must allege something more than that the quality of his argument was diminished because of defendants' practices." *Arce v. Walker*, 58 F. Supp. 2d 39, 43 (W.D.N.Y. 1999). To this end, "a claim that the prisoner could have made a more compelling

or sophisticated argument" does not support a claim for denial of access to the courts.  *Id.*  Mere

allegations that the defendants' conduct caused the plaintiff "delay" or "inconvenience" in

handling his legal affairs generally do not rise to the level of a constitutional violation.  *See Smith*

*v. O'Connor*, 901 F. Supp. 644, 649 (S.D.N.Y. 1995) (citing *Jermosen v. Coughlin*, 877 F. Supp.

864, 871 (S.D.N.Y. 1995)).

Here, to the extent Plaintiff alleges injury by suggesting that his rushed papers and sub-

par legal materials caused the trial court to deny his post-conviction motions, the Court finds the

claim insufficient to represent a constitutional violation.  (*See* Dkt. Nos. 53-2 at 7; 56 at 4.)

Indeed, the Court finds Plaintiff's claim that "[t]he judge never would have been able to deny

[Plaintiff's motions] if they were properly asserted" is speculative and conclusory.  (Dkt. No. 53-

2 at 7.)  At most, Plaintiff's allegations indicate he suffered some degree of inconvenience in

preparing his legal papers.  While perhaps frustrating, this inconvenience, without more, does not

amount to a constitutional violation.

Additionally, the Court agrees with Defendants that Plaintiff's claim regarding the exact-

cite system does not relate to the particular conduct of any Defendant in this matter.  (*See* Dkt.

No. 49-1 at 12-13.)  Rather, such allegations would run against the municipality giving rise to a

claim, if any, under *Monell v. Dep't of Soc. Servs. of the City of N.Y.*, 436 U.S. 658 (1978).[10]

Consequently, although the "exact-cite system" has been previously called into question in this

District, this Court need not add to the debate.  *See Griffin v. Coughlin*, 743 F. Supp. 1006, 1023-

---

[10]  By Text Order entered August 27, 2018, Plaintiff's letter motion (Dkt. No. 43) seeking to
make "adjustments" to his complaint including adding a "*Monell* claim" was denied for failure to
comply with Rule 15 of the Federal Rules of Civil Procedure and Local Rule 7.1(a)(4).  (Dkt.
No. 45.)  The Court further advised that a *Monell* claim "may not be asserted against individual
defendants who are the only named defendants in the operative complaint."  *Id.*  Thereafter,
Plaintiff made no additional attempts to amend his complaint to include a *Monell* claim against
Schenectady County.  (*See* Dkt. Report.)

24 (N.D.N.Y. 1990); *see also Fox v. Lee*, No. 9:15-CV-0390 (TJM/CFH), 2018 WL 1211111, at
*16 (N.D.N.Y. Feb. 5, 2018).

Based on the foregoing, the Court finds summary judgment is also warranted on these
additional bases.

### 3.    *Heck v. Humphrey*

To the extent Plaintiff's claims his current conviction and/or sentence is, in fact, his
injury, such claim is barred under *Heck v. Humphrey*, 512 U.S.477 (1994).  (*See* Dkt. Nos. 53-2
at 7; 60 at ¶¶ 4, 5.[11])  In *Heck*, the Supreme Court held that a state prisoner's claim for damages
is not cognizable under 42 U.S.C. § 1983 if a judgment in his favor "would necessarily imply the
invalidity of his conviction or sentence . . . unless the plaintiff can demonstrate that the
conviction or sentence has already been invalidated."  *Heck*, 512 U.S. at 487.

Here, it is undisputed that Plaintiff's conviction or sentence has not been invalidated.
(Dkt. Nos. 61 at 6; 53-2 at 7.)  Therefore, any judgment finding Plaintiff's First Amendment
right to access the courts was violated would necessarily call into question the state court
proceedings that rendered and affirmed his conviction.  As a result, the Court also finds
Plaintiff's claim would also be barred by the *Heck* doctrine.  *See Mancuso v. Hynes*, 379 F.
App'x 60, 61 (2d Cir. 2010); *see also Nussbaumer v. Nesbitt*, No. 11-CV-6331, 2011 WL
4828844, at *1 (W.D.N.Y. Oct. 7, 2011) (dismissing access to the courts claim under *Heck*);

---

[11]  For example, in opposition to Defendants' motion, Plaintiff explains that he "requested to
proceed *pro se*" at sentencing "due to ineffective assistance of counsel" at trial.  (Dkt. No. 60 at ¶
4.)  As such, he "contends that he was contesting the Judgment of conviction, because if he was
able to have proper access to the Court and properly filed his C.P.L. 330.30 Motion for his
sentencing hearing, as a matter of law his conviction would have been overturned, and there
would be no reason to contest the length of the sentence."  *Id.*  Plaintiff further claims he was
denied a fair trial, due process, and effective assistance of counsel.  *Id.* at ¶ 5.

*Mahon v. Comm'r of New York Police Dep't*, No. 15 Civ. 4120 (AJP), 2016 WL 1638746, at *4-5 (S.D.N.Y. Apr. 25, 2016) (same).

        4.    <u>Supervisory Liability</u>

Construed liberally, Plaintiff brings a supervisory liability claim against Dean. (Dkt. Nos. 31 at 8.) Plaintiff claims he "wrote Captain Dean expressing the [access to the court] violation and the neglect of his staff and that they were hindering [his] defense." *Id.* Plaintiff also claims Dean "was aware of [Defendants'] actions and ignored [their] misconduct . . . ." (Dkt. No. 53-1 at ¶ 13.)

The law is clear that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977). "Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*."). "Holding a position in a hierarchical chain of command, without more, is insufficient to support a showing of personal involvement." *Groves v. Davis*, No. 9:11-CV-1317 (GTS/RFT), 2012 WL 651919, at *6 (N.D.N.Y. Feb. 28, 2012) (citing *McKinnon*, 568 F.2d at 934); *see also Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (noting that a defendant may not be held liable in a § 1983 action merely because he or she held a high position of authority). Therefore, "a plaintiff must . . . allege a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).

The Second Circuit has held that personal involvement by a supervisor necessary to state a claim under § 1983 may be found where:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995).[12]

Here, because the Court finds Plaintiff's underlying First Amendment access to the courts claim is without merit, "none of the above bases for supervisory liability are applicable." *Thompson v. Carlsen*, No. 9:08-CV-487 (TJM/RFT), 2010 WL 843872, at *7 (N.D.N.Y. Mar. 10, 2010) (citing *Blyden v. Mancusi*, 186 F.3d 252, 265 (2d Cir. 1999) ("Of course, for a supervisor to be liable under Section 1983, there must have been an underlying constitutional deprivation.")). Therefore, the Court also recommends that Dean be granted summary judgment on Plaintiff's supervisory liability claim.

5.     <u>Officer Doe</u>

Defendants also argue the Officer Doe must be dismissed from the action because "[P]laintiff never moved to amend the complaint to name an actual person." (Dkt. No. 49-1 at 14.) Indeed, the District Court on initial review advised Plaintiff of the need to identify Officer Doe by name, stating, "If plaintiff fails to ascertain this defendant's name so as to permit the

---

[12] The Second Circuit has thus far expressly declined to determine whether *Iqbal* eliminated any of the *Colon* bases for liability. *See Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013).

timely amendment of the complaint and service of process on this individual, this action will be dismissed as against Officer 'Doe.'"  (Dkt. No. 15 at 7 n.5.)

Under the Federal Rules of Civil Procedure, a defendant must be served with the summons and complaint within 120 days after the filing of the complaint.  Fed. R. Civ. P. 4(m). This 120-day service period is shortened, or "expedited," by the Court's Local Rules of Practice, which provide that all defendants must be served with the summons and complaint within sixty days of the filing of the complaint.  L.R. 4.1(b).

The Court finds that Plaintiff's failure to identify Officer Doe or serve him with the summons and complaint subjects the claims against Officer Doe to dismissal.  *Phelan v. Calabrese*, No. 9:11-CV-0315 (GLS/TWD), 2013 WL 1181234, at *3 (N.D.N.Y. Feb. 13, 2013). However, because the Court finds in the foregoing analysis that Plaintiff's claims against all Defendants, including Officer Doe, fail on the merits, dismissal on this ground alone is unnecessary.

Accordingly, based on the foregoing, the Court recommends that Defendants' motion for summary judgment be granted.

### B.    Qualified Immunity

Defendants also seek summary judgment on qualified immunity grounds.  (Dkt. No. 49-1 at 14-16.)  Because the Court is recommending summary judgment in Defendants' favor on the merits, the Court finds it unnecessary to address Defendants' request for summary judgment on qualified immunity grounds.

**ACCORDINGLY**, it is hereby

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 49) be **GRANTED**; and it is further

**ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report-Recommendation, along with copies or the unpublished decisions cited herein in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.[13]  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

Dated: July 22, 2019
      Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

---

[13]  If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. P. 6(a)(1)(C).

🚩 KeyCite Yellow Flag - Negative Treatment

Distinguished by Smith v. Collins, S.D.N.Y., October 1, 2015

2006 WL 1133247
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Jeff SMITH, Plaintiff,
v.
Robert K. WOODS, Deputy Superintendent;
Joseph R. Belarge, Captain; G.J. O'Donnell,
Sergeant; F.S.A. Antonelli; and Wayne
Holt, Correction Officer, Defendants.

No. 9:03-CV-480.
|
April 24, 2006.

**Attorneys and Law Firms**

Jeff Smith Plaintiff, Pro Se, New York, NY.

Hon. Eliot Spitzer, Attorney General of the State of New York, Kelly L. Munkwitz, Esq., Asst. Attorney General, of Counsel, Department of Law, Albany, NY, for Defendants.

**DECISION and ORDER**

DAVID N. HURD, District Judge.

 *1  Plaintiff, Jeff Smith, brought this civil rights action pursuant to 42 U.S.C. § 1983. By Report-Recommendation dated March 17, 2006, the Honorable George H. Lowe, United States Magistrate Judge, recommended that defendants' motion for summary judgment be granted, and that plaintiff's motion for partial summary judgment be denied. (Docket No. 51). The plaintiff has filed objections to the Report-Recommendation. (Docket No. 53).

Based upon a de novo determination of the portions of the report and recommendations to which the plaintiff has objected, the Report-Recommendation is accepted and adopted in whole. See 28 U .S.C. 636(b)(1). Accordingly, it is ORDERED that
1. Defendants' motion for summary judgment is GRANTED;

Plaintiff's motion for partial summary judgment is DENIED. and

The complaint is DISMISSED in its entirety.

The Clerk is directed to enter judgment accordingly.

IT IS SO ORDERED.

GEORGE H. LOWE, Magistrate Judge.

**REPORT-RECOMMENDATION**

This matter has been referred to me for Report and Recommendation by the Honorable David N. Hurd, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c) of the Rules of Practice for this Court. In this *pro se* civil rights action brought under 42 U.S.C. § 1983, Jeff Smith ("Plaintiff") alleges that five employees of Upstate Correctional Facility-Deputy Superintendent Robert K. Woods, Captain Joseph R. Belarge, Sergeant G.J. O'Donnel, Food Service Administrator Richard Antonelli, and Correction Officer Wayne Holt ("Defendants")-violated his rights under the First, Fourth, Eighth, and Fourteenth Amendments by (1) retaliating against him for having previously filed a complaint, (2) subjecting him to an unreasonable search and seizure, (3) subjecting him to a damaged bunk bed while he was housed in the Upstate Correctional Facility Special Housing Unit, and (4) taking away his "good time" credits without affording him due process. (Dkt. No. 5 [Plf.'s Am. Compl.].) [1]

---

[1]  Given my duty to liberally construe a *pro se* plaintiff's civil rights complaint, I construe Plaintiff's Amended Complaint as including a claim that various Defendants violated Plaintiff's rights under the Fourth Amendment to be free from unreasonable searches and seizures. *See Phillips v. Girdich,* 408 F.3d 124, 130 (2d Cir.2005) ("We leave it for the district court to determine what other claims, if any, [the plaintiff] has raised. In so doing, the court's imagination should be limited only by [the plaintiff's] factual allegations, not by the legal claims set out in his pleadings.") [citations omitted]. *(See also* Dkt. No. 5, ¶ 44 [Plf.'s Am. Compl., alleging that Defendants Woods and Holt "violat[ed] plaintiff's 4th ... Amendment[ ] rights"], ¶ 15 [alleging that Defendant Belarge "had plaintiff's personal property searched by three officers, one of whom was Holt"]; Dkt. No. 37, Part 23, Ex. A at 26-28 [Munkowitz Decl., attaching transcript of deposition of Plaintiff, in which he explains

2006 WL 1133247

his claim under the Fourth Amendment based on the alleged unjustified search and seizure of his property].)

Currently before the Court is Defendants' motion for summary judgment (Dkt. No. 37), and Plaintiff's motion for partial summary judgment (Dkt. No. 38), both brought pursuant to Rule 56 of the Federal Rules of Civil Procedure. Because both motions were filed on the same day (February 11, 2005), and neither was filed in response to the other, I construe each motion as a "motion" and neither motion as a "cross-motion." Both Plaintiff and Defendants have responded to each other's motion (Dkt.Nos.42, 45), and replied to the other's response (Dkt.Nos.47, 48).

Generally, Defendants' motion raises six issues: (1) whether Plaintiff has failed to establish (or even state) a First Amendment retaliation claim; (2) whether Plaintiff has failed to state a Fourth Amendment claim, (3) whether Plaintiff has failed to establish (or even state) an Eighth Amendment claim; (4) whether Plaintiff has failed to exhaust his available administrative remedies regarding his Eighth Amendment claim; (5) whether Plaintiff has failed to establish (or even state) a Fourteenth Amendment due process claim; (6) whether Plaintiff has failed to establish (or properly state) a conspiracy claim; and (7) whether Defendants are protected by qualified immunity. (Dkt. No. 37, Part 25 [Defs.' Mem. of Law].)

*2 Generally, Plaintiff's motion raises three issues: (1) whether Plaintiff is entitled to judgment as a matter of law on his First Amendment retaliation claim; (2) whether Plaintiff is entitled to judgment as a matter of law on his Eighth Amendment claim; and (3) whether Plaintiff is entitled to judgment as a matter of law on his Fourteenth Amendment due process claim. (Dkt. No. 38, Part 3 [Plf.'s Mem. of Law].) Although I liberally construe Plaintiff's Amended Complaint as containing a Fourth Amendment claim, I do not liberally construe his motion as requesting judgment as a matter of law on his Fourth Amendment claim, especially given the burden on a movant under the Federal Rules of Civil Procedure. *See* Fed.R.Civ.P. 7(b)(1) (requiring that movants "shall set forth the relief or order sought," and "shall state with particularity the grounds [for the relief requested]").

For the reasons discussed below, I answer each of the six questions posed in Defendants' motion in the affirmative, and I answer each of the three questions posed in Plaintiff's motion in the negative. As a result, I recommend that Defendants' motion for summary judgment be granted and that Plaintiff's motion for partial summary judgment be denied.

I. SUMMARY JUDGMENT STANDARD

Under Rule 56(e) of the Federal Rules of Civil Procedure, summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether a genuine issue of material [2] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) (citation omitted); *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) (citation omitted).

[2]     A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986).

However, when the moving party has met its initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see also Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-87 (1986). The nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 477 U.S. 574, 585-86 (1986); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986). "A dispute regarding a material fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Ross v. McGinnis,* 00-CV-0275, 2004 WL 1125177, at *8 (W.D.N.Y. March 29, 2004) [internal quotations omitted] [emphasis added].

Imposed over this general burden-shifting framework is the generous perspective with which the Court must view a *pro se* plaintiff's pleadings. "[I]n actions in which one of the parties appears *pro se,* this Court is faced with the ... responsibility of granting significant liberality in how *pro se* pleadings are construed." *Aziz Zarif Shabazz v. Pico,* 994 F.Supp. 460, 467 (S.D.N.Y.1998); *see Haines v. Kerner,* 404 U.S. 519, 520-21 (1972) *(per curiam) (pro se* pleadings held "to less stringent standards than formal pleadings drafted by lawyers."); *Ortiz v. Cornetta,* 867 F.2d 146, 148 (2d Cir.1989). For example, where a plaintiff is proceeding *pro se,* and the defendant has filed a dispositive motion, the Court must construe the plaintiff's complaint and opposition papers liberally so as to

raise the strongest arguments that they suggest. *See Weixel v. Bd. of Ed. of City of New York,* 287 F.3d 138, 146 (2d Cir.2002) (motion to dismiss in civil rights case); *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994) (motion for summary judgment in civil rights case); *Thomas v. Irving,* 981 F.Supp. 794, 799 (W.D.N.Y.1997) (motion for summary judgment in civil rights case).

**\*3** However, although "[t]he work product of *pro se* litigants should be generously and liberally construed, ... [a *pro se* litigant's] failure to allege either specific facts or particular laws that have been violated renders [an] attempt to oppose defendants' motion ineffectual." *Kadosh v. TRW, Inc.,* 91-CV-5080, 1994 WL 681763, at \*5 (S.D.N.Y. Dec. 5, 1994). In other words, "[p]roceeding pro se does not otherwise relieve a [party] from the usual requirements to survive a motion for summary judgment ." *Bussa v. Aitalia Line Aeree Italiane S.p.A.,* 02-CV-10296, 2004 WL 1637014, at \*4 (S.D.N.Y. July 21, 2004) (citations omitted), *accord, Durran v. Selsky,* 251 F.Supp.2d 1208, 1211 (W.D.N.Y.2003) (citations omitted).

## II. STATEMENT OF MATERIAL FACTS

The facts set forth in a defendant's Rule 7.1(a)(3) Statement of Material Facts will be taken as true to the extent those facts are supported by the evidence in the record [3] and are not specifically controverted by the plaintiff. [4]

[3]   *See Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.,* 373 F.3d 241, 244 (2d Cir.2004) (citations omitted).

[4]   *See* Local Rule 7.1(a)(3) (*"Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party."*).

To "specifically controvert[ ]" each of the statements of material fact in a defendant's Rule 7.1(a)(3) Statement of Material Facts, a plaintiff must file a *response* to the Statement of Material Facts that "mirror[s] the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs" *and* that "set[s] forth a specific citation to the record where the factual issue arises." [5]

[5]   Local Rule 7.1(a)(3); *see, e.g., Jones v. Smithkline Beecham Corp.,* 309 F.Supp.2d 343, 346 (N.D.N.Y.2004) (McAvoy, J.) ("[W]here Plaintiff has failed to provide specific references to the record in support of her denials or has otherwise failed to completely deny Defendant's

assertions of fact, those assertions will be taken as true."); *Lee v. Alfonso,* 97-CV-1741, 2004 U.S. Dist. LEXIS 20746, at \*15 (N.D.N.Y. Feb. 10, 2004) (Scullin, C.J.) ("Plaintiff does not offer any facts to support his claims that would raise an issue of fact. Nor has he overcome his failure to respond to Defendants' Rule 7.1(a)(3) Statement. Therefore, Defendants' version of the facts remains uncontroverted."); *Margan v. Niles,* 250 F.Supp.2d 63, 67 (N.D.N.Y.2003) (Hurd, J.) ("Plaintiff's Rule 7.1(a)(3) statement, which contains numerous denials, does not contain a single citation to the record. Because plaintiff's response Rule 7.1(a)(3) statement does not comply with the local rules, it has not been considered."); *Mehlenbacher v. Slafrad,* 99-CV-2127, 2003 U.S. Dist. LEXIS 9445, at \*4 (N.D.N.Y. June 4, 2003) (Sharpe, M.J.) ("Since [the plaintiff] has failed to respond to the defendant's statements of material fact, the facts as set forth in the defendants' Rule 7.1 Statement ... are accepted as true."); *Adams v. N.Y. State Thruway Auth.,* 97-CV-1909, 2001 U.S. Dist. LEXIS 3206, at \*2, n. 1 (N.D.N.Y. March 22, 2001) (Mordue, J.) ("[T]o the extent plaintiff's responses violate Local Rule 7. 1, and are not properly admitted or denied, the Court will deem defendant's statement of fact admitted by plaintiff."); *see also Holtz v. Rockefeller,* 258 F.3d 62, 74 (2d Cir.2001) ("[A] Local Rule 56.1 statement is not itself a vehicle for making factual assertions that are otherwise unsupported in the record.").

Portions of the record sufficient to create a "factual issue" include affidavits or verified complaints (which are treated as affidavits for purposes of summary judgment). [6] However, to be sufficient to create a "factual issue," such an affidavit or verified complaint must, among other things, be based "on personal knowledge." [7] An affidavit or verified complaint is not based on personal knowledge if, for example, it is based on mere "information and belief" or hearsay. [8]

[6]   *See Patterson v. County of Oneida,* 375 F.2d 206, 219 (2d. Cir.2004) ("[A] verified pleading ... has the effect of an affidavit and may be relied upon to oppose summary judgment."); *Fitzgerald v. Henderson,* 251 F.3d 345, 361 (2d Cir.2001) (holding that plaintiff "was entitled to rely on [his verified amended complaint] in opposing summary judgment"), *cert. denied,* 536 U.S. 922 (2002); *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1993) ("A verified complaint is to be treated as an affidavit for summary judgment purposes.") [citations omitted]; Fed.R.Civ.P. 56(c) ("The judgment sought shall be rendered forthwith if the ... affidavits ... show that there is no genuine issue as to any material fact....").

7    Fed.R.Civ.P. 56(e) ("Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to the matters stated therein."); *see also U.S. v. Private Sanitation Indus. Ass'n of Nassau/Suffolk, Inc.,* 44 F.3d 1082, 1084 (2d Cir.1995) [citations omitted], *cert. denied sub nom, Ferrante v. U.S.,* 516 U.S. 806 (1995).

8    *See Patterson,* 375 F.3d at 219 ("[Rule 56(e)'s] requirement that affidavits be made on personal knowledge is not satisfied by assertions made 'on information and belief.'... [Furthermore, the Rule's] requirement that the affiant have personal knowledge and be competent to testify to the matters asserted in the affidavits also means that the affidavit's hearsay assertion that would not be admissible at trial if testified to by the affiant is insufficient to create a genuine issue for trial."); *Sellers v. M .C. Floor Crafters, Inc.,* 842 F.2d 639, 643 (2d Cir.1988) ("[Defendant's] affidavit states that it is based on personal knowledge *or* upon information and belief.... Because there is no way to ascertain which portions of [Defendant's] affidavit were based on personal knowledge, as opposed to information and belief, the affidavit is insufficient under Rule 56 to support the motion for summary judgment."); *Applegate v. Top Assoc., Inc.,* 425 F.2d 92, 97 (2d Cir.1970) (rejecting affidavit made on "suspicion ... rumor and hearsay"); *Spence v. Maryland Cas. Co.,* 803 F.Supp. 649, 664 (W.D.N.Y.1992) (rejecting affidavit made on "secondhand information and hearsay"), *aff'd, 995 F.2d 1147 (2d Cir.1993).*

Similarly, such an affidavit or verified complaint must not be conclusory.[9] Of course, an affidavit may be conclusory because its assertions are too general.[10] However, even where an affidavit's assertions are specific (e.g., with respect to time, place, persons, events, conversation, etc.), that affidavit may still be deemed conclusory if it is (1) "largely unsubstantiated by any other direct evidence" and (2) "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint."[11] Indeed, it has long been the rule in the Second Circuit that "issues of credibility sufficient to defeat a motion for summary judgment are not created if the contradicting or impeaching evidence is too incredible to be believed by reasonable minds." *Price v. Worldvision Enterprises, Inc.,* 455 F.Supp. 252, 266, n. 25 (S.D.N.Y.1978), *aff'd without opinion, 603 F.2d 214 (2d Cir.1979).*

9    *See* Fed.R.Civ.P. 56(e) (requiring that non-movant "set forth specific facts showing that there is a genuine issue for trial"); *Patterson,* 375 F.3d at 219 (2d. Cir.2004) ("Nor is a genuine issue created merely by the presentation of assertions [in an affidavit] that are conclusory.") [citations omitted]; *Applegate,* 425 F.2d at 97 (stating that the purpose of Rule 56[e] is to "prevent the exchange of affidavits on a motion for summary judgment from degenerating into mere elaboration of conclusory pleadings").

10    *See, e.g., Bickerstaff v. Vassar Oil,* 196 F.3d 435, 452 (2d Cir.1998) (McAvoy, C.J., sitting by designation) ("Statements [for example, those made in affidavits, deposition testimony or trial testimony] that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment.") [citations omitted]; *West-Fair Elec. Contractors v. Aetna Cas. & Sur.,* 78 F.3d 61, 63 (2d Cir.1996) (rejecting affidavit's conclusory statements that, in essence, asserted merely that there was a dispute between the parties over the amount owed to the plaintiff under a contract); *Meiri v. Dacon,* 759 F.2d 989, 997 (2d Cir.1985) (plaintiff's allegation that she "heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us" was conclusory and thus insufficient to satisfy the requirements of Rule 56[e] ), *cert. denied, 474 U.S. 829 (1985); Applegate,* 425 F.2d at 97 ("[Plaintiff] has provided the court [through his affidavit] with the characters and plot line for a novel of intrigue rather than the concrete particulars which would entitle him to a trial.").

11    *See, e.g., Jeffreys v. City of New York,* 426 F.3d 549, 554-555 (2d Cir.2005) (affirming grant of summary judgment to defendants in part because plaintiff's testimony about an alleged assault by police officers was "largely unsubstantiated by any other direct evidence" and was "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint") [citations and internal quotations omitted]; *Argus, Inc. v. Eastman Kodak Co.,* 801 F.2d 38, 45 (2d Cir.1986) (affirming grant of summary judgment to defendants in part because plaintiffs' deposition testimony regarding an alleged defect in a camera product line was, although specific, "unsupported by documentary or other concrete evidence" and thus "simply not enough to create a genuine issue of fact in light of the evidence to the contrary"); *Allah v. Greiner,* 03-CV-3789, 2006 WL 357824, at *3-4 & n. 7, 14, 16, 21 (S.D.N.

Feb. 15, 2006) (prisoner's verified complaint, which recounted specific statements by defendants that they were violating his rights, was conclusory and discredited by the evidence, and therefore insufficient to create issue of fact with regard to all but one of prisoner's claims, although verified complaint was sufficient to create issue of fact with regard to prisoner's claim of retaliation against one defendant because retaliatory act occurred on same day as plaintiff's grievance against that defendant, whose testimony was internally inconsistent and in conflict with other evidence); *Olle v. Columbia Univ., 332 F.Supp.2d 599, 612 (S.D.N.Y.2004)* (plaintiff's deposition testimony was insufficient evidence to oppose defendants' motion for summary judgment where that testimony recounted specific allegedly sexist remarks that "were either unsupported by admissible evidence or benign"), aff'd, *136 Fed. Appx. 383 (2d Cir.2005)* (unreported decision).

**\*4** Here, Defendants have a filed Rule 7.1 Statement of Material Facts, and supporting affidavits and exhibits. (Dkt. No. 37, Parts 2-25.) Plaintiff has filed a response to Defendants' Rule 7.1 Statement. (Dkt. No. 42, Part 1.) In addition, Plaintiff has filed (1) declarations and exhibits in opposition to the affidavits of Defendants Woods, Belarge, Holt, Antonelli, and Holden (Dkt. No. 42, Parts 1, 3), and (2) a verified Amended Complaint (Dkt. No. 5). Finally, because Plaintiff is proceeding *pro se* and this is a civil rights action, I will consider, in evaluating Plaintiff's response to Defendants' motion for summary judgment, Plaintiff's declaration and exhibits in support of his motion for partial summary judgment. (Dkt. No. 38, Parts 1, 4.)

I address Plaintiff's responsive documents in more detail below. However, a few general observations are appropriate here. Plaintiff's Rule 7.1 Response contains hardly any citations to the record, much less any citations to admissible evidence; rather, to the extent that Plaintiff's Rule 7.1 Response contains any citations at all, those citations are often to other portions of Plaintiff's Response or to his Amended Complaint (which are, themselves, conclusory), or to exhibits that do not support his denial of the fact asserted. Moreover, his Declarations and verified Amended Complaint are often argumentative in nature (in violation of Local Rule 7.1[a] [2] ) and not based on personal knowledge (but only hearsay or pure speculation). Finally, his Declarations and verified Amended Complaint are often conclusory and replete with inconsistencies and improbabilities.

For example, he asserts that "[a]t no time did [he] possess[ ] [Inmate Alcivar's] legal materials other than [the times when

he and Inmates Lipman and Robles approached Defendant Holt with such materials]." [12] However, his own letters and deposition testimony contain repeated representations that he was, at other times, in possession of such materials. [13]

[12]    (Dkt. No. 42, Part 1, ¶ 7 [Plf.'s Response to Woods Aff.].)

[13]    *(See, e.g.,* Dkt. No. 37, Part 22, Ex. A at 31 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, in which he testifies that, when Defendant Holt failed to take "control" of Inmate Alcivar's legal documents, Defendant Holt left Plaintiff *"stuck with them* as well as the other two inmates"], 31-32 [admitting that he did not return the documents to the law clerk's work station in the law library out of a fear that the document may fall into another inmate's hands], 32 [admitting that he took the documents to "honor" Inmate Alcivar's "wishes"], 33 [admitting that he took the documents after Inmate Alcivar's death based on his belief that "they were not supposed to be in the law library after the inmate was deceased"]; Dkt. No. 37, Part 18, Ex. B at 6-9 [Antonelli Aff., attaching letter dated 7/4/02 from Plaintiff, in which he states, "There is [sic] two inmates that Peter trusted with his papers and other legal documents, that is one inmate that housed [sic] in the same dorm as him and myself.... Peter told me that you have copies of all his papers, those of which are the same as the papers *I have here"];* Dkt. No. 37, Part 18, Ex. B at 10-12, 14 [Antonelli Aff., attaching 7/16/02 letter from Plaintiff, in which he states, "I am going to *hold a copy of the complaint"* in Inmate Alcivar's federal civil rights action]; Dkt. No. 37, Part 7 [Ex. C to Woods Aff., attaching Plaintiff's 8/5/02 letter, in which he states, "in the future if anything should come of a matter of said documents *being in my possession ...* you and the administration cannot take any action against the inmate's family nor myself"] [emphasis added].)

Similarly, he asserts that the documents allegedly discovered by Defendant O'Donnell in Plaintiff's "cube" on August 31, 2002, were in fact "the exact same materials intercepted by Woods through the U.S. mail." [14] However, those documents contained copies of two letters-dated July 4, 2002, and July 16, 2002-from Plaintiff to Inmate Alcivar's two daughters. [15] Plaintiff offers no explanation as to why Inmate Alcivar's daughters would be returning copies of those letters to Plaintiff between August 19, 2006, and August 31, 2002-the time period during which Defendant Woods allegedly intercepted Plaintiff's mail. [16]

Smith v. Woods; Not Reported in F.Supp.2d (2006)

2006 WL 1133247

14    (Dkt. No. 42, Part 1, ¶ 5.B. [Plf.'s Response to Antonelli Aff.].)

15    (Dkt. No. 37, Part 18 at 6-8, 10-12 [Ex. B to Antonelli Aff., attaching contraband allegedly found in Plaintiff's "cube"].)

16    (Dkt. No. 5, ¶ 12 [Am. Compl.].)

Generally, I find such assertions by Plaintiff to be too incredible to be believed by reasonable minds.

Accordingly, the following material facts, even when viewed most favorably to Plaintiff, are supported by evidence in the record, and are not specifically controverted by Plaintiff:

Background

1. From July of 2002 until November of 2002 (the time period relevant to the allegations contained in Plaintiff's Amended Complaint), Plaintiff was an inmate in the care and custody of the New York State Department of Correctional Services ("DOCS"), incarcerated at the Greene Correctional Facility ("Greene C.F.").[17]

17    (Dkt. No. 37, Part 2, ¶ 2 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶ 2 [Plf.'s Rule 7.1 Response]; Dkt. No. 5, ¶ 4 [Am. Compl.].)

**\*5**  At all times relevant to this action, Defendant Robert K. Woods was the Deputy Superintendent for Security at Greene C.F.; Defendant Joseph R. Belarge was a Captain at Greene C.F.; Defendant G.J. O'Donnel was a Sergeant at Greene C.F.; Defendant Richard Antonelli was a Food Services Administrator at Greene C.F.; and Defendant Wayne Holt was a Corrections Officer at Greene C.F.[18]

18    (Dkt. No. 37, Part 2, ¶¶ 4-8 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶¶ 4-8 [Plf.'s Rule 7.1 Response]; Dkt. No. 5, ¶¶ 3, 3(a), 3(b), 3(c) [Am. Compl.].)

Plaintiff's Legal Assistance to Inmate Peter Alcivar and Communications with Inmate Alcivar's Daughters

3. At some point in 2001, Inmate Peter Alcivar filed a civil rights action against DOCS and employees of Greene C.F. and Woodbourne C.F. in the United States District Court for the Northern District of New York (civil action number 9:01-CV-1198).[19]

19    (Dkt. No. 42, Part 1, ¶ 12 [Plf.'s Rule 7.1 Response]; Dkt. No. 5, "Facts of the Incident," ¶¶ 1-3 [Am. Compl.]; Dkt. No. 37, Part 18, Ex. B at 18-37 [Antonelli Aff., attaching pleading and motion from lawsuit].)

4. On or about May 7, 2002, Plaintiff provided legal assistance to Inmate Alcivar by answering a question regarding an affidavit.[20]  At the time, Plaintiff was not an inmate law clerk.[21]

20    (Dkt. No. 37, Part 2, ¶ 12 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶ 12 [Plf.'s Rule 7.1 Response, admitting that, on one occasion, Plaintiff answered a question posed by Inmate Alcivar regarding an affidavit, which question and answer were communicated with the help of Inmate Law Clerk George Robles]; Dkt. No. 5, "Facts of the Incident," ¶ 2 [Am. Compl.]; Dkt. No. 37, Part 18 [Ex. B. to Antonelli Aff.].)

21    (Dkt. No. 37, Part 2, ¶ 13 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶ 13 [Plf.'s Rule 7.1 Response].)

5. On or about May 10, 2002, Inmate Alcivar was admitted to Albany Medical Center to receive treatment for cancer.[22]

22    (Dkt. No. 1, "Facts of the Incident," ¶ 1 [Am. Compl.]; Dkt. No. 42, Part 1, ¶ 6 [Plf.'s Response to Antonelli Aff., asserting that Inmate Alcivar was "admitted to Albany Medical Center Hospital three days after Robles asked plaintiff the question [about] an affidavit and its contents"].)

6. On or about July 4, 2002, Plaintiff wrote and sent a letter to Inmate Alcivar's two daughters about Inmate Alcivar's pending federal civil rights action.[23]  In pertinent part, the letter stated,

23    (Dkt. No. 37, Part 18, Ex. B at 6-9 [Antonelli Aff., attaching letter dated 7/4/02 from Plaintiff to Raida and Raisa Alcivar, and letter dated 6/24/02]; Dkt. No. 37, Part 23, Ex. A at 79-80 [Munkwitz Dec., attaching transcript of Plaintiff's deposition, in which Plaintiff admits having written and sent the letter dated 7/4/02].)

I am writing to inform you of my assistance to Peter [Alcivar] in the above referenced matter [case number 9:01-CV-1198] where he has a Section 1983 of the U.S.C.A. Civil Rights complaint against the Department of Correctional Services now pending in the United States District Court for the Northern District of New York; that is if he (Peter) hasn't

2006 WL 1133247

already told both of you that I am helping him with the filing of his motions, etc....

Getting right to the point for the purpose of writing you, and letting you know what is going on with Peter's case. There is [sic] two inmates that Peter trusted with his papers and other legal documents, that is one inmate that housed [sic] in the same dorm as him and myself....

I have already wrote [sic] to the court on June 24, 2002, informing said court as to Peter's current situation.... See copy of the *letter addressed to the court* ... enclosed with this letter I am writing you....

Peter told me that you have copies of all his papers, those of which are the same as the papers I have here....

[I]f you wish ... you all could come to the facility to see me, I would then go over the case with all of you, tell all of you what I know from Peter, the research that I have done for him and the list of cases of authority that I have and would cite in his motions and use at trial; I also could give you all of his legal documents right there....

Both of you should ... let Peter know that he should not worry about the case, it is not going to be dismissed ... because I already wrote to the court for him. [24]

[24]    (Dkt. No. 37, Part 18, Ex. B at 6-9 [Antonelli Aff., attaching letter dated 7/4/02 from Plaintiff to Raida and Raisa Alcivar, and letter dated 6/24/02].)

7. On or about July 6, 2002, Inmate Alcivar died at Albany Medical Center. [25]

[25]    (Dkt. No. 37, Part 2, ¶ 11 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶ 11 [Plf.'s Rule 7.1 Response]; Dkt. No. 5, "Facts of the Incident," ¶ 3 [Am. Compl.].)

**\*6** 8. On or about July 16, 2002, Plaintiff wrote and sent a second letter to Alcivar's two daughters. [26] In pertinent part, the letter states: "The box containing the legal documents should be following this letter, I am going to hold a copy of the complaint so if you should find a lawyer he or she could visit me at the facility and go over the facts the claim is based on." [27] In addition, the last page of the letter states:

[26]    (Dkt. No. 37, Part 2, ¶ 18 [Defs.' Rule 7.1 Statement, asserting that Plaintiff wrote and sent the letter and

memorandum]; Dkt. No. 42, Part 1, ¶ 18 [Plf.'s Rule 7.1 Response, not specifically denying that Plaintiff wrote and sent the letter and memorandum]; Dkt. No. 37, Part 16, ¶ 9 [Antonelli Aff.]; Dkt. No. 37, Part 18, Ex. B at 10-12, 14 [Antonelli Aff., attaching 7/16/02 letter, the last page of which refers to an attached "To/From" memorandum]; Dkt. No. 37, Part 23, Ex. A at 81-82 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which he admitted writing and sending the letter and memorandum].)

[27]    (Dkt. No. 37, Part 18, Ex. B at 10 [Antonelli Aff., attaching 7/16/02 letter].)

NOTE: Read the "TO/From" memo form note that I made up, get it notarize [sic] and sign it in front of the notary public. Make a copy for your files and send me the *original*.

It is an idea to have that note in my files so non [sic] of the officers and staff members would ask what I am doing with Mr. Alcivar [sic] legal documents if he is no longer here. By doing the above your [sic] are giving me consent to have said documents in my possession. [28]

[28]    (Dkt. No. 37, Part 18, Ex. B at 10-12, 14 [Antonelli Aff., attaching 7/16/02 letter, the last page of which refers to an attached "To/From" memorandum].)

9. On or about August 8, 2002, Plaintiff wrote and sent a third letter to Alcivar's two daughters. [29] In pertinent part, the letter states: "Please send me that 'To/From' note if you already have it notarized, I told you I need it for the copy of the complaint I told you that I would hold...."

[29]    (Dkt. No. 37, Part 16, ¶ 9 [Antonelli Aff.]; Dkt. No. 37, Part 18, Ex. B at 13 [Antonelli Aff., attaching 8/8/02 letter]; Dkt. No. 37, Part 23, Ex. A at 81-82 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which he admitted writing and sending the letter].)

Plaintiff's Communications with Defendant Woods
and the Search of Plaintiff's Prison Cell (or "Cube")

10. On or about July 16, 2002, Plaintiff wrote and sent a note to Defendant Woods. [30] The note stated: "Please be advised that I need to talk to you in reference to the above subject inmate [i.e., Inmate Alcivar] which is a matter of importance. This must be in person at your earliest convenience. Thank you for your professional attention to this request." [31]

2006 WL 1133247

30    (Dkt. No. 37, Part 3, ¶ 3 [Woods Aff.]; Dkt. No. 37, Part 4, Ex A [Woods Aff.]; Dkt. No. 37, Part 2, ¶ 20 [Defs.' Rule 7.1 Statement, asserting fact]; Dkt. No. 42, Part 1, ¶ 20 [Plf.'s Rule 7.1 Response, admitting fact].)

31    (Dkt. No. 37, Part 4, Ex A [Woods Aff.].)

11. On or about July 21, 2002, Plaintiff wrote and sent a second note to Defendant Woods. [32] The note stated: "Please note that on the above subject date [i.e., July 16, 2002] I wrote to you requesting to see you. I must speak to you before July 23, 2002. This matter is very important. Thank you for your attention." [33]

32    (Dkt. No. 37, Part 3, ¶ 3 [Woods Aff.]; Dkt. No. 37, Part 5 [Ex. B to Woods Aff.]; Dkt. No. 37, Part 2, ¶ 20 [Defs.' Rule 7.1 Statement, asserting fact]; Dkt. No. 42, Part 1, ¶ 20 [Plf.'s Rule 7.1 Response, admitting fact].)

33    (Dkt. No. 37, Part 5 [Ex. B to Woods Aff.].)

12. Defendant Woods did not respond to Plaintiff's notes for two reasons: (1) Defendant Woods did not receive either of the two notes until after the date referenced by Plaintiff (i.e., July 23, 2002) had passed; and (2) Defendant Woods believed that Plaintiff's notes were "cryptic." [34]

34    (Dkt. No. 37, Part 3, ¶¶ 4-5 [Woods Aff.]; Dkt. No. 37, Part 2, ¶ 21 [Defs.' Rule 7.1 Statement, asserting fact]; Dkt. No. 42, Part 1, ¶ 21 [Plf.'s Rule 7.1 Response, not specifically controverting either that Defendant Woods did not receive the notes until after July 23, 2003, or that Defendant Woods believed the notes to be "cryptic"]; Dkt. No. 37, Part 8, Ex. D [Woods Aff., attaching Defendant Woods' 8/6/02 memorandum to Plaintiff stating that Plaintiff's two notes were "brief and very vague" and lacked "specifics"].)

13. On or about August 5, 2002, Plaintiff wrote and sent a third note to Deputy Superintendent Woods. [35] The note stated, in pertinent part:

35    (Dkt. No. 37, Part 3, ¶ 6 [Woods Aff.]; Dkt. No. 37, Part 7, Ex. C [Woods Aff., attaching note]; Dkt. No. 37, Part 2, ¶ 22 [Defs.' Rule 7.1 Statement, asserting that Plaintiff wrote and sent note]; Dkt. No. 42, Part 1, ¶ 22 [Plf.'s Rule 7.1 Response, not specifically controverting that Plaintiff wrote and sent note].)

Please take notice that since you have neglected to answer the above two (2) requests [i.e., dated July 16, 2002, and July 21, 2002] to meet with me about a very serious matter

concerning a <DEAD> man's legal documents, in the future if anything should come of a matter of said documents being in my possession or the inmate's family should have any questions of same and I answer those questions according to law, you and the administration cannot take any action against the inmate's family nor myself. [36]

36    (Dkt. No. 37, Part 7 [Ex. C to Woods Aff.].)

*7 14. On or about August 6, 2002, Defendant Woods sent a memorandum to Plaintiff. [37] That memorandum stated, in pertinent part:

37    (Dkt. No. 37, Part 3, ¶ 6 [Woods Aff., asserting that he sent this memorandum]; Dkt. No. 42, Part 1, ¶ 6 [Plf.'s Response to Woods Aff., admitting that Defendant Woods sent Plaintiff this memorandum]; Dkt. No. 37, Part 8, Ex. D [Woods Aff., attaching the memorandum].)

Your August 5th letter ... makes reference to legal documents belonging to deceased Inmate Alcivar.... I have directed Law Library Officer Holt to speak to you and recover from you any legal documents of deceased Inmate Alcivar.... In fact, you should have turned over any such documents to Law Library Officer Holt immediately. [38]

38    (Dkt. No. 37, Part 7, Ex. D [Woods Aff., attaching the 8/6/02 memorandum].)

15. On August 7, 2002, Plaintiff received Defendant Woods' memorandum. [39]

39    (Dkt. No. 5, "Facts of the Incident," ¶ 11 [Plf.'s Am. Compl.].)

16. Meanwhile, on or about August 5, 2002, Defendant Holt asked Plaintiff for Inmate Alcivar's legal documents. [40] Plaintiff denied having such documents. [41]

40    (Dkt. No. 37, Part 2, ¶ 24 [Defs.' Rule 7.1 Statement, asserting fact]; Dkt. No. 42, Part 1, ¶ 24 [Plf.'s Rule 7.1 Response, not specifically controverting fact]; Dkt. No. 37, Part 29, ¶ 7 [Holt Aff.]; Dkt. No. 5, "Facts of the Incident," ¶ 10 [Plf.'s Am. Compl.].)

41    (Dkt. No. 37, Part 2, ¶ 24 [Defs.' Rule 7.1 Statement, asserting fact]; Dkt. No. 42, Part 1, ¶ 24 [Plf.'s Rule 7.1 Response, not specifically controverting that Plaintiff denied to Defendant Holt having Inmate Alcivar's legal documents, only citing to Paragraph 12 of Plaintiff's Rule

WESTLAW    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

7.1 Response, which is not material to the asserted fact];
Dkt. No. 37, Part 29, ¶ 7 [Holt Aff.].)

17. As a result, at some point between August 5, 2002, and August 31, 2002, Defendant Woods directed Defendant Belarge to have Plaintiff's cell (or "cube") searched and to interview Plaintiff about his statements made in his August 5, 2002, note. [42]

[42]  (Dkt. No. 37, Part 3, ¶¶ 8, 9 [Woods Aff.]; Dkt. No. 37, Part 8, ¶ 3 [Belarge Aff.]; Dkt. No. 37, Part 2, ¶ 25 [Defs.' Rule 7.1 Statement, asserting that Defendant Woods directed Defendant Belarge to have Plaintiff's cell searched]; Dkt. No. 42, Part 1, ¶ 24 [Plf.'s Rule 7.1 Response, admitting that Defendant Woods directed Defendant Belarge to have Plaintiff's "cube" searched].)

18. At some point on August 31, 2002 (apparently between 8:30 a.m. and 11:00 a.m.), Defendant Belarge had Plaintiff's cell (or "cube") searched by Defendant O'Donnell (and apparently Defendant Holt and two other corrections officers). [43]  At some point (apparently during this search), Defendant O'Donnell discovered Inmate Alcivar's legal documents (as well as various correspondence between Plaintiff and Inmate Alcivar's two daughters). [44]

[43]  (Dkt. No. 37, Part 8, ¶ 4 [Belarge Aff.]; Dkt. No. 37, Part 2, ¶¶ 25-26 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶¶ 25-26 [Plf.'s Rule 7.1 Response]; Dkt. No. 37, Part 17, Ex. A [Antonelli Aff., attaching misbehavior report which suggests that Defendants Belarge and O'Donnell had in their possession Inmate Alcivar's legal documents as well as various correspondence between Plaintiff and Inmate Alcivar's two daughters, before those Defendants interviewed Plaintiff at 11:00 a.m. on August 31, 2002]; Dkt. No. 5, "Facts of the Incident," ¶¶ 13-14 [Plf.'s Am. Compl., stating that Defendant Belarge had in his possession a letter that Plaintiff had written to Raisa Alcivar by the time he interviewed Plaintiff at 10:57 a.m. on August 31, 2002].)

[44]  (Dkt. No. 37, Part 2, ¶ 26 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 26 [Plf.'s Rule 7.1 Response, not citing any admissible evidence in support of his denial of this fact]; Dkt. No. 37, Part 8, ¶ 4 [Belarge Aff.]; Dkt. No. 37, Part 3, ¶ 10 [Woods Aff.]; Dkt. No. 37, Part 16, ¶ 5 [Antonelli Aff.]; Dkt. No. 37, Part 18, Ex. B [Antonelli Aff., attaching documents discovered in Plaintiff's cell, and "Chain of Custody" Record indicating that Defendant O'Donnell was the one who found the documents]; Dkt. No. 38, Part 4 at 90 [exhibit to Plaintiff's motion

for summary judgment, attaching Contraband Receipt issued by Defendant O'Donnell]; Dkt. No. 37, Part 22, Ex. A at 31-33 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, in which he admits numerous times that, after Defendant Holt failed to take "control" of Inmate Alcivar's legal documents, Plaintiff, along with two other inmates, retained possession of those documents, out of a fear that those documents would be stolen by another inmate, and out of a sense of duty to Inmate Alcivar]; Dkt. No. 37, Part 18, Ex. B at 10-12, 14 [Antonelli Aff., attaching 7/16/02 letter from Plaintiff, in which he states, "I am going to hold a copy of the complaint" in Inmate Alcivar's federal civil rights action]; Dkt. No. 37, Part 7 [Ex. C to Woods Aff., attaching Plaintiff's 8/5/02 letter, in which he states, "in the future if anything should come of a matter of said documents being in my possession ... you and the administration cannot take any action against the inmate's family nor myself"]; *see also* Dkt. No. 37, Part 19, ¶ 3 [Holden Aff., testifying that at some point in the summer of 2002 Plaintiff told Holden that he was helping an inmate who had been taken to the hospital due to an illness]; Dkt. No. 45, Part 6, ¶¶ 4-5 [Belarge Reply Aff., swearing that evidence in question did not come from any interception of Plaintiff's mail, but from Plaintiff's personal belongings].)

19. At approximately 11:00 a.m. on August 31, 2002, Defendants Belarge and O'Donnell interviewed Plaintiff about his statements in his August 5, 2002, note to Defendant Woods. [45]  At approximately 2:50 p.m. on August 31, 2002, Defendant O'Donnell stored Inmate Alcivar's legal documents (as well as various correspondence between Plaintiff and Inmate Alcivar's two daughters) in an evidence locker at Greene C.F. [46]

[45]  (Dkt. No. 37, Part 2, ¶ 28 [Defs.' Rule 7.1 Statement, asserting that interview took place]; Dkt. No. 42, Part 1, ¶ 28 [Plf.'s Rule 7.1 Response, admitting that interview took place despite his blanket statement "Deny"]; Dkt. No. 37, Part 8, ¶ 5 [Belarge Aff.]; Dkt. No. 5, "Facts of the Incident," ¶¶ 13-15 [Plf.'s Am. Compl., stating that interview took place at 10:57 a.m. on 8/31/02]; Dkt. No. 37, Part 17, Ex. A [Antonelli Aff., attaching 8/31/02 misbehavior report, stating that the interview took place at 11:00 a.m. on 8/31/02].)

[46]  (Dkt. No. 37, Part 18, Ex. B [Antonelli Aff., attaching documents discovered in Plaintiff's cell, and "Chain of Custody" Record indicating that Defendant O'Donnell stored the documents in an evidence locker at 2:50 p.m. on 8/31/02]; Dkt. No. 37, Part 17, Ex. A at 2 [Antonelli Aff., attaching 8/31/02 misbehavior report,

stating that Defendant O'Donnell stored the documents in an evidence locker on 8/31/02].)

### Plaintiff's Misbehavior Report, Disciplinary Hearing, and Appeal

20. Relying on the documents discovered and the subsequent interview conducted, Defendants Belarge and O'Donnell issued Plaintiff a misbehavior report on August 31, 2002. [47] The misbehavior report charged Plaintiff with three offenses: (1) providing legal assistance to Inmate Alcivar without prior authorization in violation of Inmate Rule 180.17; (2) exchanging legal materials with Inmate Alcivar without authorization in violation of Inmate Rule 113.15; and (3) soliciting materials from Inmate Alcivar's family members without authorization in violation of Inmate Rule 103.20. [48]

[47]   (Dkt. No. 37, Part 8, ¶ 6 [Belarge Aff.]; Dkt. No. 37, Part 17, Ex. A [Antonelli Aff., attaching 8/31/02 misbehavior report].)

[48]   (Dkt. No. 37, Part 17, Ex. A [Antonelli Aff., attaching 8/31/02 misbehavior report]; Dkt. No. 37, Part 2, ¶ 29 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 29 [Plf.'s Response, admitting receipt of the misbehavior report, and not specifically denying that he was charged with the three offenses stated in Defendants' assertion of fact].)

21. During the time period at issue (i.e., May through August of 2002), Rule 180.17 of DOCS' Standards of Inmate Behavior prohibited inmates from providing legal assistance to other inmates without prior approval from the Superintendent or his designee; [49] Rule 113.15 of DOCS' Standards of Inmate Behavior prohibited inmates from exchanging personal property (such as legal materials) with other inmates without authorization; [50] and Rule 103.20 of DOCS' Standards of Inmate Behavior prohibited inmates from requesting or soliciting goods or services from any person other than an immediate family member without the consent or approval of the Superintendent or his designee. [51]

[49]   (Dkt. No. 37, Part 16, ¶ 7 [Antonelli Aff.]; Dkt. No. 37, Part 2, ¶ 14 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 14 [Plf.'s Response, not denying this fact, only asserting that he received permission to assist Inmate Alicvar from Defendant Holt].) *See also* 7 N.Y.C.R.R. § 270.02[B][26][vii].

[50]   (Dkt. No. 37, Part 3, ¶ 7 [Woods Aff.]; Dkt. No. 37, Part 16, ¶ 8 [Antonelli Aff.]; Dkt. No. 37, Part 2, ¶ 10 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 10 [Plf.'s Response, admitting this fact].) *See also* 7 N.Y.C.R.R. § 270.2[B][14][v].

[51]   (Dkt. No. 37, Part 16, ¶ 9 [Antonelli Aff.]; Dkt. No. 37, Part 2, ¶ 19 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 19 [Plf.'s Response, not specifically denying this fact, only denying that he indeed requested or solicited "goods or services" from Inmate Alcivar's daughters].) *See also* 7 N.Y.C.R.R. § 270.02[B][4][ii].

**\*8** 22. On September 6, 2002, Plaintiff received a disciplinary hearing, conducted by Defendant Antonelli. [52] Defendant Antonelli found Plaintiff guilty of all three charges, and imposed the following penalties: 90 days in S.H.U., 90 days loss of packages privileges, 90 days loss of commissary privileges, 90 days loss of telephone privileges, and three months loss of "good time" credits . [53] In reaching his finding of guilt, Defendant Antonelli relied on (1) the assertions by Defendants Belarge and O'Donnell in Plaintiff's misbehavior report that Plaintiff had made certain admissions to them during an interview, (2) Defendant Antonelli's belief that Plaintiff had made certain admissions in his correspondence to Inmate Alcivar's daughters, and (3) Defendant Antonelli's understanding that certain legal materials belonging to Inmate Alcivar had been found in Plaintiff's cell (or "cube"). [54]

[52]   (Dkt. No. 37, Part 2, ¶ 30 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 30 [Plf.'s Response, admitting this fact].)

[53]   (Dkt. No. 37, Part 2, ¶ 31 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 31 [Plf.'s Response, admitting this fact].)

[54]   (Dkt. No. 37, Part 16, ¶¶ 4-6, 11 [Antonelli Aff., asserting this fact]; Dkt. No. 42, Part 1, ¶¶ 4-6, 11 [Plf.'s Response to Antonelli Aff., admitting part of this fact, not specifically controverting the rest of this fact, and, in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 38, Part 4 at 43-44 [exhibit to Plaintiff's motion for summary judgment, attaching Defendant Antonelli's written hearing decision]; Dkt. No. 5, ¶ 17 [Am. Compl., acknowledging that Defendant Antonelli had, in reaching his decision, relied on, among other things, Plaintiff's misbehavior report and various letters between Plaintiff and Inmate Alcivar's daughters].)

23. Also on September 6, 2002, Plaintiff appealed Defendant Antonelli's disciplinary decision to Donald Seksky, Director of DOCS' Special Housing/Inmate Disciplinary Program, who affirmed that decision on October 28, 2002. [55] Plaintiff's appeal did not complain about any lack or denial of witnesses at his disciplinary hearing; similarly, Mr. Selky's appellate decision did not address such a complaint. [56]

[55]    (Dkt. No. 37, Part 2, ¶ 32 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 32 [Plf.'s Response, admitting this fact]; Dkt. No. 42, Part 23 at 46-48 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, in which he discusses the appeal]; Dkt. No. 38, Part 3 at 46, 68 [exhibits to Plaintiff's motion for summary judgment, attaching his appeal and Mr. Selsky's affirmance].)

[56]    (Dkt. No. 42, Part 23 at 46-48 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, in which he discusses his one-page appeal and acknowledges that it did not complain about any lack or denial of witnesses]; Dkt. No. 38, Part 3 at 46, 68 [exhibits to Plaintiff's motion for summary judgment, attaching his appeal and Mr. Selsky's affirmance].)

24. On October 24, 2002, Greene C.F. officials conducted a discretionary review of Plaintiff's SHU sentence. [57] Based upon this review, Plaintiff's SHU time was reduced from 90 days to 75 days. [58] However, Plaintiff's good time loss was unaffected by the discretionary review. [59]

[57]    (Dkt. No. 37, Part 2, ¶ 31 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 31 [Plf.'s Response, admitting part of this fact, not specifically controverting the rest of this fact, and, in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 37, Part 8, ¶ 8 [Belarge Aff.].)

[58]    (Id.)

[59]    (Id.)

Meetings Between Defendants
Woods, Belarge and O'Donnell

25. At some point between August 5, 2002, and August 31, 2002, Defendant Woods met with Defendant Belarge to discuss Plaintiff. [60] Defendant Belarge then met with Defendant O'Donnell to discuss Plaintiff. [61]

[60]    (Dkt. No. 37, Part 2, ¶ 37 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 37 [Plf.'s Response, not specifically controverting this fact, and, in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 37, Part 3, ¶¶ 9, 13 [Wood Aff.]; Dkt. No. 37, Part 8, ¶¶ 3, 9 [Belarge Aff.]; Dkt. No. 42, Part 23 at 35-37 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, asserting that such a meeting took place between Defendants Woods and Belarge at some point].)

[61]    (Dkt. No. 37, Part 2, ¶ 38 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 38 [Plf.'s Response, admitting this fact]; Dkt. No. 37, Part 8, ¶ 9 [Belarge Aff.]; Dkt. No. 42, Part 22 at 35-37 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, asserting that such a meeting took place between Defendants Belarge and O'Donnell at some point].)

26. Both meetings (which were held *prior* to the issuance of Plaintiff's misbehavior report on August 31, 2002) were held according to standard procedure at Greene C.F. [62] Specifically, the purpose of the meetings was to discuss how to investigate whether Plaintiff had violated prison rules. [63]

[62]    (Dkt. No. 37, Part 2, ¶ 39 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 39 [Plf.'s Response, not specifically controverting that the pre-misbehavior report meeting between Defendants Woods and Belarge, and the pre-misbehavior report meeting between Defendants Belarge and O'Donnell, were held according to standard procedure at Greene C.F., and, in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 37, Part 3, ¶ 13 [Wood Aff.]; Dkt. No. 37, Part 8, ¶ 9 [Belarge Aff.]; Dkt. No. 37, Part 19, ¶ 2 [Holden Aff., disclaiming any knowledge about an alleged unlawful meeting between Defendants Woods, Belarge, and O'Donnell concerning Plaintiff].)

[63]    (Dkt. No. 37, Part 2, ¶¶ 37-39 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶¶ 37-39 [Plf.'s Response, not specifically controverting this fact, and, in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 37, Part 3, ¶ 13 [Wood Aff.]; Dkt. No. 37, Part 8, ¶¶ 3, 9 [Belarge Aff.]; Dkt. No. 37, Part 19, ¶ 2 [Holden Aff., disclaiming any knowledge about an alleged unlawful meeting between Defendants Woods, Belarge, and O'Donnell concerning Plaintiff].)

Plaintiff's Bunk(s) in SHU

27. As a result of his disciplinary conviction, Plaintiff was housed in Greene C.F.'s SHU from approximately September 6, 2002, to November 21, 2002. [64]

[64]     (Dkt. No. 5, ¶¶ 26, 37 [Am. Comp.]; Dkt. No. 37, Part 23, Ex. A at 57-58 [Munkwitz Decl., attaching transcript of Plaintiff's deposition]; Dkt. No. 42, Part 1, ¶ 43 [Plf.'s Rule 7.1 Response, stating, "Plaintiff left S-Block November 21, 2002...."].)

28. At no point (either during or after the above-described time period) did Plaintiff file any written grievances, or submit any letters of complaint, about an alleged defect in any of the bunk beds that he was assigned while in SHU. [65]

[65]     (Dkt. No. 37, Part 2, ¶ 41 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 41 [Plf.'s Response, not specifically controverting this fact]; Dkt. No. 37, Part 23, Ex. A at 58-62 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which he acknowledged this fact]; Dkt. No. 48, Part 6 [Belin Aff.].)

29. On February 8, 2005, Defendant Belarge had photographs taken of the bunk beds that Plaintiff was assigned while he was in SHU; and on April 22, 2005, Defendant Belarge had photographs taken of the other bunk beds that Plaintiff suggests he may have been assigned. [66] Those photographs are made part of the record at Exhibit A to the February 10, 2005, Affidavit of Defendant Belarge, and at Exhibits A and B to the April 29, 2005, Affidavit of Kenneth Scattergood. [67] Between September 6, 2002, and February 10, 2005, there was no record of any repairs made to any of the bunk beds that Plaintiff was assigned while in SHU; and between September 6, 2002, and April 22, 2005, there was no record of any repairs made to any of the other bunk beds that Plaintiff may have been assigned while in SHU. [68]

[66]     (Dkt. No. 37, Part 2, ¶ 42 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 42 [Plf.'s Rule 7.1 Response, not specifically controverting this fact, and in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 37, Part 8, ¶¶ 11-12 [Belarge Aff.]; Dkt. No. 37, Parts 9-12 [Ex. A to Belarge Aff., attaching photographs]; Dkt. No. 48, Parts 4, 8-17 [Defs.' reply affidavits and exhibits, attaching photographs].)

[67]     (Dkt. No. 37, Part 8, ¶¶ 11-12 [Belarge Aff.]; Dkt. No. 37, Parts 9-12 [Ex. A to Belarge Aff., attaching

photographs]; Dkt. No. 48, Parts 4, 8-17 [Defs.' reply affidavits and exhibits, attaching photographs].)

[68]     (Dkt. No. 37, Part 2, ¶ 43 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 43 [Plf.'s Rule 7.1 Response, not specifically controverting this fact, and in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 37, Part 8, ¶¶ 13-14 [Belarge Aff.]; Dkt. No. 37, Parts 13-15, Ex. B [Belarge Aff., attaching work orders]; Dkt. No. 48, Parts 4-5 [Defs.' reply affidavit and exhibits, attaching work orders].)

## III. ANALYSIS

### A. Whether Plaintiff Has Failed to Establish (or Even State) a First Amendment Retaliation Claim

**\*9**  In their memorandum of law, Defendants argue that Plaintiff has failed to establish (or even state) a First Amendment retaliation claim against Defendant Antonelli because (1) he fails to establish that he had been engaging in speech or conduct that is protected by the First Amendment, and (2) in any event, he fails to establish a causal link between that protected activity and any adverse action against him by Defendant Antonelli. (Dkt. No. 37, Part 25 at 15-16 [Defs.' Mem. of Law].) Liberally construed, Plaintiff's response papers argue that (1) he had a constitutionally protected liberty right to make an oral and written complaint about Defendant Antonelli's management of the prison mess hall, and (2) as a result of Plaintiff's complaints (and an "encounter" between Plaintiff and Antonelli one week before Plaintiff's disciplinary hearing), Defendant Antonelli retaliated against Plaintiff during Plaintiff's disciplinary hearing by, among other things, depriving Plaintiff of his statutorily protected right to receive "good time" credits (which would have accelerated Plaintiff's release on parole). (Dkt. No. 42, Part 2 at 9 [Plf.'s Response].)

Claims of retaliation like those asserted by Plaintiff find their roots in the First Amendment. *See Gill v. Pidlypchak,* 389 F.3d 379, 380-81 (2d Cir.2004). Central to such claims is the notion that in a prison setting, corrections officials may not take actions which would have a chilling effect upon an inmate's exercise of First Amendment rights. *See Gill,* 389 F.3d at 381-383. Because of the relative ease with which claims of retaliation can be incanted, however, courts have scrutinized such retaliation claims with "skepticism and particular care." *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995); *see also Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983). As the Second Circuit has noted,

[t]his is true for several reasons. First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second, prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act.

*Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citations omitted), overruled on other grounds, *Swierkewicz v. Sorema N.A.,* 534 U.S. 506 (2002).

To prevail on a First Amendment claim under 42 U.S.C. § 1983, a Plaintiff must prove by the preponderance of the evidence that: (1) the speech or conduct at issue was "protected"; (2) the defendants took "adverse action" against the plaintiff-namely, action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights; and (3) there was a causal connection between the protected speech and the adverse action-in other words, that the protected conduct was a "substantial or motivating factor" in the defendants' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977); *Gill,* 389 F.3d at 380 (citing *Dawes v. Walker,* 239 F.3d 489, 492 [2d. Cir.2001] ). Under this analysis, adverse action taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper reasons alone. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted).

 *10 Here, Plaintiff's claim fails for several reasons. I acknowledge that the First Amendment protects, not only the filing of written grievances and complaints, but, under some circumstances, the making of oral complaints to corrections officers.[69] However, even assuming Plaintiff had a constitutionally protected right to make both written and *oral* complaints about Defendant Antonelli, no evidence

exists establishing (or even suggesting) that any complaints by Plaintiff against Defendant Antonelli impacted Defendant Antonelli's disciplinary decision.

[69]    *See Malik'El v. N.Y. State DOCS,* 96-CV-0669, 1998 U.S. Dist. LEXIS 5471, at *7 & n. 1 (N.D.N.Y. March 4, 1998) (Sharpe, M.J .) (under circumstances, plaintiff's oral complaint to corrections officer might state a First Amendment claim), *adopted by* 1998 U.S. Dist. 5465 (N.D.N.Y. Apr. 8, 1998) (Pooler, D.J.); *but see Rodriguez v. Phillips,* 66 F.3d 470, 479 (2d Cir.1995) ("In the context of the confrontation described in [the plaintiff's] own words, there was no clearly established First Amendment right to approach and speak to Officer Rubin.") (emphasis added); *Garrido v. Coughlin,* 716 F.Supp. 98, 101 (S.D.N.Y.1989) (plaintiff's "verbal confrontation" with corrections officer was not protected speech or conduct under the First Amendment).

For example, no evidence exists that Plaintiff submitted any grievances or complaints against Defendant Antonelli, only that he submitted a letter to Deputy Superintendent Eldred complaining about "Mess Hall Dishwashing Machines" approximately three weeks before the disciplinary hearing. [70] Plaintiff's letter did not mention Defendant Antonelli. [71] In any event, no evidence exists indicating that Defendant Antonelli knew about any grievances against him by Plaintiff at the time of Plaintiff's disciplinary hearing. [72] Similarly, no evidence exists that he ever confronted Defendant Antonelli with an oral complaint about the mess hall-other than Plaintiff's vague and uncorroborated assertions that he "met" with, or had an "encounter" with, Defendant Antonelli about the mess hall before the disciplinary hearing. [73] Finally, the record evidence establishes that Defendant Antonelli could, and indeed would, have reached the same disciplinary hearing decision (and imposed the same penalties) despite any such complaints or grievances by Plaintiff (i.e., based upon the evidence as presented to him at Plaintiff's disciplinary hearing decision). [74]

[70]    (Dkt. No. 48, Parts 6-7, ¶ 6 [Berlin Aff., testifying that the only grievance on file from Plaintiff, from between August 2002 to December 2002 was a grievance dated 8/8/02 about the legal mail limit at Greene C.F., attaching that grievance at Exhibit A]; Dkt. No. 37, Part 24 [Munkowitz Decl., attaching Plaintiff's 8/16/02 letter of complaint to Deputy Superintendent Eldred regarding the "Mess Hall Dishwashing Machines"]; Dkt. No. 37,

Smith v. Woods; Not Reported in F.Supp.2d (2006)
Case 9:17-cv-01349-DNH-TWD   Document 62   Filed 07/22/19   Page 32 of 129
2006 WL 1133247

Part 23, Ex. A at 86-90 [Munkwitz Decl., attaching transcript of Plaintiff's deposition].)

71   (Dkt. No. 37, Part 24 [Munkowitz Decl., attaching Plaintiff's 8/16/02 letter of complaint to Deputy Superintendent Eldred regarding the mess hall dishwashing machines, not mentioning any specifics, much less the name or position of Defendant Antonelli; Dkt. No. 37, Part 23, Ex. A at 86-90 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which Plaintiff admits this fact].)

72   (Dkt. No. 37, Part 17, ¶ 13 [Antonelli Aff., testifying that "I ... understand that plaintiff alleges that I retaliated against him based upon a grievance that plaintiff made against me. I am not aware of any grievances filed by plaintiff against me"]; Dkt. No. 42, Part 1, ¶ 12 [Plf.'s Response to Antonelli Aff., containing no response to Paragraph 13 of Antonelli's affidavit, and asserting conclusorily that "[the tier office] had chosen Antonelli to preside over plaintiff's tier hearing on September 6, 2002 ... and that was due to Antonelli's encounter with plaintiff one week prior to holding said hearing," without providing any specifics about the alleged "encounter," without providing any assertion that it was Antonelli who was motivated by the alleged "encounter," and without providing reason to believe Plaintiff had personal knowledge of the Tier Office's motivation in assigning Antonelli as the hearing officer].)

73   (Dkt. No. 42, Part 1¶ 12 [Plf.'s Response to Antonelli Aff., asserting that, one week before the disciplinary hearing, Plaintiff had an "encounter" with Defendant Antonelli]; Dkt. No. 37, Part 23, Ex. A at 89 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which Plaintiff states that, days before the disciplinary hearing, he "met" with Defendant Antonelli about the condition of the "utensils, dish washing machines, et cetera" in the mess hall].)

74   (See, supra, Statement of Fact Nos. 22-23 [stating evidence upon which Defendant Antonelli based his hearing decision, and fact that the decision was affirmed on appeal].)

As a result, I recommend that the Court dismiss Plaintiff's First Amendment retaliation claim.

### B. Whether Plaintiff Has Failed to State a Fourth Amendment Claim

I do not construe Defendants' memorandum of law as expressly arguing that any Fourth Amendment claim asserted by Plaintiff should be dismissed for failure to state a claim under Rule 12(b)(1) of the Federal Rules of Civil Procedure, which permits motions to dismiss for "lack of jurisdiction over the subject matter" of a claim. However, I do construe that memorandum of law, as well as defense counsel's questions of Plaintiff during his deposition, as *suggesting* that Plaintiff has failed to assert a Fourth Amendment claim (regarding the search of his property by Defendants at Greene C.F.) over which federal courts have subject matter jurisdiction. 75

75   (Dkt. No. 37, Part 25 at 8-9 [Defs.' Mem. of Law, addressing the conclusory nature of Plaintiff's claims about a "conspiracy" against him, the subject of which included the search of his property]; Dkt. No. 37, Part 22, Ex. A at 14 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which defense counsel stated, "I don't see how the [F]ourth [A]mendment gives you a right to be free from harmful situations. So I would like you to explain that to me," and Plaintiff stated, "[T]he [F]ourth [A]mendment does not apply to the specific paragraph that you are referring to," i.e., Paragraph 43 of the Amended Complaint], 22 [in which defense counsel asked, "Is there anything else in your second cause of action ..." other than a due process claim, and Plaintiff answered, "Not at this point, ma'am" even though that cause of action cites the Fourth Amendment], 26 [in which defense counsel asked, "You have a constitutional right to be free from search and seizure as an inmate?" and Plaintiff answered, "As an inmate, no, ma'am"].) See Clissuras v. CUNY, 359 F.3d 79, 81 n. 3 (2d Cir.2004) (treating a "suggestion" to the court, in the form of a letter, that subject matter jurisdiction was lacking as a request for a dismissal order under Rule 12[h][3] ).

Under Rule 12 of the Federal Rules of Civil Procedure, "[w]henever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action." Fed.R.Civ.P. 12(h)(3). Thus, the Court has a duty to examine whether or not it has subject matter jurisdiction over Plaintiff's attempted Fourth Amendment claim.

Here, I find that the Court does not have subject matter jurisdiction (pursuant to 42 U.S.C. § 1983 or otherwise) over that claim, which is asserted in Paragraphs 44 and 15 of Plaintiff's Amended Complaint. 76 Specifically, the allegations contained in Paragraph 15 of his Amended Complaint are the sole *factual* basis for Plaintiff's Fourth Amendment claim. 77 In pertinent part, that paragraph alleges that on "August 31, 2002, 11:20 A.M., Belarge ... had

plaintiff's personal property searched [for Alcivar's materials] by three officers, one of whom was Holt...." [78]

76    *(See* Dkt. No. 5, ¶ 44 [Plf.'s Am. Compl., alleging that Defendants Woods and Holt "violat[ed] plaintiff's 4th ... Amendment [ ] rights"], ¶ 15 [alleging that Defendant Belarge "had plaintiff's personal property searched by three officers, one of whom was Holt"]; Dkt. No. 37, Part 23, Ex. A at 14-22, 26-28 [Munkowitz Decl., attaching transcript of deposition of Plaintiff, in which he explains his claim under the Fourth Amendment based on the alleged unjustified search and seizure of his property].)

77    (Dkt. No. 37, Part 22, Ex. A at 14 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which Plaintiff stated, "[T]he [F]ourth [A]mendment does not apply to" Plaintiff's first cause of action], 22 [in which defense counsel asked, "Is there anything else in your second cause of action ..." other than a due process claim, and Plaintiff answered, "Not at this point, ma'am" even though the cause of action cites the Fourth Amendment], 28 [in which defense counsel asked, "Are you alleging that the facts in paragraph 15 give rise to a constitutional claim for search and seizure?" and Plaintiff answered, "Yes, ma'am"].)

78    (Dkt. No. 5, ¶ 14 [Am. Compl.].)

**\*11** The problem with Plaintiff's Fourth Amendment claim is that, even if the search occurred as Plaintiff alleged, that search was of a prisoner's cell (or "cube"). "[T]he Fourth Amendment proscription against unreasonable searches does not apply within the confines of a prison cell." *Hudson v. Palmer,* 468 U.S. 517, 526 (1984). [79] Nor does the Fourth Amendment proscription apply within the confines of a prison "cube." [80] Indeed, Plaintiff appears to recognize this point of law. [81]

79    *See also Tinsley v. Greene,* 95-CV-1765, 1997 WL 160124, at *7 (N.D.N.Y. March 31, 1997) ("Plaintiff thus may assert no cause of action here based on an alleged violation of his Fourth Amendment rights."); *Demaio v. Mann,* 877 F.Supp. 89, 95 (N.D.N.Y.) ("Searches of prison cells, even arbitrary searches, implicate no protected constitutional rights."), *aff'd,* 122 F.3d 1055 (2d Cir.1995).

80    *See Freeman v. Goord,* 02-CV-9033, 2005 U.S. Dist. LEXIS 32019, at *5 & n. 4 (S.D.N.Y. Dec. 7, 1995) (granting defendants' motion for summary judgment, in part because plaintiff had no reasonable expectation of privacy, under the Fourth Amendment, in his cell,

which plaintiff referred to as his "cube"); *Rodriguez v. Coughlin,* 795 F.Supp. 609, 611, 613 (W.D.N.Y.1992) (granting defendants' motion for summary judgment, in part because prison officials have same need, and right, to search prisoner's "cell" as his "cubicle").

81    (Dkt. No. 37, Part 22, Ex. A at 26 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which defense counsel asked, "You have a constitutional right to be free from search and seizure as an inmate?" and Plaintiff answered, "As an inmate, no, ma'am"].)

I note that I do not liberally construe Plaintiff's Amended Complaint as asserting a Fourth Amendment claim against Defendant Woods for (allegedly) unreasonably searching and seizing various pieces of Plaintiff's outgoing and incoming mail in August of 2002. However, even if I did so construe that Amended Complaint, I would conclude that this Court would not have subject matter jurisdiction over that claim. The only portion of Plaintiff's Amended Complaint that regards such a search and seizure by Defendant Woods of Plaintiff's mail is vague and conclusory. [82] Even taking as true Plaintiff's allegations, the mail in question consisted of clearly identifiable contraband (e.g., legal materials belonging to Inmate Alcivar in packages to, or from, persons bearing the last name of Alcivar). [83] I fail to see how any search and confiscation of such contraband would have violated the Fourth Amendment. Indeed, such a search and confiscation would appear to have been expressly authorized by DOCS Directive No. 4422 (which regards the Inmate Correspondence Program). [84]

82    (Dkt. No. 5, ¶ 12 [Am. Compl.].)

83    I note that the alleged "interception" by Defendant Woods of these packages was preceded by a letter from Plaintiff to Woods referring to "documents [belonging to Inmate Alcivar] being in [Plaintiff's] possession" and referring to Inmate Alcivar's family members. Furthermore, I note that the alleged contents of these packages would have reasonably appeared (at the very least) to consist of contraband (i.e., allegedly being the same documents that later gave rise to three disciplinary charges against Plaintiff, which charges resulted in a conviction that was affirmed on appeal).

84    *See, e.g.,* DOCS Directive No. 4422, § III.B.17. ("Inmates shall not be permitted to use their correspondence privileges to solicit ... services, or goods."), § III.G.1. ("All incoming general correspondence will be opened and inspected for ... photocopied materials, or contraband.") (5/18/02).

2006 WL 1133247

As a result, I recommend that the Court dismiss Plaintiff's Fourth Amendment claim.

### C. Whether Plaintiff Has Failed to Establish (or Even State) an Eighth Amendment Claim

In their memorandum of law, Defendants argue that Plaintiff has failed to establish (or even state) an Eighth Amendment claim because (1) Plaintiff has not established (or even alleged) a deprivation that is "sufficiently serious" for purposes of the Eighth Amendment, and (2) he has not established that Defendants were *deliberately* indifferent to Plaintiff's health or safety. (Dkt. No. 37, Part 25 at 11, 13-14 [Defs.' Mem. of Law].) Liberally construed, Plaintiff's response papers argue that (1) he has established a deprivation that is "sufficiently serious" through his evidence that he experienced a back injury while in SHU as a result of his "twisted bunk," and (2) he has established such deliberate indifference through his testimony that he orally complained to Defendants Woods and Belarge (as well as others) of his back injury and the fact that they "ignored" his complaints. (Dkt. No. 42, Part 2 at 13-15 [Plf.'s Response].)

"[A] prison official violates the Eighth Amendment only when two requirements are met. First, the deprivation must be, objectively, 'sufficiently serious'.... [Second,] a prison official must have a 'sufficiently culpable state of mind.' " *Farmer v. Brennan,* 511 U.S. 825, 834 (1994). "In prison-conditions cases that state of mind is one of deliberate indifference to inmate health or safety...." *Farmer,* 511 U.S. at 834.

**\*12** With regard to the first element, "the plaintiff must demonstrate that the conditions of his confinement resulted in 'unquestioned and serious deprivations of basic human needs' or 'deprive inmates of the minimal civilized measures of life's necessities.' " *Davidson v. Murray,* 371 F.Supp.2d 361, 370 (W .D.N.Y.2005) (citing *Rhodes v. Chapman,* 452 U.S. 337, 347 [1981] ). "As recognized by the Supreme Court in *Rhodes,* 'the Constitution does not mandate comfortable prisons,' ... and conditions that are 'restrictive and even harsh ... are part of the penalty that criminal offenders pay for their offenses against society.' " *Davidson,* 371 F.Supp.2d at 370 (quoting *Rhodes,* 452 U.S. at 347, 349).

With regard to the second element, "[i]n prison-conditions cases [the requisite] state of mind is one of deliberate indifference to inmate health or safety...." *Farmer,* 511 U.S. at 834. "[D]eliberate indifference describes a state of mind more blameworthy than negligence." *Id.* at 835. "Deliberate

indifference" exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

#### 1. Sufficiently Serious Deprivation

Plaintiff alleges that he was diagnosed with "spondylolisthesis"[85] in September of 2002 as a result of sleeping on a defective bed.[86] As far as I can tell from available reported decisions, all federal courts faced with evidence of such an injury on a dispositive motion in a prisoner civil rights case explicitly or implicitly assume, for the sake of argument, that the injury constitutes a serious medical need.[87] I do not make such an assumption here because, unlike the prisoners in those other civil rights cases, Plaintiff does not allege that his Eighth Amendment deprivation consisted of his "spondylolisthesis" but his defective (or "twisted") bunk bed. In addition to being supported by the express language of Plaintiff's Amended Complaint,[88] this reading of Plaintiff's allegations is supported by his testimony in his deposition that he is not asserting a claim that the medical staff was deliberately indifferent to any serious medical need.[89]

---

[85]   "Spondylolisthesis" is defined as "forward movement of the body of one of the lower lumbar vertebrae on the vertebra below it, or upon the sacrum." *Rowland v. Hildreth,* 92-CV-6140, 1993 U.S. Dist. LEXIS 10233, at \*35, n. 6 (S.D.N.Y. July 27, 1993) (citing *Stedman's Medical Dictionary* at 1456 [25th ed.1990] ).

[86]   (Dkt. No. 5, ¶ 27 [Am. Compl.]; Dkt. No. 38, Part 4 at 58-62 [Plf.'s Motion for Summary Judgment, attaching medical records repeatedly stating "spondylolisthesis"]; Dkt. No. 37, Part 23 at 54-58 [Munkowitz Decl., attaching transcript of Plaintiff's deposition testimony, in which Plaintiff describes his injury generally].)

[87]   *See Villante v. N.Y. State DOCS,* 96-CV-1484, 2002 U.S. Dist. LEXIS 26279, at \*4, 8-9 (N.D.N.Y. March 28, 2002) (Mordue, J.), *adopting report-recommendation,* 2002 U.S. Dist. LEXIS, at \*11-12 (N.D.N.Y. Oct. 26, 2001) (Homer, M.J.); *Rowland,* 1993 U.S. Dist. LEXIS 10233, at \*13-16, 30; *Smith v. Umar,* 89-CV-6988, 1989 U.S. Dist. LEXIS 14170, at \*4-6, 8-10 (E.D.Pa. Nov. 28, 1989).

[88]   (Dkt. No. 5, ¶¶ 35, 37, 38, 43 [Am. Compl., alleging that Defendants-who are non-medical personnel-violated

Plaintiff's Eighth Amendment rights by placing him in, and keeping him in, SHU, despite knowing of the allegedly substandard conditions there, which included his allegedly defective bunk].)

89    (Dkt. No. 37, Part 23 at 42-43, 53, 58 [Munkowitz Decl., attaching transcript of Plaintiff's deposition testimony, in which Plaintiff testifies that he was not asserting any claim regarding the medical treatment that he received, or that the medical staff was deliberately indifferent to a serious medical need].)

This is apparently why Defendants, in their motions papers, do not challenge Plaintiff's allegation that he suffered from "spondylolisthesis," but do challenge his allegation that he was assigned a bunk bed that was in any way defective. 90 In support of that argument, Defendants submit evidence that none of the bunk beds to which Plaintiff was assigned while in SHU (1) showed any visible defects (much less the defect that Plaintiff alleges, i.e., being "twisted") at or after the time in question, and (2) were either complained about by other inmates or repaired at or after the time in question. 91

90    (Dkt. No. 37, Part 25 at 14 [Defs.' Mem. of Law, arguing that "plaintiff cannot demonstrate that his bunk was 'damaged' in any manner," citing record evidence in an attempt to support that argument].)

91    (See, supra, Statement of Fact No. 29.)

*13   More convincing, however, is the temporal disconnect between the onset of Plaintiff's back injury and his assignment to the allegedly defective bunk bed in question. Although Defendants do not appear to argue that the onset of Plaintiff's injury pre-dated his assignment to the allegedly defective bunk bed, 92 there is evidence indicating that Plaintiff's back injury existed before he was assigned to the allegedly defective bunk bed (i.e., Bunk Number "OS-A1-20(b)") on September 23, 2002. 93 There is even evidence indicating that Plaintiff's back injury existed before he was admitted to SHU on September 6, 2002. 94

92    (Dkt. No. 37, Part 25 at 11, 13-14 [Defs.' Mem. of Law].)

93    (Compare Dkt. No. 42, Part 1, ¶¶ 10(a), 11 [Plf.'s Response to Belarge Aff., swearing that he was assigned to the allegedly "dilapidated" bunk in question-Bunk Number "OS-A1-20(b)"-on 9/23/02, after having been assigned to two different SHU cells, i.e., first in Cell "SH-0013" and then in Cell "B1-18"] with Dkt. No. 5, ¶¶ 26-27 [Plf.'s Am. Compl., containing a sworn allegation that the onset of his back injury was on or before 9/13/02,

and that the date of diagnosis was 9/20/02] and Dkt. No. 42, Part 1, ¶ 15 [Plf.'s Response to Belarge Aff., swearing that he orally complained to Belarge about the bunk on 9/18/02] and Dkt. No. 37, Part 23 at 58 [Munkowitz Decl., attaching transcript of Plaintiff's deposition testimony, in which Plaintiff testifies that he first requested sick call on 9/9/02, or three days after his admission to SHU].)

94    (Dkt. No. 38, Part 4 at 58-62 [Plf.'s Motion for Summary Judgment, attaching medical record printed on 9/9/02 containing a typed notation, apparently entered on 8/23/02 stating, "Reason for Consultation: H/O sciatica type pain which has responded to PT in the past. I request a repeat treatment series for 6 weeks" and noting that Plaintiff was 51 years old at the time] [emphasis added].)

Even if Plaintiff were alleging that his back injury existed before September 6, 2002, but that his injury was exacerbated by his various bunk beds while in SHU, I would reach the same conclusion. As I described above, the first element of the Eighth Amendment's two-part test is "objective," not "subjective." Simply stated, the Eighth Amendment does not mandate "comfortable" bunk beds. 95 For these reasons, I find that Plaintiff has failed to establish a "sufficiently serious" deprivation for purposes of the Eighth Amendment.

95    See Faunce v. Gomez, No. 97-16943, 1998 U.S.App. LEXIS. 22703, at *3 (9th Cir. Sept. 14, 1998) (affirming district court's grant of summary judgment to defendants in part because the plaintiff's Eighth Amendment claim was premised on his complaint that his mattress was uncomfortable and his bedding was insufficient); Page v. Kirby, 314 F.Supp.2d 619, 620 (N.D.W.Va.) (dismissing prisoner's Eighth Amendment claim premised on complaint that his mattress was uncomfortable); Levi v. District of Columbia, 92-CV-2653, 1993 U.S. Dist. LEXIS 1948, at *5 (D.D.C. Feb. 24, 1993) dismissing prisoner's Eighth Amendment claim premised on complaint that his mattress was uncomfortable).

2. Deliberate Indifference

Even if Plaintiff had established a "sufficiently serious" deprivation for purposes of the Eighth Amendment, I would find that he has not established that Defendants acted with deliberate indifference to Plaintiff's health or safety.

To the extent that Plaintiff alleges that any of the Defendants "knew" that Plaintiff would be assigned to an allegedly defective bunk (Bunk Number "OS-A1-20(b)" in Cell

"A1-20") *before* Plaintiff began his incarceration in the Greene C.F. SHU on September 6, 2002, I find that those allegations are wholly conclusory and without any evidentiary support whatsoever in the record. (Dkt. No. 5, ¶¶ 3 5, 37, 39, 43 [Am. Compl.].)

However, Plaintiff also asserts (rather conclusorily) that Defendants knew about the allegedly defective bunk *after* Plaintiff was assigned to it. [96] More specifically, Plaintiff submits testimony that (1) he orally complained to Defendant Woods about the bunk in question on or about September 27, 2002, (2) Plaintiff orally complained to Defendant Belarge about the bunk in question on September 18, 2002, and (3) Plaintiff orally complained to other corrections officers about the bunk in question at various other times. [97] Setting aside the lack of any testimony (of which I am aware) that Plaintiff ever orally complained to Defendants O'Donnell, Antontelli or Holt, there is a fatal flaw with Plaintiff's reliance on this evidence.

[96]    (Dkt. No. 5, ¶ 38 [Am. Compl.].)

[97]    *(See, e.g.,* Dkt. No. 42, Part 1, ¶ 15 [Plf.'s Response to Belarge Aff., swearing that he orally complained to Belarge about the bunk on September 18, 2002]; *compare* Dkt. No. 42, Part 1, ¶ 14 [Plf.'s Response to Woods Aff., swearing that his oral complaint to Woods was made on September 27, 2002] *with* Dkt. No. 42, Part 2 at 13 [Mem. of Law, arguing that his oral complaint to Woods was made on September 12, 2002].)

The problem is that, even if this evidence is true, there is no evidence that Defendants or *anyone* "ignored" Plaintiff's oral complaints. Indeed, the evidence shows that Plaintiff was assigned to the allegedly defective bunk bed for only about two weeks (between September 23, 2002, and October 7, 2002), and that he was then moved in response to his oral complaints. [98] Any assertion by Plaintiff that Defendants Woods and Belarge, upon hearing Plaintiff orally complain about the bunk, told Plaintiff to "[t]ell the officer about it" or "tell it to the officer on the unit" does not indicate deliberate indifference by supervisors such as Defendants Woods or Belarge, especially given that Plaintiff was subsequently then purposely assigned to a different bunk. [99]

[98]    (Dkt. No. 37, Part 8, ¶ 11 [Belarge Aff., identifying second bunk Plaintiff was assigned while in "S-Block" as Bunk Number "OS-A1-20(b)"]; Dkt. No. 42, ¶ 11 [Plf.'s Response to Belarge Aff., admitting that fact], ¶ 10(a) [swearing that he was assigned to the allegedly

"dilapidated" bunk in question on 9/23/02], ¶ 10(b) [swearing that, at 9:45 p.m. on or about 10/7/02-fourteen days after 9/23/02-he was purposely moved to a cell "with a better bunk," i.e., Cell "B2-40".) Any assertions by Plaintiff to the contrary are purely conclusory, self-contradictory, and frankly too incredible to be believed by reasonable minds. (Dkt. No. 5, ¶ 28 [Am. Compl., alleging conclusorily that his verbal complaints about his bunk bed "went unsolved"]; *compare* Dkt. No. 37, Part 23 at 58 [Munkowitz Decl., attaching transcript of Plaintiff's deposition testimony, in which Plaintiff testifies that he was assigned to the same bunk bed during his entire stay in SHU] *with* Dkt. No. 42, Part 1, ¶ 11 [Plf.'s Response to Belarge Aff., admitting that he served his time in SHU in four different cells], ¶ 10(a) [swearing that he was not assigned to the allegedly "dilapidated" bunk in question until 9/23/02, despite his admission to SHU on 9/6/02, and that it was the *third* such bunk to which he had been assigned in SHU], ¶ 10(b) [swearing that, at 9:45 p.m. on or about 10/7/02-fourteen days after 9/23/02-he was purposely moved to a cell "with a better bunk," i.e., Cell "B2-40".)

[99]    *(Compare* Dkt. No. 42, Part 1, ¶ 14 [Plf.'s Response to Woods Aff.] *and* Dkt. No. 42, Part 1, ¶ 15 [Plf.'s Response to Belarge Aff.] *with* Dkt. No. 42, Part 1, ¶ 10(c) [Plf.'s Response to Belarge Aff.].)

**\*14** In addition, the evidence shows that no one at Greene C.F. in any way interfered with the prompt and adequate medical care provided to Plaintiff regarding his back. Plaintiff acknowledges that his medical care at Greene C.F. included the following: (1) a CAT scan on October 17, 2002, and second CAT scan at some point between October 22, 2002, and December 11, 2002, (2) physical therapy on October 24, November 5, November 8, and November 18, 2002; (3) an MRI examination on January 10, 2003; and (4) being provided "pain killers" on September 13, 2002, five packets of Naproxen (500 mg. each) on December 11, 2002, and more "pain killers" on or after January 10, 2003, along with a back brace. [100]

[100]    (Dkt. No. 5, ¶¶ 26-33 [Am. Compl.].)

Finally, I note that the evidence shows that, on October 24, 2002, Greene C.F. officials shortened Plaintiff's stay in SHU 15 days (reducing his sentence in SHU from 90 days to 15 days). [101] Under the circumstances, I find that no reasonable fact-finder could conclude, based on the record before me, that Defendants acted with deliberate indifference to Plaintiff's health or safety

101    (See, supra, Statement of Fact No. 24.)

As a result, I recommend that the Court dismiss Plaintiff's Eighth Amendment claim.


D. Whether Plaintiff Has Failed to Exhaust His Available Administrative Remedies Regarding His Eighth Amendment Claim

In their memorandum of law, Defendants argue Plaintiff has failed to established that he exhausted his available administrative remedies regarding his Eighth Amendment claim because he acknowledges that he did not file a written administrative grievance with respect to the alleged condition of his bunk bed. (Dkt. No. 37, Part 25 at 11-13 [Defs.' Mem. of Law].) Liberally construed, Plaintiff's response papers argue that (1) no administrative remedy was available because a complaint about a defective bunk bed is not a grievable matter, (2) even if a complaint about a bunk bed were a grievable matter, he was misled by the Supervisor of the Inmate

Grievance Resolution Committee ("IGRC") into believing that the matter was not grievable, and (3) in any event, although he did not file a written grievance regarding his bunk, he filed several oral complaints regarding the bunk (i.e., to Defendant Woods, Defendant Belarge, the IGRC Supervisor, and various other corrections officers and/or sergeants). (Dkt. No. 42, Part 2 at 13-15 [Plf.'s Response].)

The Prison Litigation Reform Act of 1995 ("PLRA") requires that prisoners who bring suit in federal court must first exhaust their available administrative remedies: "No action shall be brought with respect to prison conditions under § 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e. The Department of Correctional Services ("DOCS") has available a well-established three-step grievance program:

> First, an inmate is to file a complaint with the Grievance Clerk. An inmate grievance resolution committee ("IGRC") representative has seven working days to informally resolve the issue. If there is no resolution, then the full IGRC conducts a hearing and documents the decision. Second, a grievant may appeal the IGRC decision to the superintendent, whose decision is documented. Third, a grievant may appeal to the central office review committee ("CORC"), which must render a decision within twenty working days of receiving the appeal, and this decision is documented.

*15  White v. The State of New York, 00-CV-3434, 2002 U.S. Dist. LEXIS 18791, at *6 (S.D.N.Y. Oct 3, 2002) (citing N.Y. Comp.Codes R. & Regs. Tit. 7, § 701.7). Generally, if a prisoner has failed to follow each of these steps prior to commencing litigation, he has failed to exhaust his administrative remedies. Rodriguez v. Hahn, 209 F.Supp.2d 344, 347-48 (S.D.N.Y.2002); Reyes v. Punzal, 206 F.Supp.2d 431, 433 (W.D.N.Y.2002).

However, the Second Circuit has recently held that a three-part inquiry is appropriate where a defendant contends that a prisoner has failed to exhaust his available administrative remedies, as required by the PLRA. See Hemphill v. State of New York, 380 F.3d 680, 686, 691 (2d Cir.2004). First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." Hemphill, 380 F.3d at 686 (citation omitted). Second, if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." Id. (citations omitted). Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." Id. (citations and internal quotations omitted).


1. Availability of Administrative Remedies

Plaintiff admits (repeatedly) that he filed no written grievance about his bunk bed. [102] He argues, however, that no written grievance could have been filed, because a defective bunk bed is not a grievable matter. In support of this argument, he offers only conclusory assertions, testimony containing (at best) inadmissible hearsay, and documents that are completely

2006 WL 1133247

immaterial to the fact in question.[103] Defendants, on the other hand, offer the affidavit of IGRC Supervisor Marilyn Berlin, who swears, *inter alia,* that "[c]omplaints about maintenance issues and cell conditions [such as defective bunk beds] are proper subjects of grievances." (Dkt. No. 48, Part 6, ¶ 3 [Berlin Aff.].) As a result, I must reject Plaintiff's unsupported assertion that a defective bunk bed is not grievable.

103    (Dkt. No. 37, Part 23 at 58, 61, 63, 65 [Munkowitz Decl., attaching transcript of Plaintiff's deposition].)

103    *(See, e.g.,* Dkt. No. 42, Part 2 at 13-15 [Plf.'s Response Mem. of Law, in which Plaintiff appears to argue-without any citation to evidence-that he orally complained about his bunk bed to an unidentified IGRC Supervisor, whom Plaintiff alleges orally informed him that a defective bunk bed is not a grievable matter]; Dkt. No. 37, Part 23 at 60, 63, 65 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, apparently alluding to the same hearsay remark by the IGRC Superintendent]; Dkt. No. 38, Part 4 at 50, 52, 54, 66 [Plf.'s Motion for Summary Judgment, attaching, as exhibits, documents regarding Plaintiff's grievance about the grounds for his disciplinary conviction and not his allegedly defective bunk bed].)

This does not end the inquiry, however, because "a remedy that prison officials prevent a prisoner from utilizing is not an 'available' remedy under [the Prison Litigation Reform Act]." *Miller v. Norris,* 247 F.3d 736, 740 (8th Cir.2001), *cited by Abney v. McGinnis,* 380 F.3d 663, 669 (2d Cir.2004) (holding that "[t]he defendants' failure to implement the multiple rulings in [plaintiff's] favor rendered administrative relief 'unavailable' under the PLRA."). More specifically, case law exists supporting the proposition that, assuming plaintiff was instructed by prison officials, contrary to prison regulations, that he could not file a grievance, *and plaintiff indeed did not initiate the grievance process by filing that grievance in reliance on that misrepresentation,* "the formal grievance proceeding required by [the prison grievance system] was never 'available' to [plaintiff] within the meaning of [the PLRA]." *See Brown v. Croak,* 312 F.3d 109, 112-113 (3d Cir.2002), *cited by Giano v. Goord,* 380 F.3d 670, 677 n. 6 (2d Cir.2004).

**\*16** Here, however, I can find absolutely no evidence in the record before me that IGRC Supervisor Berlin (or any prison official at Greene C.F.) at any time advised Plaintiff that a defective bunk bed is not a grievable matter. Again, in support of his argument that the IGRC made such a remark

to him, Plaintiff offers only vague testimony containing (at best) inadmissible hearsay, and documents that are immaterial to the fact in question.[104] Plaintiff's vague and conclusory argument is made even more incredible in light of IGRC Supervisor Berlin's sworn statement denying that Plaintiff ever orally complained to her about his (allegedly) defective bunk bed, or that she told him that the matter was not grievable.[105]

104    *(See, e.g.,* Dkt. No. 42, Part 2 at 13-15 [Plf.'s Response Mem. of Law]; Dkt. No. 37, Part 23 at 60, 63, 65 [Munkowitz Decl., attaching transcript of Plaintiff's deposition]; Dkt. No. 38, Part 4 at 50, 52, 54, 66 [Plf.'s Motion for Summary Judgment, attaching exhibits regarding a grievance about a different matter].)

105    (Dkt. No. 48, Part 6, ¶¶ 4-5, 8-11 [Berlin Aff.].)

### 2. Estoppel

Defendants have preserved their affirmative defense of non-exhaustion by raising it in their Answer. (Dkt. No. 17, ¶ 29 [Defs.' Answer] ) Moreover, no evidence (or even an argument) exists that any *Defendant* is estopped from raising this defense because of his or her actions inhibiting Plaintiff's exhaustion of remedies; Plaintiff merely argues that a non-party to this action (the IGRC Supervisor) advised him that his allegedly defective bunk bed was not a grievable matter.

### 3. "Special Circumstances" Justifying Failure to Exhaust

Finally, Plaintiff provides no evidence that "special circumstances" exist justifying his failure to exhaust his available administrative remedies. Plaintiff alleges that, on several occasions during the relevant time period, he made oral complaints about his allegedly defective bunk bed to various employees of Greene C.F., including Defendants Woods and Belarge. For the sake of argument, I will set aside the vagueness of this allegation, its incredibility given numerous other inconsistencies and improbabilities in Plaintiff's papers, and its total lack of support by any corroborating evidence. The problem with Plaintiff's reliance on this allegation is that, even if it were true, it would not justify Plaintiff's failure to file a written grievance about his bunk bed.

Plaintiff was 51 years old at the time of this incident; he had been incarcerated in several New York State correctional facilities before the incident; and he had even attended a year of law school.[106] He admits that, at the time of the incident,

he was familiar with the grievance process at Greene C.F. [107] Indeed, he had filed grievances immediately before and during this very time period. [108] Simply stated, it would have been unreasonable for Plaintiff to believe that he could fulfill the grievance requirement-which included a requirement that the IGRC's decision be appealed to the Greene C.F. Superintendent and then to CORC before exhaustion had occurred-by making some oral complaints to various passers by, whomever they might be.

[106]   (Dkt. No. 37, Part 23 at 6-11 [Munkowitz Decl., attaching transcript of Plaintiff's deposition]; Dkt. No. 38, Part 4 at 58 [Plf.'s Motion for Summary Judgment, attaching medical record showing his date of birth].)

[107]   (Dkt. No. 37, Part 23 at 59 [Munkowitz Decl., attaching transcript of Plaintiff's deposition].)

[108]   (Dkt. No. 38, Part 4 at 50 [Plf.'s Motion for Summary Judgment, attaching Plaintiff's grievance dated 9/18/02, about the grounds for his disciplinary conviction]; Dkt. No. 48, Part 7 [Defs. Reply, attaching grievance dated 8/7/02, about mail room, and appeal from decision regarding that grievance].)

As a result of Plaintiff's failure to exhaust his available administrative remedies, I recommend that his Eighth Amendment claim be dismissed.

E. Whether Plaintiff Has Failed to Establish (or Even State) a Fourteenth Amendment Due Process Claim

*17   In their memorandum of law, Defendants argue that Plaintiff's due process claim (which is based on the manner in which his disciplinary hearing was conducted, and which sought damages only and not injunctive relief) is not cognizable because a judgment in his favor would necessarily imply the invalidity of his disciplinary conviction (which resulted in a loss of good-time credits and thus affected the overall length of Plaintiff's confinement) and Plaintiff has not established that that conviction has been reversed, expunged, or invalidated. (Dkt. No. 37, Part 25 at 10-11 [Defs.' Mem. of Law, citing, *inter alia, Heck v. Humphrey,* 512 U .S. 477 (1994) and *Edwards v. Balisok,* 520 U.S. 641 (1997) ].) Liberally construed, Plaintiff's response papers argue (without any legal support) that, even though Plaintiff's loss of his good-time credits had not been invalidated on appeal, for Defendants to obtain summary judgment "they must prove their innocence beyond a shadow of a reasonable doubt," which (he argues) they have not done. (Dkt. No. 42, Part 2 at 10-13 [Plf.'s Response].)

I reject Plaintiff's argument, and specifically his proffered legal standard on this motion for summary judgment. Under the circumstances, Defendants have met their modest threshold burden with regard to this issue. [109] To avoid dismissal on summary judgment grounds, Plaintiff must introduce evidence raising a question of fact as to (1) whether or not his disciplinary conviction affected the overall length of Plaintiff's confinement by resulting in a loss of good-time credits or (2) whether or not his disciplinary conviction has been reversed, expunged, or invalidated. [110] He has not done so. Indeed, the evidence shows (and Plaintiff concedes) that (1) Plaintiff's disciplinary conviction affected the overall length of Plaintiff's confinement by resulting in a loss of good-time, and (2) his disciplinary conviction was not reversed, expunged, or invalidated. [111]

[109]   See *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-324 (1986); *Ciaprazi v. Goord,* 02-CV-0915, 2005 WL 3531464, at *8 (N .D.N.Y. Dec. 22, 2005) (Sharpe, J.) (adopting Report-Recommendation by Peebles, M.J.) ("[D]efendants' decision to rely ... upon the lack of evidentiary support for plaintiff's retaliation claims ... is sufficient to cast the burden upon the plaintiff to come forward with evidence demonstrating the existence of genuinely disputed material issues of fact at trial with regard to those claims.") [citations omitted].

[110]   See *Griffin v. Selsky,* 326 F.Supp.2d 429, 430 (W.D.N.Y.2004); *McNair v. Jones,* 01-CV03253, 2003 U.S. Dist. LEXIS 15825, at *7-8 (S.D.N.Y.2003); *Dawes v. Dibiase,* 91-CV-0479, 1997 WL 376043, at *7-8 (N.D.N.Y. July 3, 1997) (McAvoy, J.).

[111]   (See, e.g., Dkt. No. 5, ¶ 18 [Am. Compl., containing sworn allegation that Plaintiff was sentenced to three months loss of good-time credits]; Dkt. No. 42, Part 1 [Plf.'s Response to Belarge Aff., admitting Defendants' assertion that the discretionary review of Plaintiff's disciplinary sentence did not affect Plaintiff's loss of good-time credits]; Dkt. No. 38, Part 4 at 32 [Plf.'s Motion for Summary judgment, attaching disciplinary hearing decision, showing sentence imposed]; Dkt. No. 42, Part 2 at 13 [Plf.'s Response, arguing that "even though plaintiff's good time was not reversed, expunged, or declared invalid, that by itself does not make plaintiff's claims 'not cognizable'...."].)

As a result, I recommend that Plaintiff's Fourteenth Amendment due process claim be dismissed.

Smith v. Woods, Not Reported in F.Supp.2d (2006)

2006 WL 1133247

F. Whether Plaintiff Has Failed to Establish (or Even State) a Claim for Conspiracy

In their memorandum of law, Defendants argue that Plaintiff has failed to establish (or even state) a claim for conspiracy because (1) such a claim falls not under 42 U.S.C. § 1983 but 42 U.S.C. § 1985, which applies specifically to conspiracies, (2) to succeed on a conspiracy claim under 42 U.S.C. § 1985, Plaintiff must allege and show "a meeting of the minds," and (3) Plaintiff has not alleged and shown such a meeting of the minds but has offered mere speculative and conclusory allegations of conspiracy, *see, e.g.,* Dkt. No. 5, ¶¶ 21-22 (Am.Compl.). (Dkt. No. 37, Part 25 at 8-9 [Defs.' Mem. of Law].) Liberally construed, Plaintiff's response argues that the evidence does establish such a meeting of the minds because (1) in their affidavits, Defendants Woods, Antonelli, and Belarge all swear that they met to plan a strategy regarding Plaintiff, and (2) that strategy clearly violated DOCS' policies and procedures, which never involve a group of high-ranking officials (such as a deputy superintendent, captain, and sergeant) meeting to plan a strategy regarding an inmate, but which involve merely letting a disciplinary charge be filed and decided by a hearing officer. (Dkt. No. 42, Part 2 at 7-8 [Plf.'s Response].)

**\*18** I agree with Defendants largely for the reasons stated, and based upon the cases cited, in their memorandum of law. (Dkt. No. 37, Part 25 at 8-9 [Defs.' Mem. of Law].) Plaintiff's attempted conspiracy claim, which is asserted under 42 U.S.C. § 1983, should actually be asserted under 42 U.S.C. § 1985. *See Webb v. Goord,* 340 F.3d 105, 110 (2d. Cir.2003) (construing Section 1983 claim styled as "Conspiracy to Violate Civil Rights" as Section 1985 claim). To maintain an action under Section 1985, a plaintiff "must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Webb,* 340 F.3d at 110 [internal quotation marks and citations omitted]. Where a plaintiff does not provide such a factual basis, but only conclusory, vague or general allegations, such a conspiracy claim fails. *Id.* (dismissing conclusory allegation "that any such meeting of the minds occurred among any or all of the defendants"); *Boddie v. Schneider,* 105 F.3d 857, 862 (2d. Cir.1997) (dismissal of "conclusory, vague or general allegations of conspiracy to deprive a person of constitutional rights" is proper).

Here, Plaintiff's conspiracy claim is conclusory, vague and general. It is uncontroverted that, at some point between August 5, 2002, and August 31, 2002, a meeting took place between Defendant Woods and Defendant Belarge, and a meeting took place between Defendant Belarge and Defendant O'Donnell, and that the purpose of both meetings was to discuss Plaintiff. *(See, supra,* Statement of Fact Nos. 25-26.) The issue is whether the purpose of that meeting was "to achieve an unlawful end" or to simply investigate whether Plaintiff had violated prison rules.

Defendants offer evidence that the purpose of the meeting was to lawfully investigate Plaintiff, and Plaintiff has offered no *evidence* to the contrary. Plaintiff merely argues that DOCS' policies and procedures would *never* involve a group of high-ranking officials (such as a deputy superintendent, captain, and sergeant) meeting to discuss a Plaintiff. Even if Plaintiff had made this assertion in an affidavit or declaration rather than in a memorandum of law, I would have difficulty imagining how Plaintiff (despite his legal training and considerable experience as an inmate) could possibly have personal knowledge of such a fact. Furthermore, as a matter of common sense, it seems to me that where (as here) an inmate has made a mysterious representation to a deputy superintendent implying that he has possession of a deceased inmate's legal materials, it would be entirely conceivable (and appropriate) for the deputy superintendent to initiate an investigation of the matter, which investigation would involve lawful meetings with subordinates.

In any event, I need not base my recommendation on Plaintiff's lack of personal knowledge or on my common sense: the fact is that Plaintiff has adduced absolutely no evidence in support of his vague and conclusory allegation that Defendants Woods, Belarge and O'Donnell entered into an agreement to achieve an unlawful end. As a result, I recommend that the Court dismiss Plaintiff's conspiracy claim.

G. Whether Defendants Are Protected by Qualified Immunity

**\*19** In their memorandum of law, Defendants argue that they are entitled to qualified immunity because they could not have reasonably known that their conduct was in violation of a clearly established statutory or constitutional right. (Dkt. No. 37, Part 25 at 17 [Defs.' Mem. of Law].) Liberally construed, Plaintiff's response argues (without citing any evidence) that, under the circumstances, any reasonable person would have reasonably known that his conduct was violating Plaintiff's clearly established constitutional rights. (Dkt. No. 42, Part 2 at 15-17 [Plf.'s Response].)

2006 WL 1133247

Again, I must reject Plaintiff's conclusory argument. "Once qualified immunity is pleaded, plaintiff's complaint will be dismissed unless defendant's alleged conduct, when committed, violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Williams,* 781 F .2d at 322 (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 815 [1982] ). Regarding the issue of whether a particular right was *clearly established,* courts in this circuit consider three factors:

> (1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

*Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991) (citations omitted), cert. denied, 503 U.S. 962 (1992). [112] Regarding the issue of whether *a reasonable person would have known* he was violating such a clearly established right, this "objective reasonableness" [113] test is met if "officers of reasonable competence could disagree on [the legality of defendant's actions]." *Malley v. Briggs,* 475 U.S. 335, 341 (1986); *see also Malsh v. Correctional Officer Austin,* 901 F.Supp. 757, 764 (S.D.N.Y.1995) (citing cases); *Ramirez v. Holmes,* 921 F.Supp. 204, 211 (S.D.N.Y.1996). As the Supreme Court explained,

[112] *See also Calhoun v. N.Y.S. Div. of Parole,* 999 F.2d 647, 654 (2d Cir.1993); *Prue v. City of Syracuse,* 26 F.3d 14, 17-18 (2d Cir.1994).

[113] *See Anderson v. Creighton,* 107 S.Ct. 3034, 3038 (1987) ( "[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective reasonableness of the action.' ") (quoting *Harlow,* 457 U.S. at 819; *Benitez v. Wolff,* 985 F.2d 662, 666 (2d Cir.1993) (qualified immunity protects defendants "even where the rights were clearly established, if it was objectively reasonable for defendants to believe that their acts did not violate those rights").

[T]he qualified immunity defense ... provides ample protection to all but the plainly incompetent or those who knowingly violate the law.... Defendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity should be recognized.

*Malley,* 475 U.S. at 341. Furthermore, courts in the Second Circuit recognize that "the use of an 'objective reasonableness' standard permits qualified immunity claims to be decided as a matter of law." *Malsh,* 901 F.Supp. at 764 (citing *Cartier v. Lussier,* 955 F.2d 841, 844 [2d Cir.1992] [citing Supreme Court cases] ).

Here, based on my liberal construction of all of Plaintiff's motion papers and response papers, I will assume, for the sake of argument, that Plaintiff is claiming he had, among others, the following rights: (1) a right to have Defendant Holt take control of Inmate Alcivar's legal materials when Plaintiff offered those materials to Defendant Holt, and to later acknowledge his failure to take control of those materials; (2) a right to have Defendant Woods personally visit Plaintiff in his "cube," and not launch a disciplinary investigation against him, following Plaintiff's notes to Defendant Woods; (3) a right to have Defendants Belarge and O'Donnell not open or read Plaintiff's correspondence to and from Inmate Alcivar's two daughters, following Plaintiff's notes to Defendant Woods; (4) a right to have Defendant Antonelli recuse himself based on the (alleged) fact that Plaintiff and Defendant Antonelli, one week before the disciplinary hearing, had had an "encounter" regarding the conditions of the equipment in the prison mess hall; and (5) a right to be either transferred to a new cell in SHU, or provided with a new bunk bed in SHU, *immediately* upon making an oral complaint about his bunk bed to Defendants Woods, Belarge, O'Donnell, Antonelli and/or Holt (or upon the observations of that bunk bed by those Defendants).

**\*20** As an initial matter, it is unclear to me that any of these rights were "clearly established" in the summer and fall of 2002 (or are clearly established now). In any event, even if these rights were clearly established, it appears entirely reasonable to me for Defendants to have concluded that their treatment of Plaintiff did not violate these rights (or any rights). Simply stated, I can find no *evidence* in the record that Defendants Holt, Woods, Belarge, O'Donnell or Antonelli did anything wrong. At the very least, officers of reasonable competence could have disagreed as to the lawfulness of Defendants' actions..

As a result, even if the Court does not dismiss all of Plaintiff's claims for the reasons stated earlier in this Report-Recommendation, I recommend that the Court dismiss all of Plaintiff's claims based on qualified immunity.

H. Plaintiff's Motion for Partial Summary Judgment

Based on the above reasons, I find that Plaintiff's motion for partial summary judgment–which (at best) contains arguments regarding the issues discussed above–is without merit. I reach this conclusion for the independent reason that Plaintiff's Rule 7.1 Statement of Material Facts (Dkt. No. 38, Part 2) generally does not contain any citations to the record; and, to the extent that Rule 7.1 Statement does contain citations to the record, the record generally does not actually support the facts asserted. *See* N.D .N.Y. L.R. 7.1(a)(3) ( *"Failure of the moving party to submit an accurate and complete Statement of Material Facts shall result in a denial of the motion."*) [emphasis in original].

As a result, I recommend the denial of Plaintiff's motion for partial summary judgment.

**ACCORDINGLY,** it is

RECOMMENDED that Defendants' motion for summary judgment (Dkt. No. 37) be *GRANTED;* and it is further

RECOMMENDED that Plaintiff's motion for partial summary judgment (Dkt. No. 38) be *DENIED.*

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Svcs.,* 892 F.2d 15 [2d Cir.1989] ); 28 U.S.C. § 636(b); Fed.R.Civ.P. 6(a), 6(e), 72.

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 1133247

---

End of Document

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

1999 WL 983876
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Craig COLE, Plaintiff,
v.
Christopher P. ARTUZ, Superintendent, Green
Haven Correctional Facility, R. Pflueger, A.
Glemmon, Sgt. Stevens, Lt. Haubert, Capt.
W.M. Watford, Capt. T. Healey, and John
Doe # 1–5, all as individuals, Defendants.

No. 93 Civ. 5981(WHP) JCF.
|
Oct. 28, 1999.

**Attorneys and Law Firms**

Mr. Craig Cole, Bare Hill Correctional Facility, Malone, New York, Legal Mail, Plaintiff, pro se.

William Toran, Assistant Attorney General, Office of the Attorney General of the State of New York, New York, New York, for Defendant.

*MEMORANDUM & ORDER*

PAULEY, J.

 **\*1** The remaining defendant in this action, Correction Officer Richard Pflueger, having moved for an order, pursuant to Fed.R.Civ.P. 56, granting him summary judgment and dismissing the amended complaint, and United States Magistrate Judge James C. Francis IV having issued a report and recommendation, dated August 20, 1999, recommending that the motion be granted, and upon review of that report and recommendation together with plaintiff's letter to this Court, dated August 28, 1999, stating that plaintiff does "not contest the dismissal of this action", it is

ORDERED that the attached report and recommendation of United States Magistrate Judge James C. Francis IV, dated August 20, 1999, is adopted in its entirety; and it is further

ORDERED that defendant Pflueger's motion for summary judgment is granted, and the amended complaint is dismissed; and it is further

ORDERED that the Clerk of the Court shall enter judgment accordingly and close this case.

*REPORT AND RECOMMENDATION*

FRANCIS, Magistrate J.

The plaintiff, Craig Cole, an inmate at the Green Haven Correctional Facility, brings this action pursuant to 42 U.S.C. § 1983. Mr. Cole alleges that the defendant Richard Pflueger, a corrections officer, violated his First Amendment rights by refusing to allow him to attend religious services. The defendant now moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons set forth below, I recommend that the defendant's motion be granted.

*Background*

During the relevant time period, Mr. Cole was an inmate in the custody the New York State Department of Correctional Services ("DOCS"), incarcerated at the Green Haven Correctional Facility. (First Amended Complaint ("Am.Compl.") ¶ 3). From June 21, 1993 to July 15, 1993, the plaintiff was in keeplock because of an altercation with prison guards. (Am.Compl.¶¶ 17–25). An inmate in keeplock is confined to his cell for twenty-three hours a day with one hour for recreation. (Affidavit of Anthony Annucci dated Dec. 1, 1994 ¶ 5). Pursuant to DOCS policy, inmates in keeplock must apply for written permission to attend regularly scheduled religious services. (Reply Affidavit of George Schneider in Further Support of Defendants' Motion for Summary Judgment dated September 9, 1996 ("Schneider Aff.") ¶ 3). Permission is granted unless prison officials determine that the inmate's presence at the service would create a threat to the safety of employees or other inmates. (Schneider Aff. ¶ 3). The standard procedure at Green Haven is for the captain's office to review all requests by inmates in keeplock to attend religious services. (Schneider Aff. ¶ 3). Written approval is provided to the inmate if authorization is granted. (Affidavit of Richard Pflueger dated April 26, 1999 ("Pflueger Aff.") ¶ 5). The inmate must then present the appropriate form to the gate officer before being released to attend the services. (Pflueger Aff. ¶ 5).

 **\*2** On June 28, 1993, the plaintiff submitted a request to attend the Muslim services on July 2, 1993. (Request to Attend Scheduled Religious Services by Keep–Locked Inmate dated June 28, 1993 ("Request to Attend Services"),

attached as Exh. B to Schneider Aff.) On June 30, 1993, a supervisor identified as Captain Warford signed the request form, indicating that the plaintiff had received permission to attend the services. (Request to Attend Services). Shortly before 1:00 p m. on July 2, 1993, the plaintiff requested that Officer Pflueger, who was on duty at the gate, release him so that he could proceed to the Muslim services. (Pflueger Aff. ¶ 3). However, Officer Pflueger refused because Mr. Cole had not presented the required permission form. (Pflueger Aff. ¶ 3). The plaintiff admits that it is likely that he did not receive written approval until some time thereafter. (Deposition of Craig Cole dated February 28, 1999 at 33–35, 38).

On August 25, 1993, the plaintiff filed suit alleging that prison officials had violated his procedural due process rights. On December 4, 1995, the defendants moved for summary judgment. (Notice of Defendants' Motion for Summary Judgment dated December 4, 1995). The Honorable Kimba M. Wood, U.S.D.J., granted the motion and dismissed the complaint on the grounds that the plaintiff failed to show that he had been deprived of a protected liberty interest, but she granted the plaintiff leave to amend. (Order dated April 5, 1997). On May 30, 1997, the plaintiff filed an amended complaint, alleging five claims against several officials at the Green Haven Correctional Facility. (Am.Compl.) On November 16, 1998, Judge Wood dismissed all but one of these claims because the plaintiff had failed to state a cause of action or because the statute of limitations had elapsed. (Order dated Nov. 16, 1998). The plaintiff's sole remaining claim is that Officer Pflueger violated his First Amendment rights by denying him access to religious services on July 2, 1993. The defendant now moves for summary judgment on this issue, arguing that the plaintiff has presented no evidence that his First Amendment rights were violated. In addition, Officer Pflueger contends that he is entitled to qualified immunity. (Defendants' Memorandum of Law in Support of Their Second Motion for Summary Judgment).

A. *Standard for Summary Judgment*

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Tomka v. Seiler Corp.,* 66 F.3d 1295, 1304 (2d Cir.1995); *Richardson v. Selsky,* 5 F.3d 616, 621 (2d Cir.1993). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material

fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Where the movant meets that burden, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute concerning material facts. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). In assessing the record to determine whether there is a genuine issue of material fact, the court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party. *Anderson,* 477 U.S. at 255; *Vann v. City of New York,* 72 F.3d 1040, 1048–49 (2d Cir.1995). But the court must inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party" and grant summary judgment where the nonmovant's evidence is conclusory, speculative, or not significantly probative. *Anderson,* 477 U.S. at 249–50 (citation omitted). "The litigant opposing summary judgment may not rest upon mere conclusory allegations or denials, but must bring forward some affirmative indication that his version of relevant events is not fanciful." *Podell v. Citicorp Diners Club, Inc.,* 112 F.3d 98, 101 (2d Cir.1997) (citation and internal quotation omitted); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) (a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995) (nonmovant "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible") ((citations omitted)). In sum, if the court determines that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Matsushita Electric Industrial Co.,* 475 U.S. at 587 (quoting *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 288 (1968)); *Montana v. First Federal Savings & Loan Association,* 869 F.2d 100, 103 (2d Cir.1989).

**\*3** Where a litigant is *pro se,* his pleadings should be read liberally and interpreted "to raise the strongest arguments that they suggest." *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)). Nevertheless, proceeding *pro se* does not otherwise relieve a litigant from the usual requirements of summary judgment, and a *pro se* party's "bald assertion," unsupported by evidence, is not sufficient to overcome a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991); *Gittens v. Garlocks Sealing Technologies,* 19 F.Supp.2d 104, 110 (W.D.N.Y.1998); *Howard Johnson International, Inc. v. HBS Family, Inc.,* No. 96 Civ. 7687, 1998 WL 411334, at *3

(S.D .N.Y. July 22, 1998); *Kadosh v. TRW, Inc.,* No. 91 Civ. 5080, 1994 WL 681763, at *5 (S.D.N.Y. Dec. 5, 1994) ("the work product of *pro se* litigants should be generously and liberally construed, but [the *pro se′ *s] failure to allege either specific facts or particular laws that have been violated renders this attempt to oppose defendants' motion ineffectual"); *Stinson v. Sheriff's Department,* 499 F.Supp. 259, 262 (S.D.N.Y.1980) (holding that the liberal standard accorded to *pro se* pleadings "is not without limits, and all normal rules of pleading are not absolutely suspended").

**B.** *Constitutional Claim*

It is well established that prisoners have a constitutional right to participate in congregate religious services even when confined in keeplock. *Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993); *Young v. Coughlin,* 866 F.2d 567, 570 (2d Cir1989). However, this right is not absolute. *See Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990) (right to free exercise balanced against interests of prison officials). Prison officials can institute measures that limit the practice of religion under a "reasonableness" test that is less restrictive than that which is ordinarily applied to the alleged infringement of fundamental constitutional rights. *O'Lone v. Estate of Shaabazz,* 482 U.S. 342, 349 (1986). In *O'Lone,* the Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 349 (quoting *Turner v. Safley,* 482 U.S. 78, 89 (1987)). The evaluation of what is an appropriate and reasonable penological objective is left to the discretion of the administrative officers operating the prison. *O'Lone,* 482 U.S. at 349. Prison administrators are "accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish,* 441 U.S. 520, 547 (1979).

The policy at issue here satisfies the requirement that a limitation on an inmate's access to religious services be reasonable. The practice at Green Haven was to require inmates in keeplock to present written approval to the prison gate officer before being released to attend religious services. This policy both accommodates an inmate's right to practice religion and allows prison administrators to prevent individuals posing an active threat to security from being released. The procedure is not overbroad since it does not

permanently bar any inmate from attending religious services. Rather, each request is decided on a case-by-case basis by a high ranking prison official and denied only for good cause.

**\*4** Furthermore, in order to state a claim under § 1983, the plaintiff must demonstrate that the defendant acted with deliberate or callous indifference toward the plaintiff's fundamental rights. *See Davidson v. Cannon* 474 U.S. 344, 347–48 (1986) (plaintiff must show abusive conduct by government officials rather than mere negligence). Here, there is no evidence that the defendant was reckless or even negligent in his conduct toward the plaintiff or that he intended to violate the plaintiff's rights. Officer Pflueger's responsibility as a prison gate officer was simply to follow a previously instituted policy. His authority was limited to granting access to religious services to those inmates with the required written permission. Since Mr. Cole acknowledges that he did not present the necessary paperwork to Officer Pflueger on July 2, 1993, the defendant did nothing improper in denying him access to the religious services. Although it is unfortunate that the written approval apparently did not reach the plaintiff until after the services were over, his constitutional rights were not violated. [1]

[1]  In light of this finding, there is no need to consider the defendant's qualified immunity argument.

*Conclusion*

For the reasons set forth above, I recommend that the defendant's motion for summary judgment be granted and judgment be entered dismissing the complaint. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(e) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days to file written objections to this report and recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable William H. Pauley III, Room 234, 40 Foley Square, and to the Chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

Respectfully submitted,

**All Citations**

Not Reported in F.Supp.2d, 1999 WL 983876

**End of Document**  © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 624023
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Philip E. MODELLE and Oscar S. Grice, Plaintiffs,
v.
David FAURO, Sheriff; Mike Smith,
Major; and Kevin Laurin, Lt., Each
of Clinton County Jail, Defendants.

No. 9:08–CV–1042.
|
Feb. 18, 2010.

West KeySummary

**1** **Constitutional Law**
👉 Prisoners and Pretrial Detainees

**Prisons**
👉 Law Books, Law Libraries, and Legal
Materials

Prisoner who alleged that prison's law library
was unconstitutionally deficient still had a year
left before the statute of limitations had run for
his claim regarding allegedly inadequate prison
medical care for a hand injury. Prisoner had also
been transferred to a penal institution with a well-
equipped law library. Therefore, prisoner was
not injured by any deficiencies in prison's law
library, as required to sustain his claim for denial
of access to the courts.

Cases that cite this headnote

**Attorneys and Law Firms**

Philip E. Modelle, Malone, NY, pro se.

Oscar S. Grice, Attica, NY, pro se.

Murphy, Burns, Barber & Murphy, LLP, Thomas K. Murphy,
Esq., of Counsel, Albany, NY, for Defendants.

*DECISION and ORDER*

DAVID N. HURD, District Judge.

**\*1** Plaintiffs, Philip E. Modelle and Oscar S. Grice, brought
this civil rights action in September 2008, pursuant to 42
U.S.C. § 1983. By Report–Recommendation dated January
27, 2010, George H. Lowe, United States Magistrate Judge,
recommended that defendants' motion for summary judgment
(Docket No. 61) be granted; and plaintiff Modelle's motion for
summary judgment (Docket No. 38) be denied. Only plaintiff
Modelle filed objections to the Report–Recommendation.

Based upon a de novo review of the entire file, including the
portions of the Report–Recommendation to which plaintiff
Modelle objected, and the recommendations of magistrate
Judge Lowe, the Report–Recommendation is accepted and
adopted in all respects. *See* 28 U.S.C. 636(b)(1).

Accordingly, it is

ORDERED that

1. Defendants' motion for summary judgment (Docket No.
   61) is GRANTED;

2. Plaintiff Modelle's motion for summary judgment
   (Docket No. 38) is DENIED;

3. The Clerk is directed to file judgment accordingly and
   close the file.

IT IS SO ORDERED.

*REPORT–RECOMMENDATION*

GEORGE H. LOWE, United States Magistrate Judge.

This *pro se* prisoner civil rights action, commenced pursuant
to 42 U.S.C. § 1983, has been referred to me for Report and
Recommendation by the Honorable David N. Hurd, United
States District Judge, pursuant to 28 U.S.C. § 636(b) and
Local Rule 72.3(c). Plaintiffs Philip E. Modelle and Oscar
S. Grice allege that Defendants David Fauro, Mike Smith,
and Kevin Laurin violated their constitutional rights by failing
to provide an adequate law library at the Clinton County
Jail, recording telephone calls between inmates and their
attorneys, and failing to process and respond to Plaintiffs'

Case 9:17-cv-01349-DNH-TWD    Document 62    Filed 07/22/19    Page 47 of 129
Modelle v. Fauro, Not Reported in F.Supp.2d (2010)
2010 WL 624023

grievances. Currently pending before the Court are two
motions for summary judgment pursuant to Federal Rule of
Civil Procedure 56, one filed by Defendants (Dkt. No. 61) and
the other by Plaintiff Philip Modelle (Dkt. No. 38). For the
reasons that follow, I recommend that Defendants' motion be
granted and Plaintiff Modelle's motion be denied.

## I. LEGAL STANDARD GOVERNING MOTIONS FOR SUMMARY JUDGMENT

Under Federal Rule of Civil Procedure 56, summary
judgment is warranted if "the pleadings, depositions, answers
to interrogatories, and admissions on file, together with the
affidavits, if any, show that there is no genuine issue as
to any material fact and that the moving party is entitled
to a judgment as a matter of law." Fed.R.Civ.P. 56(c).
The party moving for summary judgment bears the initial
burden of showing, through the production of admissible
evidence, that no genuine issue of material fact exists.
*Major League Baseball Properties, Inc. v. Salvino,* 542
F.3d 290, 309 (2d Cir.2008). Where the nonmovant will
bear the burden of proof at trial, "the movant may show
prima facie entitlement to summary judgment in one of two
ways: (1) the movant may point to evidence that negates
its opponent's claims or (2) the movant may identify those
portions of its opponent's evidence that demonstrate the
absence of a genuine issue of material fact, a tactic that
requires identifying evidentiary insufficiency and not simply
denying the opponent's pleadings." *Salahuddin v. Goord,* 467
F.3d 263, 272–73 (2d Cir.2006). Only after the moving party
has met this burden is the nonmovant required to produce
evidence demonstrating that genuine issues of material fact
exist. *Id.* The nonmovant must do more than "rest upon
the mere allegations ... of the [plaintiff's] pleading" or
"simply show that there is some metaphysical doubt as to
the material facts." [1] Rather, "[a] dispute regarding a material
fact is *genuine* if the evidence is such that a reasonable
jury could return a verdict for the nonmoving party." [2] In
determining whether a genuine issue of material [3] fact exists,
the Court must resolve all ambiguities and draw all reasonable
inferences against the moving party. [4]

[1]    *Matsushita,* 475 U.S. at 585–86; *Anderson v. Liberty
       Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91
       L.Ed.2d 202 (1986); *see also* Fed.R.Civ.P. 56(e) ("When
       a motion for summary judgment is made [by a defendant]
       and supported as provided in this rule, the [plaintiff] may

not rest upon the mere allegations ... of the [plaintiff's]
pleading ....").

[2]    *Ross v. McGinnis,* 00–CV–0275, 2004 WL 1125177,
       at *8 (W.D.N.Y. Mar.29, 2004) [internal quotations
       omitted] [emphasis added].

[3]    A fact is "material" only if it would have some effect on
       the outcome of the suit. *Anderson v. Liberty Lobby,* 477
       U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

[4]    *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d
       Cir.1997) [citation omitted]; *Thompson v. Gjivoje,* 896
       F.2d 716, 720 (2d Cir.1990) [citation omitted].

## II. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### A. Claims Regarding the Adequacy of the Law Library

***2** Plaintiffs allege that the law library at the Clinton
County Jail was constitutionally deficient. (Compl.¶ II(D).)
Specifically, they allege that the jail's library failed to comply
with New York state regulations or federal constitutional
standards because it did not contain Shepard's Citations,
Federal Reporters, Supreme Court Reporters, pocket parts for
volumes of the New York Penal Law, Federal form books,
treatises on constitutional law, treatises on 42 U.S.C. § 1983,
manuals on how to conduct legal research, or the Blue Book.
(Modelle Dep. 40:16–43:4, May 1, 2009 ("Modelle Dep.");
Grice Dep. 19:24–21:6, May 27, 2009 ("Grice Dep.").)
Defendants argue that Plaintiffs' claims must be dismissed
because neither Plaintiff Modelle nor Plaintiff Grice suffered
any injury. (Memo. of Law in Supp. of Defs.' Mot. for Summ.
J., Dkt. No. 61–12 ("Defs.' Br.") at 1–4.) Defendants are
correct.

It is well settled that inmates have a First Amendment right
to "petition the Government for a redress of grievances."
U.S. Const. amend. I. This right, which is more informally
referred to as a "right of access to the courts," requires
States "to give prisoners a reasonably adequate opportunity
to present claimed violations of fundamental constitutional
rights." *Bounds v. Smith,* 430 U.S. 817, 828, 97 S.Ct. 1491,
52 L.Ed.2d 72 (1977), *modified on other grounds, Lewis v.
Casey,* 518 U.S. 343, 350, 116 S.Ct. 2174, 135 L.Ed.2d 606
(1996); *see also Bourdon v. Loughren,* 386 F.2d 88, 92 (2d
Cir.2004) (citations omitted). "However, this right is not 'an
abstract, freestanding right to a law library or legal assistance'
and cannot ground a Section 1983 claim without a showing
of 'actual injury.' " *Collins v. Goord,* 438 F.Supp.2d 399, 415

WESTLAW    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

(S.D.N.Y.2006) (quoting *Lewis v. Casey,* 518 U.S. 343, 351, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996)). As a result, to state a claim for denial of access to the courts, a plaintiff must assert non-conclusory allegations demonstrating both (1) that the defendant acted deliberately and maliciously, and (2) that the plaintiff suffered an actual injury. *Lewis,* 518 U.S. at 353; *Howard v. Leonardo,* 845 F.Supp. 943, 946 (N.D.N.Y.1994) (Hurd, M.J.).

Plaintiff Modelle alleges that the deficiencies in the facility's law library impeded him from pursuing a civil rights claim regarding medical care. (Modelle Dep. 16:19–17:20, 18:21–19:18, 21:9–17, 29:3–9.) Any deficiencies in the facility's law library did not impede Plaintiff Modelle from pursuing the claim. The serious medical need to which he alleges officials were deliberately indifferent was a hand injury that he incurred in January 2008. (Modelle Dep. 28:4.) "The applicable statute of limitations for § 1983 actions arising in New York requires claims to be brought within three years." *Pinaud v. County of Suffolk,* 52 F.3d 113, 1156 (2d Cir.1995) (citations omitted); *see also Connolly v. McCall,* 254 F.3d 36, 40–41 (2d Cir.2001). The statute of limitations on Plaintiff Modelle's § 1983 claim will not, therefore, expire until January 2011 [5]. Plaintiff Modelle thus has a year left in which to file such an action. He is no longer housed in the Clinton County Jail, with its allegedly deficient law library. Rather, he is currently housed at Upstate Correctional Facility, part of the New York Department of Correctional Services ("DOCS"). Plaintiff Modelle admits that "all of DOCS law libraries are well equipped." (Modelle Dep. 29:15–16.) Plaintiff Modelle, therefore, was not injured by any deficiencies in the Clinton County Jail's law library.

[5]   Plaintiff Modelle asserts in opposition to Defendants' motion for summary judgment that "his claims [a]re now barred by the statute of limitations." (Dkt. No. 63 at 3.) While any state tort claim Plaintiff may have had is now, absent some exception, barred by the statute of limitations (*Lieber v. Village of Spring Valley,* 40 F.Supp.2d 525, 533 (S.D.N.Y.1999) (collecting cases)), the statute of limitations on a federal civil rights action has not yet run.

**\*3**  Plaintiff Grice alleges that deficiencies in the facility's law library impeded him from defending himself in criminal proceedings, from appealing his conviction, and from pursuing a civil rights claim regarding medical care. (Grice Dep. 17:4–18:21, 26:7–11.) Any deficiencies in the facility's law library did not impede Plaintiff Grice from litigating these actions. Plaintiff Grice was represented by counsel in his criminal case and appeal. (Grice Dep. 8:4–9:20.) "The Second Circuit has held that the right of access to courts is not infringed where prisoners are not supplied with an adequate prison library, so long as they were provided with appointed counsel ." *Benjamin v. Kerik,* 102 F.Supp.2d 157, 163–64 (S.D.N.Y.2000) (citing *Spates v. Manson,* 644 F.2d 80, 84–85 (2d Cir.1981)). The medical incident about which Plaintiff Grice wanted to file a § 1983 action occurred in early 2008. (Grice Dep. 26:17–22.) The statute of limitations will therefore not expire until early 2011. Plaintiff Grice was still housed at the Clinton County Jail when a new legal research computer system that he characterized as "absolutely" adequate was installed in the fall of 2008. (Grice Dep. 15:17–16:9.) He is now housed in the DOCS system, where he has access to a full law library. He could thus still file a § 1983 action regarding medical treatment. Therefore, Plaintiff Grice was not injured by any deficiencies in the Clinton County Jail's law library. Accordingly, I recommend that Defendants' motion for summary judgment be granted as to Plaintiffs' claims regarding the adequacy of the Clinton County Jail's law library.

**B. Claims Regarding the Recording of Telephone Calls**
During the time that Plaintiffs were incarcerated at the Clinton County Jail, the facility recorded many telephone calls that inmates placed. The telephone system advised inmates via a recorded statement that any telephone calls they placed could be recorded. To proceed with the telephone call, the inmate was required to press "1" to indicate his consent to being recorded. (Stmt. of Material Facts ¶ 13, Dkt. No. 61–3.) In addition to the recorded statement, a sign near the telephone advised inmates that calls would be recorded. *Id.* ¶ 14. Telephone calls to attorneys were not exempted from the facility's policy. Plaintiffs allege that Defendants violated their constitutional rights by recording conversations between Clinton County Jail inmates and their attorneys. (Compl.¶ II(D).)

Plaintiffs' allegations regarding the recording of telephone calls implicate the First Amendment right of access to the courts; Title III of the Omnibus Crime Control and Safe Streets Act of 1968, as amended, 18 U.S.C. §§ 2510–2522 ("the Wiretap Act"); and the Fourth Amendment. Defendants move for summary judgment dismissing this claim, addressing only the access to the courts implications. (Defs.' Br. at 4–5.)

1. *Access to the Courts*

Defendants argue that any access to the courts claim arising from the recording of telephone calls from Plaintiffs to their attorneys should be dismissed. (Defs.' Br. at 4–5.) Defendants are correct.

**\*4** Before proceeding to the legal analysis of Plaintiffs' claim, I note that the facility's practice of recording telephone calls from inmates to their attorneys is disturbing. "Attorney-client communications have a special status in our legal system; their confidential nature is protected by the attorney-client privilege. The oldest privilege for confidential communications recognized by law, the attorney-client privilege is intended to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observations of law and the administration of justice." *Lonegan v. Hasty,* 436 F.Supp.2d 419, 434 (E.D.N.Y.2006). The facility's practice of recording all telephone calls, regardless of whether or not they are placed to an attorney, compromises the attorney-client privilege. *Contrast* 28 C.F.R. § 540.102 (2010) (Bureau of Prisons regulation prohibiting staff from monitoring "an inmate's properly placed call to an attorney"). I am not alone in my concern. The State Commission of Correction, upon reviewing a grievance by Plaintiff Grice regarding the facility's practice, "voted to accept [the] grievance ... and ... directed the facility to provide the Citizens' Policy and Complaint Review Council a plan of action to eliminate this practice." (Dkt. No. 72 at 29.) The fact that the facility's practice is disturbing, however, does not necessarily mean that Plaintiffs have a valid constitutional claim.

The right of access to the courts, discussed above, includes the right to seek and receive the assistance of attorneys. *See Procunier v. Martinez,* 416 U.S. 396, 419, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974), *partially overruled on other grounds by Thornburgh v. Abbott,* 490 U.S. 401, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989). The Constitution requires only that inmates' access to counsel be "reasonable." *Smith v. O'Connor,* 901 F.Supp. 644, 648 (S.D.N.Y.1995). A prison regulation or policy that implicates a constitutional right is reasonable if (1) there is a valid, rational connection between the policy and the legitimate governmental interest put forward to justify it; (2) other means of exercising the right remain open to inmates; (3) accommodating the prisoner's right will have a significant ripple effect on fellow inmates or on prison staff; and (4) ready alternatives are not available. *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). The burden is on the inmate to show that the challenged regulation is unreasonable. *Covino v. Patrissi,* 967

F.2d 73, 79 (2d Cir.1992). Because the burden is ultimately on Plaintiffs to show that the recording of telephone calls from inmates to their attorneys is unreasonable, Defendants are entitled to summary judgment if they: (1) point to evidence that negates Plaintiffs' claim that the practice is unreasonable or (2) identify those portions of Plaintiffs' evidence that demonstrate the absence of a genuine issue of material fact, a tactic that requires identifying evidentiary insufficiency and not simply denying Plaintiffs' pleadings. *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). Defendants have attempted to point to evidence that negates Plaintiffs' claim.

**\*5** Defendants' moving papers do not cite *Turner.* However, Defendants advance arguments that address the first two *Turner* factors. Regarding the first *Turner* factor (whether there is a valid, rational connection between the policy and the legitimate governmental interest put forward to justify it), Defendants' moving papers assert, without citation to evidence, that recording all outgoing telephone calls by inmates is part of "maintaining the level of security necessary in a jail facility."[6] (Defs.' Br. at 5.) Regarding the second *Turner* factor, (whether other means of exercising the right remain open to inmates), Defendants assert that "[P]laintiffs ... had reasonable access to their counsel. Plaintiffs had unlimited ability to write letters to their attorneys. Further, if an attorney called the facility to speak with an inmate client, that call could be taken by the inmate on an unrecorded line." *Id.* Defendants' memorandum of law does not cite any evidence supporting this assertion. Defendants' Statement of Material Facts does not include any facts about inmates' unlimited ability to write letters to counsel. Thus, Defendants have not supplied the Court with any evidence of this alleged alternate method of providing Plaintiffs with unrecorded access to counsel. Regarding the other alleged alternate method, Defendants' Statement of Material Facts states that "Plaintiff Grice knew that if his lawyer called in to the Clinton County Jail he would be allowed to receive that call on a different telephone line that was not recorded." (Stmt. of Materials Facts ¶ 16.) For this proposition, Defendants cite Plaintiff Grice's deposition. The cited portion of the deposition states:

[6]     Defendants were granted an extension of the dispositive motion deadline in order to obtain an affidavit from Defendant Laurin in support of the motion for summary judgment. (Dkt. No. 59.) As Plaintiff Modelle notes (Dkt. No. 64), no such affidavit accompanied Defendants' motion. It is not clear whether the proposed affidavit would have addressed security issues.

Q: Did you ever ask the staff to use a telephone that wasn't recorded?

A: Absolutely.

Q: Who did you ask?

A: I spoke to Sergeant Perrin and I believe Sergeant or Lieutenant Laurin.

Q: What did they tell you?

A: That they don't do that; that my lawyer can call in.

Q: So your lawyer could call in to the facility?

A: That's what they said, but—

Q: On a different line?

A: Yeah.

Q: All right. Then you could then be called to that line to talk with them, correct?

A: Yeah, that's what they said.

Q: Did you ever do that?

A: Have my lawyer call?

Q: Yes.

A: I asked him to but he never did.

Q: He didn't, okay. Did you ever see any other inmates use that system?

A: No.

(Grice Dep. 28:12–29:10.) This evidence does not directly support Defendants' assertion that inmates could receive unrecorded telephone calls from their attorneys.[7] I therefore find that Defendants have not met their burden of pointing to evidence that negates Plaintiffs' claim that the Clinton County Jail's practice of recording telephone calls from inmates to their attorneys is unreasonable.

[7]    In an affidavit filed in opposition to Defendants' motion for summary judgment, Plaintiff Grice disputes the fact that inmates at the facility are allowed to receive unrecorded telephone calls from their attorneys. He states that "this was the procedure before the jail was remodeled [and] now there are no phones set aside ... If

counsel calls the jail, officials would only tell Plaintiff to call attorney." (Dkt. No. 72 at 4, 10.)

Defendants, however, are entitled to summary judgment because neither Plaintiff Modelle nor Plaintiff Grice suffered any actual injury as a result of the recording of their telephone calls to their attorneys. In fact, Plaintiff Modelle explicitly testified at his deposition that he does not claim that he was injured by having his calls monitored. (Modelle Dep.59:16–18.) Plaintiff Grice suffered no actual injury, either. He testified at his deposition that he believed that the District Attorney might use recordings of telephone calls he made to non-attorney friends and associates against him, but that the recordings were not admitted at trial. (Grice Dep. 32:8–24.) Regarding telephone calls to his attorney, he testified that the facility was "I believe listening to my phone calls from my lawyer which I never received a recording of that. I can't really say, but they had to have listened ... I believe it was used in the strategy of my case." (Grice Dep. 34:7–14.) Grice does not point to any evidence supporting this belief. Therefore, I recommend that the Court dismiss Plaintiffs' access to courts claim regarding the recording of telephone calls from inmates to their attorneys.

### 2. *Wiretap Act*

**\*6** Plaintiffs' claims regarding the recording of telephone calls implicates the Wiretap Act, 18 U.S.C. § 2510–2522. Defendants have not addressed this claim. I shall do so *sua sponte.*

With certain exceptions, the Wiretap Act prohibits the intentional interception of wire, oral, and electronic communications unless specifically authorized by a court order. *See* 18 U.S.C. § 2510–22. The Wiretap Act authorizes a private right of action for any person whose wire, oral, or electronic communication is intercepted in violation of the Act. 18 U.S.C. § 2520 (2000); *Lonegan,* 436 F.Supp.2d at 427–28.

Interceptions of wire, oral, and electronic communications without a court order are not prohibited when the interceptor is "acting under color of law" and "one of the parties to the communication has given prior consent to such interception." 18 U.S.C. § 2511(2)(c). Here, Plaintiffs consented to having their telephone calls recorded in two ways. First, they impliedly consented by placing telephone calls after being advised by a sign posted near the telephones that calls would be recorded. (Stmt. of Material Facts ¶ 14; Plaintiff Grice's Response at 4; *United States v. Amen,* 831 F.2d 373, 379 (2d

Modelle v. Fauro, Not Reported in F.Supp.2d (2010)

2010 WL 624023

Cir.1987); *United States v. Willoughby,* 860 F.2d 15, 19–20 (2d Cir.1988); *United States v. Workman,* 80 F.3d 688, 693 (2d Cir.1996).)[8] Second, they explicitly consented by pressing "1" to indicate consent before placing their calls. (Stmt. of Material Facts ¶ 13.) Therefore, the recording of the calls did not violate the Wiretap Act and I recommend that the Court dismiss this claim.

[8]    *Amen, Willoughby,* and *Workman* did not involve calls between inmates and their attorneys. *Amen* and *Willoughby* involved the recording of telephone calls between inmates and non-attorneys at a federal facility. As noted above, a Bureau of Prisons regulations prohibits the recording of "properly placed" calls to attorneys. While this factual distinction is relevant to the access to courts analysis, it has no bearing on the topic of consent.

### 3. *Fourth Amendment*

Plaintiffs' claims regarding the recording of telephone calls implicate the Fourth Amendment. Defendants have not addressed this claim. I shall do so *sua sponte.*

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." The Fourth Amendment "governs not only the seizure of tangible items, but extends as well to the recording of oral statements." *Katz v. United States,* 389 U.S. 347, 353, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). The Fourth Amendment applies to recordings if (1) the plaintiff has exhibited an actual, subjective expectation of privacy; and (2) that expectation is reasonable. *Id.* at 361 (Harlan, J., concurring); *Smith v. Maryland,* 442 U.S. 735, 740, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979). If these elements are established and the Fourth Amendment applies, the court must determine whether the seizure was reasonable. Warrantless electronic surveillance is presumed unreasonable. *Katz,* 389 U.S. at 359.

Here, the Fourth Amendment does not apply. Neither Plaintiff Modelle nor Plaintiff Grice had an actual, subjective expectation of privacy in their telephone calls to their attorneys. As discussed above, signs near the telephones advised them that calls would be recorded. Plaintiffs consented to the recording of their calls by pressing "1" when prompted to do so. Plaintiff Modelle testified at his deposition that he knew that his calls might be monitored, that he consented to the procedure, and that he knew he had no privacy in the call. (Modelle Dep. 56:14–57:5.) Plaintiff Grice testified at his deposition that he knew his calls were being

recorded and that he explained to his attorney that the calls were recorded. (Grice Dep. 27:11–28:10.) *Cf. Lonegan,* 436 F.Supp.2d 419 (attorneys had actual expectation of privacy in personal visits with inmates where officers told attorneys that conversations were not being recorded). Therefore, I recommend that the Court dismiss this claim.

### C. Claims Regarding Grievances

**\*7** Plaintiffs allege that Defendants violated their civil rights because "[t]he grievance coordinator, Lt. Laurin, ignored all of the grievances sent to him from the plaintiffs, even though statutes dictate that he answer in 5 days." (Compl. at 3.) Defendants argue that this claim should be dismissed because inmates do not have a constitutional right to have grievances processed properly. (Defs.' Br. at 6.) Defendants are correct.

The First Amendment protects a prisoner's right to meaningful access to the courts and to petition the government for the redress of grievances. *See Bill Johnson's Rest., Inc. v. NLRB,* 461 U.S. 731, 741, 103 S.Ct. 2161, 76 L.Ed.2d 277 (1983). However, inmate grievance programs created by state law are not required by the Constitution and consequently allegations that prison officials violated those procedures does not give rise to a cognizable § 1983 claim. *Cancel v. Goord,* No. 00 Civ.2042, 2001 WL 303713, \*3 (S.D.N.Y. Mar. 29, 2001). If prison officials ignore a grievance that raises constitutional claims, an inmate can directly petition the government for redress of that claim. *See Flick v. Alba,* 932 F.2d 728, 729 (8th Cir.1991). "Therefore, the refusal to process an inmate's grievance or failure to see to it that grievances are properly processed does not create a claim under § 1983." *Cancel,* 2001 WL 303713, at \*3; *see also Torres v. Mazzuca,* 246 F.Supp.2d 334, 342 (S.D.N.Y.2003); *Mahotep v. DeLuca,* 3 F.Supp.2d 385, 390 (W.D.N.Y.1998).

*Shell v. Brzezniak,* 365 F.Supp.2d 362, 369–370 (W.D.N.Y.2005). Therefore, I recommend that the Court grant Defendants' motion for summary judgment and dismiss this claim.

### D. Plaintiff Modelle's Request for Further Discovery

Plaintiff Modelle argues that Defendants' motion should be denied in order for him to conduct further discovery. (Dkt. No. 63 at 4.) Further discovery would not help Plaintiffs' case. Plaintiffs do not dispute that they were represented by counsel in their criminal proceedings, the dates of the

2010 WL 624023

allegedly unconstitutional medical care, or that they were aware that their telephone calls were being recorded and that they consented to the recording. Therefore, I recommend that the Court deny Plaintiff Modelle's request for denial of Defendants' motion so that he can conduct further discovery.

### III. PLAINTIFF MODELLE'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Modelle moves for summary judgment. (Dkt. No. 38.) He argues that he is entitled to judgment as a matter of law on his claims. As discussed above, Defendants are entitled to judgment as a matter of law. Moreover, to the extent that Plaintiff Modelle argues in his motion for summary judgment that Defendants violated his Eighth Amendment rights by failing to properly treat his hand injury, that claim is not properly before the Court at this time because it was not raised in the complaint. Therefore, I recommend that the Court deny Plaintiff Modelle's motion for summary judgment.

**\*8  ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 61) be ***GRANTED*** and Plaintiff Modelle's motion for summary judgment (Dkt. No. 38) be ***DENIED.***

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

### All Citations

Not Reported in F.Supp.2d, 2010 WL 624023

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 5750998
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

John SUGGS, Andre Lane, Richard
Rosado, and Ryan Przesiek, Plaintiffs,
v.
Dr. Terri MAXYMILLIAN, Jeff Nowicki,
Peter Russell, and Ann Sullivan, Defendants.

No. 9:13–CV–359 (NAM/TWD).
|
Signed Sept. 30, 2015.

**Attorneys and Law Firms**

Bond, Schoeneck & King, PLLC, George H. Lowe, Esq., of
counsel, Syracuse, NY, for Plaintiffs.

Hon. Eric T. Schneiderman, Attorney General of the State of
New York, Christopher W. Hall, Esq., Assistant New York
State Attorney, Albany, NY, for Defendants.

**MEMORANDUM–DECISION AND ORDER**

Hon. NORMAN A. MORDUE, Senior District Judge.

**\*1** Plaintiffs filed a *pro se* complaint on April 1, 2013.
On March 28, 2014, United States Magistrate Judge Thérèse
Wiley Dancks granted plaintiffs' request for appointment of
counsel and stayed the remaining pretrial deadlines pending
further order. On September 2, 2014, Magistrate Judge
Dancks appointed Bond, Schoeneck & King, PLLC, as *pro
bono* counsel for plaintiffs. On December 5, 2014, defendants
made the instant motion (Dkt. No. 37) for summary judgment.
On July 24, 2015, plaintiffs moved (Dkt. No. 51) for leave to
file a first amended complaint.

Upon referral pursuant to 28 U.S.C. § 636(b)(1)(B) and
Local Rule 72.3(c), United States Magistrate Judge Thérèse
Wiley Dancks issued a Report and Recommendation (Dkt.
No. 58) recommending that plaintiffs' motion for leave to file
a first amended complaint be granted; that a new discovery
scheduling order be issued; that defendants' motion for
summary judgment be denied without prejudice to refiling
after the conclusion of discovery; and that Clerk be directed
to correct the docket to reflect changes in the parties. [1]

1    The changes in the parties are reflected in the caption of
     the proposed first amended complaint (Dkt. No. 51) and
     in this Memorandum–Decision and Order.

Objections to the Report and Recommendation were due on
or before October 1, 2015. Defendants filed their objection
on September 28, 2015. Plaintiffs' counsel has informed
the Court that he does not intend to submit anything
further. Therefore, the Court proceeds to address the Report
and Recommendation and defendants' objections thereto.
Pursuant to 28 U.S.C. § 636(b)(1)(C), this Court conducts *de
novo* review.

Defendants oppose amendment of the complaint primarily
on the ground of futility. The Court finds, however, as does
Magistrate Judge Dancks, that plaintiffs have adequately
shown that there are triable issues of fact regarding the
claims in the proposed first amended complaint, and that
plaintiffs are entitled to counseled discovery. On *de novo*
review of Magistrate Judge Dancks' thorough Report and
Recommendation, defendants' objection thereto, and the
papers underlying both pending motions, the Court accepts
the Report and Recommendation.

It is therefore

ORDERED that the United States Magistrate Judge Thérèse
Wiley Dancks' Report and Recommendation (Dkt. No. 58) is
accepted in its entirety; and it is further

ORDERED that plaintiffs' motion for leave to file a first
amended complaint (Dkt. No. 51) is granted; and it is further

ORDERED that the Clerk's Office is directed to file plaintiffs'
proposed first amended complaint (Dkt. No. 51–2, pp. 4–13)
as the first amended complaint herein, and that it become the
operative pleading in the case; and it is further

ORDERED that a new discovery schedule be agreed upon
with Magistrate Judge Dancks; and it is further

ORDERED that defendants' motion for summary judgment
(Dkt. No. 37) is denied; and it is further

ORDERED that the Clerk's Office is directed to correct the
docket to show the substitution of Peter Russell, currently the
Acting Executive Director of CNYPC, for former Executive
Director Maureen Bosco, as a defendant in the case; the
substitution of Ann Sullivan, currently the Commissioner of

the New York Office of Mental Health, for former Acting Commissioner of the New York Office of Mental Health Kristin Woodlock, as a defendant in the case; and the termination of Raymond Lagree as a plaintiff in the case.

**\*2** IT IS SO ORDERED.

### REPORT–RECOMMENDATION

THÉRÈSE WILEY DANCKS, United States Magistrate Judge.

Plaintiffs John Suggs ("Suggs"), Andre Lane ("Lane"), Richard Rosado ("Rosado"), Raymond Lagree ("Lagree"), and Ryan Przesiek ("Przesiek"), all of whom have been involuntarily confined in the Sex Offender Treatment Program ("SOTP") at the Central New York Psychiatric Center ("CNYPC") pursuant to Article 10 of the New York State Mental Health Law ("MHL"), commenced this civil rights action seeking injunctive and declaratory relief under 42 U.S.C. § 1983.[1] Dr. Terri Maxymillian ("Maxymillian"), Director of the SOTP; Jeffrey Nowicki ("Nowicki"), Chief of Mental Health Treatment Services for the SOTP at CNYPC; Maureen Bosco ("Bosco"), former Executive Director at CNYPC; and Kristin Woodlock ("Woodlock"), former Acting Commissioner of the New York Office of Mental Health ("OMH") were named as original Defendants.[2] In their pro se complaint, filed on April 1, 2013, Plaintiffs claim that their constitutional rights are being violated with regard to the denial of access to the courts, their conditions of confinement, and the free expression of their religious beliefs. (Dkt. No. 1.)

[1]     Michael Hogan ("Hogan"), former Commissioner of the New York State Office of Mental Health, was originally named as a defendant. (Dkt. No. 1 at 4.) The action was dismissed on Eleventh Amendment grounds as against the now retired Hogan by the Hon. Norman A. Mordue, Senior United States District Judge, in a Decision and Order dated June 20, 2013. (Dkt. No. 8.)

[2]     The Court takes judicial notice that Peter Russell ("Russell") is currently the Acting Executive Director of CNYPC, and Ann Sullivan, M.D. ("Sullivan") is currently the Commissioner of the New York OMH. See ht tps://www.omh.ny.gov/omhweb/aboutomh/omh_facility html (last visited September 11, 2015). Under Federal Rule of Civil Procedure 25(d), a public "officer's successor is automatically substituted as a party" when an "officer who is a party in an

official capacity ... ceases to hold office while the action is pending." Because Plaintiffs are seeking declaratory and injunctive relief against Defendants in their official capacities in this lawsuit, Russell and Sullivan, have been substituted for Bosco and Woodlock as defendants, respectively, and will be treated as defendants for purposes of this Order and Report–Recommendation. Russell and Sullivan have also been substituted as defendants in the proposed first amended complaint. (*See* Dkt. Nos. 51–2 at 1–2; 52–2 at 4–6.)

## I. PROCEDURAL BACKGROUND

Plaintiffs moved for appointment of counsel at the time they filed the complaint, and the Court denied the motion without prejudice on June 6, 2013. (Dkt. Nos. 7 and 8.) Defendants answered the complaint on August 16, 2013 (Dkt. No. 17), and the Court issued a Mandatory Pretrial Discovery and Scheduling Order ("Scheduling Order") on August 19, 2013. (Dkt. No. 19.) The Scheduling Order directed that discovery be completed by December 16, 2013, and that dispositive motions be filed by March 17, 2014. *Id.*

Plaintiffs filed a second application for appointment of counsel on August 27, 2013. (Dkt. No. 20.) In the application, Suggs stated that Plaintiffs were unable to prepare an adequate defense without access to a law library where they could properly research the law to respond to motions and court orders. *Id.* at ¶ B. Suggs referenced the Scheduling Order and explained that Plaintiffs were at a big disadvantage in meeting the court imposed deadlines because they did not have access to the documents they needed, which were in Defendants' possession, and they did not have access to a copier. *Id.* at ¶ B 1–2. According to Suggs, Plaintiffs were not allowed to come together for legal discussions on the case because they were in separate buildings, and that in addition to having no access to a law library, they were not allowed access to a computer to research the law and prepare legal motions. *Id.* at ¶ B 3–4.

Suggs explained in his application that Plaintiffs had requested help from Mental Hygiene Legal Service ("MHLS") and been told that MHLS was not allowed to assist in the civil action that the only matters they could assist in were those under Article 10 of the MHL. *Id.* at ¶ C. According to Suggs, Plaintiffs did not have funds to pay for a lawyer. *Id.* Suggs requested that if the Court did not feel it necessary to appoint counsel, it order in the alternative that Defendants allow Plaintiffs access to one another and access to a law library or a computer on which they could do legal research.[3] *Id.* at ¶ D.

3      See *Pollack v. Holanchock,* No. 10 CV 2402(RPP), 2011
       WL 4867558, at *2, [no LEXIS citation] (S.D.N.Y.
       Oct. 13, 2011) (finding that the Mid–Hudson Psychiatric
       Center, a secure adult forensic psychiatric inpatient
       facility, had eliminated its law library, and the MHLS did
       not represent the plaintiff in his denial of access to court
       litigation, the district court ordered, as temporary relief,
       that the plaintiff be provided with free internet access of
       Findlaw and Wikipedia Legal Research, as well as access
       to fax, and incoming and outgoing legal correspondence
       to conduct the ongoing litigations to which he was a
       party).

**\*3** Defendants filed a memorandum of law in opposition to
Plaintiffs' application on September 11, 2013. (Dkt. No. 22.)
Defendants argued that: (1) the Court was without jurisdiction
to grant the alternative relief requested by Plaintiffs, i.e.
access to one another and to a law library or computerized
legal research, because CNYPC was a nonparty state agency
entitled to Eleventh Amendment protection, *id.* at 3–4;
(2) the request that Plaintiffs be allowed access to one
another without staff oversight lacked merit because it would
seriously interfere with the day-to-day operation of the
facility and violate policies designed to maintain a safe and
therapeutic environment, *id.* at 4–5; (3) MHL § 47.03, which
specifically references MHL Article 9 but makes no reference
to Article 10, "appeared" to authorize MHLS to provide
legal services to Plaintiffs in this action, *id.* at 5; and (4)
allowing Plaintiffs access to a computer to do legal research
was contrary to CNYPC policy because in the past when
CNYPC attempted to implement a computer laboratory, some
residents made improper use of the computers, resulting in the
decision that residents would generally not be allowed access
to computers. *Id.* at 6–7.

The Court granted Plaintiffs' request for appointment of
counsel by Decision and Order filed on March 28, 2014. (Dkt.
No. 31.) In that Order, the Court also stayed the remaining
pretrial deadlines pending further order. *Id.* By Order of
September 2, 2014, the Court appointed the law firm of Bond,
Schoeneck & King, PLLC, as pro bono counsel for Plaintiffs
in the action. (Dkt. No. 33.) Approximately three months
after appointment of pro bono counsel, Defendants moved for
summary judgment. [4] (Dkt. No. 37.) Plaintiffs filed papers
in opposition to Defendants' motion (Dkt. No. 39), to which
Defendants replied. (Dkt. No. 40.) Plaintiffs' request to fde a
sur-reply was granted. (Dkt.Nos.41, 42.)

4      During a telephone conference with the Court on October
       2, 2014, Defense counsel stated that Federal Rule of

Civil Procedure 26 disclosures were complete and all
discovery had been provided to Plaintiffs. Pro bono
counsel for Plaintiffs indicated at that time that Plaintiffs
needed no further discovery from Defendants before the
filing of dispositive motions. A deadline of December 5,
2014, was set for dispositive motions. (Dkt., October 2,
2014, Text Order .)

Before filing the sur-reply, Plaintiffs' pro bono counsel
requested additional time to file an amended complaint
alleging unconstitutional conditions of confinement, a denial
of access to the courts claim regarding the lack of a law
library, and a religious freedom claim. [5] (Dkt. No. 43.)
Plaintiffs have now moved for leave to file a first amended
complaint (Dkt. No. 51) and have filed their sur-reply to
Defendants' motion for summary judgment. (Dkt. No. 52.)
Defendants have opposed Plaintiffs' motion for leave to file
their proposed first amended complaint on futility grounds.
(Dkt. No. 53.) Plaintiffs have filed a sur-reply in support of
their motion to amend. (Dkt. No. 57.)

5      During a March 20, 2015, status conference call with the
       Court, counsel were directed to discuss whether the case
       would go forward with an amended complaint, or the
       parties would stipulate to discontinue the action without
       prejudice and Plaintiffs would bring a new action. (Dkt.,
       March 20, 2015, Text Minute Entry). The case was
       stayed until June 18, 2015. *Id.* During a June 18, 2015,
       status conference call, Plaintiffs' counsel reported that
       after discussion, the case would move forward with an
       amended complaint (Dkt., June 18, 2015, Text Minute
       Entry) and by Text Order, dated June 18, 2015, the Court
       granted Plaintiffs' request to move for leave to file an
       amended complaint (Dkt. No. 43), and again granted
       permission to file a surreply to Defendants' summary
       judgment motion. (Dkt., June 18, 2015, Text Order.)

Both motions are presently before the Court. For reasons
explained below, the Court recommends that Plaintiffs'
motion for leave to file their first amended complaint be
granted and that Defendants' motion for summary judgment
be denied without prejudice to refiling after the conclusion of
discovery.

## II. PLAINTIFFS' PRO SE COMPLAINT

**\*4** Plaintiff Suggs has been confined at CNYPC since
September 9, 2009; Plaintiff Lane since August 25, 2006;
Plaintiff Rosado since February 28, 2008; and Plaintiff
Przesiek since December 13, 2006. [6] (Dkt. No. 1–2.) The
allegations in Plaintiffs' pro se complaint (Dkt. No. 1)
challenge the conditions of their confinement in CNYPC as

violative of their due process rights under the Fourteenth Amendment, the denial of their right of access to court as violative of their First Amendment rights, and the denial of their First Amendment right to religious expression.

<sup>6</sup> In his Affirmation dated July 24, 2015 (Dkt. No. 51–2 at 1), pro bono counsel George H. Lowe, Esq. has stated upon information and belief that Plaintiff Lagree, who had been confined at CNYPC June 2, 2011, has been released from commitment. Lagree has not been included as a plaintiff in Plaintiff's proposed first amended complaint. (Dkt. No. 52–2 at 4.)

## A. Conditions of Confinement

### 1. *Restraints Used During Transport*
According to Plaintiffs, when they are taken outside of the facility, they are handcuffed with a Department of Corrections black box, waist chains, leg shackles, and a short chain between the black box and leg shackles. (Dkt. No. 1 at 5–6.)

### 2. *Communications*
Plaintiffs allege that they are not allowed to watch local news on television or to possess or read any news publication from within sixty-five miles of CNYPC. (Dkt. No. 1 at 6.) In addition, they are not allowed to possess or read the *New York Daily News,* the *New York Post,* the *New York City Village Voice,* or the *New York City Islamic News. Id.* at 5–6.

### 3. *Personal Electronic Devices*
Plaintiffs claim that they are not allowed to possess personal televisions, phones, computers/laptops, MP3 players, and CDs, DVDs and their players. (Dkt. No. 1 at 6.)

### 4. *Visitation*
Plaintiffs allege that visitors must call and request permission to visit them; can visit only on Saturdays regardless of the visitor's schedule; and cannot bring food into CNYPC or send food packages. (Dkt. No. 1 at 7.) Plaintiffs further allege that visits are denied/prohibited by the Treatment Team Leader without proper authorization by the treating doctor; visitation privileges are taken away for non-compliance with the program; and Plaintiffs are pat frisked before visits and strip searched after visits. *Id.* at 6.

### 5. *Safety of Conditions*

Plaintiffs claim that they are deprived of the right to safe conditions that are free of physical and mental abuse and physical and chemical restraint, as well as the right to voice concerns without retribution. (Dkt. No. 1 at 7.) They complain of Secure Care Treatment Assistants being given "carte blanche" to punish using physical restraints and the Treatment Team depriving Plaintiffs of their constitutional rights without due process; searches without probable cause; arbitrary on the spot rules and rule changes by Secure Care Treatment Assistant II's to accommodate staff whims or moods; making Plaintiffs compliant through fear of physical abuse; and lack of ventilation and air-conditioning. *Id.* at 8.

### 6. *Equal Protection*
Plaintiffs allege they are being denied equal protection by not being allowed personal typewriters, musical instruments, or bed clothes; not being allowed to work; having free access to the dayroom, sleeping room, gym/activity center, drinking cups, books for entertainment, education and religious practices, and radios considered "privileges" that can be taken away as punishment; being denied/deprived of anything and everything for not participating in treatment; being denied advancement in treatment for not taking responsibility for unsubstantiated, uncharged, dismissed, vacated, and overturned crimes and convictions; being denied access to programs for not admitting to something not in the official record; having fewer rights as an involuntarily committed resident of CNYPC than as an inmate in the Department of Corrections and Community Supervision ("DOCCS") system; and being discriminated against by not having equal protection with regard to religious practice. (Dkt. No. 1 at 8–9.)

### 7. *No Board of Visitors Consisting of Staff and Non–Staff*
**\*5** According to Plaintiffs, CNYPC should have a Board of Visitors consisting of staff and non-staff members, one of whom should be a resident's family member. (Dkt. No. 1 at 9.)

## B. Denial of Access to Court
Plaintiffs also allege in their pro se complaint that they do not have access to a law library, they must use their own funds, stamps, and phone minutes to contact MHLS attorneys or private attorneys; MHLS attorneys were stripped of their ability to enter the building at will and can only see clients once a week and only by pre-scheduling with administration in writing; and when attorneys call, they are not allowed to speak to Plaintiffs if they are not on the ward. (Dkt. No. 1 at 7.)

Case 9:17-cv-01349-DNH-TWD    Document 62    Filed 07/22/19    Page 57 of 129
Suggs v. Maximilian, Not Reported in F.Supp.3d (2015)
2015 WL 5750998

## III. PLAINTIFFS' COUNSELED FIRST AMENDED COMPLAINT

As noted above, Plaintiffs, through their pro bono counsel, have moved to file a first amended complaint. The proposed first amended complaint (Dkt. No. 52–2 at 4–13) includes a claim for denial of access to the courts in violation of Plaintiffs First and Fourteenth Amendment rights, a number of conditions of confinement claims alleging the violation of their Fourteenth Amendment right to due process, and a First Amendment free exercise of religion claim.

### A. Denial of Access to the Courts

Both Plaintiffs' pro se complaint and proposed first amended complaint include claims for the denial of access to the courts. (Dkt. No. 52–2 at ¶ 10.) The denial of access to court claim asserted in the proposed first amended complaint, while also alleging denial of a law library, provides significantly more factual detail regarding the unavailability of MHLS attorneys to assist Plaintiffs in pursuing their conditions of confinement claims. Plaintiffs allege that they sought the assistance of MHLS attorneys with regard to their conditions of confinement claims and that, upon information and belief, those attorneys were unable to assist them because of other responsibilities and obligations *Id* . at ¶ 11. The allegation in the proposed first amended complaint is in accord with the statement in Suggs' application for appointment of counsel that MHLS was not allowed to assist in the civil action. (Dkt. No. 20 at C.)

According to Plaintiffs proposed first amended complaint, during the time they were seeking the assistance of MHLS attorneys, MHLS had a staff of approximately 35 attorneys, including management, who were to advise and represent inpatients at 193 different hospitals, developmental facilities, and other facilities spanning twenty counties in upstate New York. (Dkt. No. 52–2 at 12 and pp. 15–24.) Plaintiffs allege, upon information and belief, that since the enactment of the New York Sex Offender Management and Treatment Act in March 2007, MHLS attorneys have devoted much of their time to the Act's procedures aimed at confining persons who are believed to be "sex offenders requiring civil commitment," as codified in MHL Article 10, at the expense of MHLS' other work, and resulting in a drain on MHLS' resources. *Id.* at ¶ 13. Plaintiffs assert that given the unavailability of MHLS attorneys and Defendants' knowing and deliberate failure to provide a law library, they have been denied access to the courts during their involuntary

commitment in violation of their rights under the First and Fourteenth Amendments. *Id.* at ¶¶ 11, 14.

### B. Conditions of Confinement Claims

**\*6** Plaintiffs proposed first amended complaint, as with their pro se complaint, contains a number of claims regarding conditions of confinement which Plaintiffs contend constitute a punitive system of detention in violation of the due process clause of the Fourteenth Amendment. (*See generally* Dkt. No. 52–2.)

#### 1. *Failure to Provide Treatment*

Plaintiffs proposed Amended Complaint includes a claim for failure to provide treatment at CNYPC. (Dkt. No. 52–2 at ¶¶ 15–17.) Plaintiffs claim that they spend no more than six or seven hours per week in "treatment," that the treatment staff is not qualified to treat sex offenders, and that Plaintiffs remain in the same treatment phase for years, during which time the substance of the treatment program is basically recycled. *Id.*

#### 2. *Failure to Provide Training*

Plaintiffs allege that while in SOTP, assignments to facility employment opportunities are severely limited, and that Plaintiffs are provided with no vocational training, which was available to them while they were incarcerated in the DOCCS system. (Dkt. No. 52–2 at ¶¶ 18–19.) As a result of the lack of access to employment and vocational training, Plaintiffs are left wholly unprepared for re-entry into society, should they at some point be released from CNYPC. *Id.* at ¶ 20.

#### 3. *Lack of Access to Media*

Plaintiffs claim that during their involuntary confinement at CNYPC, they are prohibited by Defendants from having access to personal television sets and other electronic devices they were allowed to own and use while incarcerated in the DOCCS system. (Dkt. No. 52–2 at ¶ 21.) In addition, Plaintiffs allege that in the DOCCS system, they were allowed to subscribe to and possess a wide range of printed material, including books, magazines, and newspapers. *Id.* at ¶ 22. At CNYPC, on the other hand, Defendants have allegedly imposed punitive and arbitrary restrictions on Plaintiffs' access to mainstream printed materials, including, among others, the *New York Post,* the *New York Daily News,* the *New York Islamic News, Esquire, Field & Stream, Flex, Men's Fitness, Rob Report, Rolling Stone, Sportsman Guide, Men's Health, Computer Gamer, Gentlemen's Quarterly, Go*

*NYC, Democrat Chronicle, Maxim, Low Rider, Jet, ESPNThe Body Issue, Tattoo Life, Hunting Illustrated, Game Informer, National Geographic, North American Hunter, Rides, Cosmo, Vanity Fair, National Enquirer, Old Cars, Outdoor Life, Auto Trader,* and *Auto Locator. Id.* at ¶ 22.

Plaintiffs further claim that Defendants have adopted and enforced a policy that denies all persons confined at CNYPC access to local news programming and newspapers published within a 65 mile radius of CNYPC restrictions that were not applied to Plaintiffs while they were incarcerated in the DOCCS system. *Id.* at ¶ 23.

Plaintiffs contend that although there were some restrictions on their access to movies, computers/laptops, videos, MP3 players, CDs, and DVDs while they were confined in the DOCCS system, Defendants' policies and rules at CNYPC are more severely restrictive. *Id.* at ¶ 24.

#### 4. *Defendants' Visitor Program*

**\*7** Plaintiffs allege that visitation at CNYPC is more restrictive than when they were incarcerated in the DOCCS system and is, in fact, so restrictive as to be punitive. (Dkt. No. 52–2 at 25.) At CNYPC, visitors must contact a facility official seven days in advance to make visitation arrangements and be placed on the scheduled visitor list. *Id.* In addition, in Building 39 where Plaintiff Rosado is housed, visitation is allowed only on Saturdays from 9:45am to 2:45pm, and visitors are not allowed to bring in food. *Id.*

#### 5. *Use of Punitive Physical Restraints*

Plaintiffs claim, as they did in their pro se complaint, that when they are taken outside of CNYPC, they are placed in extremely painful, punitive restraints, including the "black prison box" and waist chains, often for an extended period of time. (Dkt. No. 52–2 at 26.) In their proposed first amended complaint, Plaintiff also allege, upon information and belief, that such painful restraints are not used at the St. Lawrence County Psychiatric Center and Manhattan Psychiatric Center where persons in SOTPs are committed, or at local and county jails. *Id.*

#### 6. *Arbitrary, Capricious and Punitive Privileging System*

Plaintiffs challenge the CNYPC policy implementing a "privileging" system. (Dkt. No. 52–2 at 27.) The policy states:

> Privileges are explicit rewards that are afforded based upon positive conduct and attitudes as well as overall clinical progress in the program. Negative consequences are prescribed for behaviors and attitudes that violate the rules of the program or that persistently fail to meet community expectations.

*Id.* Plaintiffs contend that having been involuntarily committed to CNYPC by a court following the completion of their prison sentence, they have to be there, but they should not have to endure "negative consequences" based upon whether or not they are perceived to have exhibited "positive conduct and attitudes" or to be making "clinical progress in the program," or to be "persistently fail [ing] to meet community expectations." *Id.* at 28. Plaintiffs allege that Defendants' practice of imposing "negative consequences" for minor infractions is, in practice, "arbitrary, capricious and unconstitutionally punitive." *Id.* at 29.

### C. Inadequate Accommodation of Plaintiffs' Religious Practices

Plaintiffs Rosado and Suggs also claim that their rights under the Free Exercise Clause of the First Amendment are being violated. (Dkt. No. 52–2 at 45.) Rosado alleges that he is a follower of Neopaganism, and that there is no spiritual leader available and he is not allowed to practice the traditions of his religion at CNYPC. *Id.* at ¶ 30. Suggs alleges that he is a Muslim who follows the traditions of Islam, and that he has limited access to an Imam, to an appropriate location for worship, and to Islamic media at CNYPC. *Id.* at 31.

### D. Relief Requested

As with Plaintiffs' pro se complaint, the proposed first amended complaint seeks declaratory and injunctive relief. (Dkt. No. 52–2 at 12.) More specifically, Plaintiffs demand judgment: (1) declaring that Defendants' policies and actions, as described in the proposed amended complaint, are in violation of Plaintiffs' constitutional rights; (2) enjoining Defendants and their agents and employees from enforcing the unconstitutional policies and from continuing to engage in the unconstitutional actions described in the proposed first

amended complaint; and (3) directing Defendants to establish a law library that is accessible to Plaintiffs at CNYPC. *Id.*

**\*8** Plaintiffs, as in their pro se complaint, have included no claim for compensatory damages in their proposed first amended complaint. *Id.* They have, however, added a claim for attorneys fees and costs pursuant to 42 U.S.C. § 1988. *Id.*

### IV. ANALYSIS

Now before the Court are Defendants' motion for summary judgment and Plaintiffs' motion for leave to amend their complaint. (Dkt. Nos. 37 and 51.)

#### A. Legal Standard for Motion to Amend

Under Federal Rule of Civil Procedure 15(a), leave to amend a complaint should be "freely" granted "when justice so requires." Fed.R.Civ.P. 15(a). A motion to amend should not be denied unless there is evidence of undue delay, bad faith, prejudice to the non-movant, or futility. *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). The decision to grant or deny a motion to amend is within the sound discretion of the district court. *Id.* A *pro se* complaint "should not [be] dismiss[ed] without [the Court] granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Chavis v. Chappius,* 618 F.3d 162, 170 (2d Cir.2010) (quoting *Branum v. Clark,* 927 F.2d 698, 705 (2d Cir.1991).

Defendants have opposed Plaintiffs' motion for leave to amend on futility grounds. (Dkt. No. 53.) The clearly articulated Second Circuit standard applicable to a determination of whether leave to amend should be denied on the basis of futility is: "An amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6)." *Lucente v. Int'l Bus. Machs. Corp.,* 310 F.3d 243, 258 (2d Cir.2002). However, the Second Circuit has applied a different rule where a cross-motion to amend the complaint is made in response to a motion for summary judgment, "and the parties have fully briefed the issue whether the proposed amended complaint could raise a genuine issue of fact and have presented all relevant evidence in support of their positions." *Milanese v. Rust–Oleum Corp.,* 244 F.3d 104,

110 (2d Cir.2001). In that case, "even if the amended complaint would state a valid claim on its face, the court may deny the amendment as futile when the evidence in support of the plaintiff's proposed new claim creates no triable issue

of fact and the defendants would be entitled to judgment as a matter of law under Fed.R.Civ.P. 56(c)." *Id.*

#### B. Plaintiffs' Motion for Leave to Amend and Federal Rule of Civil Procedure Rule 56(d) Affirmation

The Court finds that the history of this litigation has substantial relevance in the consideration of the standard to be applied with regard to Plaintiffs' motion for leave to amend in that it reveals that Plaintiffs are greatly disadvantaged in "present[ing] all relevant evidence in support of their position[ ]" in opposition to Defendants' summary judgment motion as a result of the lack of pre-motion counseled discovery. *Milanese,* 244 F.3d at 110.

**\*9** Defendants' opposition to Plaintiffs' motion on futility grounds relies in part upon the Court's October 2, 2014, Text Order, which indicates Defendants had complied with the Court's mandatory disclosure order, and pro bono counsel had "advise[d] the Court that plaintiffs need no other discovery from defendants before filing of motions." (Dkt. No. 53 at 3.) However, in his Federal Rule of Civil Procedure 56(d) [7] Affirmation requesting an order denying Defendants' \* 1 summary judgment motion and scheduling a Rule 16 conference, Plaintiffs' pro bono counsel explained the reasoning behind his initial agreement to move forward with dispositive motions only three months after being appointed and with no further discovery:

[7]    Fed.R.Civ.P. 56(d), formerly subdivision 56(f), provides that:

> If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:
> (1) defer considering the motion or deny it;
> (2) allow time to obtain affidavits or declarations or to take discovery; or
> (3) issue any other appropriate order.

5. As a practical matter, there has been little discovery in this case. (Pursuant to the Court's mandatory disclosure order, the defendants previously produced the exhibits attached to the Nowicki affidavit.) Despite this, I agreed with defendants' counsel that a prompt summary judgment motion would be appropriate. Text Minute Entry, 10/2/14. I saw no reason to waste everyone's time on discovery if *undisputed* facts and the applicable law made it clear that plaintiffs could not state a meritorious cause of action. But I did not foresee the Nowicki affidavit.
(Dkt. No. 39–1 at ¶ 5.)

Pro bono counsel elaborated, noting that the Nowicki Affidavit was silent with respect to who created the CNYPC policies and procedures; how it was done; the professional literature, studies, research, and data considered; and whether less restrictive conditions of confinement were considered. *Id.* at ¶ 6. Defendants, according to Plaintiffs' counsel, argued in totally conclusory fashion and with no factual basis, that the CNYPC conditions of confinement "result from policies formulated by mental health professionals" and "are the product of *appropriate* professional judgment." *Id.* Nowicki's Reply Affidavit provides additional information regarding his qualifications, time spent consulting with experts in the field, and the individuals involved in the creation of the policies submitted in support of Defendants' motion for summary judgment. (Dkt. No. 40–1.) However, the information Nowicki has elected to include in his Reply Affidavit is no substitute for counseled discovery from Nowicki and the other Defendants, or from nonparties identified in the Nowicki Reply Affidavit, with regard to the creation, implementation, and enforcement of the policies and procedures complained of by Plaintiffs, as well as any monitoring of their effectiveness.

A nonmoving party should not be "railroaded" into his offer of proof on a summary judgment motion. *See Trebor Sportswear Co., Inc. v. The Limited Stores, Inc.,* 865 F.2d 506, 511 (2d Cir.1989) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 326, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). The nonmoving party must have "had the opportunity to discover information that is essential to his opposition" to the motion for summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 n. 5, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Rule 56(d) "is a safeguard against premature grants of summary judgment and should be applied with a spirit of liberality." *Holmes v. Lorch,* 329 F.Supp.2d 516, 529 (S.D.N.Y.2004); *DelphiDelco Electronics Systems v. M/V NEDLLOYD EUROPA,* 324 F.Supp.2d 403, 417–18 (S.D.N.Y.2004) ( Rule 56(d) "is an important safeguard against improvident or premature motions for summary judgment, courts generally avoid overly technical rulings under this subdivision and apply it with a spirit of liberality.") (citation and internal quotation marks omitted). The grant of relief pursuant to Rule 56(d) is within the discretion of the court. *See United States v. Private Sanitation Indus. Ass'n Nassau/Suffolk, Inc.,* 995 F.2d 375, 377 (2d Cir.1993).

**\*10** Given the absence of counseled discovery in this case, Plaintiffs' Rule 56(d) Affirmation in opposition to Defendants' summary judgment motion, and, as discussed below, Plaintiffs' lack of access to a law library, computerized legal research, and assistance from MHLS, the Court concludes that the Second Circuit rule applied in *Lucente,* 310 F.3d at 58, rather than the rule in *Milanese,* 244 F.3d at 110, should be applied in assessing Defendants' argument that Plaintiffs' motion for leave to amend their complaint is futile. However, as discussed below, the Court finds that even if the District Court concludes that the *Milanese* rule must be applied, despite the absence of counseled discovery pre-summary judgment and Plaintiffs' Rule 56(d) request, Plaintiffs have adequately shown that there are triable issues of fact with regard to claims asserted in their proposed first amended complaint.

### C. Denial of Access to the Courts Claim in Plaintiffs' Proposed First Amended Complaint

It is well-established that prisoners have a constitutional right to access the courts. *Bounds v. Smith,* 430 U.S. 817, 821, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977). "Undeniably[,] the civilly committed patients [at CNYPC], like convicted inmates, enjoy a First Amendment right of meaningful access to the courts." *McChesney v. Hogan,* No. 9:08–CV–0163 (FJS/DEP), 2010 WL 3602660, at *12, 2010 U.S. Dist. LEXIS 92948, at *37 (N.D.N.Y. Aug.17, 2010) (citing *Lane v. Carpinello,* No. 9:07–cv–751 (GLS/DEP), 2009 WL 3074344, at * 24, 2009 U.S. Dist. LEXIS 88345, at * 84 (N.D.N.Y. Sept. 24, 2009). The right of access requires prison authorities "to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." *Bounds,* 430 U.S. at 828.

In *Lewis v. Casey,* 518 U.S. 343, 351, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996), the Supreme Court explained that

> prison law libraries and legal assistance programs are not ends in themselves, but only the means for ensuring a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts.... Because *Bounds* did not create an abstract, freestanding right to a law library or legal assistance, an inmate cannot establish relevant actual injury simply by establishing that his prison's

law library or legal assistance program
is subpar in some theoretical sense.

Under *Lewis,* an inmate "must go one step further and
demonstrate that the alleged shortcomings in the library or
legal assistance program hindered his efforts to pursue a
legal claim." *Id.* A plaintiff must show that a defendant's
interference caused him actual injury that "a nonfrivolous
legal claim had been frustrated or was being impeded" as a
result of defendant's actions. *Lewis,* 518 U.S. at 353.

### 1. *Claim of Denial of Law Library or Adequate Legal Assistance*

In this case, Defendants have conceded that CNYPC has
no law library and that Plaintiffs are not allowed access
to computerized legal research. (Dkt. Nos. 22 at 6–7; 37–
2 at 52.) In support of their motion for summary judgment,
Defendants claim in conclusory fashion that residents who
wish to challenge admission, retention, or care and treatment
are afforded access to MHLS for legal services and assistance.
(Dkt. No. 37–2 at 53.) In their opposition to Plaintiffs' motion
to amend, Defendants do not dispute Plaintiffs' allegation that
the MHLS caseload is too great for them to render effective
assistance of counsel to Plaintiffs. (Dkt. No. 53 at 4.) They
instead argue that even if that is true, it is beyond their
control because MHLS is an independent state agency. [8] *Id.*
at 4–5. Immediately thereafter, Defendants fall back on the
conclusory assertion in their summary judgment motion that
residents who wish to challenge care and treatment at CNYPC
are afforded access to MHLS attorneys. *Id.* at 4–5.

[8]    Plaintiffs do not appear to be claiming that Defendants
       are responsible for ensuring that MHLS provide them
       with legal assistance. Rather, they are claiming that
       Defendants, who include the OMH Commissioner,
       SOTP Director, CNYPC Executive Director, and Chief
       of Mental Health Treatment Services for the SOTP at
       CNYPC, are denying Plaintiffs' First Amendment right
       to access to the courts by not providing either a law
       library or legal assistance.

**\*11** In his application for appointment of counsel, or in
the alternative for access to a law library or computerized
legal research, signed under penalty of perjury, Plaintiff Suggs
explained that Plaintiffs had requested help from MHLS and
been told MHLS was not allowed to assist in the civil action.
(Dkt. No. 20 at C.) Defendants sole response was that MHL
§ 47.03 "appeared" to authorize MHLS to provide legal

services to Plaintiffs in the lawsuit. (Dkt. No. 22 at 5.) The
provision relied upon by Defendants contains no reference
to conditions of confinement claims by individuals civilly
confined under Article 10 of the MHL.

In support of the allegation in their proposed first amended
complaint that MHLS was not available to assist Plaintiffs
because of the MHLS attorneys' other responsibilities,
Plaintiffs have included statistics showing that MHLS
attorneys are not only severely short staffed given the number
of facilities and clients, but that MHLS's focus on the Article
10 commitment procedures has occurred at the expense
of MHLS's other work and resulted in a drain on MHLS
resources. (Dkt. No. 52–2 at ¶¶ 11–15 and pp. 14–24.)

The extent to which, if at all, MHLS is tasked with providing
legal assistance to individuals confined under Article 10 on
conditions of confinement claims is not entirely clear from
the language of MHL Article 10 or MHL § 47.03, which
sets forth the functions, powers, and duties of MHLS. [9] The
only specific reference to MHL Article 10 in MHL § 47.03
is at subsection (f), which provides that one of the duties
of MHLS is "[t]o provide legal services and assistance in
accordance with article ten of this chapter." MLH § 10.06(c),
dealing with judicial proceedings for the civil commitment
or supervision of sex offenders, for which sex offenders are
entitled to the appointment of counsel, provides that when a
civil management petition is filed, "[t]he court shall appoint
the mental hygiene legal service if possible." MHL § 10.11
provides for the involvement of MHLS when the regimen of
strict and intensive supervision and treatment imposed on a
sex offender released into the community is revoked. MHL
§ 10.13, addressing appeals from orders issued under Article
10, provides for the appointment of counsel in connection
with appeals and states that "[i]f possible, the court shall
appoint the mental hygiene legal service." Defendants have
cited no provision in the MHL specifically tasking MHLS
with providing legal assistance in conditions of confinement
matters to those civilly confined under Article 10.

[9]    *See Pollack v. Holanchock,* No. 10 CV 2402(RPP), 2012
       WL 1646893, at * 3, 2012 U.S. Dist. LEXIS 66033, at
       *11 (S.D.N.Y. May 10, 2012) ("Retention proceedings
       and admission proceedings are the raison d' être of
       MHLS.")

### 2. *Actual Injury*

Defendants contend that the denial of access to the courts
claim is futile because Plaintiffs have failed to allege actual

injury as a result of the lack of access to a law library and to legal assistance. (Dkt. No. 53 at 5.) The Court disagrees.

In *Youngberg v. Romeo,* 457 U.S. 307, 321–22, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), the Supreme Court directed that "[p]ersons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." In their pro se complaint, Plaintiffs asserted a number of conditions of confinement claims against Defendants, including, *inter alia,* the use of restraints, severely restricted access to media, not being allowed personal electronics, restrictive visitation policies, physical and mental abuse, lack of the right to voice concerns without retribution, and the "privilege" "punishment" system employed. (*See generally* Dkt. No. 1.) Plaintiffs also asserted, albeit in equal protection terms, a First Amendment free exercise of religion claim. *Id.* at 6.) Plaintiffs' conditions of confinement and free exercise of religion claims all survived initial review conducted pursuant to 28 U.S.C. § 1915(e)(2)(B). [10] (Dkt. No. 8 at 6.) Defendants made no attempt to seek dismissal of

[10]    28 U.S.C. § 1915(e) directs that when a plaintiff proceeds *in forma pauperis,* "the court shall dismiss the case at any time if the court determines that ... the action ... (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B) (i)-(iii).

*12  Plaintiffs' conditions of confinement or free exercise of religion claims to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). (Dkt. No. 17.) Plaintiffs, who initially attempted to litigate their claims with no access to a law library or computerized legal research and no legal assistance, realized it was too formidable an undertaking and, after the Scheduling Order had been issued, turned to the Court for help in the form of access to a law library or computerized legal research or appointment of pro bono counsel. [11] (Dkt. No. 20.)

[11]    The Court notes that individuals civilly confined under MHL Article 10, who have in the past filed unsuccessful pro se conditions of confinement lawsuits challenging some of the same conditions being challenged by Plaintiffs (one of which is relied upon by Defendants in seeking summary judgment), either failed to file any opposition papers or filed incomplete papers in response to the defendants' summary judgment motions. *See, e.g.,*

*Yeldon v. Hogan,* No. 9:08–CV–769 (NAM/RFT), 2010 WL 983819, 2010 U.S. Dist. LEXIS 23825 (N.D.N.Y. March 15, 2010) (summary judgment granted against pro se plaintiff claiming, *inter alia,* denial of access to local media, restricted phone use, being forced into a test program in which he was denied treatment and denied interaction with the general population where plaintiff's only response to the motion was a response to defendants' statement of material facts), *aff'd,* 400 F. App'x 580 (2d Cir.2010); *McChesney v. Hogan,* No. 9:08–CV–163 (FJS/DEP), 2010 WL 3602660, 2010 U.S. Dist. LEXIS 91681 (N.D.N.Y. Aug.17, 2010) (grant of summary judgment to defendants recommended where pro se plaintiff failed to oppose grant of summary judgment to defendants on conditions of confinement claims that included, *inter alia,* prohibitions regarding access to local media, receipt of food packages, telephone usage policy, search policy, and treatment policies and practices), *Report–Recommendation accepted in its entirety,* 2010 WL 3584360, 2010 U.S. Dist. LEXIS 91322 (N.D.N.Y. Sept.7, 2010); *see also Jirne v. Blair,* 9:09–CV–323 (FJS/TWD), 2012 WL 1048463, 2012 U.S. Dist. LEXIS 42594 (N.D.N.Y. March 28, 2012) (dismissing Plaintiff's pro se claim regarding limitations on access to local newspapers and periodicals with prejudice on a Rule 12(b)(6) motion based on *McChesney* ). Defendants have acknowledged that there is no law library available to the SOTP residents at CNYPC, plaintiffs in the above-cited cases were not represented by MHLS, and there is no indication that any of the plaintiffs received legal assistance from MHLS or any other legal counsel.

The proposed first amended complaint includes additional allegations regarding the punitive nature of the conditions of which Plaintiffs complained in their pro se complaint, as well as new claims regarding failure to provide treatment, failure to provide training, inadequate accommodation of Plaintiffs' religious practices, and Defendants' "privileging" system. (Dkt. No. 52–2 at 15–20, 27–31.) As pointed out in Plaintiffs' Reply Memorandum of Law in Support of Motion to Amend, Plaintiffs claim to have been forced to endure the conditions about which they complain for six to eight years as a result of being denied access to the courts. (Dkt. No. 57 at 5.)

Based upon the foregoing, the Court concludes that Plaintiffs, who are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish, *Youngberg,* 457 U.S. at 321–22, have adequately asserted that their "nonfrivolous legal claim[s] ha[ve] been frustrated or [were] being impeded," *Lewis,* 518 U.S. at 353, as a result of Defendants'

actions. Therefore, the Court finds that at the very least, there are triable issues of fact as to the "actual injury" element of Plaintiffs' denial of access to courts claim. *See Dorsey v. Hogan,* 511 F. App'x 96, 101 (2d Cir.2013), in which the Second Circuit acknowledged in the context of the SOTP at CNYPC that:

> The Magistrate Judge found that plaintiff had failed to allege "actual injury," as required to state a claim for a denial of access to the courts. Because we conclude, as discussed above, that plaintiff may have been confined in violation of the preliminary injunction, and that he may have been unable to vindicate his claim while incarcerated by virtue of his lack of access to a law library or counsel, we also conclude plaintiff has plausibly alleged that his efforts to pursue relief in state court were improperly hindered. We therefore reverse the district court's dismissal of plaintiff's access-to-courts claim and remand for further proceedings.

**D. Conditions of Confinement Claims in Plaintiffs' Proposed First Amended Complaint**

As noted above, civilly committed persons "are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Youngberg,* 457 U.S. at 321–22. Conditions of confinement claims asserted by civilly committed plaintiffs must be asserted and evaluated under the Due Process Clause of the Fourteenth Amendment. *See Groves v. New York,* No. 9:09–CV–0412 (GLS/DEP), 2010 WL 1257858, at * 6, 2010 U.S. Dist. LEXIS 29722, at * 21 (N.D.N.Y. March 1, 2010). "[D]ue process requires that the conditions and duration of confinement [for civilly confined persons] bear some reasonable relation to the purpose for which persons are committed." *Seling v. Young,* 531 U.S. 250, 265, 121 S.Ct. 727, 148 L.Ed.2d 734 (2001) (citations omittd).

*\*13* Courts determining whether a plaintiff's constitutional rights have been violated are required to balance "the legitimate interests of the State and the rights of the

involuntarily committed to reasonable conditions of safety and freedom from unreasonable restraints." *Yoimgberg,* 457 U.S. at 321. In considering whether a civilly committed individual's Fourteenth Amendment rights have been violated, courts must "show deference to the judgment exercised by a qualified professional." *Yoimgberg,* 457 U.S. at 322. "[A] decision, if made by a professional, is presumptively valid," and "liability may be imposed only when the decision of the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such judgment." *Id.* at 323.

1. *Failure to Provide Treatment*

Included in the Legislative findings with respect to MHL Article 10 are the following:

> (b) That some sex offenders have mental abnormalities that predispose them to engage in repeated sexual offenses.

These offenders may require long-term treatment modalities to address their risk to reoffend. They should receive such treatment while they are incarcerated as a result of the criminal process, and should continue to receive treatment when that incarceration comes to an end.

> (f) That the system should offer meaningful forms of treatment to sex offenders in all criminal and civil phases, including during incarceration, civil commitment, and outpatient supervision.

MHL § 10.01(b) and (f).

In their proposed first amended complaint, Plaintiffs allege that Defendants fail to provide them with treatment in that they spend no more than six or seven hours a week in treatment, the treatment staff is not qualified, and Plaintiffs remain in the same treatment phase for years, with the substance of the treatment program being recycled. (Dkt. No. 52–2 at 15–17.) Defendants' argument that the claims lacks

Case 9:17-cv-01349-DNH-TWD   Document 62   Filed 07/22/19   Page 64 of 129
Suggs v. Maximilian, Not Reported in F.Supp.3d (2015)
2015 WL 5750998

merit and is futile is based upon: (1) the description of the four phase treatment program established for use at CNYPC set forth in the Nowicki Affidavit (Dkt. No. 37–2 at ¶ 95) and the CNYPC Phase Movement Policy (Dkt. No. 37–14); and (2) a claim that Plaintiffs' failure to provide treatment claim is a deliberate medical indifference claim, which at best constitutes a disagreement over treatment, or is a negligence or malpractice claim that does not support a claim under § 1983. (Dkt. No. 53 at 5–6.)

Defendants have not addressed any of the specific allegations in Plaintiffs' proposed amended complaint with regard to the alleged failure to provide treatment. As a part of their Reply Memorandum in Support of Motion to Amend Complaint, Plaintiffs have submitted an August 13, 2015, Decision and Order of the Hon. James C. Tormey, New York State Supreme Court Justice, County of Onondaga, in *State of New York v. Richard Z*, Supreme Court, Oneida County, Index No. CA2007–2605, on a hearing to determine whether petitioner in the case was a dangerous sex offender requiring continued civil confinement in the SOTP at CNYPC. (Dkt. No. 57 at 15–40.)

*14 According to the Decision and Order, Justice Tormey has heard hundreds of cases under MHL Article 10, has visited facilities for civilly confined sex offenders in New York and Canada, and has organized and prepared training programs and materials with the Office of Court Administration, which sponsors statewide training between OMH, MHLS, the New York Attorney General's Office, Parole, and the Judiciary. *Id.* at 34. Based upon the evidentiary record, Justice Tormey made numerous critical observations and findings about treatment in SOTP at CNYPC. *Id.* at 7–8. Judge Tormey referenced an expert opinion that "the programs at CNYPC have good ideas," but that the treatment program for the petitioner did not necessarily "adhere to the program parameters," *id.* at 19; the treatment program submitted for the petitioner did not have "program integrity," *id;* and that the petitioner was clearly suffering from treatment fatigue, a concept that the OMH Chief Psychiatric Examiner refused to acknowledge even existed. *Id.* at 22.

Justice Tormey found that there is no definition of "meaningful treatment" under MHL Article 10, § 10.01(a), and that there was no testimony at the hearing that adequately defined it. *Id.* at 33–34. He wrote:

However, this Court knows what meaningful treatment "isn't when it sees it". In this case, we can say having repeated, attended and actively participated in over 700 group therapy sessions, having doctors testify inconsistently as to what is expected of patients in treatment to advance, having no individualized plan for [petitioner] is not "meaningful treatment" .... and simply focusing on *de minimis* rule violations to mandate a repeat of completed Phases and therapy is not "meaningful treatment". A common sense definition of "meaningful" can be found in Webster's College Dictionary as "significant, purposeful or (having) value". [Petitioner] is not presently receiving "meaningful treatment" and he has received the maximum psychological benefit for treatment as an in-patient at [CNYPC].

*Id.* at 34.

Justice Tormey concluded that "[i]t is time for the State of New York and OMH to review [MHL Article 10] and develop individualized needs for patients which complies with 'meaningful treatment' and allows patients such as [petitioner] to progress through the program ." *Id.* at 35–36. Justice Tormey took the "extraordinary measure of appointing a world-renowned expert ... to render expert advice to the Court for a program of 'meaningful treatment' for [petitioner] as a condition of [ordering a regimen of Strict and Intensive Supervision and Treatment]." *Id.* at 39.

The Court finds that Defendants' mere reiteration of the parameters of the four phase treatment plan in effect at CNYPC and claim that Plaintiffs are, in effect asserting a medical indifference claim, do not establish futility. Rather, the Court finds that Defendants' failure to address the deficiencies in treatment specifically identified in Plaintiff's proposed first amended complaint, bolstered by Justice Tormey's Decision and Order, serves to highlight the existence of triable issues of fact with regard to whether

Plaintiffs are being provided the treatment intended under Article 10 of the MHL.

### 2. *Failure to Provide Training*

**\*15** In their proposed first amended complaint, Plaintiffs allege that the severe limitation on employment opportunities and the complete absence at CNYPC of vocational training, which was available to them while they were incarcerated in the DOCCS system, leaves them wholly unprepared for re-entry into society should they be released from CNYPC. (Dkt. No. 52–2 at ¶¶ 18–20.) In his Affidavit in support of Defendants' motion for summary judgment, Nowicki states that "[w]ork is not a right nor is it required." [12] (Dkt. No. 37–2 at ¶ 88.) Nonetheless, Nowicki acknowledges that for many residents, work is an important part of their treatment. *Id.* According to Nowicki, Phase II residents are eligible for up to four hours of work a week, Phase III residents up to six hours a week, and Phase IV residents up to eight hours a week. [13] *Id.* Nowicki states that the residents allowed to work "are engaged in their treatment and value being involved in the vocational program," and that the "program is so popular that [CNYPC has a waiting list." *Id.*

[12]    It appears from CNYPC's Privileging Policy that work is a privilege that may be taken away for clinical reasons. (Dkt. No. 37–13 at 1.)

[13]    According to Nowicki, four of the Plaintiffs are in Phase II and one is in Phase III. (Dkt. No. 37–2 at ¶ 89.)

Despite Nowicki's acknowledgment that work is an important part of many residents' treatment, and that those who are allowed to work value their involvement in the program, he concedes that "[t]he reason for our wait list is based on the number of vocational staff, vocational space and available work. Since it is a limited resource, residents are not permitted unlimited hours of work." *Id.*

In their opposition to Plaintiffs' motion to amend, Defendants' "short answer" to the failure to provide training claim is that "CNYPC is not an employment program." (Dkt. No. 53 at 7.) Rather, it is a secure treatment facility for dangerous sex offenders who have been found by the Legislature to "require long-term specialized care and treatment designed to address the risks they pose to society." *Id.* Defendants assert that "[a]ccordingly, plaintiffs claim should be summarily dismissed since that is not why the CNYPC Sex Offender Treatment Program was created." *Id.* Defendants do not appear to argue that the limitations in the employment

program and lack of vocational training as alleged by Plaintiffs are the result of reasoned judgment exercised by qualified professionals as opposed to a limitation of staff and resources and the absence of a specific legislative directive.

Whether or not SOTP was created as a jobs programs, Defendants have acknowledged the importance of work to residents' treatment and have conceded that limited staff and resources force residents to be placed on waiting lists for valued employment. Therefore, the Court finds that there are issues of fact that warrant counseled discovery with regard to Plaintiffs' claim that the severe limitation on employment opportunities and absence of vocational training, which was available while they were incarcerated, leaves them wholly unprepared for re-entry into society, presumably a goal of the CNYPC treatment program.

### 3. *Lack of Access to Media*

**\*16** In their proposed first amended complaint, Plaintiffs challenge the prohibition at CNYPC on residents having access to personal television sets and certain other electronic media devices; the punitive and arbitrary restrictions on access to a host of mainstream printed materials; the prohibition on access to local news media; and restrictions on access to movies, computers/laptops, videos, MP3 players, CDs and DVDs. (Dkt. No. 52–2 at ¶¶ 21–24.) Plaintiffs contend that the prohibitions and restrictions are far more severe than those imposed while they were incarcerated in the DOCCS system. *Id.*

Defendants rely upon the evidence submitted in support of their motion for summary judgment for their opposition to Plaintiffs' motion to amend. (Dkt. No. 53 at 8.) The CNYPC Policy on Resident Access and Usage of Media, submitted by Defendants in support of their motion for summary judgment states that the CNYPC's SOTP "recognizes that the responsible use of music, videos, TV, and printed media can be an important aspect of therapeutic leisure, can possess educational value and may be incorporated into actual program curricula." (Dkt. No. 37–4 at 1.) The Policy also notes that SOTP has a responsibility to provide guidance to residents regarding media use and to provide limits and parameters such as prohibiting media content determined to be clearly counter-therapeutic. *Id.* The Policy states that "[t]he SOTP staff shall maintain an individualized approach in the implementation of this policy and this policy does not replace the clinical experience of the Treatment Team." *Id.*

2015 WL 5750998

In this Affidavit, Nowicki describes the policy with regard to outside news as one "which minimizes access to personal information about staff members and their families" so that inmates cannot use personal information about staff to further their own self-interests. (Dkt. No. 37–2 at ¶¶ 24–25.) According to Nowicki, a reasoned administrative determination was made that safety concerns outweighed the interest of the residents in having access to local media. *Id.* at 27. Nowicki acknowledges that a significant number of magazines, newspapers, and periodicals are not permitted due to their content, i.e., materials containing nudity, inciting violence or civil disobedience, depicting how to make weapons, or targeted to minors. *Id.* at ¶ 28.

Nowicki states in his Affidavit that the SOTP at CNYPC has several day rooms where residents are permitted to watch television shows found acceptable, but that personal televisions are not allowed because they might prevent residents from meaningful participation in programs offered at CNYPC. *Id.* at ¶ 35. According to Nowicki, television viewing is allowed only during non-program hours because "[t]ime spent sitting idle, watching television, will not provide a resident with any knowledge and skills to address his sex offending history." *Id.* at 38. Another concern expressed by Nowicki regarding personal televisions is that it would be impossible to monitor their viewing for unacceptable content. *Id.* at 35–36.

**\*17** Personal computers are not allowed because they have internet capability, and unfettered access to the internet would allow residents to view inappropriate websites. *Id.* at ¶ 41. DVDs, CDs and their players, along with MP3 machines are considered contraband because "[a]llowing such devices would only further frustrate CNYPC constant vigilance in maintain (sic) a therapeutic and safe environment by giving residents an additional opportunity to receive and distribute contraband." *Id.* at ¶ 45.

Defendants rely upon the district court decisions in *McChesney v. Hogan,* 2010 WL 3584360, 2010 U.S. Dist. LEXIS 91322 (N.D.N.Y. Sept.7, 2010) and *June v. Blair,* 9:09–CV–323 (FJS/TWD), 2012 WL 1048463, 2012 U.S. Dist. LEXIS 42594 (N.D.N.Y. March 28, 2012) in support of their motion for summary judgment and opposition to Plaintiffs' motion for leave to amend with regard to Plaintiffs' media access claim. (Dkt. Nos. 37–18 at 14–15; 53 at 8.) In *McChesney,* the District Court granted summary judgment to defendants on plaintiffs Fourteenth Amendment claim regarding media access restrictions at CNYPC. In *June,*

following *McChesney,* the District Court granted defendants' motion to dismiss a media access restriction claim for failure to state a claim on a Rule 12(b)(6) motion.

As noted above, Plaintiffs appeared pro se in both *McChesney* and *June* and presumably had no access to a law library. Moreover, there is no indication they received legal assistance from MHLS or other legal counsel with regard to their media access claims. Therefore, while *McChesney* and *June* no doubt provide guidance on the issue, the Court finds them to be of little precedential value.

Plaintiffs' constitutional claim regarding access to media must be balanced against the legitimate interests of the State in restricting that access. *See Youngberg,* 457 U.S. at 321. In that process, deference must be shown to the judgment of qualified professionals involved in developing, monitoring, and enforcing the media access policy. *Youngberg,* 457 U.S. at 322. Moreover, the decisions of those qualified professionals must be deemed presumptively valid. *Id.*

The Court acknowledges the likelihood that the CNYPC policies regarding media access will ultimately be upheld in part, or in their entirety as they were in *McChesney* and *June* where plaintiffs did not have the benefit of counseled discovery. However, the Court finds that finds that given CNYPC's recognition that music, videos, TV, and printed media can be an important aspect of therapeutic leisure; the comprehensive nature of the media access restrictions at CNYPC and Policy statement that staff are to maintain an individualized approach in its application; and Plaintiffs' assertion that the restrictions surpass those imposed in the DOCCS system, Plaintiffs should be given the opportunity to conduct counseled discovery with regard to their media access claims prior to summary judgment motions in the case.

### 4. *The Visitor Program*

**\*18** Plaintiffs allege in their proposed first amended complaint that the restrictions on visitation at CNYPC are more restrictive than those imposed while they were incarcerated in the DOCCS system and are so restrictive as to be punitive. (Dkt. No. 52–2 at 25.) More specifically, Plaintiffs complain of the requirement that visitors must contact a CNYPC official seven days in advance and be placed on a schedule to visit; visitation is limited to Saturdays in Building 39 where one of the Plaintiffs is housed, visits are permitted only from 9:45 am to 2:45pm; and visitors are not allowed to bring food. *Id.*

2015 WL 5750998

Defendants have submitted the CNYPC Visitation Policy in support of their motion for summary judgment. (Dkt. No. 37–6.) According to the Policy, "[t]he Sex Offender Treatment Program (SOTP) recognizes the importance of the residents to have an opportunity for their family to have a role in their treatment and recovery and visit with significant others." *Id.* at 1.

In his Affidavit, Nowicki states that "[v]isiting at facilities is strongly encouraged for both family and friends as it helps maintain ties to the community," although according to Nowicki, visitation should not interfere with regularly scheduled programs and because of the nature of the SOTP population at CNYPC, visitation must be pre-approved. (Dkt. No. 37–2 at 47–48.)

Despite Defendants' acknowledgment of the importance of visits by family and friends to residents' treatment and recovery, Nowicki discloses in his Affidavit that SOTP has only one visiting room in each of its two buildings, and there are significant space limitations in those two rooms. *Id.* at ¶ 48. According to Nowicki, Building 39 houses 180 residents, and the visiting room has a capacity of forty people, including residents and staff. *Id.* Building 41 houses up to 150 residents and the visiting room has a capacity of thirty people, including residents and staff. *Id.* The Visitation Policy indicates that Buildings 39 and 41 have visitation on Saturdays and major holidays from 9:45am to 2:45pm. (Dkt. No. 37–6 at 1.) Building 41 also has visitation on Sundays from 9:45am to 2:45pm. *Id.*

Given the acknowledgment in both the Visitation Policy (Dkt. No. 37–6 at 1) and the Nowicki Affidavit (Dkt. No. 37–2 at 47) of the therapeutic importance of visitation with family and friends, and the absence of any claim by Defendants that the space allowed for visitation is limited for therapeutic reasons, the Court finds that there are triable issues of fact with regard to Plaintiffs' claim, and Plaintiffs should be allowed an opportunity to engage in discovery on the visitation issue.

### 5. *Physical Restraints*

Plaintiffs allege in their proposed first amended complaint that they are placed in extremely painful physical restraints when they are taken out of the facility. (Dkt. No. 52–2 at 26.) They allege, upon information and belief, that such painful restraints are not used in two other New York SOTP facilities or at local or county jails. *Id.*

**\*19** In support of their motion for summary judgment, Defendants rely upon the Use of Safety and Security Devices for Transport Purposes Policy, which provides for the use of safety and security devices for all SOTP resident transports, (Dkt. No. 37–3 at 3), and the Nowicki Affidavit which explains that the use of such restraints in resident transports is "designed to ensure staff and public safety." (Dkt. No. 37–2 at ¶ 18.) In *Balkum v. Sawyer,* No. 6:06–CV–1467 (NPM), 2011 WL 5041206, at \* 9–10, 2011 U.S. Dist. LEXIS 122467, at \*27 (N.D.N.Y. Oct.21, 2011), the court granted defendants' motion for summary judgment on the plaintiffs challenge to CNYPC's policy of restraining residents with handcuffs, waist chains, and leg shackles during transport, finding that plaintiff had not shown that "the use of restraints in this manner and for this purpose represents a substantial departure [from] accepted professional judgment, standards, or practice." *See also June v. Hogan,* No. 9:09–CV–0323 (FJS/TWD), 2014 WL 502536, 2014 U.S. Dist. LEXIS 16039, at \*11–12 (N.D.N.Y. Jan.16, 2014) (recommending summary judgment for defendants on plaintiff's Fourteenth Amendment challenge to use of shackles and handcuffs during transport outside the facility), *Report–Recommendation accepted in its entirety,* 2014 WL 502536 at \* 1; *Miller v. Dobier,* 634 F.3d 412, 414–15 (7th Cir.2011) (detainee under sexually violent persons act had no constitutionally protected liberty interest in avoiding the "black box" restraints).

The Court recognizes based on the legitimate state interest in ensuring staff and public safety, as well as legal precedent, that Defendants may more likely than not ultimately prevail on this claim. However, given Defendants' failure to respond to the allegation in Plaintiffs' proposed first amended complaint that the restraints about which Plaintiffs complain are not utilized at two other SOTP facilities, the Court finds that Plaintiffs should be allowed the opportunity to conduct discovery on the claim.

### 6. *The Privileging System*

In their proposed first amended complaint, Plaintiff challenge the privileging system at CNYPC in which, according to Plaintiffs, "negative consequences" are imposed based upon whether residents are perceived to have exhibited "positive conduct and attitudes," to be making "clinical progress in the program," or to be "persistently fail[ing] to meet community expectations." (Dkt. No. 52–2 at 28.) Plaintiffs contend that the imposition of "negative consequences," often for minor in fractions, is, in practice arbitrary, capricious and unconstitutionally punitive." *Id.* at ¶ 29.

Defendants contend generally in opposition to Plaintiffs' motion to amend, that the privileging policies, in which residents must participate in the sex offender program to earn privileges, "is an effective treatment approach in assisting in the development of pro-social, desirable behavior." (Dkt. No. 53 at 10.) They do not directly address the imposition of negative consequences which Plaintiffs allege are a part of the privileging policy and the claim that, in practice, they are imposed in an arbitrary, capricious, and unconstitutionally punitive manner.

**\*20**  Plaintiffs have had no opportunity to conduct discovery concerning their privilege system claims. In his Decision and Order in *State of New York v. Richard* Z, Justice Tormey addressed an instance of the imposition of negative consequences for minor infractions:

> Richard Z. received a demotion to Phase II (acquisition and practice) for receiving non-toxic glue from his 89 year old mother taped in a sweatshirt pocket; paint from his Brother, which was delivered by mail order from a non-approved vendor; and referred to by the New York State Attorney General, a non-offensive DVD title "Blue Rose" rated in the PG category, within a greeting card. Additionally, triple hearsay allegations were written in a report wherein one worker told another worker that he overheard Richard Z. on the telephone with his Mother asking her to send $80.00 in cash to him, which would be a violation of the rules of CNYPC if cash was received. No cash had been received or reportedly ever found.

(Dkt. No. 57 at 16.) Justice Tormey concluded that "simply focusing on *de minimis* rule violations to mandate a repeat of completed Phases and therapy, is not 'meaningful treatment.' " *Id.* at 34.

In light of Defendants' failure to address Plaintiffs' "negative consequences" claim and Justice Tormey's Decision and Order, the Court finds that it reasonable to conclude that triable issues of fact exist with regard to Defendants' privileging system and whether it is implemented in an arbitrary, capricious, punitive manner, and that Plaintiffs should be given an opportunity to conduct counseled discovery on the claim.

**E. Plaintiff's Free Exercise of Religion Claim**
Plaintiffs allege in their proposed first amended complaint that Defendant Rosado, who is a follower of Neopaganism, is not allowed to practice the traditions of his religion at CNYPC, and that no spiritual leader is available at the facility. (Dkt. No. 52–2 at 30 .) They also allege that Suggs, who is a Muslim who follows the religion of Islam, has limited access to an Imam, to an appropriate location for worship, and to Islamic media. *Id.* at 31.

In their opposition to Plaintiffs' motion to amend, Defendants do not deny Rosado and Suggs' claims. (Dkt. No. 53 at 11.) Rather, they state generally that CNYPC religious policy (Dkt. No. 37–17) permits any resident to practice his religion as he may chose, and quote from Nowicki's Affidavit in support of Defendants' motion for summary judgment that Rosado and Suggs "are permitted to practice their religions, observe religious holy days, maintain religious texts and follow dietary restrictions of their faith." (Dkt. No. 53 at 11.)

Therefore, the Court finds that there are triable issues of fact with regard to Plaintiffs' free exercise of religion claim that warrant discovery.

**V. CONCLUSION**
Based upon the foregoing, the Court recommends that Plaintiffs' motion for leave to file an amended complaint (Dkt. No. 51) be granted, and that the Clerk be directed to file Plaintiffs' proposed first amended complaint (Dkt. No. 52–2 at 4–13) and that it become the operative pleading in the case; and that a new Scheduling Order allowing the parties a reasonable period of time for discovery and motions be agreed upon with the Court. The Court further recommends that Defendants' motion for summary judgment (Dkt. No. 37) be denied without prejudice to refiling after the conclusion of discovery.

**\*21**  **ACCORDINGLY,** it is hereby

**RECOMMENDED** that Plaintiffs' motion for leave to file a first amended complaint (Dkt. No. 51) be granted, and that the Clerk be directed to file Plaintiffs' proposed first amended

complaint (Dkt. No. 52–2 at 4–13), and that it become the operative pleading in the case; and it is further

**RECOMMENDED** that a new Scheduling Order allowing the parties a reasonable period of time for discovery and motions be agreed upon with the Court; and it is further

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 37) be denied without prejudice to refding after the conclusion of discovery; and it is further

**RECOMMENDED** that the Clerk's Office be directed to correct the docket to show thesubstitution of Peter Russell, currently the Acting Executive Director of CNYPC, for former Executive Director Maureen Bosco, as a Defendant in the case; the substitution of Ann Sullivan, currently the Commissioner of the New York Office of Mental Health, for former Acting Commissioner of the New York Office of Mental Health Kristin Woodlock, as a Defendant in the case;

and the termination of Raymond Lagree as a Plaintiff in the case.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.* *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15, 16 (2d Cir.1989) (per curiam)); 28 U.S.C. § 636(b)(1) (Supp.2013); Fed.R.Civ.P. 72, 6(a).

Filed Sept. 14, 2015.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 5750998

---

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 1758715
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

UNITED STATES of America,
v.
Raheen DAVIS, Defendant.

No. 05 Crim. 1157(LAK).
|
April 16, 2008.

**MEMORANDUM AND ORDER**

LEWIS A. KAPLAN, District Judge.

**\*1** By letter dated April 13, 2008, defendant-who at the moment again is proceeding *pro se*, albeit with the assistance of standby counsel appointed by the Court, with respect at least to his motion to suppress evidence-moves to stay the trial until he is released from the Special Housing Unit at the Metropolitan Detention Center and is permitted to go to the law library available to prisoners in the general population and to use a telephone. He claims that he is being deprived of access to the courts to the extent that the case proceeds while he does not have these privileges because he "can not adequately fight [his] case."

In *Bounds v. Smith,* 430 U.S. 817 (1977), the Supreme Court held that "prison authorities [must] assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries *or adequate assistance from persons trained in the law." Id.* at 828 (emphasis added). It emphasized, however, that adequate law libraries are only "one acceptable method to assure meaningful access to the courts" and did not "foreclose alternative means to achieve that goal," strongly suggesting that the provision of counsel, among other things, would suffice. *Id.* at 830-32.

In this case, defendant thus far has been provided with no fewer than six different court-appointed, publicly-paid attorneys. Most recently, he has rejected the services of Michael Dinnerstein, Esq., who was appointed under the Criminal Justice Act, in favor of self representation. Notwithstanding defendant's action, the Court has directed that Mr. Dinnerstein continue as defendant's advisor and that

he remain available to resume the defense should defendant have a change of heart. Defendant thus has had, and continues to have, the means of obtaining constitutionally adequate access to the courts-in this instance the services, either as counsel of record or as an advisor and standby counsel-of a qualified attorney.

In these circumstances, defendant has no right of unqualified access to a library or a telephone. *E.g., Bourdon v. Loughren,* 386 F.3d 88, 92-94 (2d Cir.2004) ("appointment of counsel can be a valid means of fully satisfying ... obligation to provide ... pretrial detainees[ ] with access to the courts"); *Degrate v. Godwin,* 84 F.3d 768, 769 (5th Cir.1996) (per curiam) ("the United States satisfied its obligation under the sixth amendment when it offered defendant the assistance of counsel which he declined"); *United States v. Chapman,* 954 F.2d 1352, 1362 (7th Cir.1992) ("This court has consistently held that 'when a defendant (pretrial detainee) is offered the assistance of appointed counsel and refuses the same, no constitutional right exists mandating that the prisoner in the alternative be provided access to a law library should he refuse the services of court-appointed counsel.' ") (citation omitted); *United States v. Knox,* 950 F.2d 516, 519-20 (8th Cir.1991) (denial of access to law library not improper because defendant refused assistance of standby counsel); *United States v. Smith,* 907 F.2d 42, 45 (6th Cir.1990) ( "by knowingly and intelligently waiving his right to counsel, the appellant also relinquished his access to a law library [viz. one of the benefits that would have been afforded to him had he had counsel]"); *United States v. Pina,* 844 F.2d 1, 6 (1st Cir.1988) ("[w]hen a defendant refuses assistance of appointed counsel, he has no right to unqualified access to a law library .... [Standby C]ounsel was appointed ... to provide ... 'any requested materials that are, in the judgment of standby counsel, needed or useful in [defendant's] preparation for defense.' ") (citation omitted); *United States v. Chatman,* 584 F.2d 1358, 1360 (4th Cir.1978) ("the United States satisfied its obligations under the sixth amendment when it offered defendant the assistance of counsel which he declined"); *Wesley v. City of New York,* No. 05 Civ. 9227(DLC), 2006 WL 2882973 (S.D.N.Y. Oct. 10, 2006) ("defendants who voluntarily decline publicly funded counsel and choose to represent themselves have no constitutional right of access to a law library"). As one commentator aptly put it:

**\*2** "An imprisoned defendant who chooses to represent himself relinquishes many of the traditional rights associated with the right to counsel. A state need not offer a pro se defendant access to a wide range of legal services

once it has fulfilled its constitutional obligation by offering him competent legal assistance. This principle was recently illustrated by the Court of Criminal Appeals of Alabama when the court held that prison officials must provide either the direct legal assistance of an attorney or access to a law library, but not both." John F. Decker, *The Sixth Amendment Right to Shoot Oneself in the Foot: An Assessment of the Guarantee of Self-Representation Twenty Years After Faretta,* 6 SETON HALL CONST. L.J. 483, 561 (1996).

This defendant repeatedly has been warned that " ' a pro se defense is usually a bad defense, particularly when compared to a defense provided by an experienced criminal defense attorney.' " *Martinez v. Court of Appeal of California, Fourth Appellate District,* 528 U.S. 152, 161 (2000) (quoting *id.* at 598). But if he knowingly and voluntarily elects to "shoot himself in the foot," this Court, within broad limits, is obliged to permit him to do so.

The motion to stay the trial is denied.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 1758715

---

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Fox v. Lee, Not Reported in Fed. Supp. (2018)
2018 WL 1211111

Case 9:17-cv-01349-DNH-TWD    Document 62    Filed 07/22/19    Page 72 of 129

2018 WL 1211111
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Javell FOX, Plaintiff,
v.
Superintendent LEE, et al., Defendants.

No. 9:15-CV-0390 (TJM/CFH)
|
Signed 02/05/2018

**Attorneys and Law Firms**

Javell Fox, 12-B-1626, Attica Correctional Facility, Box 149, Attica, New York 14011, pro se.

Hon. Eric T. Schneiderman, Attorney General for the State of New York, OF COUNSEL: MARIA E. LISI-MURRAY, ESQ., ADRIENNE J. KERWIN, ESQ., Assistant Attorneys General, The Capitol, Albany, New York 12224, Attorney for Defendants.

**REPORT-RECOMMENDATION AND ORDER** [1]

[1]     This matter was referred to the undersigned for Report-Recommendation and Order pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

CHRISTIAN F. HUMMEL, U.S. MAGISTRATE JUDGE

**\*1** Plaintiff pro se Javell Fox ("plaintiff"), an inmate who was, at all relevant times, in the custody of the New York Department of Corrections and Community Supervision ("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983, alleging that defendants Superintendent ("Supt.") Lee, DOCCS Commissioner ("Comm.") Anthony Annucci, Correction Deputy Superintendent of Administration ("Deputy Superintendent") Wendland, Correction Deputy Superintendent Security ("DSS") Russo, Deputy Calao, Captain ("Capt.") Webbe, Lieutenant ("Lieut.") Madison, Lieut. Simmons, Lieut. Sullivan, Sergeant ("Sgt.") Bey, Sgt. Connor, Sgt. Vanacore, Sgt. Barg, Corrections Officer ("C.O.") Kozak, C.O. Waugh, C.O. Miller, C.O. Henry, C.O. Williamson, C.O. S. Cruz, Corrections Steward C. Jennings, and Corrections Steward Diane Labatte—who at all relevant times, were employed at Eastern Correctional Facility ("Eastern")—violated his constitutional rights under the First, Fourth, Eighth, and Fourteenth Amendments. Dkt. No. 76 ("Am. Compl."). Presently pending before the Court are plaintiff's Motion for Summary Judgment [2] pursuant to Federal Rules of Civil Procedure ("Fed. R. Civ. P.") 56 and defendants' Cross-Motion to Dismiss pursuant to Fed. R. Civ. P. 12(c). Dkt. Nos. 111, 118. [3]

[2]     Plaintiff does not move for summary judgment on his Religious Land Use and Institutionalized Persons Act ("RLUIPA") claims.

[3]     Plaintiff's Motions for Contempt, Dkt. Nos. 117, 129, 130, 131, 138, will be addressed in a subsequent decision. Plaintiff's Motion for Preliminary Injunction, Dkt. No. 128, is currently before the assigned District Judge for review.

On July 27, 2017, defendants opposed plaintiff's motion on the grounds that (1) it was premature, as discovery had not yet concluded; and (2) plaintiff's motion failed to comply with N.D.N.Y. Local Rules 7.1(a)(1), (a)(3). Dkt. No. 112. [4] Out of "extreme solicitude" to plaintiff pro se, the Court "accepted for filing plaintiff's enlarged Memorandum of Law ... that contains his statement of material facts within," and directed defendants to file a supplemental response. Dkt. No. 113. On August 9, 2017, plaintiff filed a reply. Dkt. No. 116. On August 18, 2017, defendants filed a supplemental response in opposition to plaintiff's Motion for Summary Judgment, and cross-moved for dismissal pursuant to Fed. R. Civ. P. 12(c). Dkt. No. 118. Plaintiff filed a reply to defendants' cross-motion. Dkt. No. 123. For the following reasons, it is recommended that plaintiff's Motion for Summary Judgment be denied, and defendants' Cross-Motion to Dismiss be denied.

[4]     In their original memorandum of law in opposition, defendants argued that plaintiff failed to comply with N.D.N.Y. Local Rule 7.1(a)(1), (3) by filing a motion exceeding the twenty-five page limit and failing to file a separate Statement of Material Facts with specific record citations. Dkt. No. 112 at 7-8. Defendants have re-alleged their argument as to the Material Statement of Facts in their Memorandum of Law in Opposition and Cross-Motion to Dismiss pursuant to Fed. R. Civ. P. 12(c), and it will be discussed infra. See Dkt. No. 118-3 ("Def.'s Mem. of Law") at 3.

**I. Arguments**

Case 9:17-cv-01349-DNH-TWD   Document 62   Filed 07/22/19   Page 73 of 129

**Fox v. Lee, Not Reported in Fed. Supp. (2018)**

2018 WL 1211111

### A. Plaintiff's Motion for Summary Judgment

**\*2**  In support of his Motion for Summary Judgment, plaintiff filed a Statement of Material Facts. [5] On review of plaintiff's Motion for Summary Judgment, the facts will be related herein in the light most favorable to defendants as the nonmoving parties. See Rattner v. Netburn, 930 F.2d 204, 209 (2d Cir. 1991) ("In assessing the record ... to determine whether there is a genuine issue as to any material fact, the court is required to resolve all ambiguities and draw all factual inferences in favor of the party against whom summary judgment is sought.").

[5]   Local Rule 7.1(a)(3) states:

Summary Judgment Motions

Any motion for summary judgment shall contain a Statement of Material Facts. The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established. The record for purposes of the Statement of Material Facts includes the pleadings, depositions, answers to interrogatories, admissions and affidavits.

The opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute. Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.

N.D.N.Y. L.R. 7.1(a)(3).

### 1. Free Exercise of Religion and Freedom of Expression

On or about November 7, 2014, Lieut. Madison directed plaintiff to cut his hair because it was "shaved on the sides and dreadlocked in a Mohawk style." Dkt. No. 111-1 ("Pl.'s Mem. of Law") ¶ 1. Plaintiff refused, citing his right to freedom of expression and free exercise of religion. Id. On November 9, 2014, Lieut. Madison directed non-party C.O. Skred to issue plaintiff a misbehavior report charging him with refusing a direct order (106.11). Id. ¶¶ 2, 3. On or about November 11,

2014, Lieut. Simmons conducted a disciplinary hearing and found plaintiff not guilty, "acknowledg[ing] that the charge was unconstitutional and that plaintiff had a right to exercise his religion and a freedom of expression, equal protection of the law[,] and religious rights under the Religious Land Use and Institutionalized Persons Act of 2000." Id. ¶ 4.

On November 29, 2013, Lieut. Madison complained to C.O. Cruz about Lieut. Simmons' not guilty disposition at the November 2014 disciplinary hearing. Pl.'s Mem. of Law ¶ 5. C.O. Cruz informed Lieut. Madison that the next time he saw plaintiff, he would write him another misbehavior report because of his hairstyle. Id. On December 7, 2014, C.O. Cruz "abandoned his post" supervising inmates "on the other side of the jail" and directed C.O. Williamson and C.O. Waugh to frisk plaintiff. Id. ¶¶ 6, 7, 8. C.O. Williamson "pat frisked and strip frisked" plaintiff by forcing him "to remove his religious headgear and shake his hair out." Id. ¶ 11. After the frisk, C.O. Williamson and C.O. Waugh instructed plaintiff to return to his cell. Id. ¶ 12. Five minutes later, C.O. Williamson arrived to search plaintiff's cell. Id. ¶ 13. C.O. Williamson informed plaintiff that his cell was being searched because of plaintiff's hairstyle. Id. C.O. Waugh issued plaintiff a misbehavior report for "altered pants" and refusing to cut his hair. Id. ¶ 14.

Lieut. Simmons commenced a disciplinary hearing [6] as to the December 7, 2014 misbehavior report and found plaintiff guilty of altered pants and not guilty of refusing a direct order. Id. ¶ 16. As to plaintiff's not guilty disposition, Lieut. Simmons stated that "plaintiff ha[d] a constitutional right to wear a Mohawk hairstyle and said hairstyle posed no threat to the safety, security[,] and order of the facility." Id. Plaintiff informed Lieut. Simmons on the record that he had been retaliated against for a "favorable hearing," and that Lieut. Simmons was not supposed to find him guilty of altered pants. Id. Lieut. Simmons sentenced plaintiff to thirty days keeplock, [7] and thirty days loss of commissary, recreation, packages and phone privileges. Id. ¶ 17.

[6]   Plaintiff does not specify the tier of the disciplinary hearing.

[7]   "Keeplock is a form of disciplinary confinement segregating an inmate from other inmates and depriving him of participation in normal prison activities." Green v. Bauvi, 46 F.3d 189, 192 (2d Cir. 1995); N.Y. COMP. CODES R. & REGS. tit. 7, § 301.6.

**\*3**  As part of a grievance investigation, [8] Supt. Lee assigned Capt. Webbe to investigate plaintiff's claims of harassment by C.O. Waugh, C.O. Williamson, C.O. Cruz, and Lieut.

Case 9:17-cv-01349-DNH-TWD    Document 62    Filed 07/22/19    Page 74 of 129

Fox v. Lee, Not Reported in Fed. Supp. (2018)
2018 WL 1211111

Madison. Pl.'s Mem. of Law ¶ 20. Capt. Webbe "covered up" C.O. Waugh, C.O. Williamson, C.O. Cruz, and Lieut. Madison's conduct. Id. ¶ 21. Capt. Webbe affirmed that there was no official misconduct, and that Sgt. Connor gave the officers permission to frisk plaintiff and search his cell. Id. ¶ 22. As part of a grievance investigation,[9] Supt. Lee assigned DSS Russo to investigate Capt. Webbe's "covering up official misconduct." Id. ¶ 24. DSS Russo "covered up" any misconduct of lower-level officers. Id. Supt. Lee also "covered up" the misconduct of his subordinates. Id. ¶ 27. On January 30, 2015, C.O. Kozak issued plaintiff a "frivolous misbehavior report" in retaliation for plaintiff's grievance against C.O. Cruz. Id. ¶ 56.

[8]    Plaintiff does not identify the grievance associated with this investigation.

[9]    Plaintiff also does not identify the grievance underlying this investigation.

Lieut. Madison ordered plaintiff to remove his "religious headgear," and directed Sgt. Vanacore to issue plaintiff a misbehavior report for his hairstyle. Pl.'s Mem. of Law ¶ 68. On March 6, 2015, C.O. Cruz and C.O. Miller also wrote plaintiff a misbehavior report for his hairstyle. Id. ¶¶ 69, 147. Both misbehavior reports charged plaintiff with untidy person (118.30), and refusing a direct order (106.11). Id. ¶ 70. On or about May 2, 2015, Lieut. Madison approached plaintiff's cell and remarked that he "can't believe plaintiff still got [sic] that stupid haircut." Pl.'s Mem. of Law ¶ 120. Lieut. Madison directed non-party Lieut. Geminez to write plaintiff a misbehavior report. Id. Eventually, plaintiff suffered a "mild heart attack" due to the "stress [of] retaliation." Id. ¶ 118.

On or about June 1, 2015, non-party C.O. Calotti issued plaintiff a misbehavior report for "having magazines and books." Pl.'s Mem. of Law ¶ 144. One of these magazines was a religious magazine. Id. ¶ 145. On or about June 12, 2015, Lieut. Simmons sentenced plaintiff to thirty days keeplock. Id. When plaintiff explained that he had a constitutional right to have books, magazines, and religious reading material, Lieut. Simmons told him to "take it up with the court [because] he don't [sic] care." Id. ¶ 146. On or about June 16, 2015, Dep. Russo denied plaintiff permission to attend Ramadan services, fast, and "brotherhood with fellow prisoners as plaintiff is registered N.O.I." Id. ¶ 125.

On or about July 18, 2015, plaintiff was released from keeplock. Pl.'s Mem. of Law ¶ 130. During a pat frisk,[10] Sgt. Bey questioned plaintiff about the instant lawsuit. Id.

¶ 133. On or about August 2, 2015, Sgt. Barg and non-party C.O. Krantz planted marijuana on plaintiff. Id. ¶ 134. Sgt. Barg placed plaintiff in protective custody so that he would be unable to access his property to prepare for the disciplinary hearing.[11] Id. ¶ 135. After the hearing,[12] Sgt. Barg released plaintiff from protective custody. Id. ¶ 138. Sgt. Barg informed plaintiff that "he planted the marijuana and had Officer Krantz make the report and that he got the marijuana from the locker." Id. ¶ 139. Plaintiff received fifty days keeplock stemming from this incident. Id. ¶ 141.

[10]    Plaintiff does not indicate when the pat frisk occurred.

[11]    Plaintiff does not specify the disciplinary hearing to which he is referring or the tier of the hearing.

[12]    Plaintiff does not indicate the tier of the hearing.

On a date plaintiff does not specify, Lieut. Madison harassed plaintiff about his religious headgear and forced him to remove it. Pl.'s Mem. of Law ¶ 142. Lieut. Madison called plaintiff an "idiot" for wearing the religious headgear. Id.

## 2. Conditions of Confinement

While plaintiff was in keeplock, C.O. Henry, Sgt. Vanacore, and non-party C.O. Cotton refused to unlock plaintiff's cell door so that he could receive his meals. Pl.'s Mem. of Law ¶ 28. Because there were no food slots at ground level, plaintiff had to climb to the top of the cell bars and "slide his open food tray ... through the top of the ceiling" to retrieve his meals each day. Id. ¶¶ 28, 32. To fit through the slot, plaintiff had to remove the lid on his food tray, often resulting in paint chips falling from the ceiling into his food. Id. ¶ 32. C.O. Henry harassed plaintiff, calling him a "monkey" as he climbed to retrieve his food. Id. ¶ 28. On December 23, 2014, plaintiff fell while climbing to retrieve his meal. Id. ¶ 33. Plaintiff was hospitalized for three days with a "damaged [ ] lower back," and walked with a cane for six weeks. Id. ¶ 34. Plaintiff was released to a cell that did not require him to "use the steps,"[13] but was soon transferred back to his old cell conditions. Id. ¶¶ 35, 37. Eventually, plaintiff was transferred to a cell with a ground-level "feed up slot." Id. ¶ 41.

[13]    Although unclear, it appears that plaintiff is indicating that he was required to climb up the stairs, rather than climb his cell's bars, to retrieve his food from a slot near the ceiling of his cell.

Case 9:17-cv-01349-DNH-TWD    Document 62    Filed 07/22/19    Page 75 of 129

Fox v. Lee, Not Reported in Fed. Supp. (2018)

2018 WL 1211111

**\*4** While keeplocked, plaintiff was subjected to "nearly two weeks" of extreme cold weather, as "civilians" repaired holes in the windows. Pl.'s Mem. of Law ¶ 42. [14] Corrections officers did not provide plaintiff with additional blankets or clothing, and the heat was off. Id. ¶ 42. Corrections officers denied plaintiff cleaning products to clean the feces, urine, and spit stains in his cell's toilet and sink. Id. ¶ 44. Capt. Webbe directed Sgt. Bey to "threaten plaintiff to cut his hair or receive a Tier III misbehavior report." Pl.'s Mem. of Law ¶ 74. Sgt. Bey subsequently issued plaintiff a Tier III misbehavior report. Id. ¶ 77. [15]

[14]    Plaintiff does not provide a date as to when these alleged violations occurred.

[15]    Plaintiff does not specify the subject matter of the Tier III misbehavior report.

### 3. Sexual Harassment

On January 26, 2015, plaintiff was transferred to Eastern's west wing. Pl.'s Mem. of Law ¶ 47. The next day, C.O. Cruz escorted plaintiff to a mental health counseling session. Id. ¶¶ 50, 51. On the return escort, C.O. Cruz brought plaintiff to a secluded area and "sexually frisked" him. Id. ¶ 51. C.O. Cruz "began to go up plaintiff's testicle and penis as he searched plaintiff's body, he pulled plaintiff's legs in a way to seem as if he was being kinky and a dominatrix." Id. ¶ 52. On February 12, 2015, while escorting plaintiff to his disciplinary hearing, C.O. Cruz conducted a pat frisk, in which he "pulled the back of plaintiff's pants down[,] [caressed] plaintiff's thighs, [ ] grinded his penis against plaintiff's buttocks, groped plaintiff's penis and testicles, and then stated, 'I forgot your pussy hurts.' " Id. ¶ 58. At an unspecified date, while Supt. Lee made his rounds, plaintiff requested a transfer from C.O. Cruz's housing unit; Supt. Lee refused the transfer request. Id. ¶ 63. C.O. Cruz's "perverted" behavior continued, and, on various occasions, he opened plaintiff's cell door while plaintiff was naked, which would allow other inmates to observe plaintiff naked. Id. ¶ 62. [16] At an unspecified date, C.O. Cruz instructed plaintiff to "get the fuck on the wall." Pl.'s Mem. of Law ¶ 105. Plaintiff complied, and C.O. Cruz "pull[ed] plaintiff's pants up into the crack of [his] buttock[s], kick[ed] plaintiff's feet, rub[bed] his hands up plaintiff's penis[,] and then banged plaintiff's head on the wall." Id. ¶ 106. That same day, C.O. Cruz ordered plaintiff to return to his cell, and denied plaintiff recreation. Id. ¶ 107. C.O. Cruz told plaintiff that he "can't wait" until

plaintiff was transferred to another jail so that "he could get plaintiff stabbed the fuck up." Id. ¶ 108.

[16]    Plaintiff's facts section contains two paragraphs (¶ ) labeled with 62. See Pl.'s Mem. of Law at !3, 24. The information cited here is taken from the ¶ 62 on page 24 of plaintiff's memorandum of law.

### 4. Due Process

Lieut. Simmons conducted a hearing [17] and informed plaintiff that "his supervisors told him to find [plaintiff] guilty." Id. ¶ 72. Deputy Superintendent Wendland conducted a Tier III hearing [18] as to Sgt. Bey's misbehavior report, and incorrectly stated that plaintiff's hair was "braided and in locks." Id. ¶ 79. At Deputy Superintendent Wendland's hearing, plaintiff produced a prison counselor as a witness, who testified that plaintiff wore his hair in "locks." Id. Plaintiff informed Deputy Superintendent Wendland that his hairstyle was "a part of his religious practice." Id. ¶ 77. [19] Deputy Superintendent Wendland found plaintiff guilty for refusing to cut his hair "after ... [Sgt. Bey] told her that Captain Webbe sent him to threaten [plaintiff]." Id. ¶ 82. Sgt. Vanacore issued plaintiff a misbehavior report for refusing a direct order to cut his hair. Pl.'s Mem. of Law ¶ 109-10. Lieut. Simmons conducted a Tier II disciplinary hearing, and found plaintiff guilty "because his supervisors told him to[ ]." Id. ¶¶ 110-11. [20]

[17]    It is unclear from plaintiff's submission to which disciplinary hearing he is referring, or if the undated and March 6, 2015 misbehavior reports were consolidated into one hearing.

[18]    Plaintiff does not state when this hearing was held.

[19]    Plaintiff's facts section contains two paragraphs (¶ ) labeled 77. See Pl.'s Mem. of Law at 24, 25. The information cited here is taken from the ¶ 77 on page 25.

[20]    Plaintiff does not specify the subject matter of this hearing.

**\*5** On or about April 27, 2015, plaintiff received a misbehavior report for refusing a direct order and violation of grooming standards. Pl.'s Mem. of Law ¶ 124. Lieut. Sullivan conducted a disciplinary hearing, [21] and stated that "he knows it's nothing wrong with [plaintiff's] hair, but [he] should cut it because Lt. Madison don't [sic] like it." Id. Lieut. Sullivan

**Fox v. Lee, Not Reported in Fed. Supp. (2018)**
Case 9:17-cv-01349-DNH-TWD    Document 62    Filed 07/22/19    Page 76 of 129
2018 WL 1211111

sentenced plaintiff to thirty days in keeplock, in addition to the five months he already served. Id.

<sup>21</sup>    Plaintiff does not specify the tier of the disciplinary hearing nor does he state when this hearing was held.

On or about May 15, 2015, Capt. Webbe conducted a disciplinary hearing,[22] and stated that "Supt. Lee sent him to hold the hearing so that he could skim[23] plaintiff real good." Pl.'s Mem. of Law ¶ 121. Capt. Webbe found plaintiff guilty, and sentenced him to four months keeplock and four months loss of phone, commissary, packages, and property. Id. ¶ 122. Capt. Webbe ordered plaintiff to surrender his Koran, religious paperwork and newspapers, and books and magazines. Id. ¶ 123.

<sup>22</sup>    Plaintiff does not specify the tier of the disciplinary hearing.

<sup>23</sup>    Plaintiff defines "skim" as ensuring that he received maximum time. Pl.'s Mem. of Law ¶ 121.

On June 18, 2015, plaintiff was scheduled to be released from keeplock, but Lieut. Simmons changed his release date to July 18, 2015. Pl.'s Mem. of Law ¶ 128. Due to continued extensions for reasons plaintiff does not specify, plaintiff spent an additional seventy-two days in keeplock past his release date. Id. ¶ 129.

### 5. Access to the Courts

Ms. Labatte and Mr. Jennings, both "corrections stewards," refused to give plaintiff "copies," despite plaintiff's indigent status. Pl.'s Mem. of Law ¶ 97. Plaintiff requested copies "for months to do [an] Article 78 for misbehavior reports plaintiff received, and because of the denial, plaintiff has missed the [four] month deadline." Id. ¶ 98. Deputy Calao, Mr. Jennings, and Ms. Labatte continued to deny plaintiff "copies," and because of those denials, plaintiff "lost a non-frivolous [sic] claim." Id. ¶ 143.

### 6. Defendants' Response in Opposition

In opposition, defendants argue that (1) plaintiff failed to provide a complete and accurate statement of material facts pursuant to N.D.N.Y. Local Rule 7.1(a)(3); and (2) plaintiff's submissions fail to establish his entitlement to summary judgment. Dkt. No. 118-3 ("Def.'s Mem. of

Law") at 3-4. Defendants deny the majority of plaintiff's allegations, admitting only that (1) plaintiff filed a grievance on December 10, 2014; (2) Capt. Webbe found no official misconduct following an investigation regarding a frisk and search of plaintiff's cell; (3) plaintiff filed a complaint requesting to be removed from Eastern's west wing following harassment from C.O. Cruz; (4) on March 6, 2015, C.O. Cruz issued plaintiff a misbehavior report; (5) plaintiff received a misbehavior report for possession of property in an unauthorized area, contraband, and providing false statements/information; and (6) C.O. Miller co-signed a misbehavior report against plaintiff. Dkt. No. 118-1 at 3, 4, 5, 6, 10. Defendants allege plaintiff injured his back by falling off of a chair and slipping on ice. Id. at 4. Defendants further contend that the temperature in west wing was not ten degrees, as plaintiff alleges, but rather "estimated to be 67-71 degrees." Id. Defendants argue that plaintiff was not moved to the west wing out of retaliation, as he suggests; rather, plaintiff was "in keeplock status pending a disciplinary hearing for altering the waistband of all his pants such that contraband could be hidden." Id. at 5.

**\*6** In reply, plaintiff argues that (1) this Court "excused" his failure to comply with Local Rule 7.1(a)(3); and (2) he establishes his entitlement of summary judgment on all of his claims. Dkt. No. 123-2 at 3-4. Plaintiff also contends that defendants' cross-motion to dismiss should be denied because they failed to "properly refute" plaintiff's motion for summary judgment. Id. at 13-14.

### B. Defendants' Cross-Motion to Dismiss

Defendants cross-move for dismissal pursuant to Fed. R. Civ. P. 12(b)(c), arguing that (1) plaintiff failed to "allege facts sufficient to state a claim, much less prove one"; and (2) plaintiff failed to exhaust his administrative remedies. Def.'s Mem. of Law at 19-20. In opposition, plaintiff argues that defendants' cross-motion should be denied because (1) defendants failed to "properly refute plaintiff's motion for summary judgment"; (2) plaintiff alleges facts sufficient to state a claim; and (3) plaintiff exhausted his administrative remedies, and in the alternative, administrative remedies were unavailable. Dkt. No. 123-3 at 13-14.

### II. Legal Standards

Case 9:17-cv-01349-DNH-TWD    Document 62    Filed 07/22/19    Page 77 of 129

Fox v. Lee, Not Reported in Fed. Supp. (2018)
2018 WL 1211111

### A. Summary Judgment Standard

"A court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party has the burden of showing the absence of disputed material facts by providing the Court with portions of "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which support the motion. FED. R. CIV. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A fact is material if it may affect the outcome of the case as determined by substantive law, such that "a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "In determining whether summary judgment is appropriate, [the Court will] resolve all ambiguities and draw all reasonable inferences against the moving party." Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

To avoid summary judgment, a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Carey v. Crescenzi, 923 F.2d 18, 19 (2d Cir. 1991) (quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)) (internal quotation marks omitted). A non-moving party must support such assertions by evidence showing the existence of a genuine issue of material fact. Id. "When no rational jury could find in favor of the non-moving party because the evidence to support is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." Gallo v. Prudential Services, Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994).

As the Second Circuit has stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude," ... that a pro se litigant's submissions must be construed "liberally," ... and that such submissions must be read to raise the strongest arguments that they "suggest," At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, ... or arguments that the submissions themselves do not "suggest," ... that we should not "excuse frivolous or vexatious filings by pro se litigants," ... and

that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law....

*7 Id. (citations and footnote omitted); see also Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191-92 (2d Cir. 2008).

### B. Motion to Dismiss under Fed. R. Civ. P. 12(c)

"The standard for addressing a Rule 12(c) motion for judgment on the pleadings is the same as that for a Rule 12(b)(6) motion to dismiss for failure to state a claim." Cleveland v. Caplaw, 448 F.3d 518, 521 (2d Cir. 2006) (citing Karedes v. Ackerley Grp., Inc., 423 F.3d 107, 113 (2d Cir. 2005)). The Court is required to "accept[ ] as true the complaint's factual allegations and draw[ ] all inferences in the plaintiff's favor." Id. However, this "tenet ... is inapplicable to legal conclusions[; thus, t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 554, 555 (2007) (holding that "entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action ... [as] courts are not bound to accept as true a legal conclusion couched as a factual allegation.")).

To defeat a motion to dismiss or a motion for judgment on the pleadings, a claim must include "facial plausibility ... that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678, 129 S.Ct. 1937 (citing Twombly, 550 U.S. at 556, 127 S.Ct. 1955 (explaining that the plausibility test "does not impose a probability requirement ... it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct].")); see also Arar v. Ashcroft, 585 F.3d 559, 569 (2d Cir. 2009) (holding that, "[o]n a motion to dismiss, courts require enough facts to state a claim to relief that is plausible....") (citations omitted).

Still, "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.' " Twombly, 550 U.S. at 555, 127 S.Ct. 1955 (citations omitted). Although a complaint attacked under the standard set forth in Rule 12(b)(6) does not require detailed factual allegations, "a plaintiff's obligation to provide the 'grounds'

Fox v. Lee, Not Reported in Fed. Supp. (2018)

2018 WL 1211111

of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Id. (citations omitted).

### C. N.D.N.Y Local Rule 7.1(a)(3)

N.D.N.Y. Local Rule 7.1(a)(3) requires a party moving for summary judgment to file and serve a Statement of Material Facts. See N.D.N.Y. L.R. 7.1(a)(3). "The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue." Id. The opposing party is required to file a response to the Statement of Material facts "admitting and/or denying each of the movant's assertions in matching numbered paragraphs." Id. "Failure of the moving party to submit an accurate and complete Statement of Material Facts shall result in a denial of the motion." Id. (emphasis omitted).

**\*8** A court is not required to "perform an independent review of the record to find proof of a factual dispute." Amnesty Am. v. Town of W. Hartford, 288 F.3d 467, 470 (2d Cir. 2002). The Local Rules are not "empty formalities," and courts within this District have routinely denied a party's motion for summary judgment based on their failure to file a Statement of Material Facts. See Jackson v. Broome Cty. Corr. Facility, 194 F.R.D. 436, 437 (N.D.N.Y. 2000) (denying the defendant's motion for summary judgment for failure to comply with the Local Rules); Monroe v. Critelli, No. 9:05-CV-1590 (FJS/GHL), 2008 WL 508748, at *2-3 (N.D.N.Y. Feb. 21, 2008) (same); Kele v. Middaugh, No. 9:04-CV-0377 (TJM/GHL), 2006 WL 1313348, at *2 (N.D.N.Y. May 12, 2006) (same); see also Lore v. City of Syracuse, No. 5:00-CV-1833, 2007 WL 655628, at *1 (N.D.N.Y. Feb. 26, 2007) (internal quotation marks and citation omitted) ("The Local Rules are not empty formalities[,] ... serve to notify the parties of the factual support for their opponent's arguments, but more importantly inform the court of the evidence and arguments in an organized way—thus facilitating its judgment of the necessity for a trial. Each of these functions is critical. A party's failure to comply with these rules is fundamentally unfair to the opposing party.").

### III. Discussion [24]

[24] All unpublished opinions cited in this Report-Recommendation and Order, unless otherwise noted, have been provided to plaintiff.

### A. Procedural Issues

#### 1. Statement of Material Facts

Plaintiff failed to submit a Statement of Material Facts in conjunction with his Motion for Summary Judgment; instead, his memorandum of law contains a "Facts" section with numbered paragraphs. Pl.'s Mem. of Law at 4-39. In opposition, defendants argued, in part, that plaintiff's failure to provide a Statement of Material Facts pursuant to Local Rule 7.1(a)(3), and that his motion should be denied on that ground. Dkt. No. 112 at 7. On August 1, 2017, the undersigned issued a Text Order stating that, "[o]ut of extreme solicitude to plaintiff's pro se status, the Court accepts for filing plaintiff's enlarged ... Memorandum of Law for filing that contains his statement of material facts within." Dkt. No. 113. Defendants now renew this argument, contending that plaintiff's "factual statement is insufficient and improper and therefore, defendants cannot properly respond as required by the Local Rules." Def.'s Mem. of Law at 3. In deference to plaintiff's pro se status, the undersigned does not recommend dismissal of plaintiff's motion on this ground. See Bulter v. Hyde, No. 9:08-CV-0299 (LEK/GHL), 2009 WL 3164753, at *3 (N.D.N.Y. Sept. 29, 2009) (declining to recommend dismissal of the pro se plaintiff's Motion for Summary Judgment due to the plaintiff's failure to file an "accurate and complete" Statement of Material Facts). Therefore, the undersigned will review the summary judgment record, and inconsistent and unsupported facts contained in plaintiff's facts section will not be accepted as true. See, e.g., McKnight v. Dormitory Auth. of State of N.Y., 189 F.R.D. 225, 227 (N.D.N.Y. 1999) ("Thus, the Court deems the portions of [d]efendants 7.1(a)(3) statement that are not specifically controverted by Plaintiff to be admitted.").

Insofar as plaintiff argues that defendants failed to properly refute his facts section, the undersigned concludes that defendants' response "mirror[s] the movant's [facts] by admitting and/or denying each of the movant's assertions in matching numbered paragraphs." N.D.N.Y. L.R. 7.1(a)(3); Dkt. No. 118-1. For each denial, defendants set forth a specific citation to the record. See Dkt. No. 118-1. Therefore, the undersigned determines that defendants properly refuted plaintiff's facts section.

**2. Prematurity of Summary Judgment Motion**

In their July 27, 2017 submission, defendants argue that plaintiff's Motion for Summary Judgment is premature because defendants have not completed discovery. Dkt. No. 112 at 5. Plaintiff contends that the motion is not premature because in the "2015 order[,] the Court directed defendants to take plaintiff[']s depositions and defendants willfully failed to." Dkt. No. 123-2 at 3 n.1.

**\*9** Generally, "a party may file a motion for summary judgment at any time until 30 days after the close of all discovery." FED. R. CIV. P. 56(b). However, "[t]he nonmoving party should not be 'railroaded' into his offer of proof in opposition to summary judgment." Trebor Sportswear Co., Inc. v. The Limited Stores, Inc., 865 F.2d 506, 511 (2d Cir. 1989) (citing Celotex Corp., 477 U.S. at 326, 106 S.Ct. 2548). "Under Rule 56(f), summary judgment 'may be inappropriate where the party opposing it shows ... that he cannot at the time present facts essential to justify his opposition.' " Id. (citing FED. R. CIV. P. 56(e) advisory committee's note to 1963 amendment). Nevertheless, a "trial court may properly deny further discovery if the nonmoving party has had a fully adequate opportunity for discovery." Id. (citing First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 290-99, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)).

Plaintiff commenced this action on April 2, 2015. Dkt. No. 1 ("Compl."). The Mandatory Pretrial Discovery and Scheduling Order directed that all discovery be completed before April 5, 2016. Dkt. No. 33 at 4. On February 2, 2016, plaintiff filed a motion to amend his complaint and submitted his mandatory disclosures. Dkt. Nos. 42, 43. On April 1, 2016, plaintiff filed a second motion to amend his complaint. Dkt. No. 55. On July 27, 2016, the undersigned issued a Text Order denying plaintiff's February 2, 2016 leave to file a motion to amend, and acknowledging that his April 1, 2016 motion to amend would be reviewed by the Court. Dkt. No. 65. On May 19, 2016, defendants filed a letter motion requesting an extension of the April 5, 2016 discovery deadline "to depose the plaintiff after a decision is rendered on the plaintiff's motion to amend his complaint." Dkt. No. 60. On June 2, 2016, the undersigned issued a Text Order resetting the discovery deadline to June 30, 2016, and staying defendants' motion to extend the discovery deadline until the undersigned decided plaintiff's motion to amend. Dkt. No. 61. On December 19, 2016, the undersigned granted

plaintiff's April 1, 2016 motion to amend his complaint. Dkt. No. 75. The undersigned set new answer deadlines, and new defendants were served. Text Min. Entry dated Dec. 19, 2016. On June 14, 2017, plaintiff filed a motion to supplement his complaint. Dkt. No. 105. On June 19, 2017, the undersigned issued a Text Order directing that all discovery be completed by October 2, 2017. Dkt. No. 106. On June 29, 2017, plaintiff advised the Court that he would not be submitting a second amendment to his complaint. Dkt. No. 109. On July 17, 2017, plaintiff moved for summary judgment. Dkt. No. 111.

Defendants argue that due to (1) the June 2, 2016 stay of discovery; (2) the December 19, 2016 grant of plaintiff's motion to amend; and (3) plaintiff's indication that he wanted to further supplement his complaint, they did not have ample opportunity to depose plaintiff. Dkt. No. 112-1 ¶¶ 39-41. In light of the fact that plaintiff's case has been pending for over two years, in the interest of judicial efficiency, the undersigned declines to recommended dismissal of plaintiff's Motion for Summary Judgment on the basis that it is premature. Defendants are not prejudiced by such conclusion as the undersigned recommends plaintiff's Motion for Summary Judgment be denied. See Young v. Benjamin Dev. Inc., 395 Fed.Appx. 721, 723 (2d Cir. 2010) (summary order) ("Even if Young had been granted the discovery he sought, it would not have changed the outcome of this matter."); Davidson v. Talbot, No. 9:01-CV-0473, 2005 WL 928620, at \*16 (N.D.N.Y. Mar. 31, 2005) ("Moreover, limited discovery that may possibly address the issue of exhaustion would not shed any further light on the merits of his constitutional claims, which the Court has already found to be frivolous and lacking merit."). Therefore, it is recommended that defendants' Motion to Dismiss be denied on this ground.

**3. Exhaustion**

**\*10** Defendants contend that plaintiff failed to exhaust his administrative remedies prior to commencing this action. Def.'s Mem. of Law at 20-22. Plaintiff argues that he fully exhausted his administrative remedies. Dkt. No. 123-2 at 4 n.3, 13. Plaintiff claims that he appealed his grievance alleging retaliation and harassment to CORC on or about January 2, 2015. Id. at 14. When CORC failed to render a decision within the requisite time frame, he initiated the present action in federal court, "as he was being abused and had no other avenue." Id. Additionally, plaintiff contends that, as to his Eighth Amendment conditions of confinement claims, the grievance supervisor refused to forward his

Fox v. Lee, Not Reported in Fed. Supp. (2018)

Case 9:17-cv-01349-DNH-TWD    Document 62    Filed 07/22/19    Page 80 of 129

2018 WL 1211111

grievances to "administrative [sic] at the highest channels, and when plaintiff attempted to forward [them] [himself], the mail clerks discarded [the mail] so plaintiff was blocked." Pl.'s Mem. of Law ¶ 30.

The Prison Litigation Reform Act ("PLRA") requires that a prisoner exhaust any administrative remedies available to him or her before bringing an action for claims arising out of his or her incarceration. See Porter v. Nussle, 534 U.S. 516, 524, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002); see also Woodford v. Ngo, 548 U.S. 81, 82, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006). The exhaustion requirement applies "to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter, 534 U.S. at 532, 122 S.Ct. 983. Further, the exhaustion requirement applies even where the prisoner seeks relief not available in the administrative grievance process, such as monetary damages. Id. at 524, 122 S.Ct. 983. To exhaust administrative remedies, the inmate must complete the full administrative review process set forth in the rules applicable to the correctional facility in which he or she is incarcerated. See Jones v. Bock, 549 U.S. 199, 218, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007) (internal citation omitted).

Although the Supreme Court of the United States has deemed exhaustion mandatory, the Second Circuit has recognized that "certain caveats apply." Ruggiero v. Cty. of Orange, 467 F.3d 170, 175 (2d Cir. 2006) (citation omitted). The Supreme Court recently held that "[c]ourts may not engraft an unwritten 'special circumstances' exception onto the PLRA's exhaustion requirement." Ross v. Blake, —— U.S. ——, 136 S.Ct. 1850, 1862, 195 L.Ed.2d 117 (2016). Thus, the "special circumstances" exception in Hemphill v. New York, 680 F.3d 680, 686 (2d Cir. 2004) is no longer consistent with the statutory requirements of the PLRA. Williams v. Priatno, 829 F.3d 118, 123 (2d Cir. 2016).[25]

[25]  In Williams v. Priatno, the Second Circuit debated Ross's effect on Hemphill's estoppel exception. See Williams, 829 F.3d at 123. The Williams Court stated that "Ross largely supplants our Hemphill inquiry by framing the exception issue entirely within the context of whether administrative remedies were actually available to the aggrieved inmate." Id. (citing Ross, 136 S.Ct. at 1858-59).

Although Ross eliminates the "special circumstances" exception, courts must still consider the PLRA's "textual exception to mandatory exhaustion." Ross, 136 S.Ct. at

1858. Under this exception, courts must determine whether administrative remedies were "available" to a prisoner. Id. The Supreme Court identified three circumstances where administrative remedies may be unavailable to a prisoner. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." Id. at 1859 (citing Booth v. Churner, 532 U.S. 731, 736, 738, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001)). "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." Id. Lastly, administrative remedies are unavailable where "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." Id. at 1860.

### 4. Did Plaintiff Exhaust his Administrative Remedies?

**\*11**  There is no genuine dispute that at all relevant times, DOCCS had in place a three-step inmate grievance program. N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5.[26] "[I]nmates are not required to specially plead or demonstrate exhaustion in their complaints." Jones, 549 U.S. at 216, 127 S.Ct. 910. Nevertheless, failure to exhaust may be the basis for dismissal on a motion to dismiss for failure to state a claim. See id. It is well-settled that:

> If non[-]exhaustion is clear from the face of the complaint (and incorporated documents), a motion to dismiss pursuant to Rule 12(b)(6) for failure to exhaust should be granted.

> If non[-]exhaustion is not clear from the face of the complaint, a defendant's motion should be converted, pursuant to Rule 12(b), to one for summary judgment limited to the narrow issue of exhaustion and the relatively straightforward questions about the plaintiff's efforts to exhaust, whether remedies were available, or whether exhaustion might be, in very limited circumstances, excused.

Scott v. Gardner, 287 F.Supp.2d 477, 485 (S.D.N.Y. 2003) (internal quotation marks omitted) (quoting McCoy v. Goord, 255 F.Supp.2d 233, 248 (S.D.N.Y. 2003)).

**Fox v. Lee, Not Reported in Fed. Supp. (2018)**
2018 WL 1211111

Case 9:17-cv-01349-DNH-TWD    Document 62    Filed 07/22/19    Page 81 of 129

If a prisoner chooses to plead facts regarding exhaustion, and those facts show that he failed to exhaust his available administrative remedies, then his complaint may be dismissed for failure to state a claim. Simply stated, if a prisoner says nothing or little about exhaustion in his *pro se* civil rights complaint, he is likely protected from a [Rule] 12(b)(6) motion to dismiss premised on failure to exhaust. However, if he says too much about exhaustion in that complaint so that his non-exhaustion is readily apparent, he may "plead himself out of court," as the saying goes.

Trapani v. Pullen, No. 9:14-CV-00556 (TJM/TWD), 2016 WL 1295137, at *6 (N.D.N.Y. Feb. 18, 2016) (internal quotation marks and citations omitted). To the extent plaintiff discusses possible exhaustion, both his complaint and his amended complaint reference filing grievances, but do not comment on the status of those grievances or the level they were at in the administrative process. See generally Compl.; Am. Compl. [27] Because plaintiff has said "little" regarding exhaustion his complaints, non-exhaustion is not "readily apparent" from the face of his complaint. See Trapini, 2016 WL 1295137, at *6; Morgan v. Ward, No.1:14-CV-7921-GHW, 2016 WL 427913, at *1 (S.D.N.Y. Feb. 2, 2016) ("Because exhaustion of remedies is an affirmative defense, and the plaintiff's failure to exhaust his remedies is not apparent on the face of the complaint, the motion to dismiss the action in its entirety is denied."); cf. Lewis v. Hanson, No. 9:16-CV-804 (MAD/TWD), 2017 WL 4326084, at *3 (N.D.N.Y Sept. 28, 2017) ("In his July 5, 2016 complaint, Plaintiff states that his 'grievance is pending.' Therefore, it is clear from the face of the complaint that Plaintiff had not exhausted his administrative remedies at the time he initiated this action."); Cuadrado v. Brueault, No. 9:14-CV-1293 (DNH/CFH), 2015 WL 1606178, at *4 (N.D.N.Y. Apr. 8, 2015) (establishing that because the plaintiff's complaint stated "grievance is still pending," it was clear from the face of the complaint that the plaintiff had not exhausted his administrative remedies).

[26] First, the inmate must file a complaint with an inmate grievance program ("IGP") clerk within twenty-one days of the alleged incident. N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5(a)(1). An IGP representative has sixteen calendar days to informally resolve the issue. Id. § 701.5(b)(1). If no informal resolution occurs, the IGRC must hold a hearing within sixteen days of receipt of the grievance and must issue a written decision within two working days after the conclusion of the hearing. Id. §§ 701.5(b)(2)(i)-(ii). If the determination is unfavorable to the inmate, the inmate may appeal the IGRC's determination to the facility superintendent within seven calendar days of receipt of the determination. Id. § 701.5(c)(1). If the superintendent's determination is unfavorable, the inmate may appeal to CORC within seven days after receipt of the superintendent's determination. Id. §§ 701.5(d)(i)-(ii). CORC must "review each appeal, render a decision on the grievance, and transmit its decision to the facility, with reasons stated, for the [inmate], the grievance clerk, the superintendent, and any direct parties within thirty (30) calendar days from the time the appeal was received." Id. § 701.5(d)(3)(ii).

[27] Insofar as defendants argue that "plaintiff's own amended complaint states that plaintiff did not exhaust many of his claims," Def.'s Mem. of Law at 5 n.5, the undersigned notes that plaintiff also suggests that there may be an excuse for the failure to exhaust. In the portion of the amended complaint that defendants cite, plaintiff contends, regarding his Eighth Amendment conditions of confinement claim, that the "grievance supervisor refused to forward plaintiff's grievances to administration at the highest channels, and when plaintiff attempted to forward it [him]self[,] the mail clerks discarded it ... so plaintiff was blocked." Am. Compl. ¶ 30. This, plaintiff suggests that administrative remedies may have been unavailable.

**\*12** As non-exhaustion is not clear from the face of plaintiff's complaint, in order to consider the documents defendants attach to their motion, defendants' motion must be converted to one for summary judgment for the limited purpose of determining exhaustion. See Gardner, 287 F.Supp.2d at 487. However, the Federal Rules require that this Court "ensure that the opposing party is given proper notice of the conversion." McCoy, 255 F.Supp.2d at 251 (citing Villante v. Dep't of Corr. of City of New York, 786 F.2d 516, 521 (2d Cir. 1986)). "Such notice is especially important when a plaintiff is pro se; the Second Circuit has required 'unequivocal notice' of conversion." Id. (citing Beacon Enters., Inc. v. Menzies, 715 F.2d 757, 767 (2d Cir. 1983)). Defendants have not provided plaintiff

**Fox v. Lee, Not Reported in Fed. Supp. (2018)**
Case 9:17-cv-01349-DNH-TWD    Document 62    Filed 07/22/19    Page 82 of 129

2018 WL 1211111

with "unequivocal notice" of potential conversion; thus, the undersigned recommends that defendants' Motion to Dismiss be denied without prejudice, with the opportunity to renew by way of a combined motion to dismiss and motion for summary judgment limited to the issue of exhaustion, or, in the alternative, by way of an exhaustion hearing, should defendants request such a hearing. See Dawkins v. Jones, No. 03Civ.0068(DAB)(AJP), 2005 WL 196537, at *1 (S.D.N.Y. Jan. 31, 2005) (denying the defendants' motion to dismiss because non-exhaustion is unclear from the face of the complaint, and granting leave to renew as a combined motion to dismiss and for summary judgment).

### B. Merits Review of Motion for Summary Judgment

### 1. First Amendment

Plaintiff contends that defendants violated his First Amendment rights by (1) infringing on his freedom of expression; (2) preventing him from freely exercising his religion; (3) subjecting him to retaliation; and (4) infringing on his right of access to the courts. Pl.'s Mem. of Law at 44-54, 69. Defendants argue that plaintiff fails to establish his entitlement to summary judgment. Def.'s Mem. of Law at 5-10.

### a. Freedom of Expression and Free Exercise Claims [28]

[28]    Plaintiff's freedom of expression claim is "cognizable under the First Amendment's Free Exercise Clause." Shepherd v. Fisher, No. 08-CV-9297 (RA), 2017 WL 666213, at *31 (S.D.N.Y. Feb. 16, 2017). Therefore, plaintiff's freedom of expression claim will be discussed in conjunction with his free exercise claim.

Plaintiff contends that Supt. Lee, DSS Russo, Lieut. Madison, Lieut. Simmons, Lieut. Sullivan, Deputy Superintendent Wendland, Capt. Webbe, Sgt. Bey, Sgt. Vanacore, Sgt. Barg, [29] C.O. Waugh, C.O. Miller, C.O. Williamson, and C.O. Cruz violated his First Amendment free exercise rights by "punish[ing] [him] for expressing his religious belief through his Mohawk hairstyle." Pl.'s Mem. of Law at 44, 49. The First Amendment protects the right to free exercise of religion. See generally Cutter v. Wilkinson, 544 U.S. 709, 719, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005). "Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's

Free Exercise Clause." Ford v. McGinnis, 352 F.3d 582, 588 (2d Cir. 2003) (citing Pell v. Procunier, 417 U.S. 817, 822 (1974)).

> To assess a free exercise claim, a court must determine (1) whether the practice asserted is religious in the person's scheme of beliefs, and whether the belief is sincerely held; (2) whether the challenged practice of the prison officials infringes upon the religious belief; and (3) whether the challenged practice of the prison officials furthers some legitimate penological objective.

Farid v. Smith, 850 F.2d 917, 926 (2d Cir. 1988) (citations omitted). This right is not absolute and can be limited due to the inmate's "incarceration and from valid penological objectives—including deterrence of crime, rehabilitation of prisoners, and institutional security." O'Lone v. Estate of Shabazz, 482 U.S. 342, 348, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987) (citations omitted); see also Benjamin v. Coughlin, 905 F.2d 571, 574 (2d Cir. 1990) ("The governing standard is one of reasonableness, taking into account whether the particular regulation ... is reasonably related to legitimate penological interests.") (citations omitted).

> The Turner Court determined that the four factors to be considered are: 1) whether there is a rational relationship between the regulation and the legitimate government interests asserted; 2) whether the inmates have alternative means to exercise the right; 3) the impact that accommodation of the right will have on the prison system; and 4) whether ready alternatives exist which accommodate the right and satisfy the governmental interest.

**\*13**  Benjamin, 905 F.2d at 574 (citing Turner v. Safely, 483 U.S. 78, 89-91 (1987)).

**Fox v. Lee, Not Reported in Fed. Supp. (2018)**
Case 9:17-cv-01349-DNH-TWD    Document 62    Filed 07/22/19    Page 83 of 129
2018 WL 1211111

29    Plaintiff alleges that Sgt. Barg only violated his free exercise of religion. Pl.'s Mem. of Law at 48.

### i. Sincerely-Held Belief

It is the plaintiff's burden to establish that "the disputed conduct substantially burdens his sincerely held beliefs." Salahuddin v. Goord, 467 F.3d 263, 274-75 (2d Cir. 2006) (citing Ford, 352 F.3d at 591). However, in assessing whether a plaintiff's belief is sincerely held, courts may not "question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds." McEachin v. McGuinnis, 357 F.3d 197, 201 (2d Cir. 2004) (quoting Hernandez v. Comm'r, 490 U.S. 680, 699, 109 S.Ct. 2136, 104 L.Ed.2d 766 (1989)) (internal quotation marks omitted).

Defendants contend that they "have no ability to counter plaintiff's bald, conclusory statement of belief, or challenge whether his beliefs related to his hairstyle are 'religious in nature' with any admissible evidence" because of the lack of discovery. Def.'s Mem. of Law at 6. The undersigned agrees, and concludes that the record is insufficient to determine whether plaintiff has a sincerely-held belief in the Anunaki religion.

In Singh v. Goord, the Second Circuit acknowledged the "difficulty of assessing the sincerity of an individual's religious beliefs." Singh v. Goord, 520 F.Supp.2d 487, 499 (S.D.N.Y. 2007). Nonetheless, it concluded that the plaintiff had established the first prong of the test, as the evidence indicated that:

> 1) plaintiff was born a Sikh, was raised as a Sikh, and regularly attended Sikh services growing up; 2) plaintiff consistently expressed his belief in Sikhism since he was first incarcerated; and that 3) plaintiff has engaged in hunger strikes in protest of the denial of religious exercise, and has continued to adhere to the teachings of his religion, despite being punished for doing so.

Id.

Here, plaintiff offers no evidence as to the sincerity of his religious beliefs other than the conclusory allegation that his "religious belief is sincerely held as [he] is a member of the Anunaki religion." Pl.'s Mem. of Law at 44, 48-49; cf. Panayoty v. Annucci, 898 F.Supp.2d 469, 482-83 (N.D.N.Y. 2012) (concluding that the plaintiffs' detailed declarations explaining their religion's structure and belief system established that the religion was, "for First Amendment purposes, religious in [its] scheme of beliefs and such beliefs [were] sincerely held."). The record also does not sufficiently support plaintiff's allegation that his Mohawk hairstyle "is religious and represents in part higher conscious [and] resurrection," or that his hairstyle is otherwise related to his sincerely-held religious beliefs. Dkt. No. 123-2 at 5. Further, insofar as plaintiff claims that yoga magazines constitute religious materials, Pl.'s Mem. of Law ¶ 145—and their confiscation violated his constitutional rights—there is not enough information in the record to establish whether the yoga magazines relate to his faith to amount to religious reading materials.

*14  Moreover, unlike the plaintiff in Singh, there is no indication in the record that plaintiff "consistently expressed his belief ... since he was first incarcerated"; indeed, the record suggests the opposite. Singh, 520 F.Supp. at 499. In his amended complaint, plaintiff alleges that he is registered "N.o.I." ("Nation of Islam"),30 and that the defendants prevented him from "attend[ing] services for the month of Ramadan[,] for fasting[,] and Brotherhood with fellow prisoners." Am. Compl. at 40. Thus, plaintiff's amended complaint conflicts insofar as he indicates he is a member of the Nation of Islam in one portion of the complaint, and of the Anunkai religion in his Motion for Summary Judgment. Compare Am. Compl. at 40 ("N.o.I") with Pl.'s Mem. of Law at 44, 48-49 (member of Anunkai religion). Such inconsistencies in plaintiff's allegations create an issue of material fact regarding the religion with which plaintiff identified that cannot be decided on summary judgment. See Jordan v. Fischer, 773 F.Supp.2d 255, 262 (N.D.N.Y. 2011) ("Insofar as Jordan contends that he should be entitled to summary judgment on this claim, the court rejects that contention in light of the factual disputes and inconsistencies in Jordan's allegations."). Further, plaintiff has not established that he has a sincerely-held belief as a member of multiple religions. Therefore, the record is unclear as to whether plaintiff has a sincerely-held belief in the Anunaki religion.

**Fox v. Lee, Not Reported in Fed. Supp. (2018)**
**Case 9:17-cv-01349-DNH-TWD    Document 62    Filed 07/22/19    Page 84 of 129**
2018 WL 1211111

30    Plaintiff varies in the capitalization of "N.o.I."

### ii. Legitimate Penological Purpose

Even if the undersigned concluded that plaintiff established a "sincerely-held belief" in the Anunkai religion, plaintiff's claim must be denied because defendants establish that they had a legitimate penological purpose. See Salahuddin, 467 F.3d at 274. Once a plaintiff has demonstrated a sincerely-held religious belief, the burden shifts to defendants to establish a legitimate penological purpose. See id. If a legitimate penological purpose is identified, the Court must then assess its reasonableness under the Turner factors set forth above. See subsection III.B.1.a., supra.

Assistant Commissioner for Correctional Facilities James A. O'Gorman and DSS Russo declared that DOCCS Directive 4914 regulates grooming standards as "hair styles can [ ] be used to hide or transport contraband, including but not limited to, drugs, weapons and unauthorized communications." Dkt. No. 119-14 ("O'Gorman Decl.") at 3; Dkt. No. 119-15. ("Russo Decl.") at 3. Thus, because "[p]revening the smuggling of contraband, such as weapons and drugs, comports with the type of penological interests contemplated under the Turner ... standard," defendants have set forth a legitimate penological interest. Benjamin v. Coughlin, 905 F.2d 571, 578 (2d Cir. 1990). DSS Russo further declares that plaintiff's "disciplinary history has occasions where drugs and smuggling have occurred," and that plaintiff's hairstyle "become[s] difficult to search when the need arises." Russo Decl. at 4. Plaintiff does not argue that defendants' alleged justification is pretextual, and the record does not support such a conclusion. See Lowrance v. Coughlin, 862 F.Supp. 1090, 1103 (S.D.N.Y. 1994) ("Plaintiff has successfully demonstrated that the exercise of his First Amendment rights was a substantial factor motivating this transfer, and that the justification offered by the defendants was a pretext. During plaintiff's incarceration at Auburn, several incidents occurred demonstrating hostility by DOCS personnel toward plaintiff's exercise of his right to religious freedom and free speech."). Thus, plaintiff has not established that there is no genuine dispute as to any material fact to warrant summary judgment. FED. R. CIV. P. 56(a). Accordingly, it is recommended that plaintiff's Motion for Summary Judgment as to his freedom of expression and free exercise claims be denied.

### b. Retaliation

Plaintiff contends that his "right to the freedom of speech to file grievances and civil suits is protected, [and] defendants took adverse action against [him] for filing grievances and civil suits about [their] violations of his freedom of expression by him wearing a Mohawk haircut and his free exercise of religion." Pl.'s Mem. of Law at 53.

Courts are to "approach [First Amendment] retaliation claims by prisoners 'with skepticism and particular care[.]' " See, e.g., Davis v. Goord, 320 F.3d 346, 352 (2d Cir. 2003) (quoting Dawes v. Walker, 239 F.3d 489, 491 (2d Cir. 2001), overruled on other grounds by Swierkiewicz v. Sorema, N. A., 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002)). A retaliation claim under Section 1983 may not be conclusory and must have some basis in specific facts that are not inherently implausible on their face. See Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009); South Cherry St., LLC v. Hennessee Grp. LLC, 573 F.3d 98, 110 (2d Cir. 2009). "To prove a First Amendment retaliation claim under Section 1983, a prisoner must show that '(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action.' " Espinal v. Goord, 558 F.3d 119, 128 (2d Cir. 2009) (quoting Gill v. Pidlypchak, 389 F.3d 379, 380 (2d Cir. 2004), overruled on other grounds by Swierkiewicz, 534 U.S. at 560, 122 S.Ct. 999). In order to prove an adverse action, a plaintiff must show that the defendant's " 'retaliatory conduct ... would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights.... Otherwise, the retaliatory act is simply de minimis, and therefore outside the ambit of constitutional protection.' " Roseboro v. Gillespie, 791 F.Supp.2d 353, 366 (S.D.N.Y. 2011) (quoting Dawes, 239 F.3d at 292-93). If the plaintiff meets this burden, the defendants must show, by a preponderance of the evidence, that they would have taken the adverse action against the plaintiff "even in the absence of the protected conduct." Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). "Types of circumstantial evidence that can show a causal connection between the protected conduct and the alleged retaliation include temporal proximity, prior good discipline, finding of not guilty at the disciplinary hearing, and statements by defendants as to their motives." Barclay v. N.Y., 477 F.Supp.2d 546, 558 (N.D.N.Y. 2007).

Fox v. Lee, Not Reported in Fed. Supp. (2018)

2018 WL 1211111

**\*15** To satisfy the first element of a retaliation claim, a plaintiff must show that he engaged in a protected activity. See Espinal, 558 F.3d at 128. The Second Circuit has concluded that use of the prison grievance system constitutes a protected activity. See Gill, 389 F.3d at 384; Franco v. Kelly, 854 F.2d 584, 589 (2d Cir. 1988) ("Moreover, intentional obstruction of a prisoner's right to seek redress of grievances is precisely the sort of oppression that section 1983 is intended to remedy.") (alteration and internal quotation marks omitted); see also Roseboro, 791 F.Supp.2d at 367 (finding that the filing of a grievance is a protected activity); Mateo v. Fischer, 682 F.Supp.2d 423, 433 (S.D.N.Y. 2010) (same).

Plaintiff contends that: (1) on or about November 11, 2014, Lieut. Simmons conducted a disciplinary hearing and found plaintiff not guilty of refusing a direct order to cut his hair; (2) on November 29, 2014, Lieut. Madison "complain[ed] about plaintiff being found not guilty"; (3) C.O. Cruz "volunteered to assure that plaintiff [would] be punished"; (4) plaintiff filed a grievance against Lieut. Madison; (5) C.O. Cruz directed C.O. Williamson to write plaintiff a misbehavior report for refusal to comply with DOCCS Directive 4914 "out of retaliation for plaintiff's grievances"; (6) on December 23, 2014, Sgt. Bey issued plaintiff a misbehavior report for his refusal to cut his hair "out of retaliation again after plaintiff was not found guilty on two occasions"; (7) on January 16, 2015, Deputy Superintendent Wendland conducted a misbehavior hearing and found plaintiff guilty for refusing to cut his hair; (8) C.O. Kozak issued plaintiff a frivolous misbehavior report for unspecified behavior; (9) C.O. Waugh subjected plaintiff to retaliatory searches "out of retaliation"; (10) Capt. Webbe, DSS. Russo, and Supt. Lee "refused to stop their subordinates and punished plaintiff out of retaliation for plaintiff's grievances"; (11) in April 2015, Lieut. Simmons conducted a disciplinary hearing and found plaintiff guilty of refusing a direct order to cut his hair; and (12) C.O. Miller, Sgt. Vanacore, and Sgt. Barg "punished plaintiff for refusing to cut his hair ... out of retaliation for plaintiff writing grievance [sic] and wearing a Mohawk hairstyle." Pl.'s Mem. of Law at 53-56.

Although plaintiff alleges that defendants retaliated against him because he filed grievances, plaintiff's own recitation of the facts also suggests that defendants retaliated against him because he was found not guilty at disciplinary proceedings, wore a Mohawk hair style, or some combination of the two. See Pl.'s Mem. of Law at 53-56. Thus, defendants' alleged motive is unclear. First, plaintiff has not established

that his grievances were a "substantial or motivating factor" for defendants' alleged adverse action. Cole v. Fischer, 416 Fed.Appx. 111, 113 (2d Cir. 2011) (summary order) ("To show retaliation, [the plaintiff] was required to present evidence that his constitutionally protected conduct in filing past grievances was a substantial or motivating factor for a prison official's adverse action.") (citing Bennett v. Goord, 343 F.3d 122, 137 (2d Cir. 2003)). Second, to the extent that plaintiff suggests that his Mohawk hair style—which he wore as an expression of his religion—was the "substantial or motivating factor" for defendants' alleged adverse action, plaintiff must establish that "the disputed conduct substantially burden[ed] his sincerely[-] held religious beliefs." Washington v. Gonyea, 538 Fed.Appx. 23, 26 (2d Cir. 2013) (summary order). Even if it were clear that plaintiff was arguing that his religion was a substantial or motivating factor for defendants' conduct, because plaintiff has not demonstrated that he has a sincerely-held religious belief, he cannot show defendants' conduct "burdened" a sincerely-held religious belief. Washington, 538 Fed.Appx. at 26. Thus, plaintiff fails to demonstrate that his religion, through his hair style, was a substantial or motivating factor for defendants' conduct. Finally, insofar as plaintiff suggests that his "not guilty" disposition at a disciplinary hearing was a substantial and motivating factor for defendants' conduct, such circumstantial evidence may establish a causal connection between a plaintiff's conduct and a defendant's adverse action, but does not constitute protected conduct. See Barclay, 477 F.Supp.2d at 558 ("Types of circumstantial evidence that can show a causal connection between the protected conduct and the alleged retaliation include temporal proximity, prior good discipline, *finding of not guilty at the disciplinary hearing,* and statements by defendants as to their motives.") (emphasis added). Accordingly, it is recommended that plaintiff's Motion for Summary Judgment as to his retaliation claims be denied.

### c. Access to the Courts

**\*16** Plaintiff contends that Deputy Calao violated his right of access to the courts by "refus[ing] to appoint [him] an inmate law clerk and instead forc[ing] [him] to use a book request system." Pl.'s Mem. of Law at 69-70. Plaintiff further contends that Mr. Jennings and Ms. Labatte delayed sending his appeal brief relating to a state court claim and denied him copies. Id.

Case 9:17-cv-01349-DNH-TWD    Document 62    Filed 07/22/19    Page 86 of 129

Fox v. Lee, Not Reported in Fed. Supp. (2018)

2018 WL 1211111

### i. Inmate Law Clerk

Plaintiff contends that Deputy Calao knew that "plaintiff was keeplocked confined and couldn't physically get to the law library to do research and need[ed] a law clerk to assist him." Pl.'s Mem. of Law at 69. Instead, Deputy Calao "refused to appoint plaintiff [an] inmate law clerk and [ ] forced plaintiff to use a book request system making research very hard and time consuming." Id. Defendants argue that (1) plaintiff cannot allege actual injury; and (2) plaintiff does not have a constitutional right to an inmate law clerk. Def.'s Mem. of Law at 14-15.

The Supreme Court has held "that the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." Bounds v. Smith, 430 U.S. 817, 828, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977); see also Lewis v. Casey, 518 U.S. 343, 351, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996). This right is not unlimited and "an inmate cannot establish relevant actual injury simply by establishing that his prison's law library or legal assistance program was subpar in some theoretical sense." Lewis, 518 U.S. at 351, 116 S.Ct. 2174. Thus, to demonstrate an actionable injury, "a plaintiff must assert non-conclusory allegations demonstrating both (1) that the defendant acted deliberately and maliciously, and (2) that the plaintiff suffered an actual injury." Vega v. Artus, 610 F.Supp.2d 185, 201 (N.D.N.Y. 2009) (citations omitted); see also Lewis, 518 U.S. at 351-52, 116 S.Ct. 2174 (explaining the actual injury requirement). Such injury must affect "a nonfrivolous legal claim [which] had been frustrated or was being impeded due to the actions of prison officials." Warburton v. Underwood, 2 F.Supp.2d 306, 312 (W.D.N.Y. 1998) (citations omitted); Shine v. Hofman, 548 F.Supp.2d 112, 117-18 (D. Vt. 2008) (explaining that actual injury "is not satisfied by just any type of frustrated legal claim because the Constitution guarantees only the tools that inmates need in order to attack their sentences ... and ... challenge the conditions of their confinement.") (internal quotation marks and citations omitted).

Plaintiff does not establish in non-conclusory terms that Dept. Calao deliberately and maliciously denied him legal assistance. See Pl.'s Mem. of Law at 71. Plaintiff solely argues that "[d]efendant[ ] Calao ... deliberately violated [his] right of access to the courts."). Moreover, the record

lacks evidence of Dep. Calao's intent. Insofar as plaintiff contends that the book request system did not amount to legal assistance, courts tend to give "close scrutiny to ... remote control arrangements"—like book request systems —"[b]ecause of the practical difficulties in doing research without free access to a library." Griffin v. Coughlin, 743 F.Supp. 1006, 1023 (N.D.N.Y. 1990) (internal quotation marks and citation omitted). The Griffin Court found that a book request system failed to provide the plaintiffs with "meaningful, adequate access to the courts," relying on the plaintiffs' allegations that they were unable to "browse through materials in order to compare legal theories and formulate ideas," "experience[d] delays in receiving books," and "receive[d] books other than the ones they requested." Id. at 1023-24. The record here lacks such allegations. Plaintiff merely alleges that the book request system was "very hard and time consuming." Pl.'s Mem. of Law at 69. However, he does not contend that he was unable to obtain the legal materials he requested.

**\*17** Even assuming Deputy Calao acted deliberately and maliciously in denying plaintiff an inmate law clerk, the record does not establish that Deputy Calao's alleged denial resulted in actual injury. See Lewis, 518 U.S. at 351-52, 116 S.Ct. 2174 (explaining the actual injury requirement). Plaintiff's contentions that he "lost a civil suit against the City of Utica Police Department for brutality that [he] was unable to appeal because he had no help and was denied copies[,] [and] also [ ] was unable to do Article 78 to the Court" are not supported in the record. Pl.'s Mem. of Law at 70. Thus, it is unclear whether Deputy Calao impeded plaintiff's meritorious claim. As the record is unclear as to whether plaintiff suffered actual injury due to Deputy Calao's denial of an inmate law clerk, it is recommended that plaintiff's Motion for Summary Judgment as to his access to the courts claim against Deputy Calao be denied.

### ii. Interference with Legal Mail

Plaintiff contends that Mr. Jennings and Ms. Labatte "held [his] appeal brief for three weeks before mailing it and once the court received it, it was untimely and dismissed." Pl.'s Mem. of Law at 70. Plaintiff further claims that if Mr. Jennings and Ms. Labatte had "sent [his] appeal brief expeditiously as they supposed too [sic] plaintiff would have won his appeal and been released from prison." Id. Further, plaintiff contends that Mr. Jennings and Ms. Labatte denied him copies. Pl.'s Mem. of Law at 69-70. Defendants argue

that plaintiff does not have a constitutionally-protected right to "expeditious mail delivery." Def.'s Mem. of Law at 15. [31]

[31]    Defendants note that plaintiff brought this First Amendment access to the courts claim against Ms. Labatte in a prior lawsuit. See Dkt. No. 119-11 at 8-9; Fox v. Labatte, No. 9:15-CV-0144 (LEK/DJS), 2016 WL 1266958 (N.D.N.Y. Mar. 31, 2016). Because the Court in Fox v. Labatte concluded that plaintiff "did not exhaust all of his available administrative remedies prior to bringing the within action," his claim was dismissed without prejudice, and, therefore, he is not barred from bringing the claim in the present action. See Leal v. Johnson, 315 F.Supp.2d 345, 347 (W.D.N.Y.) ("Thus, although the exhaustion requirement is not jurisdictional, Richardson v. Goord, 347 F.3d 431 (2d Cir. 2003), where it appears that plaintiff has begun, but not completed, the grievance procedure, the appropriate course would be to dismiss the action without prejudice to allow plaintiff to meet the exhaustion requirement.") (internal citation omitted).

"A prisoner's right to the free flow of incoming and outgoing mail is protected by the First Amendment." Davis v. Goord, 320 F.3d 346, 351 (2d Cir. 2003) (citations omitted). To state a prima facie access to the courts claim based on interference with legal mail, the plaintiff must establish (1) that a prison official deliberately and maliciously interfered with his or her mail, and (2) that interference caused actual injury. Id. (citation omitted). Such injury must affect "a nonfrivolous legal claim [which] had been frustrated or was being impeded due to the actions of prison officials." Warburton, 2 F.Supp.2d at 312 (citations omitted). Without identification of the underlying action which was prejudiced, actual injury, and by extension a First Amendment violation, cannot be established. See Christopher v. Harbury, 536 U.S. 403, 415, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002) ("[T]he underlying cause of action ... is an element that must be described in the complaint, just as much as allegations must describe the official acts frustrating the litigation.").

First, plaintiff has failed to establish, and there is no indication in the record, that either Mr. Jennings or Ms. Labatte deliberately or maliciously interfered with his mail. Plaintiff makes no mention of Mr. Jennings or Ms. Labatte's conduct, beyond the conclusory allegation that they continued to deny plaintiff "copies," and because of those denials, plaintiff "lost a non-frivolous [sic] claim." Pl.'s Mem. of Law ¶ 143. Second, even if plaintiff had demonstrated intent, plaintiff has not established actual injury. With regard to the "non-frivolous [sic] claim," plaintiff claims that if Mr. Jennings and Ms.

Labatte had "sent [his] appeal brief expeditiously as they supposed too [sic] plaintiff would have won his appeal and been released from prison." Id. at 70. In support of that contention, plaintiff proffers a letter dated December 25, 2014 that he contends he sent to Ms. Labatte concerning "advance forms and mail" that Ms. Labatte was "holding" and "slowing up [his] access to the court, legal support, and to the statesmen." Dkt. No. 111-2 at 34. Plaintiff also proffers an Appellate Division scheduling notice, dated April 9, 2015, setting an appeal briefing schedule. Id. at 34. However, as defendants argue, the Appellate Division scheduling notice plaintiff submits is dated April 5, 2015; thus, the scheduling notice cannot coincide with any lawsuit plaintiff referenced in the December 25, 2014 letter to Ms. Labatte because the scheduling notice is dated four months after the issue plaintiff claims in his letter. Compare Dkt. No. 111-2 at 32 with Dkt. No. 111-2 at 34. If the scheduling notice does coincide with the issue plaintiff references in the December 25, 2014 letter, plaintiff has failed to demonstrate this connection. Therefore, because plaintiff fails to identify the underlying cause of action he alleges Mr. Jennings and Ms. Labatte have prejudiced by denying him required copies and failing to expeditiously send mail, it is recommended that plaintiff's Motion for Summary Judgment as to his access to the courts claim be denied.

#### d. Access to Reading Materials

**\*18** As to plaintiff's claim about denial of access to the remaining magazines, which he does not allege were religious in nature, plaintiff contends that Capt. Webbe, Lieut. Simmons, and Supt. Lee violated his constitutional rights by denying him access to magazines. Pl.'s Mem. of Law at 67. Plaintiff's claim, however, cannot stand because inmates do not have a constitutional right to privileges such as reading materials. See generally Montalvo v. Lamy, 139 F.Supp.3d 597, 605 (W.D.N.Y. 2015) ("[P]risoners have no constitutional right to access a commissary."); Rosales v. LaValley, No. 9:11-CV-106 (MAD/CFH), 2014 WL 991865, at \*11 (N.D.N.Y. Mar. 13, 2014) ("It is well established that prison inmates do not have a constitutional right to watch television because the amenity is not considered a necessity for inmates."). Plaintiff has no constitutional right to non-religious magazines or other reading materials. Therefore, it is recommended that plaintiff's Motion for Summary Judgment is denied as to his denial of non-religious reading materials claim.

Case 9:17-cv-01349-DNH-TWD    Document 62    Filed 07/22/19    Page 88 of 129

Fox v. Lee, Not Reported in Fed. Supp. (2018)
2018 WL 1211111

## 2. Fourth Amendment

Plaintiff contends that Sgt. Connor, C.O. Williamson, and C.O. Cruz violated his Fourth Amendment rights during a search/strip search and cell search. Pl.'s Mem. of Law at 65-66. Defendants argue that "plaintiff cannot establish that [ ] conduct by any defendant violated the Fourth Amendment." Def.'s Mem. of Law at 12. The Fourth Amendment establishes that "[t]he right of the people to be secure in their persons ... against unreasonable searches and seizures[ ] shall not be violated." U.S. CONST. amend. IV. Generally, inmates are not afforded the same privacy rights as non-inmates because "[l]oss of ... privacy [is an] inherent incident[ ] of confinement." Bell v. Wolfish, 441 U.S. 520, 536, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); see Nash v. McGinnis, 315 F.Supp.2d 318, 320 (W.D.N.Y. 2004) ("One of the incidents of confinement for a convict is the loss of privacy, which serves the legitimate purpose of retribution as well as the institutional security needs of the prison system. We therefore hold that 'society is not prepared to recognize as legitimate any subjective expectation of privacy that a [convict] might have in his prison cell.' ") (quoting Willis v. Artuz, 301 F.3d 65, 69 (2d Cir. 2002)). "Strip frisks pass constitutional muster, even if the strip frisk is conducted without probable cause, so long as the search is reasonable and not abusive." Shabazz v. Pico, 994 F.Supp. 460, 473 (S.D.N.Y. 1998) (citing Bell, 411 U.S. at 558-60, 93 S.Ct. 1713). In assessing reasonableness under the Fourth Amendment, "[c]ourts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." Bell, 441 U.S. at 558, 99 S.Ct. 1861.

### a. Cell Search

Insofar as plaintiff contends that Sgt. Connor, C.O. Williamson, and C.O. Cruz violated his Fourth Amendment rights during a cell search, "[t]he Supreme Court has held that searches of prison cells do not implicate protected constitutional rights; prisoners have no reasonable expectation of privacy within the confines of their cell." Leitzsey v. Coombe, 998 F.Supp. 282, 289 (W.D.N.Y. 1998) (citing Hudson v. Palmer, 468 U.S. 517, 526-27, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984)); DeMaio v. Mann, 877 F.Supp. 89, 95 (N.D.N.Y. 1995) ("Searches of prison cells, *even arbitrary searches*, implicate no protected constitutional rights.") (emphasis added). Therefore, it is recommended

that plaintiff's Motion for Summary Judgment on his Fourth Amendment claim regarding cell searches be denied.

### b. Strip Search/Frisk

Plaintiff contends that C.O. Williamson "pat frisked and strip frisked" plaintiff by forcing him "to remove his religious headgear and shake his hair out." Pl.'s Mem. of Law at 65, ¶ 11. Defendants argue that the "removal of headgear, and shaking out one's hair" fails to implicate a right to bodily privacy as a matter of law. Def.'s Mem. of Law at 12. The undersigned agrees with defendants. Plaintiff fails to establish, and the record does not suggest, that it was unreasonable for C.O. William to order plaintiff to remove his headgear and shake his hair during the search. See Rodriguez v. Mercado, No. 00 CIV. 8588 JSRFM, 2002 WL 1997885, at *1, 6 (S.D.N.Y. Aug. 28, 2002) (determining that the defendant corrections officer's request that the plaintiff remove his "religious hat" and search his hair during a search did not violate the plaintiff's Fourth Amendment rights). Plaintiff does not allege that the search was abusive, nor does he detail the manner in which either C.O. Williamson or C.O. Cruz conducted the search beyond stating that C.O. Williamson "directed [him] to get against the wall" and "pat frisked and strip frisked" him. Am. Compl. at 10-11;[32] see Shabazz, 994 F.Supp. 460, 473 (S.D.N.Y. 1998) ("Strip frisks pass constitutional muster, even if the strip frisk is conducted without probable cause, so long as the search is reasonable and not abusive.") (citing Bell, 411 U.S. at 558-60, 93 S.Ct. 1713). As there is no evidence that the search was unreasonable or abusive, it is recommended that plaintiff's Motion for Summary Judgment as to his Fourth Amendment claim regarding a strip/pat frisk be denied.

[32]    Plaintiff contends that C.O. Williamson and C.O. Cruz strip frisked him, but does not allege that he removed his clothing during the incident. Am. Compl. at 10-11.

### 3. Eighth Amendment

**\*19** Plaintiff contends that Supt. Lee, Capt. Webbe, Lieut. Simmons, Lieut. Sullivan, and C.O. Henry violated his Eighth Amendment rights by subjecting him to cruel and unusual punishment due to the conditions of his confinement. Pl.'s Mem. of Law at 59-64. Plaintiff further contends that C.O. Cruz violated his Eighth Amendment rights by subjecting him to excessive force and sexual harassment. Id. at 72.

Fox v. Lee, Not Reported in Fed. Supp. (2018)

2018 WL 1211111

Case 9:17-cv-01349-DNH-TWD   Document 62   Filed 07/22/19   Page 89 of 129

#### a. Conditions of Confinement

Plaintiff contends that the aforementioned defendants "locked [him] in a cell that had no feed up slot to receive meals." Pl.'s Mem. of Law at 59. Plaintiff was forced to "climb up the bars" of his cell [33] and "slide his food through the slot in the ceiling," which forced him "to eat food with hair, paint chips, and dust in it." Id. at 59-60. Plaintiff further claims that his cell "had urine and feces on and in the toilet, and green spittal [sic] in the sink," and that defendants denied him cleaning supplies. Id. at 60. Moreover, plaintiff contends that his cell "was directly across from a window that had a 8 to ten inch hole in it and the weather outside was ten degrees," and defendants refused to provide him with clothing, additional blankets, or heat. Id. at 60-61. Defendants argue that plaintiff fails to establish that Supt. Lee, C.O. Henry, Capt. Webbe, Lieut. Sullivan, and Lieut. Simmons were personally involved in creating or contributing to the alleged adverse conditions. Def.'s Mem. of Law at 11-12.

[33]     As indicated earlier, plaintiff also suggests that he had to climb stairs in order to reach his food ray. Thus, the record is unclear as to whether plaintiff's only method of retrieving his food was to climb his cell bars or if he also had access to stairs. Supra at 8 n.13.

"The Constitution does not mandate comfortable prisons but neither does it permit inhumane ones, and it is now settled that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." Farmer v. Brennan, 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). As with other Eighth Amendment claims, a "plaintiff must satisfy both an objective ... and subjective test." Jolly v. Coughlin, 76 F.3d 468, 480 (2d Cir. 1996) (citations omitted). Objectively, the deprivation must be "sufficiently serious [such] that [the inmate] was denied the minimal civilized measure of life's necessities[.]" Walker v. Schult, 717 F.3d 119, 125 (2d Cir. 2013) (internal quotation marks and citation omitted). To satisfy the subjective prong of the test, the inmate must show that "the defendant official acted with a sufficiently culpable state of mind ... such as deliberate indifference to inmate health or safety." Id. (internal quotation marks and citation omitted); see also Phelps v. Kapnolas, 308 F.3d 180, 185 (2d Cir. 2002).

The objective prong of the test can be satisfied where the plaintiff pleads "conditions [that] either alone or in combination, pose an unreasonable risk of serious damage to [the plaintiff's] health[.]" Darnell v. Pineiro, 849 F.3d 17, 30 (2d Cir. 2017) (quoting Walker, 717 F.3d at 125). There is no "static test" to determine whether an alleged deprivation is sufficiently serious to satisfy the objective prong. Id. Rather, courts must determine whether the conditions violate "contemporary standards of decency." Id. (quoting Blissett v. Coughlin, 66 F.3d 531, 537 (2d Cir. 1995)) (additional citation omitted).

#### i. Unsanitary Cell Conditions

*20   Plaintiff contends that he was "confined to a cell that had urine and feces on and in the toilet, and green spittal [sic] in the sink." Pl.'s Mem. of Law at 60. Courts have held that "chronic exposure to human waste will give rise to a colorable [§ 1983] claim." Florio v. Canty, 954 F.Supp.2d 227, 234 (S.D.N.Y. 2003) (internal quotation marks omitted) (quoting Ortiz v. Dep't of Corr., No. 08 Civ. 2195, 2011 WL 2638137, at *6 (S.D.N.Y. Apr. 29, 2011), report and recommendation adopted, 2011 WL 2638140 (S.D.N.Y. July 5, 2011)). In Florio, the Southern District of New York dismissed the plaintiff's Eighth Amendment claim, finding that the plaintiff's exposure to waste in his cell was "only for brief periods" totaling "less than a few hours," and, therefore, "simply too minor to state an Eighth Amendment claim." Florio, 954 F.Supp.2d at 235. In Gaston v. Coughlin, the Second Circuit held that the plaintiff's exposure to "human feces, urine, and sewage water" for "several consecutive days" constituted an Eighth Amendment violation. Gaston v. Coughlin, 249 F.3d 156, 165-66 (2d Cir. 2001).

Here, plaintiff does not allege how long the feces and urine remained in or on the toilet or how long the spittle remained in the sink; instead, he states that he was "forced to live in these conditions for months." [34] See Pl.'s Mem. of Law at 61. There is no indication that the feces, urine, or spittle amounted to anything other than "stains," plaintiff's own allegations indicate that those stains were confined to plaintiff's toilet and sink. Pl.'s Mem. of Law at 60; cf. Florio, 954 F.Supp.2d at 238 (noting that the human waste was not limited to the plaintiff's toilet, but, instead, "ankle high" in his cell). Therefore, based on the current record, the undersigned cannot determine whether the conditions in plaintiff's cell constituted "chronic exposure" to give rise to an Eighth Amendment claim. See Florio, 954 F.Supp.2d at 234 (quoting Ortiz, 2011 WL 2638137 at *6).

**Fox v. Lee, Not Reported in Fed. Supp. (2018)**
Case 9:17-cv-01349-DNH-TWD    Document 62    Filed 07/22/19    Page 90 of 129

2018 WL 1211111

34    It is unclear if plaintiff is referring to the unsanitary conditions or the cold temperatures. See Pl.'s Mem. of Law at 61.

However, even assuming that plaintiff's cell conditions met the objective component of the test, plaintiff has not established that defendants had a "sufficiently culpable state of mind" to satisfy the subjective component. See Walker, 717 F.3d at 125. Aside from plaintiff's conclusory allegation that "defendants deliberately and maliciously subjected [him] to cruel and unusual punishment," the record lacks evidence regarding Capt. Webbe, Supt. Lee, Lieut. Simmons, and Lieut. Sullivan's mental state. Pl.'s Mem. of Law at 63. Moreover, the record does not suggest that Capt. Webbe, Lieut. Simmons, and Lieut. Sullivan had any control over his cell conditions. See generally Felix-Torres v. Graham, 687 F.Supp.2d 38, 52 (N.D.N.Y. 2009) ("[E]ven if the Court were to find that some admissible record evidence exists that Defendant Ryerson had a supervisory role in assisting qualified inmates in obtaining lower bunk assignments, the Court can find no admissible record evidence that Defendant Ryerson, as a supervisor, was personally involved in the constitutional violations alleged."). Insofar as plaintiff contends that Supt. Lee "knew about ... [the] conditions and refused to do anything," Pl.'s Mem. of Law at 61, plaintiff's conclusory statement, unsupported by any details of when or the manner in which Supt. Lee learned of the conditions, fails to establish a culpable mental state. See Walker, 717 F.3d at 125.

To the extent that plaintiff suggests that the denial of cleaning supplies demonstrates that defendants had a culpable mental state regarding his allegedly dirty cell, the record is unclear as to whether Capt. Webbe, Supt. Lee, Lieut. Simmons, and Lieut. Sullivan knew or were aware that plaintiff had been denied cleaning supplies as plaintiff does not specifically allege that he requested the cleaning supplies from these defendants or that it was these defendants who denied his request. See Ortiz, 2011 WL 2638137 at *9 ("Plaintiff does not sufficiently allege that defendants actually knew of and disregarded a substantial risk to plaintiff's health or safety, or that defendants were aware of facts from which they could have inferred that there was a substantial risk of serious harm, that they drew such an inference and that they disregarded it."). Additionally, the denial of cleaning supplies, without more, does not give rise to an Eighth Amendment violation. See Gonzales v. Hasty, 269 F.Supp.3d 45, 53-54, 64 (E.D.N.Y. 2017) (concluding that the defendants' failure to supply the plaintiff cleaning supplies when they knew the plaintiff's cell was dirty is "not the type of claim[ ] that the Eighth

Amendment is meant to remedy."); Dolberry v. Levine, 567 F.Supp.2d 413, 417-18 (W.D.N.Y. 2008) (citing cases for the proposition that denial of cleaning supplies does not amount to a constitutional violation).

*21  Moreover, although plaintiff contends that he suffered "small bumps on his body from the dirty cell," even if plaintiff were to demonstrate that the "bumps" were caused by his cell condition, de minimis injury does not amount to a constitutional violation. See id. (finding that the plaintiff's skin rash is a de minimis injury that does not give rise to a constitutional claim).

Therefore, because plaintiff has not established both the subjective and objective components of an Eighth Amendment analysis, it is recommended that his Motion for Summary Judgment as to his Eighth Amendment claim regarding unsanitary cell conditions and denial of cleaning supplies be denied.

### ii. Cold Living Conditions

Plaintiff alleges that defendants subjected him to "nearly two weeks of extreme cold weather," as "civilians" repaired holes in the windows of or adjacent to his cell. Pl.'s Mem. of Law ¶ 42. During this time, Supt. Lee denied him additional blankets. Id. The Second Circuit has held that exposure to severely cold temperatures for an extended period of time may constitute an Eighth Amendment violation. See Corselli v. Coughlin, 842 F.2d 23, 37 (2d Cir. 1988) (reversing the district court's grant of summary judgment where the plaintiff established that he was exposed to "bitterly cold temperatures for approximately three months."); Gaston, 249 F.3d at 165 (reversing the district court's grant of summary judgment where the plaintiff alleged that the windows in his cell block "remained unrepaired the entire winter, exposing him to freezing and sub-zero temperatures.").

Plaintiff clearly states that he was exposed to the cold for "nearly two weeks," which is below the thresholds that courts in this district have found sufficient to amount to an Eighth Amendment violation. See Corselli, 842 F.2d at 37 (three months); Gaston, 249 F.3d at 165 ("the entire winter"); cf. Cusamano v. Carlsen, No. 9:08-CV-755 (FJS/ GHL), 2011 WL 7629512, at *8 (N.D.N.Y. Dec. 16, 2011) (concluding that the plaintiff's exposure to the cold for "about two weeks" was not "so serious" as to amount to an Eighth Amendment violation). Although plaintiff contends

Fox v. Lee, Not Reported in Fed. Supp. (2018)

Case 9:17-cv-01349-DNH-TWD    Document 62    Filed 07/22/19    Page 91 of 129

2018 WL 1211111

that Supt. Lee "refuse[d] to give [him] ... extra clothing" after C.O. Williamson took "all" of plaintiff's clothing, wearing the same clothes for two weeks does not amount to a constitutional violation. See Crichlow v. Fischer, No. 9:17-CV-00194 (TJM/TWD), 2017 WL 6466556, at *13 (N.D.N.Y. Sept. 5, 2017) (citing cases for the proposition that there is "no Eighth Amendment Violation where [an] inmate was forced to wear the same uniform for three weeks."); Mortimer Excell v. Fischer, No. 9:08-CV-945 (DNH/RFT), 2009 WL 3111711, at *5 (N.D.N.Y. Sept. 24, 2009) (finding no Eighth Amendment violation where the plaintiff was forced to wear the same clothes for two weeks). Insofar as plaintiff suggests that Supt. Lee deprived him of sufficient clothing for the cold temperatures, defendants refute plaintiff's allegation that it was "ten degrees," Pl.'s Mem. of Law at 60, contending that the temperature in the west wing was "estimated to be 67-71 degrees." Dkt. No. 118-1 at 4. Thus, a disputed issue of fact remains as to whether Supt. Lee deprived plaintiff of sufficient clothing for the requisite temperature.

As to plaintiff's claim that Supt. Lee denied him additional blankets, although courts have found an Eighth Amendment violation "when a plaintiff is subjected to extreme cold for an extensive period of time," Vaiana v. Nassau Cty. Dept. of Corr., No. 11-CV-1013 (JFB) (WDW), 2012 WL 541086, at *4 (E.D.N.Y. Feb. 21, 2012), based on the facts plaintiff alleged, he has not demonstrated that he was subjected to the cold for an extensive period of time. Although there is no bright-line rule, plaintiff has not established that two weeks of exposure to cold cell temperatures amounts to an "extensive period of time." See Corselli, 842 F.2d at 37; Gaston, 249 F.3d at 165. Further, there exist disputed facts regarding the cell temperatures as defendants argue that the cell temperature was "estimated to be 67-71 degrees." Dkt. No. 118-1 at 4.

*22 Even assuming that plaintiff's cell conditions met the objective component of the test, plaintiff has not established that defendants had a "sufficiently culpable state of mind" to satisfy the subjective component. See Walker, 717 F.3d at 125. Aside from plaintiff's conclusory allegation that "defendants deliberately and maliciously subjected [him] to cruel and unusual punishment," Pl.'s Mem. of Law at 63, there is no evidence regarding Capt. Webbe, Supt. Lee, Lieut. Simmons, and Lieut. Sullivan's mental state. See Gaston, 249 F.3d at 164 (citing cases for the proposition that the Second Circuit has applied the deliberate indifference standard to assess conditions of confinement claims). Further, the record does not support a contention that Capt. Webbe,

Supt. Lee, Lieut. Simmons, and Lieut. Sullivan "knew of and disregarded an excessive risk," Farmer, 511 U.S. at 837, 114 S.Ct. 1970, to plaintiff's health or safety because, as plaintiff himself claims, the windows were repaired within two weeks. Pl.'s Mem. of Law ¶ 42; see Cusamano, 2011 WL 7629512, at *8 (concluding that the plaintiff's exposure to the cold for "about two weeks" was not "so serious" as to amount to an Eighth Amendment violation). Moreover, plaintiff has not demonstrated that there is no genuine dispute of material fact as to his allegations regarding the lack of heat. See Dkt. No. 118-1 at 4 (alleging that the temperature in the west wing was "estimated to be 67-71 degrees."). Therefore, because plaintiff cannot establish both the subjective and objective components of an Eighth Amendment analysis, it is recommended that his Motion for Summary Judgment as to his Eighth Amendment claims regarding his exposure to cold temperatures be denied.

### iii. "Feed-Up Slot"

Plaintiff contends that his cell did not have a "feed-up slot to receive meals." Pl.'s Mem. of Law at 59. Because defendants did not open plaintiff's door to hand him his food, plaintiff had to "climb up the bars and slide his food through the slot by the ceiling."[35] Id. Plaintiff fell "from being forced to climb up the bars to receive his [trays]" and "injured his back and had to be admitted to the prison hospital for nearly a week," and use a cane. Id. at 60.[36] An inmate may not be deprived of "basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety." Helling v. McKinney, 509 U.S. 25, 32, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993). While, "no court has explicitly held that denial of food is a per se violation of a prisoner's Eighth Amendment rights, under certain circumstances a substantial deprivation of food may well be recognized as being of constitutional dimension." Robles v. Coughlin, 725 F.2d 12, 15 (2d Cir. 1983) (internal citation omitted). "To establish a valid claim that the denial of food ... constitutes an Eighth Amendment violation, one must establish that there was a sufficiently serious condition that resulted from the food not being received. A condition is serious for constitutional purposes if it presents a condition of urgency that may result in degeneration or extreme pain." Lewis v. Zon, 920 F.Supp.2d 379, 387 (W.D.N.Y. 2013) (internal quotation marks and citations omitted).

**Fox v. Lee, Not Reported in Fed. Supp. (2018)**

2018 WL 1211111

Case 9:17-cv-01349-DNH-TWD Document 62 Filed 07/22/19 Page 92 of 129

35    As indicated, plaintiff also suggests that he had to climb stairs in order to reach his food tray. Supra at 8 n.13, 44 n. 33.

36    In his Facts section, plaintiff alleges that he remained in the hospital for three days. Pl.'s Mem. of Law ¶ 34.

Plaintiff does not allege that defendants outright denied him food, rather, that the cell's configuration required him to climb to retrieve his meals, eventually resulting in injury and that the process of retrieving his food tray resulted in the contamination of his food. See Pl.'s Mem. of Law at 59-60. Defendants contend that the injuries plaintiff references were caused by plaintiff's falling and/or slipping on ice, not by falling in his cell while retrieving his food tray, a contention that plaintiff's medial records supports. Dkt. No. 118-1 at 4 ("Plaintiff fell off a chair and slipped on ice; see Dkt. No. 123-4 at 33 ("Pt. fell off chair c/o back pain.").). Moreover, as noted, plaintiff also suggests that his cell contained "steps" that he used to reach his food trays, conflicting with his allegation that he was forced to "climb up the bars." Compare Pl.'s Mem. of Law ¶ 35 ("I was put on a unit that didn't require [me] to use the steps.") with Pl.'s Mem. of Law at 60 (alleging that he was "forced to climb up the bars" to receive his food tray). However, the lack of a feed-up slot at the ground level of plaintiff's cell arguably "pose[d] an unreasonable risk of serious damage to [the plaintiff's] health," and satisfies the objective component. See Darnell, 849 F.3d at 30.

*23  Plaintiff does not allege, and the record does not suggest, that Capt. Webbe, Lieut. Simmons, Lieut. Sullivan, Supt. Lee, or C.O. Henry assigned plaintiff to this cell, had control over an inmate's placement in a particular cell, or had the ability to transfer plaintiff out of the cell. Plaintiff does not claim in nonconlusory terms that Capt. Webbe, Lieut. Simmons, Lieut. Sullivan, or Supt. Lee were aware of the lack of a "feed-up slot" in plaintiff's cell or were aware that plaintiff's required method of obtaining his food tray put him at risk of injury.

To the extent that plaintiff contends that his food contained "hair, paint chips and dust" because he "had to take the lid off" to slide the tray through the "opening in the ceiling," which caused these particles to fall into his food, Pl.'s Mem. of Law at 60, such claim "could be characterized as a sufficiently serious prison condition to satisfy the objective prong of a conditions-of-confinement claim." Gray v. Metro. Det. Cntr., No. 09-CV-4520(KAM)(LB), 2011 WL 2847430, at *11 (E.D.N.Y. July 15, 2011) (concluding that an "allegedly contaminated meal ... could be characterized as a sufficiently

serious prison condition to satisfy the objective prong."). However, plaintiff does not allege, and the record does not suggest, that Capt. Webbe, Lieut. Simmons, Lieut. Sullivan, or Supt. Lee placed the hair, paint chips, or dust in plaintiff's food, nor is there any indication that they knew that the way in which plaintiff received his food tray caused these particles to fall into plaintiff's food. See id. ("Plaintiff has not alleged that either of the [i]ndividual [d]efendants had actual knowledge that plaintiff's food was contaminated at the time they served it."). As plaintiff has not established that defendants intentionally contaminated his food, plaintiff has not demonstrated an Eighth Amendment violation. Gray, 2011 WL 2847430, at *11

As plaintiff has failed to establish that there is no genuine dispute as to any material fact to warrant summary judgment, it is recommended that plaintiff's Motion for Summary Judgment as to his Eighth Amendment claims relating to the lack of a "feed-up slot" at ground level be denied. FED. R. CIV. P. 56(a). Moreover, insofar as plaintiff suggests that C.O. Henry harassed him by "call[ing] him a monkey" and "teas[ing]" him for having to climb to obtain his food tray, Pl.'s Mem. of Law at 59, "[a]llegations of verbal abuse, without more, generally fail to state an actionable claim under the Eighth Amendment." Morrison v. Hartman, 898 F.Supp.2d 577, 584 (W.D.N.Y. 2012). Thus, plaintiff has failed to demonstrate C.O. Henry violated his Eighth Amendment rights on this ground.

#### b. Excessive Force

Plaintiff contends that, during a pat frisk, C.O. Cruz "kicked plaintiff's feet apart, pulled plaintiff's pants between his buttocks and banged plaintiff's head against the wall." Pl.'s Mem. of Law at 72. As a result, plaintiff sustained a "permanent knot on the right side of [his] forehead." Id. "The Eighth Amendment protects prisoners from cruel and unusual punishment by prison officials." Crawford v. Cuomo, 796 F.3d 252, 256 (2d Cir. 2015) (quoting Wilson v. Seiter, 501 U.S. 294, 297, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)). To state a prima facie claim of excessive force under the Eighth Amendment, a plaintiff must establish both objective and subjective elements. See Blyden v. Mancusi, 186 F.3d 252, 262 (2d Cir. 1999).

The objective element of the excessive force analysis is "responsive to contemporary standards of decency" and requires a showing "that the injury actually inflicted

is sufficiently serious to warrant Eighth Amendment protection." Hudson v. McMillian, 503 U.S. 1, 9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992) (internal citations omitted); Blyden, 186 F.3d at 262. However, "the malicious use of force to cause harm [ ] constitute[s an] Eighth Amendment violation per se[,]" regardless of the seriousness of the injuries. Blyden, 186 F.3d at 263 (citing Hudson, 503 U.S. at 9, 112 S.Ct. 995). "The Eighth Amendment's prohibition of cruel and unusual punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." Hudson, 503 U.S. at 9-10, 112 S.Ct. 995 (internal quotation marks and citations omitted). "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." Sims v. Artuz, 230 F.3d 14, 22 (2d Cir. 2000) (citation omitted).

**\*24** The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." Sims, 230 F.3d at 21 (internal quotation marks and citation omitted). The wantonness inquiry "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' " Id. (quoting Hudson, 503 U.S. at 7, 112 S.Ct. 995). In determining whether a defendant acted in a malicious or wanton manner, the Second Circuit has identified five factors to consider: "[1] the extent of the injury and the mental state of the defendant[;] [2] ... the need for the application of force; [3] the correlation between that need and the amount of force used; [4] the threat reasonably perceived by the defendants; and [5] any efforts made by the defendants to temper the severity of a forceful response." Scott v. Coughlin, 344 F.3d 282, 291 (2d Cir. 2003) (internal quotation marks and citations omitted).

Plaintiff has not established that there is no genuine dispute as to any material fact as to whether C.O. Cruz used excessive force, and whether that force was malicious. See Griffin v. Crippen, 193 F.3d 89, 91 (2d Cir. 1999) (internal quotation marks and citation omitted) ("[T]he malicious use of force to cause harm constitutes an Eighth Amendment violation[ ] per se ... whether or not significant injury is evident."). Although plaintiff submits medical records in support of his motion, they do not pertain to the incident with C.O. Cruz. See Dkt. No. 111-2 at 20-23. Further, it is unclear if plaintiff sought medical treatment after the incident. See Henry v. Brown, No.14-CV-2828 (LDH)(LB), 2016 WL 3079798, at * (E.D.N.Y. May 27, 2016) ("[W]here

undisputed medical records directly and irrefutably contradict a plaintiff's descriptions of his injuries attributed to an alleged use of excessive force, no reasonable jury could credit plaintiff's account of the happening.")(internal citation and quotation marks omitted). Nonetheless, "any or even no injuries resulting from the events plaintiff described could amount to a per se constitutional violation." Brown v. Dubois, No. 9:15-CV-1515 (LEK/CFH), 2017 WL 2983305, at *9 (N.D.N.Y. June 16, 2017) (citing Baskerville v. Mulvaney, 411 F.3d 45, 48-49 (2d Cir. 2005)); Tafari v. McCarthy, 714 F.Supp.2d 317, 352 (N.D.N.Y. 2010) (internal quotation marks and citation omitted) (denying the defendants' motion for summary judgment because although the plaintiff's injuries were de minimis, "the extent of injury suffered by the inmate is only one factor that may suggest whether the use of force could plausibly have been thought necessary in a particular situation or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur.").

Assessing the subjective prong of the excessive force analysis, plaintiff does not set forth C.O. Cruz's alleged mental state other than to claim that C.O. Cruz was "furious" that plaintiff submitted a grievance against him. [37] Pl.'s Mem. of Law at 73. Other than plaintiff's self-serving allegation, the record does not contain enough factual background as to C.O. Cruz's mental state at the time of the pat-frisk to conclude that he acted maliciously or sadistically. See Sims, 230 F.3d at 21; Santiago v. C.O. Campisi Shield No. 4592, 91 F.Supp.2d 665, 668, 673 (S.D.N.Y. 2000) (concluding that the plaintiff's allegations that the defendant "singled him out to punish him for their altercation the day before," and "assaulted him without provocation," satisfied the subjective prong of the Eighth Amendment analysis). Therefore, it is recommended that plaintiff's Motion for Summary Judgment as to excessive force claim against C.O. Cruz, be denied.

[37] Plaintiff does not bring a retaliation claim against C.O. Cruz for this incident. See subsection II.C.2. supra.

### c. Sexual Harassment

**\*25** Plaintiff contends that during a frisk on January 25, 2015, C.O. Cruz "intentionally made contact with [his] genitalia, buttock[s], thighs and chest in a [sic] intimate dominatrix way that served no penological purpose and was undertaken with the intent to humiliate [him]." Pl.'s Mem. of Law at 72. Plaintiff claims that C.O. Cruz "began to go

Case 9:17-cv-01349-DNH-TWD   Document 62   Filed 07/22/19   Page 94 of 129

Fox v. Lee, Not Reported in Fed. Supp. (2018)
2018 WL 1211111

up plaintiff's testicle and penis as he searched [his] body, he pulled plaintiff's legs in a way to seem as if he was being kinky and a dominatrix." Id. ¶ 52. Defendants argue that because they "have no idea what is meant by 'intimate dominatrix,'" they are "unable to ascertain if plaintiff has a plausible argument" under established case law. Def.'s Mem. of Law at 16.

In Crawford v. Cuomo, the Second Circuit stated that a single incident of sexual abuse may violate the Eighth Amendment if it is "sufficiently severe or serious." Crawford, 796 F.3d at 257. The Crawford Court explained:

> [t]o show that an incident or series of incidents was serious enough to implicate the Constitution, an inmate need not allege that there was penetration, physical injury, or direct contact with uncovered genitalia. A corrections officer's intentional contact with an inmate's genitalia or other intimate area, which serves no penological purpose and is undertaken with the intent to gratify the officer's sexual desire or humiliate the inmate, violates the Eighth Amendment. Similarly, if the situation is reversed and the officer intentionally brings his or her genitalia into contact with the inmate in order to arouse or gratify the officer's sexual desire or humiliate the inmate, a violation is self-evident because there can be no penological justification for such contact.

Id. Ultimately, in assessing whether an Eighth Amendment violation has occurred, "the principal inquiry is whether the contact is incidental to legitimate official duties, such as a justifiable pat frisk or strip search, or by contrast whether it is undertaken to arouse or gratify the officer or humiliate the inmate." Id. at 257-58 (citing Whitley v. Albers, 475 U.S. 312, 320, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986) (determining that an Eighth Amendment inquiry turns on "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.")).

The record is unclear whether C.O. Cruz intended to humiliate plaintiff or act for his own sexual gratification during the January 27, 2015 pat frisk. See Crawford, 796 F.3d at 257. Plaintiff does not explain how C.O. Cruz acted in a "kinky and dominatrix" way. Pl.'s Mem. of Law at ¶ 52. Plaintiff also does not proffer evidence as to whether C.O. Cruz's contact with his body was incidental to C.O. Cruz's legitimate duties, or whether he touched plaintiff to gratify himself, humiliate plaintiff, or both. Id. at 257-58. Thus, a disputed issue of fact remains as to the January 27, 2015 incident.

Plaintiff further alleges that on February 12, 2015, while escorting plaintiff to his disciplinary hearing, C.O. Cruz conducted a pat frisk in which he "pulled the back of plaintiff's pants down[,] [caressed] plaintiff's thighs, [ ] grinded his penis against plaintiff's buttocks, groped plaintiff's penis and testicles, and then stated, 'I forgot your pussy hurts.'" Id. ¶ 58. Although C.O. Cruz's alleged February 12, 2015 conduct took place during a pat frisk, which, if properly conducted, serves a valid penological purpose, the nature of C.O. Cruz's alleged actions, combined with his sexual commentary, suggests that C.O. Cruz intended to humiliate plaintiff or act for his own sexual gratification. See Shepherd, 2017 WL 666213, at *18 ("Even if each pat frisk, if properly conducted, could have served a valid penological objective, the alleged aggressive squeezing and fondling of Plaintiff's genitalia, combined with the accompanying threats of sexual violence or retaliation, would allow a reasonable factfinder to find that the corrections officers lacked a penological purpose and intended to sexually gratify themselves, to humiliate Shepherd, or both."); Shannon v. Venettozzi, 670 Fed.Appx. 29, 31 (2d Cir. 2016) (summary order) ("These [sexually-explicit] statements, in conjunction with Shannon's description of the forcefulness of some of the pat-downs, were sufficient to plausibly allege that Officer McTurner conducted the pat-downs either 'to gratify [his] sexual desire or to humiliate' Shannon, neither of which is a permissible motivation, rather than for any legitimate penological purpose."); Allah v. Morrison, No. 14-CV-6735, 2016 WL 4017340, at *3-4 (W.D.N.Y. July 22, 2016) ("[The defendant's] alleged taunts to [the plaintiff], including the statements, 'you know what I want' and 'give me what I want and you'll get what you want', suggest that [the defendant's] conduct was designed to humiliate [the plaintiff], gratify herself, or both."); see also Crawford, 796 F.3d at 259 ("[The defendant's] demeaning comments, including the statements '[t]hat doesn't feel like a penis to me,' [and] 'I'll run my hands up the crack of your ass if I want to' ... suggest that [the defendant] undertook the search in order to arouse

Fox v. Lee, Not Reported in Fed. Supp. (2018)

2018 WL 1211111

himself, humiliate [the plaintiff], or both."). However, the record does not definitively support a conclusion that C.O. Cruz intended to humiliate plaintiff; thus, as defendants deny that this conduct occurred, a reasonable fact finder could conclude that C.O. Cruz did not intentionally touch plaintiff in a sexual manner, and that he did not intend to humiliate plaintiff and/or gratify himself. See Crawford, 796 F.3d at 257-58. Therefore, it is recommended that plaintiff's Motion for Summary Judgment be denied on this ground.

#### 4. Fourteenth Amendment Due Process

**\*26** Plaintiff contends that Supt. Lee denied him a "fair hearing and failed to be [a] fair and impartial" hearing officer by "purposely den[ying] [him] the right of due process ... [because] plaintiff refus[ed] to cut his hair and filing grievances," and "subjecting plaintiff to confinement that was atypical hardship." Pl.'s Mem. of Law at 75-76. Plaintiff further contends that Capt. Webbe, DSS Russo, Lieut. Simmons, and Deputy Superintendent Wendland acted as hearing officers and "punished plaintiff for refusing to cut his hair under atypical and hardship confinement." Id. at 78. Plaintiff claims that Lieut. Sullivan violated his due process rights by finding him guilty of refusing a direct order, after finding him innocent in two earlier disciplinary hearings regarding his hairstyle. Id. at 79. Defendants argue that plaintiff fails to explain "why or how Supt. Lee was not impartial." Def.'s Mem. of Law at 17.

The Due Process Clause of the Fourteenth Amendment states: "[n]o State shall ... deprive any person of life, liberty, or property without due process of law." U.S. CONST. amend. XIV § 1. To set forth a prima facie due process claim, "a plaintiff must establish (1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process." Giano v. Selsky, 238 F.3d 223, 225 (2d Cir. 2001) (citation and quotation marks omitted); see Mitchell v. Keane, 974 F.Supp. 332, 342 (S.D.N.Y. 1997) ("To state a procedural due process claim challenging a disciplinary action, a prisoner must allege *both* that he was deprived of a liberty interest cognizable under the Due Process Clause, and that he was deprived of that interest without the requisite [procedural due] process.") (emphasis added).

#### a. Liberty Interest

Plaintiff reiterates the conditions of confinement claims alleged in his Eighth Amendment claim. See subsection III.B.3.a. supra. An inmate has a protected liberty interest in being free from segregated confinement but only where the alleged deprivation imposed amounts to an "atypical and significant hardship in relation to the ordinary incidents of prison life." Sandin v. Connor, 515 U.S. 472, 483-84, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). "Factors relevant to determining whether the inmate endured an 'atypical and significant hardship' include 'the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions' and 'the duration of the disciplinary segregation imposed compared to discretionary confinement.' " Davis v. Barrett, 576 F.3d 129, 133 (2d Cir. 2009) (quoting Sandin, 515 U.S. at 484, 115 S.Ct. 2293); see Jenkins v. Haubert, 179 F.3d 19, 28 (2d Cir. 1999) (quoting Sandin, 515 U.S. at 486, 115 S.Ct. 2293) ("Although there is no bright-line rule regarding the length or type of sanction that would give rise to an 'atypical and significant hardship,' this standard will not be met unless the disciplinary and administrative sanctions are onerous."). Based on the analysis set forth in Section II.E.1, the undersigned assumes for the purposes of this assessment that plaintiff's 240 days in keeplock implicates a liberty interest.

#### b. Procedural Due Process

Although inmates retain their constitutional right to due process protections, "[p]rison disciplinary proceedings are not part of a criminal prosecution, and the fully panoply of rights due a defendant in such proceedings does not apply." Wolff v. McDonnell, 418 U.S. 539, 556, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); see also Arce v. Walker, 139 F.3d 329, 335 (2d Cir. 1998) (holding that an inmate is entitled to minimal due process protections when being involuntary placed in administrative confinement).

> Certain due process protections therefore apply where disciplinary proceedings may lead to the loss of good time credit or would subject an inmate to solitary confinement in the SHU. Inmates are entitled to advance written notice of the charges; a fair and impartial hearing officer; a reasonable opportunity to call witnesses and present documentary evidence; and a

written statement of the disposition, including supporting facts and reasons for the action taken.

**\*27** [Luna v. Pico, 356 F.3d 481, 487 (2d Cir. 2004)](#) (citation omitted).

### i. Supt. Lee

Plaintiff suggests that Supt. Lee failed to act as a fair and impartial hearing officer. An inmate is entitled to a fair and impartial hearing officer to preside over his or her disciplinary hearing. See [Sira v. Morton, 380 F.3d 57, 69 (2d Cir. 2004)](#). However, "the degree of impartiality required of prison hearing officials does not rise to the level of that required of judges generally." [Francis v. Coughlin, 891 F.2d 43, 46 (2d Cir. 1989)](#). Instead, "due process requires only that the hearing officer not be a 'hazard of arbitrary decision making.'" [Espinal v. Goord, 180 F.Supp.2d 532, 539 (S.D.N.Y. 2002)](#) (quoting [Wolff, 418 U.S. at 571, 94 S.Ct. 2963](#)). Due process is thereby satisfied so long as there is "some evidence" that substantiates the hearing officer's decision. [Superintendent, Mass. Corr. Inst. v. Hill, 472 U.S. 445, 455, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985)](#).

Plaintiff does not allege any facts regarding Supt. Lee's disciplinary hearing, and, therefore, the undersigned is unable to determine whether Supt. Lee acted as a fair and impartial hearing officer. Thus, it is recommended that plaintiff's Motion for Summary Judgment as to his due process claims against Supt. Lee be denied.

### ii. DSS Russo

Insofar as plaintiff claims that DSS Russo violated his due process rights by "punish[ing] [him] for refusing to cut his hair under atypical and hardship confinement," such claim cannot stand. Pl.'s Mem. of Law at 78. The record does not establish that DSS Russo conducted any of plaintiff's disciplinary hearings. Therefore, it is recommended that plaintiff's Motion for Summary Judgment as to his due process claim against DSS Russo be denied on this ground.

### iii. Capt. Webbe

Plaintiff claims that Capt. Webbe stated that "Supt. Lee sent him to hold the hearing so that he could skim plaintiff real good." Pl.'s Mem. of Law ¶ 121. However, plaintiff does not proffer the disciplinary hearing transcripts. Plaintiff offers a disciplinary disposition attributed to Capt. Webbe, but it is unclear if this is the hearing plaintiff refers to as he alleges Capt. Webbe's hearing commenced "on or around May 15, 2015," and the proffered disposition is dated April 9, 2015. Pl.'s Mem. of Law ¶ 121; Dkt. No. 123-4 at 118. Thus, the undersigned is unable to conclude whether there was "some evidence" to substantiate Capt. Webbe's disciplinary dispositions. [Superintendent, Mass. Corr. Inst., 472 U.S. at 455, 105 S.Ct. 2768](#). Thus, plaintiff has not established that there is no genuine dispute as to any material fact to warrant summary judgment. [FED. R. CIV. P. 56(a)](#). Therefore, it is recommended that plaintiff's Motion for Summary Judgment as to his due process claim against Capt. Webbe be denied.

### iv. Lieut. Simmons

Plaintiff claims that Lieut. Simmons informed plaintiff that "his supervisors told him to find [plaintiff] guilty." Pl.'s Mem. of Law ¶ 72. However, plaintiff does not proffer the disciplinary hearing transcripts. Plaintiff offers disciplinary dispositions attributed to Lieut. Simmons, but those dispositions do not correspond with the dates plaintiff set forth in his facts section, and it is unclear whether these represent the hearings plaintiff claims violated his due process rights. Thus, the undersigned is unable to conclude whether there was "some evidence" to substantiate Lieut. Simmons' disciplinary dispositions. [Superintendent, Mass. Corr. Inst., 472 U.S. at 455, 105 S.Ct. 2768](#). Thus, plaintiff has not established that there is no genuine dispute as to any material fact to warrant summary judgment. [FED. R. CIV. P. 56(a)](#). Therefore, it is recommended that plaintiff's Motion for Summary Judgment as to his due process claim against Lieut. Simmons be denied.

### v. Lieut. Sullivan

**\*28** Insofar as plaintiff contends that Lieut. Sullivan was biased because he "stated off the record that he had to [find plaintiff guilty] because his supervisors (Webbe, Lee, and Russo) told him too [sic]," Pl.'s Mem. of Law at 79, plaintiff has proffered no evidence to substantiate his claim other than his self-serving allegation. See [Sloane v. Borawski, 64 F.Supp.3d 473, 488 (W.D.N.Y. 2014)](#) ("Plaintiff's bare,

Case 9:17-cv-01349-DNH-TWD Document 62 Filed 07/22/19 Page 97 of 129

Fox v. Lee, Not Reported in Fed. Supp. (2018)

2018 WL 1211111

conclusory assertion that [the defendant] denied him a fair and impartial hearing is belied by the evidence in the record before this Court."); Tirino v. Local 164, Bartenders and Hotel and Restaurant Emp. Union, AFL-CIO, 282 F.Supp. 809, 817 (E.D.N.Y. 1968) ("Such conclusory statements fall far short of the requirement of Fed. R. Civ. P. 56(e) that evidentiary facts must be offered in support of a motion for summary judgment."). Therefore, it is recommended that plaintiff's Motion for Summary Judgment as to his due process claim against Lieut. Sullivan be denied.

**vi. Deputy Superintendent Wendland**

Plaintiff claims that Deputy Superintendent Wendland, as his hearing officer, incorrectly stated that plaintiff's hair was "braided and in locks," and asked improper questions of witnesses. Pl.'s Mem. of Law ¶¶ 79, 79-80. [38] Plaintiff does not proffer the disciplinary hearing transcript for this hearing or provide a disciplinary disposition, and the undersigned is unable to conclude whether there was "some evidence" to substantiate Deputy Superintendent Wendland's disciplinary dispositions. Superintendent, Mass. Corr. Inst., 472 U.S. at 455, 105 S.Ct. 2768. Moreover, there is no indication that Deputy Superintendent Wendland denied plaintiff the opportunity to call witnesses, Luna, 356 F.3d at 487; indeed, plaintiff's memorandum of law establishes that he did call a witness. Pl.'s Mem. of Law ¶ 79, p. 25. Thus, plaintiff has not established that there is no genuine dispute as to any material fact to warrant summary judgment. FED. R. CIV. P. 56(a). Therefore, it is recommended that plaintiff's Motion for Summary Judgment as to his due process claim against Deputy Superintendent Wendland be denied.

[38] Plaintiff's facts section contains two paragraph (¶ ) 79s. See Pl.'s Mem. of Law at 24, 25. The information cited here is taken from both ¶ 79s on pages 24 and 25 of plaintiff's memorandum of law.

**5. Supervisory Liability**

Plaintiff contends that Comm. Annucci and Supt. Lee "were aware ... that the cells at Eastern [ ] had no way for inmates to receive food if they are confined ... [and] did nothing even after plaintiff fell and injured his back." Pl.'s Mem. of Law at 82-83. Plaintiff further claims that Supt. Lee "did nothing after plaintiff made [him] aware that he was being punished and confined for wearing a Mohawk hairstyle." Id.

at 83. Defendants argue that plaintiff's contentions "amount to no more than claims of respondeat superior liability," and that neither "Superintendent Lee or Commissioner Annucci were personally involved in any of the alleged constitutional claims." Def.'s Mem. of Law at 19.

Supervisory officials may not be held liable for their subordinates' constitutional violations merely because they are in a position of authority. See Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996). In this Circuit, the "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994) (quoting Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir. 1991) (additional citations omitted)). However, supervisory personnel may be considered personally involved in their subordinate's conduct if:

(1) the defendant participated directly in the alleged constitutional violation;

(2) the defendant, after being informed of the violation through report or appeal, failed to remedy the wrong;

**\*29** (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;

(4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or

(5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) (citing Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994) (additional citation omitted)). [39] Absent a subordinate's underlying constitutional violation, there can be no supervisory liability. See Hernandez v. Keane, 341 F.3d 137, 145 (2d Cir. 2003); see also Elek v. Inc. Vill. of Monroe, 815 F.Supp.2d 801, 808 (S.D.N.Y. 2011) (collecting cases for the proposition that "because [p]laintiff has not established any underlying constitutional violation, she cannot state a claim for 1983 supervisory liability.").

[39] Various courts in the Second Circuit have postulated how, if at all, the Iqbal decision affected the five Colon factors which were traditionally used to determine personal involvement. Pearce v. Estate of Longo, 766 F.Supp.2d 367, 376 (N.D.N.Y. 2011), rev'd in part on other grounds

Fox v. Lee, Not Reported in Fed. Supp. (2018)

2018 WL 1211111

Case 9:17-cv-01349-DNH-TWD    Document 62    Filed 07/22/19    Page 98 of 129

sub nom., Pearce v. Labella, 473 Fed.Appx. 16 (2d Cir. 2012) (summary order) (recognizing that several district courts in the Second Circuit have debated Iqbal's impact on the five Colon factors); Kleehammer v. Monroe Cnty., 743 F.Supp.2d 175 (W.D.N.Y. 2010) (holding that "[o]nly the first and part of the third Colon categories pass Iqbal's muster...."); D'Olimpio v. Crisafi, 718 F.Supp.2d 340, 347 (S.D.N.Y. 2010) (disagreeing that Iqbal eliminated Colon's personal involvement standard).

Plaintiff seems to suggest that because Supt. Lee and Comm. Annucci "walk around [the facility] and inspect the prison," they knew of the alleged constitutional violations, and failed to remedy the wrong. See Pl.'s Mem. of Law at 82-83. This argument falls under the second Colon factor. See Colon, 58 F.3d at 873. Plaintiff does not claim that he sent a letter to either Supt. Lee or Comm. Annucci informing them of the lack of "feed-up slots" in the cells and how the failure to have a feed-up slot at ground level put him at risk of injury, nor does plaintiff contend that he verbally informed either defendant of his concerns regarding the feed-up slot. Supt. Lee and Comm. Annucci's potential presence in the facility does not amount to actual knowledge of plaintiff's conditions of confinement and does not constitute personal involvement under the second Colon factor. See Colon, 58 F.3d at 873.

Moreover, as to plaintiff's claim that Supt. Lee "did nothing after plaintiff made [him] aware that he was being punished and confined for wearing a Mohawk hairstyle," Pl.'s Mem. of Law at 83, the record belies his claim. After plaintiff informed Supt. Lee of these alleged violations, Supt. Lee directed Capt. Webbe and DSS Russo to investigate his claims. Pl.'s Mem. of Law ¶¶ 20, 24. As it is within the purview of a superior officer to delegate responsibility to others, Supt. Lee's referral to subordinate officers does not suffice to demonstrate his personal involvement. See Vega v. Artus, 610 F.Supp.2d 185, 198 (N.D.N.Y. 2009) (finding no personal involvement where "the only involvement of the supervisory official was to refer the inmate's complaint to the appropriate staff for investigation.") (citing Ortiz-Rodriguez v. N.Y. State Dep't of Corr. Servs., 491 F.Supp.2d 342, 347 (W.D.N.Y. 2007)).

**\*30** Insofar as plaintiff contends that Comm. Annucci failed to train employees on how to "properly respect prisoner's constitutional rights" and failed to supervise subordinates at Eastern, plaintiff's conclusory statement, unsupported by the record, does not amount to personal involvement. Pl.'s Mem. of Law ¶¶ 99-100. Plaintiff may not name and attempt to hold liable these individuals merely because they hold positions of authority within the prison system without substantiating

claims against them. See Colon, 58 F.3d at 874 ("The bare fact that [the defendant] occupies a high position in the New York prison hierarchy is insufficient to sustain Colon's claim."); cf. Thomas v. Calero, 824 F.Supp.2d 488, 509 (S.D.N.Y. 2011) ("We believe that, as a matter of pleading, [Director of Special Housing/Inmate Disciplinary Programs] Bezio's actions, by affirming CHO Calero's determination with only a modification of the penalty, are sufficient to demonstrate personal involvement and could lead a trier of fact to impose liability under the second Colon factor."); Rodriguez v. Selsky, No. 9:07-CV-0432 (LEK/DEP), 2010 WL 980273, \*6 (N.D.N.Y. Mar. 15, 2010) ("Those cases concluding that a plaintiff's allegations that defendant [Director of Special Housing and Inmate Disciplinary Programs for DOCS] Selsky reviewed and upheld an alleged constitutionally suspect disciplinary determination are enough to show his personal involvement in the alleged violation appear to be both better reasoned and more consistent with the Second Circuit's position regarding personal involvement.").

Accordingly, it is recommended that plaintiff's Motion for Summary Judgment as to his supervisory liability claims against Supt. Lee and Comm. Annucci be denied.

## IV. Conclusion

**WHEREFORE**, for the reasons stated herein, it is hereby **RECOMMENDED**, that plaintiff's Motion for Summary Judgment (Dkt. No. 111) be **DENIED**; and it is further

**RECOMMENDED**, that defendants' Motion to Dismiss pursuant to Fed. R. Civ. P. 12(c) (Dkt. No. 118) be **DENIED without prejudice**, and with opportunity to renew by way of a combined motion to dismiss and motion for summary judgment limited to the issue of exhaustion or, in the alternative, by way of an exhaustion hearing, should defendants request such a hearing; and it is further,

**RECOMMENDED**, that if the District Judge adopts this Report-Recommendation and Order in full, the Clerk of the Court will return this case to the Magistrate Judge to set deadlines for this renewed motion; and it is

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order on all parties in accordance with Local Rules.

**IT IS SO ORDERED**.

**Fox v. Lee, Not Reported in Fed. Supp. (2018)**

Case 9:17-cv-01349-DNH-TWD    Document 62    Filed 07/22/19    Page 99 of 129

2018 WL 1211111

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Secretary of Health and Human Servs., 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); FED R. CIV. P. 6(a), 6(e), 72.[40]

40    If you are proceeding pro se and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Id. § 6(a)(1)(C).

**All Citations**

Not Reported in Fed. Supp., 2018 WL 1211111

---

**End of Document**    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Mahon v. Commissioner of New York City Police Dept., Not Reported in Fed. Supp. (2016)

2016 WL 1638746

2016 WL 1638746
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Kalonji MAHON, Plaintiff,

v.

COMMISSIONER OF NEW YORK CITY
POLICE DEPT., Governor of New York State,
Detective (former) Luis Rodriguez, Shield
No. 3110, North Bronx Narcotics Bureau,
Sergeant John Urena, Narcotics Bureau Bronx
(N.B.B.X.), and City of New York, Defendants.

15 Civ. 4120 (AJP)
|
Signed April 25, 2016

**Attorneys and Law Firms**

Kalonji Mahon, Coxsackie, NY, pro se.

Maria Fernanda DeCastro, NYC Law Department, New York, NY, for Defendants.

### OPINION AND ORDER

ANDREW J. PECK, United States Magistrate Judge.

**\*1** Pro se plaintiff Kalonji Mahon brings this § 1983 action alleging violations of his rights under the Constitution and New York law. (*See generally* Dkt. No. 2: Compl.) Mahon seeks injunctive relief, and compensatory and punitive damages. (Compl.¶ V.) Presently before the Court is defendants' summary judgment motion. (Dkt. No. 34: Notice of Mot.) The parties have consented to decision of this case by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). (Dkt. No. 29.) Mahon has not responded to defendants' motion, and the time to do so has passed. (*See* Notice of Mot. ("[P]ursuant to Court Order dated March 7, 2016, opposition papers, if any, shall be filed on or before April 15, 2016."); Dkt. No. 31: 3/7/16 Order)

For the reasons set forth below, defendants' summary judgment motion is *GRANTED.*

### FACTS

On December 1, 2010, Kalonji Mahon sold two bags of crack cocaine to an undercover police officer in exchange for $30 of pre-recorded buy money ("PRBM"). (Dkt. No. 37: DeCastro Aff. Ex. D: O.C.C.B. Buy Report.) [1] Mahon was arrested later that day by Detective Luis Rodriguez, who recovered $207 from Mahon (Ex. G: Property Clerk Invoice), including the $30 of PRBM (Ex. F: Mahon Dep. at 78–79; O.C.C.B. Buy Report; Dkt. No. 2: Compl. ¶ II(D)). Sergeant John Urena supervised Mahon's arrest. (Compl.¶ II(D).)

[1]   Unless otherwise indicated, all references to exhibits are to the exhibits to the DeCastro Affidavit, Dkt. No. 37.

Detective Rodriguez created a post-arrest property voucher for $182, accounting for $177 recovered from Mahon and $5 of PRBM. (Property Clerk Invoice.) The remaining $25 of PRBM was returned to the N.Y.P.D. fund. (Property Clerk Invoice.) Mahon claims that his property was vouchered inaccurately, he was not given "adequate notice/receipt," and ultimately his property was not returned to him in its entirety. (Compl.¶ II(D); *id.* ¶ III; Mahon Dep. at 78–79, 8283.) Mahon alternately states that excluding the PRBM he had exactly $182 on his person at the time of his arrest (Mahon Dep. at 79), and that he had more than $182 (probably $200) on his person at the time of his arrest (Mahon Dep. at 83; Dkt. No. 32: 2/17/16 Conf. Tr. at 9).

On December 6, 2010, Mahon was indicted by a Bronx County grand jury. (Ex. E: Grand Jury Indictment No. 4569–10.) On May 21, 2012, Mahon was convicted in Supreme Court, Bronx County of third degree criminal possession and sale of a controlled substance. (Ex. H: Certificate of Disposition.) At Mahon's trial, the prosecution presented as evidence a photocopy of the PRBM the undercover officer used to purchase crack cocaine from Mahon on December 1, 2010. (Mahon Dep. at 92–93.) Sergeant Urena testified that the N.Y.P.D. preserves only the smallest bill from the PRBM. (Compl.¶ II(D).)

Mahon alleges that the "municipal defendant New York City Police Department has created [a] widespread unofficial policy, custom or practice where PRBM/U.S. currency is missing from it's obligation/duty to provide adequate and true notice due." (Compl.¶ II(D).) Mahon asserts that the City's policy of recycling PRBM for successive buy and bust operations allows arresting officers to "dummy up the receipts" (Mahon Dep. at 93), and creates a chain of custody issue that runs afoul of due process and interferes with

Case 9:17-cv-01349-DNH-TWD   Document 62   Filed 07/22/19   Page 101 of 129

Mahon v. Commissioner of New York City Police Dept., Not Reported in Fed. Supp. (2016)

2016 WL 1638746

adequate access to the Courts (Compl. ¶ V; *see also* Mahon Dep. at 82–83, 92; 2/17/16 Conf. Tr. at 14, 17).

**\*2** Mahon additionally alleges that the N.Y.P.D. Commissioner is liable for failing to train his subordinates to account for arrestees' property after buy and bust operations, and that the Governor of New York is liable for creating an "environment where N.Y.P.D. members normal, usual, ongoing practice [is] to lose U.S. currency through issue of false receipt, and claim that PRBM is being recycled without due notice, chain of custody or record." (Compl.¶ II(D).)

### *ANALYSIS*

#### I. *SUMMARY JUDGMENT STANDARD*

Rule 56 of the Federal Rules of Civil Procedure provides that the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *see also, e.g., Celotex Corp.* v. *Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); *Anderson* v. *Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10 (1986); *Humphreys* v. *Cablevision Sys. Corp.,* 553 Fed.Appx. 13, 14 (2d Cir. 2014); *Connolly* v. *Calvanese,* 515 Fed.Appx. 62, 62 (2d Cir. 2013); *Lang* v. *Ret. Living Publ'g Co.,* 949 F.2d 576, 580 (2d Cir. 1991).

The burden of showing that no genuine factual dispute exists rests on the party seeking summary judgment. *See, e.g., Adickes* v. *S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608 (1970); *Alzawahra* v. *Albany Med. Ctr.,* 546 Fed.Appx. 53, 54 (2d Cir. 2013); *Chambers* v. *TRM Copy Ctrs. Corp.,* 43 F.3d 29, 36 (2d Cir. 1994); *Gallo* v. *Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1223 (2d Cir. 1994). The movant may discharge this burden by demonstrating to the Court that there is an absence of evidence to support the non-moving party's case on an issue on which the non-movant has the burden of proof. *See, e.g., Celotex Corp.* v. *Catrett,* 477 U.S. at 323, 106 S.Ct. at 2552–53; *Dolan* v. *Cassella,* 543 Fed.Appx. 90, 90 (2d Cir. 2013).

To defeat a summary judgment motion, the non-moving party " 'must do more than simply show that there is some metaphysical doubt as to the material facts.' " *Scott* v. *Harris,* 550 U.S. 372, 380, 127 S.Ct. 1769, 1776 (2007) (quoting *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986)). Instead, the non-moving party must "cit[e] to particular parts of materials in

the record" to show that "a fact ... is genuinely disputed." Fed.R.Civ.P. 56(c)(1); *see, e.g., Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.,* 475 U.S. at 587, 106 S.Ct. at 1356; *Alzawahra* v. *Albany Med. Ctr.,* 2013 WL 6284286 at \*1; *Weinstock* v. *Columbia Univ.,* 224 F.3d 33, 41 (2d Cir. 2000) (at summary judgment, "[t]he time has come ... 'to put up or shut up' "), *cert. denied,* 540 U.S. 811, 124 S.Ct. 53 (2003).

In evaluating the record to determine whether there is a genuine issue as to any material fact, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson* v. *Liberty Lobby, Inc.,* 477 U.S. at 255, 106 S.Ct. at 2513.[2] The Court draws all inferences in favor of the non-moving party only after determining that such inferences are reasonable, considering all the evidence presented. *See, e.g., Apex Oil Co.* v. *DiMauro,* 822 F.2d 246, 252 (2d Cir.), *cert. denied,* 484 U.S. 977, 108 S.Ct. 489 (1987). "If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." *Chambers* v. *TRM Copy Ctrs. Corp.,* 43 F.3d at 37.

> [2]    *See also, e.g., Crown Castle NG E. Inc.* v. *Town of Greenburgh, N.Y.,* 552 Fed.Appx. 47, 49 (2d Cir. 2014); *Alzawahra* v. *Albany Med. Ctr.,* 2013 WL 6284286 at \*1; *Feingold* v. *New York,* 366 F.3d 138, 148 (2d Cir. 2004); *Chambers* v. *TRM Copy Ctrs. Corp.,* 43 F.3d at 36; *Gallo* v. *Prudential Residential Servs., Ltd. P'ship,* 22 F.3d at 1223.

**\*3** In considering a motion for summary judgment, the Court is not to resolve contested issues of fact, but rather is to determine whether there exists any disputed issue of material fact. *See, e.g., Donahue* v. *Windsor Locks Bd. of Fire Comm'rs,* 834 F.2d 54, 58 (2d Cir. 1987); *Knight* v. *U.S. Fire Ins. Co.,* 804 F.2d 9, 11 (2d Cir. 1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570 (1987). To evaluate a fact's materiality, the substantive law determines which facts are critical and which facts are irrelevant. *See, e.g., Anderson* v. *Liberty Lobby, Inc.,* 477 U.S. at 248, 106 S.Ct. at 2510. While "disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment[,] [f]actual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248, 106 S.Ct. at 2510 (citations omitted); *see also, e.g., Knight* v. *U.S. Fire Ins. Co.,* 804 F.2d at 11–12.

"The Court recognizes that it must extend extra consideration to pro se plaintiffs" and that "pro se parties are to be given

Case 9:17-cv-01349-DNH-TWD    Document 62    Filed 07/22/19    Page 102 of 129

Mahon v. Commissioner of New York City Police Dept., Not Reported in Fed. Supp. (2016)

2016 WL 1638746

special latitude on summary judgment motions." *Salahuddin v. Coughlin,* 999 F.Supp. 526, 535 (S.D.N.Y.1998) (Peck, M.J.) (citations & internal quotations omitted); *see, e.g., McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir. 1999) (a pro se party's pleadings should be read liberally and interpreted " 'to raise the strongest arguments that they suggest' ").[3] "Nevertheless, proceeding pro se does not otherwise relieve a litigant from the usual requirements of summary judgment, and a pro se party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz,* 93 Civ. 5981, 1999 WL 983876 at *3 (S.D.N.Y. Oct. 28, 1999) (citing cases).[4]

[3]    *See also, e.g., Ferran v. Town of Nassau,* 471 F.3d 363, 369 (2d Cir. 2006); *Fuller v. Armstrong,* 204 Fed.Appx. 987, 988 (2d Cir. 2006), cert. denied, 552 U.S. 906, 128 S.Ct. 209 (2007); Gildor v. U.S. Postal Serv., 179 Fed.Appx. 756, 758 (2d Cir. 2006); Porter v. Coughlin, 421 F.3d 141, 144 n.2 (2d Cir. 2005); Hemphill v. New York, 380 F.3d 680, 687 (2d Cir. 2004); Bennett v. Goord, 343 F.3d 133, 137 (2d Cir. 2003); Johnson v. Buffalo Police Dep't, 46 Fed.Appx. 11, 12 (2d Cir. 2002), cert. denied, 539 U.S. 959, 123 S.Ct. 2645 (2003).

[4]    *See also, e.g., United States v. Acomb,* No. 99–6308, 216 F.3d 1073 (table), 2000 WL 899482 at *1 (2d Cir. June 29, 2000); *James v. Phillips,* 05 Civ. 1539, 2008 WL 1700125 at *3 (S.D.N.Y. Apr. 9, 2008); *Thompson v. Tracy,* 00 Civ. 8360, 2008 WL 190449 at *5 (S.D.N.Y. Jan. 17, 2008); *Bunting v. Nagy,* 452 F.Supp.2d 447, 454 (S.D.N.Y.2006); *Rodriguez v. McClenning,* 399 F.Supp.2d 228, 234 & n.52 (S.D.N.Y.2005); *Pack v. Artuz,* 348 F.Supp.2d 63, 78 (S.D.N.Y.2004); *Rector v. Sylvania,* 285 F.Supp.2d 349, 353 (S.D.N.Y.2003); *Walker v. Vaughan,* 216 F.Supp.2d 290, 296–97 (S.D.N.Y.2002); *Hussein v. The Waldorf–Astoria,* 134 F.Supp.2d 591, 596 (S.D.N.Y.2001), aff'd, 31 Fed.Appx. 740 (2d Cir. 2002).

## II. *DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON MAHON'S § 1983 CLAIMS*

The Court construes Mahon's complaint liberally, and reads three due process claims into his allegations. (Dkt. No. 2: Compl.) First, that on Mahon's December 1, 2010 arrest his personal property was taken from him without due process of law. (Compl.¶ II(D).) Second, that the City's failure to present as evidence at Mahon's trial the physical PRBM recovered from Mahon's person created a "chain of custody" problem that violated due process. (Ex. F: Mahon Dep. at 92; *see also*

Dkt. No. 22: 1/12/16 Conf. Tr. at 18; Dkt. No. 32: 2/17/16 Conf. Tr. at 16–17.) Third, although nebulously articulated, appears to be that the City's policy of "recycl[ing]" PRBM violates due process generally. (Compl.¶¶ II, III.)

### A. New York State Law Provides Mahon an Adequate Remedy for Property Deprivation

**\*4**  To the extent Mahon's claim is that Detective Rodriguez' allegedly inadequate voucher *(see* page 2 above) deprived him of his personal property without due process of law, "such claim is barred where the state provides a meaningful post-deprivation remedy under state law." *Omor v. City of N.Y.,* 13 Civ. 2439, 2015 WL 857587 at *8 (S.D.N.Y. Feb. 27, 2015) (citing *Hudson v. Palmer,* 468 U.S. 517, 533, 104 S.Ct. 3194, 3204 (1984) ("[A]n unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful post-deprivation remedy for the loss is available.")). The Second Circuit has applied this principle to find that if the state provides an adequate post-deprivation remedy, a "random and unauthorized" deprivation of property will not give rise to a § 1983 claim. *Butler v. Castro,* 896 F.2d 698, 700 (2d Cir. 1990); *see also, e.g., Watts v. N.Y.C. Police Dep't,* 100 F.Supp.3d 314, 328 (S.D.N.Y.2015); *Ruane v. Cty. of Suffolk,* No. CIV.A. 12–1658, 2015 WL 2337329 at *9 n.6 (E.D.N.Y. May 13, 2015).

Further, "the Second Circuit has determined that 'New York in fact affords an adequate post-deprivation remedy in the form of, *inter alia,* a Court of Claims action.' " *Acevedo v. Fischer,* 12 Civ. 6866, 2014 WL 5015470 at *13 (S.D.N.Y. Sept. 29, 2014) (quoting *Jackson v. Burke,* 256 F.3d 93, 96 (2d Cir. 2001)); *see also, e.g., Toliver v. City of N.Y.,* 10 Civ. 5806, 2013 WL 6476791 at *7 (S.D.N.Y. Dec. 10, 2013) ("It is well established that New York provides inmates with the opportunity for a meaningful postdeprivation hearing through state law causes of action for 'negligence, replevin, or conversion which could fully compensate [the plaintiff] for his alleged property loss.' "), *R. & R. adopted,* 2014 WL 549402 (S.D.N.Y. Feb. 11, 2014). Accordingly, a claim in New York for a random and unauthorized property deprivation is barred from federal court review.

Mahon presents no evidence to suggest that the alleged property deprivation was not "random and unauthorized."[5] Mahon's " 'failure to take advantage' " of the post-deprivation remedy provided by New York State law " 'does not convert

Case 9:17-cv-01349-DNH-TWD    Document 62    Filed 07/22/19    Page 103 of 129

Mahon v. Commissioner of New York City Police Dept., Not Reported in Fed. Supp. (2016)

2016 WL 1638746

his cause of action into a constitutional due process claim.' " *Watts* v. *N.Y.C. Police* Dep't, 100 F.Supp.3d at 329. As New York state provides an adequate post deprivation remedy, and Mahon fails to show that the alleged property deprivation was not a "random and unauthorized" act, this claim is dismissed.

[5]    Mahon states that the PRBM was recycled "against the [N.Y.P.D.'s] written policy" (Dkt. No. 32: 2/17/16 Conf. Tr. at 14), which would support a finding that any property deprivation in fact was random and unauthorized.

### B. *Mahon's Evidentiary Claim is Barred by His Conviction*

Mahon contends that the physical PRBM recovered from him upon his arrest, rather than photocopies of the PRBM, should have been vouchered and presented as evidence at trial. *(See* pages 2–3 above.) Mahon additionally asserts that the City's failure to preserve the PRBM created a "chain of custody" issue that runs afoul of substantive due process, and interfered with his adequate access to the court. (*See* page 3 above.)

To the extent that Mahon challenges the evidentiary admissibility or sufficiency of the photocopies of PRBM that were presented as evidence against him at trial, such claim is barred by *Heck* v. *Humphrey,* 512 U.S. 477, 114 S.Ct. 2364 (1994). Under *Heck,* a state prisoner may not bring a § 1983 claim that "would necessarily imply" the invalidity of his underlying conviction, unless the conviction already has been invalidated. *Heck* v. *Humphrey,* 512 U.S. at 486–87, 114 S.Ct. at 2372; *see also,* e.g., *Poventud* v. *City of N.Y.,* 750 F.3d 121, 132 (2d Cir. 2014) (en banc).

**\*5** Mahon's due process and access to court claims implicate the validity of his state court conviction. As a *Brady* violation necessitates a new trial, Mahon's claims imply that his conviction was invalid. *See, e.g., Poventud* v. *City of N.Y.,* 750 F.3d at 132–34; *Bowers* v. *Kelly,* 13 Civ. 6265, 2015 WL 2061582 at *4 (S.D.N.Y. May 4, 2015).* The Court interprets Mahon's access to court claim as a claim that the City's failure to preserve the PRBM prevented him from mounting a full defense at trial. This claim too challenges the validity of Mahon's underlying conviction. *See, e.g., Hunter* v. *City of N.Y.,* 35 F.Supp.3d 310, 316–17 (S.D.N.Y.2014) ("To the extent that Plaintiff asserts that his constitutional rights were violated by the arresting officers' failure to hand over the surveillance tape to the district attorney in a timely fashion ... Plaintiff is challenging the constitutionality and therefore the lawfulness

of his conviction."). Mahon's underlying conviction has not been invalidated. Thus, Mahon's evidentiary claims as to the PRBM are barred by *Heck* and are dismissed without prejudice. *See, e.g., Amaker* v. *Weiner,* 179 F.3d 48, 52 (2d Cir. 1999) ("Disposition of the case on *Heck* grounds, however, warrants only dismissal *without* prejudice ...."); *see also, e.g., Bowers* v. *Kelly,* 2015 WL 2061582 at *4.

Even if Mahon's claim were not barred by *Heck,* a break in chain of custody "do[es] not bear upon the admissibility of evidence, only the weight of the evidence." *United States* v. *Hemmings,* 482 Fed.Appx. 640, 643 (2d Cir.), *cert. denied,* 133 S.Ct. 256 (2012); *see also,* e.g., *Crawford* v. *Artuz,* 165 F.Supp.2d 627, 636 (S.D.N.Y.2001); *People* v. *Moore,* 213 A.D.2d 352, 353, 624 N.Y.S.2d 412, 413 (1st Dep't 1995). [6] A challenge based on the weight of the evidence is a state law claim without corollary in federal law, and does not rise to the level of a constitutional violation. *See, e.g., McKinnon* v. *Sup't, Great Meadow Corr. Facility,* 422 Fed.Appx. 69, 75 (2d Cir. 2011), *cert. denied,* 132 S.Ct. 1151 (2012); *Lopez* v. *Sup't of Five Points Corr. Facility,* 14 Civ. 4615, 2015 WL 1300030 at *14 (S.D.N.Y. Mar. 23, 2015), *R. & R. adopted,* 2015 WL 2408605 (S.D.N.Y. May 20, 2015); *Wilkerson* v. *N.Y.S. Bd. of Parole,13* Civ. 3817, 2015 WL 678581 at *23 (S.D.N.Y. Feb. 17, 2015); *Jones* v. *LaValley,* 11 Civ. 6178, 2014 WL 1377589 at *17 (S.D.N.Y. Apr. 3, 2014) (Peck, M.J.), *R. & R. adopted,* 2015 WL 1439406 (S.D.N.Y. Mar. 30, 2015), *appeal dismissed,* No. 15–1209 (2d Cir. May 29, 2015).

[6]    At least one judge in this district has found that pre-recorded buy money may not require a chain of custody at all, as it " 'possesses unique characteristics or markings and is not subject to material alteration which is not readily apparent.' " *Alvarado* v. *Burge,* 05 Civ. 1851, 2006 WL 1840020 at *3 (S.D.N.Y. June 30, 2006).

### C. *Mahon Fails to Establish An Underlying Constitutional Violation For Monell Liability*

Mahon's Monell claim is based on the City's allegedly "widespread unofficial policy, custom or practice where[by] P.R.B.M./U.S. currency is missing from it's obligation/duty to provide adequate and true notice due to person equally ... in the court of law." (Dkt. No. 2: Compl. ¶ II(D).) The City contends that Mahon fails to allege a constitutional violation, and proffers no evidence of a municipal policy or custom. (Dkt. No. 38: City. Br. at 10–13.)

Case 9:17-cv-01349-DNH-TWD    Document 62    Filed 07/22/19    Page 104 of 129

Mahon v. Commissioner of New York City Police Dept., Not Reported in Fed. Supp. (2016)

2016 WL 1638746

### 1. *Standards Governing Monell Claims*

It is well established that a municipality may not be held liable under Section 1983 for alleged unconstitutional actions by its employees below the policy-making level solely upon the basis of respondeat superior. *E.g., Monell* v. *Dep't of Soc. Servs. of City of N.Y.,* 436 U.S. 658, 694, 98 S.Ct. 2018, 2037–38 (1978); *Patterson* v. *Cty. of Oneida,* 375 F.3d 206, 226 (2d Cir. 2004); *DeCarlo* v. *Fry,* 141 F.3d 56, 61 (2d Cir. 1998); *Zahra* v. *Town of Southold,* 48 F.3d 674, 685 (2d Cir. 1995); *Ricciuti* v. *N.Y.C. Transit Auth.,* 941 F.2d 119, 122 (2d Cir. 1991). Rather, in order to hold a municipality liable under § 1983 for the unconstitutional acts of its employees, the plaintiff must plead and prove that the violation of constitutional rights resulted from a municipal custom or policy. *See, e.g., Connick* v. *Thompson,* 563 U.S. 51, 60, 131 S.Ct. 1350, 1359 (2011); *Pembaur* v. *City of Cincinnati,* 475 U.S. 469, 478–83, 106 S.Ct. 1292, 1297–300 (1986); *Costello* v. *City of Burlington,* 632 F.3d 41, 49 (2d Cir. 2011); *Batista* v. *Rodriguez,* 702 F.2d 393, 397 (2d Cir. 1983). The plaintiff need not identify an explicit, official policy or practice. *See,* e.g., *Patterson* v. *Cty. of Oneida,* 375 F.3d at 226; *Sorlucco* v. *N.Y.C. Police Dep't,* 971 F.2d 864, 870 (2d Cir. 1992). It is sufficient to show a widespread pattern of behavior that constitute a "custom or usage with the force of law" or "the constructive acquiescence of senior policy-making officials." *Patterson* v. *Cty. of Oneida,* 375 F.3d at 226 (quotations omitted); *see, e.g., Connick* v. *Thompson,* 563 U.S. at 61, 131 S.Ct. at 1359 ("Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law."); *Belpasso* v. *City of N.Y.,* 07 Civ. 3627, 2008 WL 2676579 at *5 (S.D.N.Y. July 2, 2008); *Gorton* v. *Gettel,* 04 Civ. 0236, 2007 WL 2154193 at *9 (S.D.N.Y. June 22, 2007), *aff'd,* 554 F.3d 60 (2d Cir. 2009). "A policy, custom, or practice may also be inferred where 'the municipality so failed to train its employees as to display a deliberate indifference to the constitutional rights of those within its jurisdiction.' " *Patterson* v. *Cty. of Oneida,* 375 F.3d at 226; *see, e.g., Connick* v. *Thompson,* 131 S.Ct. at 1359. Any analysis of an allegation of municipal liability under § 1983 begins with "the question whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton* v. *Harris,* 489 U.S. 378, 385, 109 S.Ct. 1197, 1203 (1989).

### 2. *Application to Mahon's Claim*

**\*6** Mahon challenges the City's alleged policy of recycling PRBM on several grounds. Mahon's first claim appears to be that because the City recycles PRBM from one buy and bust operation to the next, an arrestee's personal money can get "mixed up" with the PRBM rather than being vouchered and eventually returned. (Ex. F: Mahon Dep. at 83; Dkt. No. 2: Compl. ¶¶ II(D).) As an initial matter, an unauthorized intentional deprivation of property by a state employee does not constitute a constitutional violation if state law provides a meaningful post deprivation remedy, as New York does. *See* cases cited at pages 6–7 above. Accordingly, Mahon cannot establish an injury to a constitutionally protected right on this basis.

Further, although Mahon states that his December 1, 2010 arrest was the second instance in which the N.Y.P.D. failed adequately to voucher and return his property (Mahon Dep. at 83), he sets forth no facts as to the first instance, and otherwise adduces no evidence to establish the existence of a policy or practice. Even accepting Mahon's allegations as to the first instance, his bare allegations are insufficient to establish a municipal policy. *See, e.g., Giaccio* v. *City of N.Y.,* 502 F.Supp.2d 380, 389 (S.D.N.Y.2007) (where plaintiff alleged only two unlawful incidents, there was "insufficient evidence in the record to support a finding of a custom, policy or practice"), *aff'd,* 308 Fed.Appx. 470 (2d Cir. 2009).

Mahon's second claim is that because PRBM is photocopied prior to a buy and bust operation, an arresting officer has the opportunity to "dummy up the receipts." (Mahon Dep. at 93.) Mahon seems to allege that because an arresting officer knows in advance the serial numbers of the marked bills, and is not required to return to the precinct to photocopy or voucher recovered PRBM, it is possible for the officer to falsify evidence by pretending to recover "whatever they want" during a buy and bust operation. (Mahon Dep. at 93.) As Mahon does not contest his possession of the $30 of PRBM attributed to him at the time of his arrest, the Court could not possibly determine that he suffered a constitutional injury on this basis. Morever, Mahon presents no evidence beyond the barest conjecture to establish that the City has a policy of falsifying evidence with doctored receipts. "[S]peculative and conclusory allegations are insufficient to support a claim of municipal liability." *Staten* v. *City of N.Y.,* 12 Civ. 3544, 2014 WL 3907926 at *6 (S.D.N.Y. Aug. 7, 2014) (collecting cases). To the extent Mahon implicitly challenges the credibility of

Case 9:17-cv-01349-DNH-TWD   Document 62   Filed 07/22/19   Page 105 of 129

Mahon v. Commissioner of New York City Police Dept., Not Reported in Fed. Supp. (2016)

2016 WL 1638746

the police testimony at his trial, *Heck* bars that claim, and in any event, this Court is not in a position to disturb a jury's finding as to a witness' credibility. *See, e.g., United States* v. *Yu Ming Chen,* 597 Fed.Appx. 650, 651 (2d Cir. 2015) ("We will not, however, supplant the jury's evaluation of Li's credibility as a witness, a determination that falls squarely within the jury's purview."); *United States* v. *Bandrich, 12* Cr. 934, 2014 WL 7330434 at *3 (S.D.N.Y. Dec. 22, 2014) ("To the extent Defendant now seeks to impugn the credibility of these and other Government witnesses, 'the proper place for a challenge to a witness's credibility is in cross-examination and in subsequent argument to the jury.' " (quoting *United States* v. *Roman,* 870 F.2d 65, 71 (2d Cir.), *cert. denied,* 490 U.S. 1109, 109 S.Ct. 3164 (1989))).

Finally, to the extent Mahon's claim is that the City has a duty to preserve all evidence, including PRBM, even a failure to preserve potentially exculpatory evidence does not rise to the level of a due process violation without a showing of bad faith by the police. *See,* e.g., *Fappiano* v. *City of N.Y.,* No. 15–260, —— Fed.Appx. ——, 2016 WL 860255 at *4 (2d Cir. Mar. 7, 2016) ("When a § 1983 fair trial claim is premised upon the failure of the police to preserve potentially exculpatory evidence for future testing, the plaintiff must show that the police destroyed the evidence in bad faith."). Additionally, to the extent the N.Y.P.D. has a procedure for saving only the smallest bill upon arrest in a buy and bust operation and recycling the remaining PRBM *(see* page 2 above), other Circuits have found that "destruction of evidence in accordance with an established procedure precludes a finding of bad faith absent other compelling evidence." *United States* v. *Deaner,* 1 F.3d 192, 200 (3d Cir. 1993); *see also,* e.g., *United States* v. *Beckstead,* 500 F.3d 1154, 1159 (10th Cir. 2007), *cert. denied,* 552 U.S. 1304, 128 S.Ct. 1757 (2008). There is no evidence to suggest that the PRBM recovered from Mahon was exculpatory, or that the City recycles PRBM in a bad faith effort to destroy evidence, exculpatory or otherwise.

**\*7** As Mahon fails to establish a constitutional violation, or a municipal policy or custom that caused a constitutional injury, his *Monell* claim is dismissed. [7]

[7]  As the imposition of supervisory liability requires an underlying constitutional violation, Mahon's claims against Governor Cuomo and Commissioner Bratton likewise are dismissed. *See,* e.g., *Tompkins* v. *City of N.Y.,* 50 F.Supp.3d 426, 434 (S.D.N.Y.2014); *Elek* v. *Inc. Vill. of Monroe,* 815 F.Supp.2d 801, 808 (S.D.N.Y.2011).

## III. *MAHON LACKS STANDING TO SEEK INJUNCTIVE RELIEF*

Mahon seeks an injunction against "defendants in their official capacity to stop practice, policy, custom of not vouchering/counting all of the U.S. currency involved in 'buy [and] bust' operations in New York City because inadequate notice/receipt flows from such a practice [and] policy which violates substantive process due and adequate access to courts." (Dkt. No. 2: Compl. ¶ V.) Defendants assert that Mahon lacks standing to seek injunctive relief. (Dkt. No. 38: City Br. at 14–15.)

The Second Circuit has held that "to meet the constitutional minimum of standing to seek injunctive relief," a plaintiff must establish that " 'he has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged official conduct.' " *Shain* v. *Ellison,* 356 F.3d 211, 215 (2d Cir. 2004) (quoting *City of L.A.* v. *Lyons,* 461 U.S. 95, 101–02, 103 S.Ct. 1660, 1665 (2004)). "In doing this, he cannot rely on past injury to satisfy the injury requirement but must show a likelihood that he ... will be injured in the future. Finally, abstract injury is not enough; rather, the injury or threat of injury must be both real and immediate, not conjectural or hypothetical." *Shain* v. *Ellison,* 356 F.3d at 215 (quotations & citations omitted). When challenging an official policy "a plaintiff seeking injunctive relief must demonstrate *both* a likelihood of future harm *and* the existence of an official policy or its equivalent." *Id.* at 216.

To establish standing, Mahon would have to show the likelihood that in the future he would sell narcotics to an undercover officer and be arrested by the N.Y.P.D., with PRBM on his person, that the PRBM would be confiscated and recycled, that his property would not be listed in its entirety on the property voucher, and that he would have a trial at which photocopies of the PRBM were presented as evidence. A finding that Mahon is likely to suffer such an injury again is "simply too speculative and conjectural to supply a predicate for prospective injunctive relief." *Shain* v. *Ellison,* 356 F.3d at 216; *see also,* e.g., *Williams* v. *City of N.Y.,* 34 F.Supp.3d 292, 297 (S.D.N.Y. July 22, 2014); *MacIssac* v. *Town of Poughkeepsie,* 770 F.Supp.2d 587, 601 (S.D.N.Y.2011) (finding plaintiff lacked standing where the "likelihood of suffering the same harm again" depended on his "willfully breaking the law"). Accordingly, Mahon's request for injunctive relief is dismissed.

Case 9:17-cv-01349-DNH-TWD    Document 62    Filed 07/22/19    Page 106 of 129

Mahon v. Commissioner of New York City Police Dept., Not Reported in Fed. Supp. (2016)

2016 WL 1638746

## IV. *MAHON'S SUPPLEMENTAL STATE LAW CLAIMS ARE UNTIMELY*

The Court interprets Mahon's supplemental state law claims for failure to preserve evidence as against both the City and Detective Rodriguez personally. (Dkt. No. 2: Compl. ¶ II(D).) Defendants argue that Mahon's claims must be dismissed for his failure to commence this action within the applicable state law statute of limitations. (Dkt. No. 32: City Br. at 13–14.) Under New York law, an aggrieved individual is required to submit a notice of claim and then bring suit against a municipality or its employees within one year and ninety days "after the happening of the event upon which the claim is based." N.Y. Gen. Mun. Law § 50–i(1)(c).

**\*8** Mahon's claim is based on his December 1, 2010 arrest, but he asserts that he was not aware of the City's allegedly inadequate voucher until his trial on May 17, 2012. (Compl.¶ II(D).) Even if the trial date were the proper trigger, Mahon commenced this action in May 2015, more than three years after his trial, and thus his state law claims are untimely. *See,* e.g., *Daughtry* v. *New York,* No. 12–CV–2655, 2015 WL 2454115 at *10 (E.D.N.Y. Feb. 23, 2015)*, R. &*

*R. adopted,* 2015 WL 2454117 (E.D.N.Y. May 21, 2015); *Cooper* v. *City of New Rochelle,* 925 F. Supp.2d 588, 601 n.7 (S.D.N.Y.2013). Accordingly, Mahon's supplemental state law claims are dismissed.

## *CONCLUSION* [8]

[8]   If Mahon requires copies of any of the cases reported only in Westlaw, he should request copies from opposing counsel. *See Lebron* v. *Sanders,* 557 F.3d 76, 79 (2d Cir. 2009); SDNY–EDNY Local Civil Rule 7.2.

For the reasons set forth above, defendants' summary judgment motion (Dkt. No. 34) is *GRANTED.* The Clerk of Court is directed to enter judgment accordingly and to close the case.

SO ORDERED.

### All Citations

Not Reported in Fed. Supp., 2016 WL 1638746

---

End of Document                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 651919
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Kenneth Carl GROVES, Sr., Plaintiff,

v.

Brett DAVIS, Secure Care Treatment Aid; David
W. Sill, Secure Care Treatment Aid; Thomas
Nicolette, RN, Ward Nurse; Charmaine Bill,
Treatment Team Leader; Jill E. Carver, Social
Worker, Primary Therapist; Edwin Debroize,
Psychologist Assist; Jeff Nowicki, Chief of Mental
Health Treatment Serv.; Terri Maxymillian,
Ph.D., Dir. of Mental Health Serv.; Sgt. Sweet,
Security Services, CNYPC; Michael Hogan,
Comm'r, Dep't of Mental Health, Defendants.

No. 9:11–CV–1317 (GTS/RFT).
|
Feb. 28, 2012.

**Attorneys and Law Firms**

Kenneth Carl Groves, Sr., Marcy, NY, pro se.

***MEMORANDUM DECISION and ORDER***

Hon. GLENN T. SUDDABY, District Judge.

**\*1** Currently before the Court, in this *pro se* civil rights
action filed by Kenneth Carl Groves, Sr. ("Plaintiff"), against
numerous employees of New York State or the Central New
York Psychiatric Center ("Defendants"), are Plaintiff's motion
to proceed *in forma pauperis,* his motion for a temporary
restraining order and preliminary injunction, and his motion
for appointment of counsel. (Dkt.Nos.2, 3, 4.)[1] For the
reasons set forth below, Plaintiff's motion to proceed *in
forma pauperis* is granted; his motion for a preliminary
injunction is denied; his motion for appointment of counsel
is denied; Plaintiff's claims of deliberate indifference to his
mental health needs against Defendants Bill, Carver and
DeBroize are *sua sponte* dismissed with prejudice; Plaintiff's
claims against Defendants Bill, Carver, DeBroize, Nowicki,
Maxymillian, and Hogan arising from their alleged personal
involvement in the August 8, 2011 assault are *sua sponte*
dismissed without prejudice and with leave to amend in this

action in accordance with Fed.R.Civ.P. 15; Sgt. Sweet is *sua
sponte* dismissed without prejudice as a Defendant in this
action; the Clerk is directed to issue summonses, and the U.S.
Marshal is directed to effect service of process on Defendants
Davis, Sill, and Nicolette.

| [1] | This is the fourth civil rights action filed by Plaintiff in this District. Generally, two of these actions arose out of Plaintiff's refusal to consent to a strip search and the subsequent actions taken against Plaintiff as a result of his refusal. *See Groves v. New York,* 09–CV–0406, Decision and Order (N.D.N.Y. filed May 11, 2009) (Hurd, J.) (*sua sponte* dismissing complaint pursuant to 28 U.S.C. § 1915[e][2][B] ); *Groves v. The State of New York,* 9:09–CV–0412, Decision and Order (N.D.N.Y. filed Mar. 26, 2010) (Sharpe, J.) (granting defendants' motion to dismiss the complaint pursuant to Fed.R.Civ.P. 12[b][6] ). The third action alleged numerous violations of Plaintiff's constitutional rights during the period July 23, 2009, and August 26, 2009, and was dismissed without prejudice upon Plaintiff's request in October, 2010. *See Groves v. Maxymillian,* 9:09–CV–1002, Decision and Order (N.D.N.Y. filed Oct. 8, 2010) (Suddaby, J.). As a result, it does not appear that the current action is barred because of res judicata, collateral estoppel, and/or the rule against duplicative litigation. |
|---|---|

**I. RELEVANT BACKGROUND**

On November 7, 2011, Plaintiff commenced this action
*pro se* by filing a civil rights Complaint, together with a
motion to proceed *in forma pauperis.* (Dkt. Nos.1, 2.)[2]
Liberally construed, Plaintiff's Complaint alleges that the
following constitutional violations against him occurred
during his confinement at Central New York Psychiatric
Center ("CNYPC"): (1) Defendants Davis and Sill used
excessive force against him under the Eighth and/or
Fourteenth Amendments; (2) Defendant Nicolette knew of
and failed to take action to protect Plaintiff from the
assault under the Eighth and/or Fourteenth Amendments;
(3) Defendants Bill, Carver, and DeBroize were deliberately
indifferent to his mental health needs under the Eighth and/
or Fourteenth Amendments; and (4) Defendants Bill, Carver,
DeBroize, Nowicki, Maxymillian, Bosco, and Hogan failed to
"adequately train the staff under their supervision" and to take
appropriate action in response to the incident. (*See generally*
Dkt. No. 1.) For a more detailed description of Plaintiff's
claims, and the factual allegations giving rise to those claims,
the reader is referred to Part III.B of this Decision and Order.

2    At that time, Plaintiff also filed motions for injunctive relief and for appointment of counsel. (Dkt.Nos.3, 4.)

## II. MOTION TO PROCEED *IN FORMA PAUPERIS*

Because Plaintiff sets forth sufficient economic need, the Court finds that Plaintiff may properly commence this action *in forma pauperis.* (Dkt. No. 2.)

## III. *SUA SPONTE* REVIEW OF PLAINTIFF'S COMPLAINT

In light of the foregoing, the Court must now review the sufficiency of the allegations that Plaintiff has set forth in his Complaint in light of 28 U.S.C. § 1915(e)(2)(B). This is because Section 1915(e)(2)(B) directs that, when a plaintiff seeks to proceed *in forma pauperis,* "(2) ... the court shall dismiss the case at any time if the court determines that—... (B) the action ... (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B).[3]

3    The Court notes that, similarly, Section 1915A(b) directs that a court must review any "complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity" and must "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted; or ... seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b).

### A. Governing Legal Standard

**\*2** It has long been understood that a dismissal for failure to state a claim upon which relief can be granted, pursuant to Fed.R.Civ.P. 12(b)(6), can be based on one or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Fed.R.Civ.P. 8(a)(2); or (2) a challenge to the legal cognizability of the claim. *Jackson v. Onondaga Cnty.,* 549 F.Supp.2d 204, 211, nn. 15–16 (N.D.N.Y.2008) (McAvoy, J., adopting Report–Recommendation on *de novo* review).

Because such dismissals are often based on the first ground, a few words regarding that ground are appropriate. Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a pleading contain "a *short and plain* statement of the claim *showing* that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2) [emphasis added]. In the Court's view,

this tension between permitting a "short and plain statement" and requiring that the statement "show[ ]" an entitlement to relief is often at the heart of misunderstandings that occur regarding the pleading standard established by Fed.R.Civ.P. 8(a)(2).

On the one hand, the Supreme Court has long characterized the "short and plain" pleading standard under Fed.R.Civ.P. 8(a)(2) as "simplified" and "liberal." *Jackson,* 549 F.Supp.2d at 212, n. 20 (citing Supreme Court case). On the other hand, the Supreme Court has held that, by requiring the above-described "showing," the pleading standard under Fed.R.Civ.P. 8(a)(2) requires that the pleading contain a statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." *Jackson,* 549 F.Supp.2d at 212, n .17 (citing Supreme Court cases) (emphasis added).

The Supreme Court has explained that such *fair notice* has the important purpose of "enabl[ing] the adverse party to answer and prepare for trial" and "facilitat[ing] a proper decision on the merits" by the court. *Jackson,* 549 F.Supp.2d at 212, n. 18 (citing Supreme Court cases); *Rusyniak v. Gensini,* 629 F.Supp.2d 203, 213 & n. 32 (N.D.N.Y.2009) (Suddaby, J.) (citing Second Circuit cases). For this reason, as one commentator has correctly observed, the "liberal" notice pleading standard "has its limits." 2 *Moore's Federal Practice* § 12.34[1][b] at 12–61 (3d ed.2003). For example, numerous Supreme Court and Second Circuit decisions exist holding that a pleading has failed to meet the "liberal" notice pleading standard. *Rusyniak,* 629 F. Supp .2d at 213, n. 22 (citing Supreme Court and Second Circuit cases); *see also Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949–52, 173 L.Ed.2d 868 (2009).

Most notably, in *Bell Atlantic Corp. v. Twombly,* the Supreme Court reversed an appellate decision holding that a complaint had stated an actionable antitrust claim under 15 U.S.C. § 1. *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). In doing so, the Court "retire[d]" the famous statement by the Court in *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Twombly,* 127 S.Ct. at 1968–69. Rather than turn on the *conceivability* of an actionable claim, the Court clarified, the "fair notice" standard turns on the *plausibility* of an actionable claim. *Id.* at 1965–74. The Court explained

2012 WL 651919

that, while this does not mean that a pleading need "set out in detail the facts upon which [the claim is based]," it does mean that the pleading must contain at least "some factual allegation[s]." *Id* . at 1965. More specifically, the "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," assuming (of course) that all the allegations in the complaint are true. *Id.*

**\*3** As for the nature of what is "plausible," the Supreme Court explained that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 129 S.Ct. at 1949. "[D]etermining whether a complaint states a plausible claim for relief ... [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not show[n]—that the pleader is entitled to relief." *Id.* at 1950 [internal quotation marks and citations omitted]. However, while the plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully," *id.,* it "does not impose a probability requirement." *Twombly,* 550 U.S. at 556.

Because of this requirement of factual allegations plausibly suggesting an entitlement to relief, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by merely conclusory statements, do not suffice." *Iqbal,* 129 S.Ct. at 1949. Similarly, a pleading that only "tenders naked assertions devoid of further factual enhancement" will not suffice. *Iqbal,* 129 S.Ct. at 1949 (internal citations and alterations omitted). *Rule 8* "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (citations omitted).

This pleading standard applies even to *pro se* litigants. While the special leniency afforded to *pro se* civil rights litigants somewhat loosens the procedural rules governing the form of pleadings (as the Second Circuit has observed), it does not completely relieve a *pro se* plaintiff of the duty to satisfy the pleading standards set forth in *Fed.R.Civ.P. 8, 10* and *12.* [4] Rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in *Fed.R.Civ.P. 8, 10* and *12* are procedural rules that even *pro se* civil rights plaintiffs must follow. [5] Stated more simply, when a plaintiff is proceeding *pro se,* "all normal rules of pleading

are not absolutely suspended." *Jackson,* 549 F.Supp.2d at 214, n. 28 [citations omitted]. [6]

[4]  *See Vega v. Artus,* 610 F.Supp.2d 185, 196 & nn. 8–9 (N.D.N.Y.2009) (Suddaby, J.) (citing Second Circuit cases); *Rusyniak,* 629 F.Supp.2d at 214 & n. 34 (citing Second Circuit cases).

[5]  *See Vega,* 610 F.Supp.2d at 196, n. 10 (citing Supreme Court and Second Circuit cases); *Rusyniak,* 629 F.Supp.2d at 214 & n. 34 (citing Second Circuit cases).

[6]  It should be emphasized that *Fed.R.Civ.P. 8*'s plausibility standard, explained in *Twombly,* was in no way retracted or diminished by the Supreme Court's decision (two weeks later) in *Erickson v. Pardus,* in which (when reviewing a *pro se* pleading) the Court stated, *"Specific facts are not necessary"* to successfully state a claim under *Fed.R.Civ.P. 8(a)(2).* *Erickson v. Pardus,* 551 U.S. 89, 93, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) [emphasis added]. That statement was merely an abbreviation of the often-repeated point of law—first offered in *Conley* and repeated in *Twombly*—that a pleading need not "set out *in detail* the facts upon which [the claim is based]" in order to successfully state a claim. *Twombly,* 127 S.Ct. 1965, n. 3 (citing *Conley,* 355 U.S. at 47) [emphasis added]. That statement did not mean that all pleadings may achieve the requirement of "fair notice" without ever alleging any facts whatsoever. Clearly, there must still be enough fact set out (however set out, whether in detail or in a generalized fashion) to raise a right to relief above the speculative level to a plausible level. *See Rusyniak,* 629 F.Supp.2d at 214 & n. 35 (explaining holding in *Erickson* ).

**B. Analysis of Plaintiff's Complaint**

The Court prefaces its analysis of Plaintiff's Complaint by noting that, although Plaintiff is a civilly committed sex offender and no longer a prisoner, the Court will look to cases addressing prisoner's rights in analyzing Plaintiff's claims, because "confinement of civilly committed patients is similar to that of prisoners." *Holly v. Anderson,* 04–CV–1489, 2008 WL 1773093, at \*7 (D.Minn. Apr.15, 2008); *see also Morgan v. Rabun,* 128 F.3d 694, 697 (8th Cir.1997) ("The governmental interests in running a state mental hospital are similar in material aspects to that of running a prison."). Thus, whereas claims of excessive force by convicted criminals are analyzed under the Eighth Amendment to the United States Constitution, because Plaintiff is a civilly committed sex offender and no longer a prisoner, his substantive rights to be free from unsafe conditions of confinement arise under

the Due Process Clause of the Fourteenth Amendment. In *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), the Court stated "[i]f it is cruel and unusual punishment to hold convicted criminals in unsafe conditions, it must be unconstitutional [under the Due Process Clause] to confine the involuntarily committed–who may not be punished at all–in unsafe conditions." *Youngberg,* 457 U.S. at 315–16. As have numerous other courts which have considered the issue, this Court has found that "the standard for analyzing a civil detainee's Fourteenth Amendment [conditions of confinement] claim is the same as the Eighth Amendment standard." *Groves v. Patterson,* 09–CV–1002, Memorandum–Decision and Order at *15–16 (N.D.N.Y. filed Nov. 18, 2009). [7]

[7]    *See Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996) ("[W]hile the Supreme Court has not precisely limned the duties of a custodial official under the Due Process Clause to provide needed medical treatment to a pretrial detainee, it is plain that an unconvicted detainee's rights are at least as great as those of a convicted prisoner."); *Walton v. Breeyear,* 05–CV–0194, 2007 WL 446010, at *8, n. 16 (N.D.N.Y. Feb.8, 2007) (Peebles, M.J.) (noting that pretrial detainees enjoy protections under the due process clause of the Fourteenth Amendment parallel to those afforded to sentenced prisoners by the Eighth Amendment); *Vallen v. Carrol,* 02–CV–5666, 2005 WL 2296620, at ––––8–9 (S.D.N.Y. Sep.20, 2005) (finding that the Eighth Amendment standard of "deliberate indifference" is the correct one for Section 1983 claims brought by involuntarily committed mental patients based on alleged failures to protect them that violated their substantive due process rights); *Bourdon v. Roney,* 99–CV–0769, 2003 WL 21058177, at *10 (N.D.N.Y. Mar.6, 2003) (Sharpe, M.J.) ("The standard for analyzing a pretrial detainee's Fourteenth Amendment [conditions of confinement] claim is the same as the Eighth Amendment standard.").

**1. Excessive Force Claims Against Defendants Davis, Still and Nicolette**

**\*4** Plaintiff alleges that on August 8, 2011, Defendant Davis entered Plaintiff's dorm room at CNYPC and "viciously attacked and brutally assaulted and battered" him. (Dkt. No. 1 at 4.) During the course of this assault, Defendant Sill is alleged to have entered Plaintiff's room and "jump[ed] on the plaintiff's legs holding and pinning them as Defendant Davis [continued to beat Plaintiff]." (*Id.*) As alleged in the Complaint, although Defendant Nicolette knew in advance that this assault was planned, he "remained in the Nurses

Station" and "did nothing to interceed [sic] or stop the brutal attack on the plaintiff." (*Id.* at 5.)

To validly assert a violation of the Eighth Amendment through the use of excessive force, an inmate must allege the following: (1) subjectively, that the defendants acted wantonly and in bad faith; and (2) objectively, that the defendants' actions violated "contemporary standards of decency." *Blyden v. Mancusi,* 186 F.3d 252, 262–63 (2d Cir.1999) (internal quotation marks omitted) (citing *Hudson v. McMillian,* 503 U.S. 1, 8 [1992] ).

Here, construing the factual allegations of Plaintiff's Complaint with special leniency, the Court finds that Plaintiff appears to have alleged facts plausibly suggesting that he was subjected to excessive force by Defendants Davis and Sill. In addition, by alleging that Defendants Davis, Sill and Nicolette discussed the assault in advance of it occurring, and that Nicolette was in the vicinity of Plaintiff's room and had an opportunity to intervene to prevent it, the Complaint sufficiently alleges that Defendant Nicolette was personally involved and/or failed to protect Plaintiff from the assault. *See Bhuiyan v. Wright,* 06–CV–0409, 2009 WL 3123484, at *7 (N.D.N.Y. Sept.29, 2009) (Scullin, J.) ("The fact that defendant Davis was not in the room, but was acting as a 'lookout' so that no one came into the room while plaintiff was being beaten, would not absolve him from liability for the assault. An officer's failure to intervene during another officer's use of excessive force can itself constitute an Eighth Amendment violation unless the assault is "sudden and brief," and the defendant had no real opportunity to prevent it."); *Jeffreys v. Rossi,* 275 F.Supp.2d 463, 474 (S.D.N.Y.2003) (holding that an officer may be personally involved in the use of excessive force if he either directly participates in the assault or if he was present during the assault, yet failed to intervene on behalf of the victim, even though the officer had a reasonable opportunity to do so).

As a result, a response to these claims is required from Defendants David, Sill, and Nicolette. In so ruling, the Court expresses no opinion as to whether Plaintiff's claims can withstand a properly filed motion to dismiss or for summary judgment.

**2. Deliberate Indifference Claims Against Defendants Bill, Carver and DeBroize**

Plaintiff alleges that on August 9, 2011, the day after the alleged assault, he attempted to "discuss the incident and what transpired" with Defendants Bill and Carver. (Dkt. No. 1 at 5.)

Plaintiff alleges that Defendant Bill told him, "I don't want to discuss this Mr. Groves, we're too busy for your foolishness and the matter is being investigated." (*Id.*) Plaintiff's effort to explain that he was frightened by the incident was rebuffed by Defendant Bill, who told Plaintiff to "grow up." (*Id.* at 5–6.) The following day, Plaintiff attempted to discuss the incident with Defendant Carver, his primary therapist, again without success. A further attempt at discussion later that day was met with Defendant Carver "stating to the plaintiff in a snotty tone 'grow the hell up!' " (*Id.* at 6.) On August 10, 2011, Plaintiff attempted to discuss the incident "and his current fears and feelings," during his Monday afternoon "Process Group," which is facilitated by Defendant DeBroize. As alleged, Defendant DeBroize told Plaintiff and the other group members that the matter was under investigation "so no one could discuss the incident with anyone." (*Id.* at 6.)

**\*5** To state a claim of deliberate indifference to a serious medical and/or mental health need under the Eighth Amendment, a plaintiff must first allege facts plausibly suggesting that prison officials acted with "deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). "[T]he plaintiff must allege conduct that is 'repugnant to the conscience of mankind' or 'incompatible with the evolving standards of decency that mark the progress of a maturing society.' " *Ross v. Kelly,* 784 F.Supp. 35, 44 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.1992) (quoting *Estelle v. Gamble,* 429 U.S. at 102, 105–06). The "deliberate indifference standard embodies both an objective and a subjective prong," both of which the plaintiff must establish. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995). "First, the alleged deprivation must be, in objective terms, 'sufficiently serious.' " *Id.* (citations omitted). Second, the defendant "must act with a sufficiently culpable state of mind." *Id.*

With regard to the first element, generally, to be sufficiently serious for purposes of the Constitution, a medical condition must be "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J. dissenting) [citations omitted], *accord, Hathaway,* 37 F.3d at 66; *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998).). [8] Under the subjective component, a plaintiff must also allege facts plausibly suggesting that the defendant acted with "a sufficiently culpable state of mind." *Hathaway,* 37 F.3d at 66. The requisite culpable mental state is similar to that of criminal recklessness. *Wilson v. Seiter,* 501 U.S. 294, 301–03, 111 S.Ct.

2321, 115 L.Ed.2d 271 (1991). A physician's negligence in treating or failing to treat a prisoner's medical condition does not implicate the Eighth Amendment and is not properly the subject of a Section 1983 action. *Estelle,* 429 U.S. at 105–06; *Chance,* 143 F.3d at 703. [9]

[8]   Relevant factors informing this determination include whether the plaintiff suffers from an injury that a "reasonable doctor or patient would find important and worthy of comment or treatment," a condition that "significantly affects" a prisoner's daily activities, or "the existence of chronic and substantial pain." *Chance,* 143 F.3d at 702.

[9]   Thus, a physician who "delay[s] ... treatment based on a bad diagnosis or erroneous calculus of risks and costs" does not exhibit the mental state necessary for deliberate indifference. *Harrison,* 219 F.3d at 139. Likewise, an inmate who disagrees with the physician over the appropriate course of treatment has no claim under Section 1983 if the treatment provided is "adequate." *Chance,* 143 F.3d at 703. The word "adequate" reflects the reality that "[p]rison officials are not obligated to provide inmates with whatever care the inmates desire. Rather, prison officials fulfill their obligations under the Eighth Amendment when the care provided is 'reasonable.' " *Jones v. Westchester Cnty. Dept. of Corr.,* 557 F.Supp.2d 408, 413 (S.D.N.Y.2008). In addition, "disagreements over medications, diagnostic techniques (e .g., the need for X-rays), forms of treatment, or the need for specialists or the timing of their intervention are not adequate grounds for a section 1983 claim." *Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 312 (S.D.N.Y.2001). However, if prison officials consciously delay or otherwise fail to treat an inmate's serious medical condition "as punishment or for other invalid reasons," such conduct constitutes deliberate indifference. *Harrison,* 219 F.3d at 138.

Here, even when construed with the utmost special liberality, Plaintiff's Complaint fails to allege facts plausibly suggesting that Defendants Bill, Carver, and DeBroize acted with deliberate indifference to Plaintiff's serious mental health condition when they declined to discuss the incident of August 8, 2011. There is nothing in the Complaint that even remotely suggests that the requested conversations were integral to Plaintiff's treatment as a convicted sex offender involuntarily committed to CNYPC, or that Defendants' refusal to discuss the incident with Plaintiff when he requested to do so caused Plaintiff to suffer any harm or worsening of his condition. In addition, Plaintiff does not allege that any

2012 WL 651919

of these Defendants acted with the requisite culpable state of mind.

Moreover, the statements made by Defendants Bill and Carver that he should "grow up," even if construed as verbal harassment, do not give rise to a cognizable claim that may be pursued under Section 1983. Allegations of verbal harassment are insufficient to support a Section 1983 claim. *Johnson v. Eggersdorf,* 8 F. App'x 140, 143 (2d Cir.2001); *see also Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986) ("[A]llegations of verbal harassment are insufficient to base a § 1983 claim if no specific injury is alleged .").

 **\*6** For these reasons, Plaintiff's deliberate indifference claims against Defendants Bill, Carver, and DeBroize are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and Fed.R.Civ.P. 12(b)(6). Moreover, because the Court cannot imagine how Plaintiff might correct this claim through better pleading, he is not granted leave to attempt to do so in an amended pleading.[10] Rather, this claim is hereby dismissed with prejudice.

[10]   The Court notes that, generally, leave to amend pleadings shall be freely granted when justice so requires. Fed.R.Civ.P. 15(a). However, an opportunity to amend is not required where amendment would be futile. *John Hancock Mut. Life Ins. Co. v. Amerford Int'l Corp.,* 22 F.3d 458, 462 (2d Cir.1994). *John Hancock Mut. Life Ins. Co.,* 22 F.3d at 462. The Second Circuit has explained that "[w]here it appears that granting leave to amend is unlikely to be productive, ... it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.,* 987 F.2d 129, 131 (2d Cir.1993); *see Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) ("The problem with [Plaintiff's] cause of action is substantive; better pleading will not cure it. Repleading would thus be futile. Such a futile request to replead should be denied."). This rule is applicable even to *pro se* plaintiffs. *See, e.g., Cuoco,* 222 F.3d at 103.

### 3. Failure to Supervise Claims Against Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan

To prevail on a claim under 42 U.S.C. § 1983, a defendant must be personally involved in the plaintiff's constitutional deprivation. *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977). Generally, for purposes of 42 U.S.C. § 1983, supervisory personnel may be considered "personally involved" only if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through

a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring.[11]

[11]   *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (adding fifth prong); *Wright,* 21 F.3d at 501 (adding fifth prong); *Williams v. Smith,* 781 F.2d 319, 323–324 (2d Cir.1986) (setting forth four prongs).

Holding a position in a hierarchical chain of command, without more, is insufficient to support a showing of personal involvement. *McKinnon,* 568 F.2d at 934. Rather, a plaintiff must demonstrate " 'a tangible connection between the acts of the defendant and the injuries suffered.' " *Austin v. Pappas,* 04–CV–7263, 2008 WL 857528, at \*2 (S.D.N.Y. Mar.31, 2008) (quoting *Bass v. Jackson,* 790 F.2d 260, 263 [2d Cir.1986] ) (other citation omitted). An official's failure to respond to grievance letters from inmates, however, "does not establish supervisory liability." *Watson v. McGinnis,* 964 F.Supp. 127, 130 (S.D.N.Y.1997).[12] Moreover, "the law is clear that inmates do not enjoy a constitutional right to an investigation of any kind by government officials." *Pine v. Seally,* 9–CV–1198, 2011 WL 856426, at \*9 (N.D.N.Y. Feb.4, 2011).[13]

[12]   *See also Gillard v. Rosati,* 08–CV–1104, 2011 WL 4402131, at \*7 (N.D.N.Y. Aug.22, 2011) (Peebles, J.) ("It is well-established that without more, 'mere receipt of letters from an inmate by a supervisory official regarding a medical claim is insufficient to constitute personal liability." [internal quotation marks and brackets omitted] ); *Greenwaldt v. Coughlin,* 93–CV–6551, 1995 WL 232736, at \*4 (S.D.N.Y. Apr.19, 1995) ("it is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations."); *Clark v. Coughlin,* 92–CV 0920, 1993 WL 205111, at \*5 n. 2 (S.D.N.Y. Jun.10, 1993) ("Courts in this jurisdiction have consistently held that an inmate's single letter does not constitute the requisite personal involvement in an alleged constitutional deprivation to trigger the Commissioner's liability.")

[13]   *See also Bernstein v. N.Y.,* 591 F.Supp.2d 448, 460 (S.D.N.Y.2008) ("Courts within the Second Circuit have determined that there is no constitutional right

to an investigation by government officials." [internal quotation marks, brackets and ellipsis omitted] ).

In his Complaint, Plaintiff alleges in wholly conclusory terms that Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan failed to "adequately train the staff under their supervision and fail[ed] to act within the scope and training of the position and job title they hold." (Dkt. No. 1 at 8.) Plaintiff alleges that he submitted a letter of complaint to Defendant Hogan and wrote to Defendant Nowicki on several occasions expressing concern his complaint had not been responded to, only to be advised that in September, 2011 that an investigation was ongoing. (*Id.* at 6–7.) Plaintiff does not allege that any of these Defendants personally participated in the alleged assault on August 8, 2011.

Here, even when construed with the utmost special liberality, Plaintiff's Complaint fails to allege facts plausibly suggesting any personal involvement by these Defendants in the alleged used of excessive force on August 8, 2011. As a result, Plaintiff's claims against Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan arising from this incident are *sua sponte* dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and Fed.R.Civ.P. 12(b)(6). This dismissal is without prejudice to Plaintiff's right to file an Amended Complaint that corrects the above-described pleading defects, and states a viable claim against these Defendants. The Court notes that, at this early stage of the case, Plaintiff has the right—without leave of the Court—to file an Amended Complaint within the time limits established by Fed.R.Civ.P. 15(a)(1)(B). However, if he seeks to file an Amended Complaint after those time limits, he must file a motion for leave to file an Amended Complaint in accordance with Fed.R.Civ.P. 15(a)(2). In either event, Plaintiff is advised that *any Amended Complaint must be a complete pleading that will replace and supersede the original Complaint in its entirety, and that may not incorporate by reference any portion of the original Complaint. See* N.D.N.Y. L.R. 7.1(a) (4).

**\*7** Finally, although Plaintiff names Sgt. Sweet as a Defendant in the caption of the complaint and in the listing of the parties, he has not set forth in the Complaint any allegations of fact regarding the conduct of this Defendant complained of. (*See generally* Dkt. No. 1.) As a result, the Complaint fails to state a claim upon which relief may be granted and Sgt. Sweet is dismissed from this action without prejudice to Plaintiff's right to file an Amended Complaint as set forth above.

## IV. MOTION FOR INJUNCTIVE RELIEF

A preliminary injunction is an "extraordinary remedy that should not be granted as a routine matter." *Patton v. Dole,* 806 F.2d 24, 28 (2d Cir.1986). In most cases, to warrant the issuance of a preliminary injunction, a movant must show (a) irreparable harm and (b) either (1) a likelihood of success on the merits of the claim or (2) sufficiently serious questions going to the merits, and a balance of hardships tipping decidedly in favor of the moving party. *D.D. ex rel. V.D. v. New York City Bd. of Educ.,* 465 F.3d 503, 510 (2d Cir.2006) (quotation omitted). "The purpose of issuing a preliminary injunction is to 'preserve the status quo and prevent irreparable harm until the court has an opportunity to rule on the ... merits.' " *Candelaria v. Baker,* 00–CV–912, 2006 WL 618576, at \*3 (W.D.N.Y. Mar.10, 2006) (quoting *Devose v. Herrington,* 42 F.3d 470, 471 [8th Cir.1994] ). Preliminary injunctive relief " 'should not be granted unless the movant, by a clear showing, carries the burden of persuasion.' " *Moore v. Consolidated Edison Co. of New York, Inc.,* 409 F.3d 506, 510 (2d Cir.2005) (quoting *Mazurek v. Armstrong,* 520 U.S. 968, 972 [1997] ). "Where there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary circumstances." *Moore,* 409 F.3d at 510 (citing *Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 381, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992). The same standards govern consideration of an application for a temporary restraining order. *Perri v. Bloomberg,* 06–CV–0403, 2008 WL 2944642, at \*2 (E.D.N.Y. Jul.31, 2008) [citation omitted]. The district court has broad discretion in determining whether to grant a preliminary injunction. *Moore,* 409 F.3d at 511.

"The Second Circuit has defined 'irreparable harm' as 'certain and imminent harm for which a monetary award does not adequately compensate,' noting that 'only harm shown to be non-compensable in terms of money damages provides the basis for awarding injunctive relief.' " *Perri,* 2008 WL 2944642, at \*2 (citing *Wisdom Import Sales Co., L.L.C. v. Labatt Brewing Co., Ltd.,* 339 F.3d 101, 113–14 [2d Cir.2003] ); *see also Kamerling v. Massanari,* 295 F.3d 206, 214 (2d Cir.2002) ("To establish irreparable harm, a party seeking preliminary injunctive relief must show that there is a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation.") (internal quotation omitted). Speculative, remote or future injury is not the province of injunctive relief. *Los Angeles v. Lyons,* 461 U.S. 95, 111–12, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983); *see also Hooks v. Howard,* 07–CV–0724, 2008 WL 2705371, at \*2

2012 WL 651919

(N.D.N.Y. Jul.3, 2008) (citation omitted) ("Irreparable harm must be shown to be imminent, not remote or speculative, and the injury must be such that it cannot be fully remedied by monetary damages.").

 **\*8** Plaintiff has submitted a document entitled "Order to Show Cause for Preliminary Injunction and Tempor[ary] Restraining Order." (Dkt. No. 3.) Construed liberally, Plaintiff's submission seeks a temporary restraining order and injunctive relief enjoining Defendants from "submitting and filing false and untrue statements and reports" regarding the August 11, 2011 incident, and to "stop all retaliatory actions against the plaintiff ...." (*Id.* at 1.) Plaintiff also seeks an "Order of Separation [sic]" directing that Defendants Davis, Sill, Nicolette, Bill, Carver and DeBroize be "restrained from being within 100 feet from the plaintiff in any form or matter." (*Id.* at 2.)

The Court has reviewed Plaintiff's motion papers thoroughly and considered the claims asserted therein in the light most favorable to Plaintiff, as a *pro se* litigant. Based upon that review, the Court finds that the harm Plaintiff alleges is purely speculative and, therefore, not "irreparable." Plaintiff's motion is supported only by a recitation of the alleged assault in August, 2011. (*Id.* at 1–4.) Plaintiff has not supported the claims of ongoing misconduct set forth in his motion papers with any factual allegations, such as the dates on which the misconduct occurred, the nature of the injuries he claims to have suffered, the identities of the persons responsible for the conduct he seeks to enjoin, or the relationship between those actions and the claims asserted in his Complaint. Simply stated, Plaintiff's alleged fear of future wrongdoing by the Defendants is not sufficient to warrant the extraordinary remedy of preliminary injunctive relief.

The Court further notes that the requested injunctive relief cannot be granted unless there is also proof that Plaintiff has a likelihood of succeeding on the merits of his claim, or evidence that establishes sufficiently serious questions going to the merits of his claim and a balance of hardships tipping decidedly toward him. *See Covino v. Patrissi,* 967 F.2d 73, 77 (2d Cir.1992). Plaintiff has failed to submit *proof or evidence* that meets this standard. Plaintiff's allegations, standing alone, are not sufficient to entitle him to preliminary injunctive relief. *See Ivy Mar Co. v. C.R. Seasons Ltd.,* 907 F.Supp. 547, 561 (E.D.N.Y.1995) ("[B]are allegations, without more, are insufficient for the issuance of a preliminary injunction."); *Hancock v. Essential Resources, Inc.,* 792 F.Supp. 924, 928 (S.D.N.Y.1992) ("Preliminary injunctive relief cannot rest on mere hypotheticals."). Without evidence to support his claims that he is in danger from the actions of anyone at CNYPC, the Court will not credit Plaintiff's conclusory allegations that he will be retaliated against or harmed in the future.

Plaintiff has failed to establish either of the two requisite elements discussed above. As a result, Plaintiff's request for a temporary restraining order and/or injunctive relief is denied.

## V. MOTION FOR APPOINTMENT OF COUNSEL
 **\*9** Courts cannot utilize a bright-line test in determining whether counsel should be appointed on behalf of an indigent party. *Hendricks v. Coughlin,* 114 F.3d 390, 392–93 (2d Cir.1997). Instead, a number of factors must be carefully considered by the court in ruling upon such a motion:

> [T]he district judge should first determine whether the indigent's position seems likely to be of substance. If the claim meets this threshold requirement, the court should then consider the indigent's ability to investigate the crucial facts, whether conflicting evidence implicating the need for cross examination will be the major proof presented to the fact finder, the indigent's ability to present the case, the complexity of the legal issues and any special reason in that case why appointment of counsel would be more likely to lead to a just determination.

*Terminate Control Corp. v. Horowitz,* 28 F.3d 1335, 1341 (2d Cir.1994) (quoting *Hodge v. Police Officers,* 802 F.2d 58, 61 [2d Cir.1986] ). This is not to say that all, or indeed any, of these factors are controlling in a particular case. [14] Rather, each case must be decided on its own facts. *Velasquez v. O'Keefe,* 899 F.Supp. 972, 974 (N.D.N.Y.1995) (McAvoy, C.J.) (citing *Hodge,* 802 F.2d at 61).

14      For example, a plaintiff's motion for counsel must always be accompanied by documentation that substantiates his efforts to obtain counsel from the public and private sector, and such a motion may be denied solely on the failure of the plaintiff to provide such documentation. *See*

2012 WL 651919

*Terminate Control Corp. v. Horowitz,* 28 F.3d 1335, 1341 (2d Cir.1994); *Cooper v. Sargenti Co., Inc.,* 877 F.2d 170, 172, 174 (2d Cir.1989) [citation omitted].

Upon due consideration, the Court finds that the relevant factors weigh decidedly against granting Plaintiff's motion at this time. For example, the Court finds as follows: (1) the case does not present novel or complex issues; (2) it appears to the Court as though, to date, Plaintiff has been able to effectively litigate this action; (3) while it is possible that there will be conflicting evidence implicating the need for cross-examination at the time of the trial, as is the case in many actions brought under 42 U.S.C. § 1983 by *pro se* litigants, "this factor alone is not determinative of a motion for appointment of counsel," *Velasquez,* 899 F.Supp. at 974; (4) if this case survives any dispositive motions filed by Defendants, *it is highly probable that this Court will appoint trial counsel at the final pretrial conference;* (5) this Court is unaware of any special reasons why appointment of counsel at this time would be more likely to lead to a just determination of this litigation; and (6) Plaintiff's motion for counsel is not accompanied by documentation that substantiates his efforts to obtain counsel from the public and private sector.

For these reasons, Plaintiff's motion for the appointment of counsel is denied without prejudice. After the Defendants have responded to the allegations in the Complaint which survive *sua sponte* review, and the parties have undertaken discovery, Plaintiff may file a second motion for the appointment of counsel, at which time the Court may be better able to determine whether such appointment is warranted in this case. Plaintiff is advised that any second motion for appointment of counsel must be accompanied by documentation that substantiates his efforts to obtain counsel from the public and private sector.

**\*10  ACCORDINGLY,** it is

**ORDERED** that Plaintiff's motion to proceed *in forma pauperis* (Dkt. No. 2) is *GRANTED;* [15] and it is further

[15]  Plaintiff should note that he will still be required to pay fees that he may incur in this action, including but not limited to copying and/or witness fees.

**ORDERED** that Plaintiff's motion for injunctive relief (Dkt. No. 3) is *DENIED;* and it is further

**ORDERED** that Plaintiff's motion for appointment of counsel (Dkt. No. 4) is *DENIED* without prejudice; and it is further

**ORDERED** that Plaintiff's claims of deliberate indifference against Defendants Bill, Carver and DeBroize are *sua sponte* *DISMISSED* **with prejudice** pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and Fed.R.Civ.P. 12(b)(6); and it is further

**ORDERED** that Plaintiff's claims against Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan arising from their alleged personal involvement in the August 8, 2011 incident are *sua sponte* *DISMISSED* **without prejudice and with leave to amend** in this action in accordance with Fed.R.Civ.P. 15 (as described above in Part III.B.3. of this Decision and Order), pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and Fed.R.Civ.P. 12(b)(6); and it is further

**ORDERED** that Defendant Sweet is *sua sponte* *DISMISSED* **without prejudice and with leave to be reinstated** as a Defendant in this action in accordance with Fed.R.Civ.P. 15, pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and Fed.R.Civ.P. 12(b)(6); and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is otherwise accepted for filing (i.e., as to the claims against Defendants Davis, Sill, and Nicolette arising from the August 8, 2011 incident); and it is further

**ORDERED** that Plaintiff provide a summons, USM–285 form and a copy of the complaint for Defendant Davis, Sill and Nicollette for service, and upon receipt from Plaintiff of the documents required for service of process, the Clerk shall (1) issue summonses and forward them, along with copies of the Complaint to the United States Marshal for service upon the remaining Defendants, and (2) forward a copy of the summons and Complaint by mail to the Office of the New York State Attorney General, together with a copy of this Decision and Order; and it is further

**ORDERED** that, after service of process on Defendants, a response to the Complaint shall be filed by the Defendants or their counsel as provided for in the Federal Rules of Civil Procedure; and it is further

**ORDERED** that all pleadings, motions and other documents relating to this action be filed with the Clerk of the United States District Court, Northern District of New York, 7th Floor, Federal Building, 100 S. Clinton St., Syracuse, New

2012 WL 651919

York 13261–7367. **Any paper sent by a party to the Court or the Clerk must be accompanied by a certificate showing that a true and correct copy of it was mailed to all opposing parties or their counsel. Any document received by the Clerk or the Court which does not include a certificate of service showing that a copy was served upon all opposing parties or their attorneys will be stricken from the docket .** Plaintiff must comply with any requests by the Clerk's Office for any documents that are necessary to maintain this action. All parties must comply with Local Rule 7.1 of the Northern District of New York in filing motions. **Plaintiff is also required to promptly notify, in writing, the Clerk's Office and all parties or their counsel of any change in Plaintiff's address; his failure to so may result in the dismissal of this action.** All motions will be decided on submitted papers without oral argument unless otherwise ordered by the Court.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 651919

---

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 843872

2010 WL 843872
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
N.D. New York.

Derrick THOMPSON, Plaintiff,

v.

Mr. CARLSEN, Superintendent of
Ulster Correctional Facility; White, Ms.,
Administrative Nurse; Franza, Nurse,
Ulster Correctional Facility; Crawley, Nurse,
Ulster Correctional Facility, Defendants.

Civ. No. 9:08-CV-487 (TJM/RFT).
|
March 10, 2010.

**Attorneys and Law Firms**

Derrick Thompson, Rego Park, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State of New York, Krista A. Rock, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants.

**DECISION & ORDER**

THOMAS J. McAVOY, Senior District Judge.

**I. INTRODUCTION**

*1 This *pro se* action brought pursuant to 42 U.S.C. § 1983 was referred to the Hon. Randolph F. Treece, United States Magistrate Judge, for a Report and Recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). No objections to the Report-Recommendation and Order dated February 16, 2010 have been filed, and the time to do so has expired. Furthermore, after examining the record, this Court has determined that the Report-Recommendation and Order is not subject to attack for plain error or manifest injustice. Accordingly, the Court adopts the Report-Recommendation and Order for the reasons stated therein.

It is therefore,

**ORDERED** that Defendants' Motion for Summary Judgment (Dkt. No. 24) is **GRANTED** and the Complaint (Dkt. No. 1) is **DISMISSED** in its entirety. The Clerk of the Court is instructed to enter judgment in favor of Defendants and to close the file in this matter.

**IT IS SO ORDERED.**

**_REPORT-RECOMMENDATION and ORDER_**

RANDOLPH F. TREECE, United States Magistrate Judge.

*Pro se* Plaintiff Derrick Thompson has filed a civil rights action, pursuant to 42 U.S.C. § 1983, alleging that Defendants were deliberately indifferent to his serious medical needs and therefore violated his Eighth Amendment rights. Dkt. No. 1, Compl. Defendants now move for summary judgment pursuant to FED. R. CIV. P. 56(c). Dkt. No. 24. Plaintiff opposes the Motion. Dkt. No. 26. For the reasons that follow, it is recommended that the Defendants' Motion be **GRANTED.**

**I. FACTS**

The following facts were derived mainly from the Defendants' Statement of Material Facts, submitted in accordance with N.D.N.Y.L.R. 7.1, which were not, in their entirety, specifically countered nor opposed by Plaintiff. *See* N.D.N.Y.L.R. 7.1(a)(3) (*"Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party."* (emphasis in original)). However, where Plaintiff has contradicted Defendants' Statement of Material Facts, either in his Complaint or in his Response in Opposition to Defendants' Motion, we will not deem those facts admitted for the purposes of addressing this Motion.

At around 9 a.m. on October 9, 2007, while Plaintiff was housed at Ulster Correctional Facility ("Ulster"), Plaintiff complained to his dorm officer about pain in his chest. Dkt. No. 24, Defs.' 7.1 Statement at ¶ 1. The dorm officer called Defendant Nurse Franza and informed her that Plaintiff wished to be seen by medical staff as soon as possible. *Id.* at ¶ 2. At the time Franza received that call, the regular sick call for that day was over, nonetheless, an emergency sick call procedure is available every day for inmates who need to be seen for a medical emergency. *Id.* at ¶¶ 3-4.

At around 9:30 a.m. that morning, Defendant Nurse Crawley received a phone call from a corrections officer working in Plaintiff's housing dorm, stating that Plaintiff was complaining about burning in his chest and wanted to be seen by medical staff. *Id.* at ¶ 9. Crawley advised the corrections officer that Plaintiff should sign up for the next available sick call. *Id.* at ¶ 10; Pl.'s Resp. in Opp'n to Defs.' Mot., Mem. of Law at p. 2. The corrections officer asked Crawley whether Plaintiff should be sent for emergency sick call, to which Crawley responded that Plaintiff's description of his medical problem did not seem to constitute a medical emergency. Defs.' 7.1 Statement at ¶¶ 11-12. Crawley questioned the officer about whether Plaintiff was showing any signs of distress, including profuse sweating, chest pain and/or difficulty breathing. *Id.* at ¶ 13; Pl.'s Mem. of Law at pp. 3-4. There was no indication that Plaintiff was exhibiting any such symptoms. Defs.' 7.1 Statement at ¶ 14.

**\*2** Thereafter, a sergeant sent Plaintiff to the infirmary to be seen by medical staff. *Id.* at ¶ 15. Nurse Crawley attended to Plaintiff upon his arrival in the infirmary, where he complained of chest pain. *Id.* at ¶¶ 16-17; Pl.'s Mem. of Law at p. 2. Plaintiff left the emergency room area without permitting Crawley to complete a more thorough physical examination. Defs.' 7.1 Statement at ¶ 21. Crawley issued Plaintiff a Misbehavior Report, alleging that after he arrived at the infirmary on October 9, 2007, Crawley denied his request for non-emergency medication and Plaintiff became loud, argumentative, and refused further assessment. *Id.* at ¶ 22; Dkt. No. 24-10, Nurse W. Crawley Aff., dated June 10, 2009, Ex. C, Misbehavior Rep., dated Oct. 9, 2007 (hereinafter "Misbehavior Rep."). In the Misbehavior Report, Plaintiff was charged with interference with an employee, harassment, and disobeying a direct order. Defs.' 7.1 Statement at ¶ 22; Misbehavior Rep. Plaintiff pled guilty to all three charges. Defs.' 7.1 Statement at ¶ 23.

On October 10, 2007, Plaintiff again went to the infirmary and was seen by Defendant Franza. *Id.* at ¶ 24. Plaintiff filed a Grievance regarding the allegedly inappropriate medical care provided on October 9, 2007. *Id.* at ¶ 25. That Grievance was processed pursuant to departmental policy and was ultimately denied. *Id.* at ¶¶ 28-29.

## II. DISCUSSION

### A. Summary Judgment Standard

Pursuant to FED. R. CIV. P. 56(c), summary judgment is appropriate only where "there is no genuine issue as to any material fact and [the moving party] is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through " 'pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any,' " that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e) ] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.,* 964 F.2d 149, 154 (2d Cir.1992).

To defeat a motion for summary judgment, the non-movant must "set out specific facts showing [that there is] a genuine issue for trial," and cannot rest "merely on allegations or denials" of the facts submitted by the movant. FED. R. CIV. P. 56(e); *see also Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525-26 (2d Cir.1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin,* 344 F.3d at 289 (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) and *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995)).

**\*3** When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 742 (2d Cir.1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d

1219, 1224 (2d Cir.1994). Furthermore, where a party is proceeding *pro se,* the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994), *accord, Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995). Nonetheless, mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991).

### B. Eighth Amendment Claim

To state an Eighth Amendment claim for denial of adequate medical care, a prisoner must demonstrate that prison officials acted with "deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 104 (1976). The plaintiff must allege conduct that is " 'repugnant to the conscience of mankind' or 'incompatible with the evolving standards of decency that mark the progress of a maturing society.' " *Ross v. Kelly,* 784 F.Supp. 35, 44 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.1992)) (quoting *Estelle v. Gamble,* 429 U.S. at 102, 105-06).

To state a claim for denial of medical care, a prisoner must demonstrate (1) a serious medical condition and (2) deliberate indifference. *Farmer v. Brennan,* 511 U.S. 825, 834-35 (1994); *Hathaway v. Coughlin ("Hathaway I"),* 37 F.3d 63, 66 (2d Cir.1994). The first prong is an objective standard and considers whether the medical condition is sufficiently serious. The Second Circuit has stated that a medical need is serious if it presents " 'a condition of urgency' that may result in 'degeneration' or 'extreme pain.' " *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (quoting *Hathaway I,* 37 F.3d 63, 66 (2d Cir.1994)). Among the relevant factors to consider are "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individuals daily activities; or the existence of chronic and substantial pain." *Chance v. Armstrong,* 143 F.3d at 702 (quoting *McGuckin v. Smith,* 974 F.2d 1050, 1059-60 (9th Cir.1992)). The second prong is a subjective standard requiring a plaintiff to demonstrate that the defendant acted with the requisite culpable mental state similar to that of criminal recklessness. *Wilson v. Seiter,* 501 U.S. 294, 301-03 (1991); *Hathaway I,* 37 F.3d at 66. A plaintiff must demonstrate that the defendant acted with reckless disregard to a known substantial risk of harm. *Farmer v. Brennan,* 511 U.S. at 836. This requires

"something more than mere negligence ... but something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* at 835; *see also Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996) (citing *Farmer* ). Further, a showing of medical malpractice is insufficient to support an Eighth Amendment claim unless "the malpractice involves culpable recklessness, i.e., an act or a failure to act by the prison doctor that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Chance v. Armstrong,* 143 F.3d at 702 (quoting *Hathaway v. Coughlin ("Hathaway II"),* 99 F.3d 550, 553 (2d Cir.1996)); *see also Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) (citations omitted).

**\*4** In this case, Plaintiff asserts that Defendants Franza and Crawley were deliberately indifferent to his serious medical needs when they allegedly denied him treatment for his chest pain on October 9 and 10, 2007.

### 1. *Claims against Crawley*

In his Complaint, Plaintiff alleges that on October 9, 2007, Defendant Crawley denied his request to see a doctor and denied him medical treatment. Compl. at p. 3. Plaintiff further asserts that he was seen by a doctor on the following day, and was diagnosed as having a heart murmur. *Id.* In his Grievance, dated October 9, 2007, Plaintiff made the following allegations: On October 9th, Crawley denied his request to see a doctor through a corrections officer with whom she was speaking on the telephone. Grievance at p. 2. Thereafter, Plaintiff was sent down to the medical clinic, where Crawley again denied him the medical attention he needed. *Id.*

In her Affidavit submitted in support of the Motion for Summary Judgment, Crawley affirms that on the morning of October 9th, she received a phone call from a corrections officer working in Plaintiff's housing dorm, who told her that Plaintiff "was complaining of burning in his chest and that he was out of his acid reflux medication and wanted to be seen by medical staff as soon as possible." [1] Crawley Aff. at ¶¶ 5-6. Crawley swears that she asked the officer "whether plaintiff was showing any signs of distress, including profuse sweating, chest pain and/or difficulty breathing, which would have been indicators of some sort of cardiac event." Crawley Aff. at ¶ 8. However, because "[t]here was no indication that plaintiff was suffering any such symptoms," Crawley concluded that it was not an emergency situation, and

"advised the Corrections Officer that [Plaintiff] should sign up for the next available regular sick call." Crawley Aff. at ¶¶ 7-9. Crawley states that shortly thereafter, a sergeant called and informed her he was sending Plaintiff to the infirmary. *Id.* at ¶ 10. According to Crawley, upon Plaintiff's arrival at the infirmary, he showed no signs of physical distress, complained only of a burning sensation in his chest, and asked for more acid reflux medication, showing her a prior prescription for acid reflux medication. *Id.* at ¶ 11. Plaintiff denies asking for medication, Pl.'s Mem. of Law at p. 2, however, he stated in his Grievance that *"when I asked for something for the pain* [ ] ... I was told no," and that he "tried to show [Crawley] what a [ ] doctor on Riker's Island gave [him] when [he] had this problem [ ]," Grievance at p. 2 (emphasis added). Thus, Plaintiff's statement in his Grievance confirms that he did in fact ask for medication to remedy his chest pain.

[1]    In his Response to Defendants' Motion, Plaintiff denies complaining of burning in his chest. Pl.'s Resp. at p. 4. However, we note that Plaintiff stated in his Complaint that his "chest was burning," Compl. at p. 3, and complained in his Grievance that he "was stuck in a dorm left with a burning chest!," Grievance at p. 2.

Crawley "advised Plaintiff that in order to have his medication refilled, [she] could not do so as a Nurse, he would have to sign up for regular sick call." Crawley Aff. at ¶ 12. At that point, Plaintiff "became very loud and argumentative[,] insisting that he be given medication at that time. He then left the emergency room area without permitting me to complete a more thorough examination." *Id.* As a consequence, Crawley issued Plaintiff a Misbehavior Report on October 9th charging him with interference with an employee, harassment, and disobeying a direct order; Plaintiff later pled guilty to all three charges.[2] *Id.* at ¶ 15; Dkt. No. 24-16, Scott Carlsen Aff., dated June 22, 2009, Ex. C, Disciplinary Hr'g Tr., dated Oct. 20, 2007, at p. 4 (pleading guilty with an explanation to all three charges).

[2]    In his Complaint, Plaintiff does not bring any claims related to the filing of the Misbehavior Report. In his Response to Defendants' Motion, Plaintiff alleges that the Misbehavior Report was false and retaliatory in nature. These new and conclusory claims are addressed below in Part II.B.3.

**\*5** Crawley asserts that Plaintiff has failed to demonstrate any deliberate indifference on her part. We agree. Plaintiff has offered no evidence to rebut Crawley's sworn Affidavit. Furthermore, based on the allegations contained in Plaintiff's Grievance, it appears that Crawley examined Plaintiff,

determined his condition was non-severe based on his subjective complaints and his lack of symptoms, and told him to submit his request for medicine in accordance with standard non-emergency procedures. Even assuming Crawley was incorrect in her medical assessment of Plaintiff's condition,[3] such a misdiagnosis does not constitute deliberate indifference and therefore is not a valid basis for an Eighth Amendment claim. *Estelle v. Gamble,* 429 U.S. at 106 (a claim that a medical professional "has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."). Thus, to the extent Plaintiff brings this § 1983 claim on a theory of negligence, *see* Compl. at p. 5, that claim must fail. *Id.* Finally, Plaintiff's preference for a different course of treatment than the one provided does not form the basis of a valid § 1983 claim; a prisoner does not have the right to the treatment of his choice. *Chance v. Armstrong,* 143 F.3d at 703.

[3]    Defendants do not challenge Plaintiff's factual allegation that he suffered from a heart murmur condition nor his legal conclusion that his condition was sufficiently serious under the objective prong of the Eighth Amendment test. Thus, for the purposes of addressing Defendants' Motion, we need not address those issues.

Because Plaintiff has failed to demonstrate that a material question of fact exists with respect to his Eighth Amendment claim based on Crawley's medical treatment, it is recommended that Summary Judgment be **granted** on this claim.

### 2. *Claims against Franza*

In his Complaint, Plaintiff alleges that Franza denied his request to see a doctor when the corrections officer in his unit called the infirmary on October 9, 2007. Compl. at p. 3. In support of his Motion for Summary Judgment, Franza has submitted an Affidavit in which he states that the corrections officer who called the infirmary on October 9th told him that "inmate Thompson was complaining of heartburn and was out of his acid reflux medication and wanted to be seen by medical staff as soon as possible." Dkt. No. 24-14, C. Franza Aff., dated June 10, 2009, at ¶ 5. Franza states that neither heartburn nor a request for a medication refill constitute a medical emergency and therefore, he advised Plaintiff to sign up for the next regular sick call day. *Id.* at ¶ 8. Finally, Franza

states that his "entire understanding of inmate Thompson's condition was based on what the Corrections Officer told [him]. In [his] professional opinion, there was nothing in the description provided to [him] by the officer that led [him] to believe plaintiff was in any danger or had a condition requiring immediate medical attention." *Id.* at ¶ 9.

Again, Plaintiff has failed to rebut Franza's Affidavit, in which he swears that based on the information provided to him by the corrections officer, he determined that Plaintiff did not require immediate medical attention. As previously discussed, such a medical assessment, even if wrong, does not constitute deliberate indifference. *Estelle v. Gamble,* 429 U.S. at 106.

**\*6** For the above reasons, it is recommended that Summary Judgment be **granted** on Plaintiff's Eighth Amendment claim against Franza.

### 3. *Allegations against Crawley and Franza raised in Plaintiff's Response in Opposition to Defendants' Motion*

Although unmentioned in the Complaint, Plaintiff alleges in his Response to Defendants' Motion that he saw Franza during another emergency sick call on October 10, 2007. Pl.'s Mem. of Law at pp. 2-3. Plaintiff alleges that Franza threatened him during his sick call visit and conspired with Crawley to "pre-date" the Misbehavior Report in retaliation for Plaintiff's October 9th Grievance. These new allegations were not added to the Complaint by amendment, and are therefore improper. However, even if we were to consider the merits of these new claims, they would still fail.

It is well-settled in this Circuit that "threats do not amount to violations of constitutional rights." *Moncrieffe v. Witbeck,* 2000 WL 949457, at \*3 (N.D.N.Y. June 29, 2000) (quoting *Malsh v. Austin,* 901 F.Supp. 757, 763 (S.D.N.Y.1995)). Furthermore, there is "no general constitutional right to be free from being falsely accused in a misbehavior report." *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997) (citing *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986)); *see also Gill v. Riddick,* 2005 WL 755745, at \*7 (N.D.N.Y. Mar. 31, 2005). Finally, Plaintiff's claim that Franza and Crawley conspired to file a false Misbehavior Report against him in retaliation for the Grievance he filed against them on October 9th is wholly conclusory and belied by the record. *See Bell. Atl. Corp. v. Twombly,* 550 U.S. 544-45 (stating that a valid claim must have enough factual allegations "to raise a right

to relief above the speculative level"). Plaintiff pleaded guilty to all the charges brought in Crawley's Misbehavior Report. Disciplinary Hr'g Tr. at p. 4. Moreover, the Misbehavior Report is dated October 9, 2007, and, although Plaintiff claims that Crawley and Franza "pre-dated" the Misbehavior Report, there is no evidence on the record of such action. Nor is there any other evidence to suggest that the Misbehavior Report was issued for anything other than Plaintiff's violation of the rules, for which he admitted guilt and accepted responsibility. Thus, Plaintiff's retaliation and conspiracy claims are also without merit.

For the above reasons, it is recommended that these claims be **dismissed.**

### C. Supervisory Liability

Plaintiff names Superintendent of Ulster Correctional Facility Carlsen and Administrative Nurse Ms. White as Defendants. Beyond listing these Defendants in his Complaint, Plaintiff provides no details concerning his claims against these Defendants. However, given their supervisory roles, we assume Plaintiff seeks damages against these Defendants based on a theory of supervisory liability.

If a plaintiff seeks to bring a § 1983 action for supervisory liability, liability on the part of the supervisor may exist

> **\*7** in one or more of the following ways: 1) actual direct participation in the constitutional violation, 2) failure to remedy a wrong after being informed through a report or appeal, 3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, 4) grossly negligent supervision of subordinates who committed a violation, or 5) failure to act on information indicating that unconstitutional acts were occurring.

*Hernandez v. Keane,* 341 F.3d 137, 145 (2d Cir.2003) (citing *Colon v. Coughlin,* 58 F.3d at 873) (further citations omitted).

2010 WL 843872

In this case, because we find that Plaintiff's underlying Eighth Amendment claims are without merit, none of the above bases for supervisory liability are applicable. *See Blyden v. Mancusi,* 186 F.3d 252, 265 (2d Cir.1999) ("Of course, for a supervisor to be liable under Section 1983, there must have been an underlying constitutional deprivation."). Therefore, to the extent Plaintiff intended to bring claims of supervisory liability against Defendants Carlsen and White, it is recommended that Summary Judgment be **granted** on those claims.

### III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED,** that the Defendants' Motion for Summary Judgment (Dkt. No. 24) be **GRANTED** and the Complaint (Dkt. No. 1) **DISMISSED** in its entirety; and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs .,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72, 6(a), & 6(e).

### All Citations

Not Reported in F.Supp.2d, 2010 WL 843872

---

**End of Document**                          © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 1181234
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Kenneth J. PHELAN, Plaintiff,

v.

Christina CALABRESE and John Doe, Defendants.

No. 9:11–CV–0315 (GLS/TWD).
|
Feb. 13, 2013.

### Attorneys and Law Firms

Kenneth J. Phelan, Romulus, NY, pro se.

Hiscock & Barclay, LLP, Michael J. Smith, Esq., of Counsel, Albany, NY, for Defendants Calabrese and Doe.

### *REPORT–RECOMMENDATION*

THÉRÈSE WILEY DANCKS, United States Magistrate Judge.

**\*1** This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable Gary L. Sharpe, Chief United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Plaintiff Kenneth J. Phelan claims that Defendants Christina Calabrese and John Doe, both Assistant District Attorneys, violated his civil rights during criminal proceedings by misrepresenting his previous criminal history and using illegal evidence. (Dkt. No. 1.) Currently pending before the Court is Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Dkt. No. 51.) For the reasons discussed below, I recommend that the Court grant Defendants' motion.

### I. FACTUAL AND PROCEDURAL SUMMARY

Plaintiff alleges in his verified complaint that Defendant Doe lied to former Defendant Judge Wagner during Plaintiff's July 2008 arraignment in Albany City Court. (Dkt. No. 1 at 3–4.) Defendant Doe allegedly falsely informed the judge that Plaintiff had two prior felonies when Plaintiff only had one. *Id.* at 4–5. Plaintiff alleges that Defendant Calabrese knowingly used illegally seized evidence against Plaintiff at his trial. *Id.* at 5.

Plaintiff filed this action on March 21, 2011. (Dkt. No. 1.) As is relevant here, Plaintiff requests declaratory relief and injunctive relief. *Id.* at 6–7. Specifically, Plaintiff requests (1) a declaration that Defendants Calabrese and Doe broke state and federal law; and (2) an injunction directing Defendants Calabrese and Doe "to stop lying in court and not use illegally seized property against any defendants...." *Id.*

Defendants Wagner, Doe, Calabrese, and the State of New York were dismissed upon the Court's initial screening of the complaint. (Dkt. No. 7.) The Court reinstated the claims for declaratory and injunctive relief against Defendants Wagner, Calabrese, and Doe in response to Plaintiff's motion for reconsideration. (Dkt. No. 23.) The Court dismissed the claims against Defendant Wagner in response to his motion to dismiss. (Dkt. No. 49.) Thus, the only claims remaining in this action are the claims against Defendants Calabrese and Doe for declaratory and injunctive relief.

Defendants now move for summary judgment of the remaining claims. (Dkt. No. 51.) Plaintiff has opposed the motion. (Dkt. No. 56.) Defendants have filed a reply. (Dkt. No. 57.)

### II. APPLICABLE LEGAL STANDARDS

#### A. Legal Standard Governing Motions for Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Id.* at 273. The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). Rather, a dispute regarding a material fact is *genuine* "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material [1] fact exists, the Court must

resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.,* 542 F.3d 290, 309 (2d Cir.2008).

[1]   A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson,* 477 U.S. at 248.

### B. Legal Standard Governing Motion to Dismiss for Failure to State a Claim

**\*2** To the extent that a defendant's motion for summary judgment under Federal Rule of Civil Procedure 56 is based entirely on the allegations of the plaintiff's complaint, such a motion is functionally the same as a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). As a result, "[w]here appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment." *Schwartz v. Compagnie Gen. Transatlantique,* 405 F.2d 270, 273 (2d Cir.1968); *accord, Katz v. Molic,* 128 F.R.D. 35, 37–38 (S.D .N.Y.1989) ( "This Court finds that ... a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties."). Accordingly, it is appropriate to summarize the legal standard governing Federal Rule of Civil Procedure 12(b)(6) motions to dismiss.

A defendant may move to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) on the ground that the complaint fails to state a claim upon which relief can be granted. In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia,* "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)) (emphasis added). "Determining whether a complaint states a plausible claim for relief ... requires the ... court to draw on its judicial experience and common sense ... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Id.* at 679 (internal citation and punctuation omitted).

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor ." *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (citation omitted). Courts are "obligated to construe a *pro se* complaint liberally." *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009) (citation omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 556 U.S. at 678 (citing *Twombly,* 550 U.S. at 556).

### III. ANALYSIS

#### A. Failure to Serve Defendant Doe

Defendants argue that the claims against Defendant Doe must be dismissed because "[n]o other Albany County District Attorney, other than Ms. Calabrese, has been served with a summons and complaint in this action." (Dkt. No. 51–7 at 5 .[2]) Plaintiff argues that Defendant Doe "has answered my complaint through his attorney ..., and is therefore a valid defendant." (Dkt. No. 56–1 at 2.)

[2]   Citations to page numbers in Defendants' memorandum of law refer to the page numbers in the original document rather than to those assigned by the Court's electronic filing system.

**\*3** Under the Federal Rules of Civil Procedure, a defendant must be served with the summons and complaint within 120 days after the filing of the complaint. Fed.R.Civ.P. 4(m). This 120–day service period is shortened, or "expedited," by the Court's Local Rules of Practice, which provides that all defendants must be served with the summons and complaint within sixty days of the filing of the complaint. L.R. 4.1(b).

Here, Plaintiff has never identified Defendant Doe or served him with the summons and complaint. Generally, this would subject the claims against Defendant Doe to dismissal. However, counsel did, as Plaintiff notes, file an answer on behalf of Defendant Doe.[3] (Dkt. No. 28.) The answer did not plead untimely service as an affirmative defense. *Id.* A defense of insufficient service is waived where the defendant fails to raise it in a motion to dismiss or in the answer to the complaint. Fed.R.Civ.P. 12(h).

[3]   In relevant part, the answer states that "Defendants, Christina Calabrese and 'John Doe,' the latter being intended to be an unnamed Albany County Assistant District Attorney, by their attorneys ... as and for their answer to the complaint of the Plaintiff ... allege[ ]

2013 WL 1181234

as follows ... Wherefore, the Responding Defendants Christina Calabrese and 'John Doe' an unnamed Albany County Assistant District Attorney, respectfully pray [ ] that a judgment b[e] made and entered dismissing the Complaint in its entirety and for costs, disbursements, and, if appropriate attorneys' fees in favor of the Responding Defendants." (Dkt. No. 28 at 1, 4.)

Given Plaintiff's *pro se* status and the inclusion of Defendant Doe in the answer, I recommend that the Court decline to dismiss the claim against Defendant John Doe for failure to timely serve the summons and complaint. However, as discussed below, both Defendants are entitled to judgment on the merits.

### B. Injunctive Relief

Plaintiff seeks injunctive relief from Defendants Calabrese and Doe. (Dkt. No. 1 at 7.) Defendants argue that Plaintiff is not entitled to such relief. (Dkt. No. 51–7 at 9.) Defendants are correct.

When seeking injunctive relief, the plaintiff carries the burden of establishing that he or she "has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged official conduct." *Shain v. Ellison,* 356 F.3d 211, 215 (2d Cir.2004) (quoting *City of Los Angeles v. Lyons,* 461 U.S. 95, 101–02 (1983)). The plaintiff "cannot rely on past injury to satisfy the injury requirement but must show a likelihood that he [or she] will be injured in the future." *Id.* (quoting *Deshawn E. by Charlotte E. v. Safir,* 156 F.3d 340, 344 (2d Cir.1998)) (punctuation omitted). This threat of injury must be "real and immediate, not conjectural or hypothetical." *Id.* (punctuation omitted).

In *Shain,* for example, an attorney with no criminal record was arraigned on misdemeanor charges and remanded to the Nassau County Correctional Center ("NCCC"). *Id.* at 213, 215. There, the attorney was strip-searched in accordance with a facility policy requiring such searches of all admittees, regardless of whether or not the admittee was suspected of concealing a weapon or contraband. *Id.* at 213. The attorney sued. *Id.* The case eventually went to trial, where the attorney received nominal damages and a declaration that the suspicionless strip-search policy was unconstitutional. *Id.* at 213–14. The district court later issued an injunction prohibiting enforcement of the suspicionless strip-search policy. *Id.* at 214. On appeal, the Second Circuit held that the attorney lacked standing to seek injunctive relief because the threat of future injury was too speculative. The court stated that:

**\*4** to establish a sufficient likelihood of a future unconstitutional strip search, [the attorney] would have to show that *if* he is arrested in Nassau County and *if* the arrest is for a misdemeanor and *if* he is not released on bail and *if* he is remanded to NCCC and *if* there is no particularized reasonable suspicion that he is concealing contraband, he will again be strip searched. Such an accumulation of inferences is simply too speculative and conjectural to supply a predicate for prospective injunctive relief.

*Id.* at 216 (emphasis in original).

Here, Plaintiff argues that "there is a realistic threat of it happening again to me in the future because there is a pattern of officially sanctioned behavior to use illegally seized evidence at trial." (Dkt. No. 56–1 at 6.) This assertion is insufficient to establish standing. Even if one assumes that Albany County has a policy of officially sanctioning the use of illegally seized evidence at trial, the existence of such a policy is insufficient to confer standing on Plaintiff. Rather, "a plaintiff seeking injunctive relief must demonstrate *both* a likelihood of future harm *and* the existence of an official policy or its equivalent." *Shain,* 356 F.3d at 216 (emphasis in original). Plaintiff has not demonstrated the likelihood of future harm. It is undisputed that Plaintiff "is not involved in any current contact or proceedings with the moving Defendants." (Dkt. No. 51–6 ¶ 23; Dkt. No. 56–2 ¶ 23.) The notion that Plaintiff might be released from prison, be arrested for and charged with another crime in Albany County, refuse to accept a plea deal, proceed to trial, and face prosecution by Defendants Doe or Calabrese is purely conjectural. Accordingly, Plaintiff does not have standing to seek injunctive relief. Therefore, I recommend that the Court grant Defendants' motion for summary judgment and dismiss Plaintiff's claims for injunctive relief against Defendants Calabrese and Doe.

### D. Declaratory Relief

**Phelan v. Calabrese, Not Reported in F.Supp.2d (2013)**
2013 WL 1181234
Case 9:17-cv-01349-DNH-TWD   Document 62   Filed 07/22/19   Page 126 of 129

Plaintiff seeks declaratory relief from Defendants Calabrese Doe. (Dkt. No. 1 at 6.) Defendants argue that Plaintiff is not entitled to such relief. (Dkt. No. 51–7 at 7–8.) Defendants are correct. As this Court observed in its order dismissing the declaratory relief claims against former Defendants Nichole Lichva and Lynda Rymanowski, "[t]o have standing to sue for ... declaratory relief, the plaintiff must be the person who will be injured by the future action sought to be enjoined." (Dkt. No. 49 at 8, quoting *Cooley v. Di Vecchio,* No. 06–178, 2008 U.S. Dist. LEXIS 121013, at *14, 2008 WL 2755846, at *6 (W.D.Pa. July 15, 2008).[4] ) As discussed above, Plaintiff has not demonstrated anything beyond a speculative possibility of future injury. Therefore, I recommend that the Court grant Defendants' motion for summary judgment and dismiss the claim for declaratory relief against Defendants Calabrese and Doe.

[4]   Lexis and Westlaw list different dates for this decision. I have used the date listed by Westlaw because that is the version cited by Chief Judge Sharpe in his previous order in this case. (Dkt. No. 49 at 8.)

**ACCORDINGLY,** it is

 **\*5   RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 51) be ***GRANTED.***

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 (2d Cir.1989) (per curiam)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a).

### All Citations

Not Reported in F.Supp.2d, 2013 WL 1181234

Footnotes

**End of Document**                                                © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 4828844
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

John William NUSSBAUMER, Plaintiff,

v.

John G. NESBITT, Seneca County, Seneca County
Sheriffs Dept., Jack Stenberg (Sheriff), Barry Porsch,
D.A. and Doe Officer = Sgt. Thompson, Defendants.

No. 11–CV–6331Fe.
|
Oct. 7, 2011.

DECISION AND ORDER

CHARLES J. SIRAGUSA, District Judge.

### INTRODUCTION

*1 Plaintiff, John W. Nussbaumer, an inmate of the Groveland Correctional Facility, filed a *pro se* action seeking relief under 42 U.S.C. § 1983. Plaintiff was directed to amend the complaint (Docket # 3). The Court has reviewed the amended complaint pursuant to 28 U.S.C. §§ 1915(e)(2)(B) and 1915A(a).

Plaintiff claims that his constitutional rights were violated when his house was searched and he was subject to excessive force, falsely arrested and maliciously prosecuted. Further, plaintiff was assaulted by an inmate while in the custody of Seneca County, suffered serious injuries, deliberate indifference, and was denied adequate medical care. Plaintiff's revised caption includes some of the defendants he refers to in the body of the Complaint, but not all. Some of plaintiff's claims must be dismissed as premature, some must be stayed pending resolution of the criminal matter, and some may go forward.

### DISCUSSION

The Court interprets plaintiff to name as defendants, in the Caption or in the body of the complaint, Seneca County Sheriff Deputy John G. Nesbitt and Sergeant Thompson, Seneca County, the Seneca County Sheriffs Department,

Sheriff Jack Stenberg and medical staff from the Seneca County Law Enforcement Center, and the Seneca County District Attorney Barry L. Porsch, and his retained and appointed attorneys Michael Conroy and John Nabinger. Pursuant to it's review, the Court finds the following.

### Claims under *Heck v. Humphrey* and *Wallace v. Kato*

Plaintiff's complaint makes clear that he was convicted of the charges for which he was arrested, and that products of the allegedly unlawful search and seizure were used against him in that prosecution. He indicates that he has attempted, but not yet succeeded, in appealing his conviction, making clear that the resulting convictions have not been invalidated at this time, yet may still be appealed. Plaintiff's claims related to his conviction, due process and equal protection, malicious prosecution, "inappropriate counsel", and access to the courts are dismissed as premature pursuant to *Wallace v. Kato,* 549 U.S. 384, 127 S.Ct. 1091, 166 L.Ed.2d 973 (2007) and *Heck v. Humphrey,* because the challenged actions would impugn an extant conviction. [1]

[1]
The Supreme Court has held that a claim arising from an outstanding criminal conviction does not constitute a cognizable cause of action under § 1983.

[I]n order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254. A claim for damages bearing that relationship to a conviction or sentence that has not been so invalidated is not cognizable under § 1983.

*Heck v. Humphrey,* 512 U.S. 477, 487, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994).

### False arrest and illegal search and seizure

In *Wallace v. Kato,* the United States Supreme Court discussed the accrual and statute of limitations issues surround a false arrest/false imprisonment claim. The Supreme Court found that a litigant may file a false arrest claim on the first day of confinement and that the claim accrues on the date on which plaintiff was arraigned on the charges, or "when legal process was initiated against him,...." *Wallace v. Kato,* 549 U.S. 384, 127 S.Ct. 1091,

166 L.Ed.2d 973 (2007). Following *Wallace,* several Courts have applied that same analysis to Fourth Amendment claims based on events occurring "between an unlawful arrest and the institution of legal process...." *Mondragon v. Thompson,* 519 F.3d 1078, 1083 (10th Cir.2008). *And see Dominguez v. Hendley,* 545 F.3d 585, 2008 WL 4395651, *2 (7th Cir.2008) ("Fourth Amendment claims for false arrest or unlawful searches accrue at the time of (or termination of) the violation"); *Johnson v. Dossey,* 515 F.3d 778, 781–82 (7th Cir.2008) (distinguishing between claims that accrue when a litigant first appears before a magistrate, controlled by *Wallace,* and claims that arise during the legal process (controlled by *Heck* )); *Mallard v. Potenza,* Not Reported in F .Supp.2d, 2007 WL 4198246 (E.D.N.Y.2007) (seeing no reason to distinguish between false arrest and search and seizure claims; *"Wallace* applies with equal force to a claim for an illegal search and seizure").

*2  To the extent that (i) Plaintiff sets forth potentially viable claims which accrue prior to a favorable termination ruling and (ii) Plaintiffs underlying conviction is not final, to preserve such claims from expiring, the Court may exercise its discretion to grant a stay until a favorable termination has either been obtained or is no longer available. *See Wallace v. Kato,* 549 U.S. 384, 393–94, 127 S.Ct. 1091, 166 L.Ed.2d 973 (2007) (citations omitted) ("lf a plaintiff files a false-arrest claim before [*10] he has been convicted ..., it is within the power of the district court ... to stay the civil action until the criminal case ... is ended.... If the plaintiff is ultimately convicted, and if the stayed civil suit would impugn that conviction, *Heck* will require dismissal; otherwise, the civil action will proceed, absent some other bar to suit."); *Jackim v. City of Brooklyn,* No. 05–1678, 2010 WL 4923492, at *3 (N.D.Ohio Nov.29, 2010) (allowed stay of *Heck*-barred claim until plaintiff exhausted appeals in criminal case); *Crooker v. Burns,* No. 06–30187 et al., 2010 WL 3781877, at *1 (D.Mass. Sept.21, 2010) (stayed *Heck*-barred claims until completion of criminal case, including any appeal thereof); *Smart v. Township of Gloucester,* No. 06–138, 2007 WL 1186043, at *2 (D.N.J. Apr.20, 2007) (recognizing that a stay necessitated under *Heck/Kato* may extend for years while post-conviction relief of the criminal conviction at issue is sought). *See also, Gibson v. Superintendent of N.J. Dep't of Law and Public Safety–Div. of State Police,* 411 F.3d 427, 451 (3d Cir.2005) (where claim would impugn the only evidence supporting conviction, Heck applies and claim must be deferred until the conviction is overturned). Though it is possible that upon final determination of plaintiff's appeal the Courts may find the allegedly improper seizures were

not inextricable from plaintiff's criminal conviction, and thus escape the Heck bar, conservation of judicial resources makes it prudent that a single determination as to the applicability of Heck be made at the conclusion of all criminal proceedings. Thus, the Court will stay plaintiff's false arrest and search and seizure claims pending final resolution of his criminal proceedings, or success in overturning his conviction.

**Excessive force**

Plaintiff's excessive force claim against defendant Nesbitt in his individual capacity may go forward at this time.

**Municipal Liability and Medical Care**

As to the denial of medical care claim: the Court will not dismiss Seneca County on the basis that plaintiff may be able to state a claim for municipal liability on allegations that he was left in his cell with multiple fractures to his scull, not able to stand, and was not seen by a doctor for seven weeks. The Seneca County Sheriff Department is merely a division of the municipality, Seneca County, and is, therefore, dismissed.

Plaintiff alleges that he was denied medical care by "medical staff from the Seneca County Law Enforcement Center." Plaintiff does not set out facts from which the Court could request that the Seneca County Attorney determine the identities of the staff pursuant to *Valentin v. Dinkins,* 121 F.3d 72 (2d. Cir.1997) (per curiam). Plaintiff will, therefore, need to conduct discovery and amend his complaint to name specific medical staff prior to the expiration of the statute of limitations.

*3  Plaintiff has not alleged that he has filed a notice of claim, and the Court will not address whether he has a viable pendent State negligence claim. *See,* N.Y. Gen. Mun. Law § 50–i(1)(b) (requiring that the plaintiff pleads in his complaint or moving papers that at least thirty days have lapsed since the service of a notice of claim).

*CONCLUSION*

Plaintiffs claims related to his conviction, due process and equal protection, malicious prosecution, "inappropriate counsel", and access to the courts, are dismissed as premature. Plaintiffs claims of false arrest and violation of his fourth amendment rights are stayed pending final resolution of his criminal conviction. The excessive force, denial of medical

care and deliberate indifference claims may go forward and be served.

### ORDER

IT HEREBY IS ORDERED, that plaintiffs claims related to his conviction, due process and equal protection, malicious prosecution, "inappropriate counsel", and access to the courts are dismissed as premature;

FURTHER, that the Clerk of the Court is directed to correct the docket to reflect that the defendants are as follows: Seneca County Sheriff Deputy John G. Nesbitt and Sergeant Thompson, Seneca County, the Seneca County Sheriffs Department, Sheriff Jack Stenberg, medical staff from the Seneca County Law Enforcement Center, Seneca County District Attorney Barry L. Porsch and attorneys Michael Conroy and John Nabinger;

FURTHER, that the Clerk of the Court is directed to terminate defendants Seneca County Sheriffs Department and the Seneca County District Attorney Barry L. Porsch, and attorneys Michael Conroy and John Nabinger as defendants to this action;

FURTHER, that plaintiffs claims of false arrest and violation of his fourth amendment rights are stayed pending final resolution of his criminal conviction;

FURTHER, that plaintiffs claims of excessive force, denial of medical care and deliberate indifference may go forward and be served upon Seneca County Sheriff Deputy John G. Nesbitt and Sergeant Thompson, Seneca County and Sheriff Jack Sternberg;

FURTHER, that defendants are directed to answer the complaint.

SO ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2011 WL 4828844

---

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.